586 A.2d 85

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ROBERT O. MARSHALL, DEFENDANT–APPELLANT.

Argued January 30, 1990—Decided January 24, 1991.

See also 199 N.J.Super. 502, 489 A.2d 1235.

6

8

16

*Bernadette DeCastro,* Assistant Deputy Public Defender, and *Judith L. Borman,* First Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender of New Jersey, attorney; *Bernadette DeCastro* and *Judith L. Borman,* of counsel; *Bernadette DeCastro, Judith L. Borman, James K. Smith, Jr.,* Deputy Public Defender, *Daniel A. Warshawsky, Claudia Van Wyk, Mark H. Friedman, Robert Seelenfreund,* Assistant Deputy Public Defenders, and *Lucy M. Rosano,* Designated Counsel, on the briefs).

*Janet Flanagan,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| | Introduction | 27 |
| I. | Facts | 28 |
| II. | Pretrial Motions | 62 |
| | A. Letters Seized in Best Western Mailbox | 62 |
| | B. Venue | 73 |
| III. | Jury–Selection Issues | 79 |
| | A. Three Prospective Jurors Not Excused for Cause | 80 |
| | B. Qualification of Juror Neil Marzano | 87 |
| | C. Death Qualification | 89 |
| | D. Constitutionality of Atlantic County Jury–Selection Procedures | 98 |

26

| | | Page |
|---|---|---|
| IV. | Guilt–Phase Issues | 98 |
| | A. Photographs | 98 |
| | B. Admissibility of Hearsay Statements of Robert Cumber | 100 |
| | C. Cross–Examination of McKinnon | 105 |
| | D. Expert's Examination of Tire | 105 |
| | E. Admissibility of Victim's Hearsay Statements | 110 |
| | F. Alleged Infringements on Defendant's Privilege Against Self–Incrimination | 113 |
| | G. Prosecutorial Questioning Concerning Defendant's Retention of Counsel | 121 |
| | H. Questioning and Argument Challenging Defendant's Professed Love For His Deceased Wife | 126 |
| | I. Exclusion of Testimony by Henry Tamburin | 129 |
| | J. Preclusion of Portion of Testimony of Defendant's Son John Marshall | 130 |
| | K. Admissibility of Testimony Discrediting Defense Witness Rakoczy | 131 |
| | L. Denial of Defendant's Motion for Mistrial Based on State's Discovery Violations | 133 |
| | M. Dilution of State's Burden of Proof | 134 |
| | N. Sufficiency of the Evidence | 136 |
| V. | Sentencing–Phase Issues | 136 |
| | A. Aggravating Factor Duplicating Element of Crime | 136 |
| | B. Instructions on Aggravating Factor | 138 |
| | C. Absence of Mitigating Evidence | 140 |
| | D. Adequacy of Sentencing–Phase Instructions | 141 |
| | E. Presumption Against Imposition of Death Penalty | 152 |
| VI. | Other Issues | 152 |
| | A. Prosecutorial Misconduct | 152 |
| | B. Ineffective Assistance of Counsel | 164 |
| | C. Constitutionality of Capital Punishment Act | 169 |
| | D. Cumulative Error | 169 |
| | E. Proportionality Review | 170 |
| VII. | Remand Hearing to Consider Alleged Brady Violation | 171 |
| | Introduction | 171 |
| | A. Disqualification of Prosecutor's Office from Hearing | 176 |
| | B. Limitation of Discovery | 178 |
| | C. Limitation of Cross–Examination Regarding Willfulness | 185 |
| | D. Finding of Nonwillfulness | 193 |
| | E. Materiality of Nondisclosure | 199 |
| | F. The McKinnon Letters | 205 |
| Conclusion | | 207 |

The opinion of the Court was delivered by

STEIN, J.

Defendant, Robert Marshall, was tried and convicted of conspiracy to commit the murder of Maria Marshall, *N.J.S.A.* 2C:5–2 and 2C:11–3a(1) or (2), and of the murder of Maria Marshall as an accomplice who procured the commission of the murder by payment or promise of payment of money, *N.J.S.A.* 2C:2–6 and 2C:11–3a(1) or (2). After a separate sentencing proceeding on the murder conviction, see *N.J.S.A.* 2C:11–3c(1), the court sentenced defendant to death, as required by the jury's verdict. It merged the conspiracy conviction with the conviction for capital murder. Defendant appeals as of right to this Court. *N.J.S.A.* 2C:11–3e. We affirm defendant's convictions and the sentence of death.

Defendant was tried together with co-defendant Larry Thompson, who was also charged with conspiracy to commit the murder of Maria Marshall, *N.J.S.A.* 2C:5–2 and 2C:11–3a(1) or (2), and with the purposeful or knowing murder of Maria Marshall by his own conduct. *N.J.S.A.* 2C:11–3a(1) or (2); 2C:11–3c. The jury acquitted Thompson of both charges.

Co-defendant Robert Cumber, charged with conspiracy to murder Maria Marshall, *N.J.S.A.* 2C:5–2 and 2C:11–3a(1) or (2), and with purposely or knowingly causing the death of Maria Marshall as an accomplice, *N.J.S.A.* 2C:2–6 and 2C:11–3a(1) or (2), was tried separately, convicted on both counts, and sentenced to thirty-years imprisonment without eligibility for parole.

Pursuant to a plea agreement, co-defendant Billy Wayne McKinnon, indicted for the same offenses as Cumber, pled guilty only to conspiracy to commit murder, and was sentenced to five-years imprisonment. The details of McKinnon's plea agreement are described elsewhere in this opinion. *Infra* at 41, 586 *A.*2d at 104.

I.

Facts

Before summarizing the proofs presented at trial by the State and co-defendants Marshall and Thompson, we provide an overview of the evidence as a context for the discussion that follows. The State's case against defendant was weighty and compelling. Many of the State's proofs were indisputable, although their significance was sharply contested. Thus, the State proved and Marshall acknowledged his long-standing extramarital relationship with Sarann Kraushaar, which had developed to the extent that both contemplated leaving their respective spouses and living together. Marshall had taken preliminary steps toward renting a house in Beach Haven West for that purpose. It was also uncontested that Marshall had substantial debt, including a $128,000 home-equity loan and short-term bank debt in excess of $40,000. The State's proofs suggested a connection between Marshall's indebtedness and the large amount of life insurance he concededly maintained on the decedent, in excess of one-million dollars at the time of her death. Several of the policies had been acquired within months of the homicide, and Marshall and decedent were examined for an additional policy on the morning preceding Maria's death. Marshall testified that the amount of insurance maintained on himself and decedent was commensurate with sound insurance practice and realistically reflected the needs of the survivor in the event of the death of either.

The testimony of co-defendant Billy Wayne McKinnon was the most incriminating evidence against Marshall. McKinnon was a former sheriff's officer from Louisiana who was referred to Marshall by co-defendant Cumber, whom Marshall had met at a party in New Jersey in May 1984. Marshall conceded that he had hired McKinnon to investigate his wife, in order to determine whether she knew of his relationship with Kraushaar and to attempt to account for several thousand dollars in casino winnings Marshall had given Maria. Marshall admitted that he had met with McKinnon at least twice in Atlantic City, the last

meeting occurring at Harrah's casino on the night of the murder. Marshall also acknowledged that he paid McKinnon $6,300 for his investigative services, without receiving any work product, and that the last payment of $800 was made in cash at Harrah's on the night of the homicide.

McKinnon testified that Marshall hired him not to investigate his wife but to kill her. He testified that Marshall had paid him $20,000 or $22,000 prior to the murder, that an additional $15,000 was supposed to have been available for him in Marshall's pockets at the scene of the homicide, and that $50,000 more was to be paid to him out of the insurance proceeds.

McKinnon testified that the Oyster Creek Picnic Area had been selected with Marshall's concurrence as the crime scene. By prearrangement, Marshall was to feign car trouble on the way home from Atlantic City and pull into the picnic area on the pretext of checking to see what was wrong with his car. According to McKinnon, he had dropped off co-defendant Thompson at the picnic area before the Marshalls arrived and then had driven back to the toll plaza just south of the picnic area to await their car. He testified that the prearranged plan was for Thompson to hit Marshall on the head without seriously injuring him, and then to shoot and kill his wife. McKinnon testified that he had seen the Marshalls' car pass him at the toll plaza and, after delaying a few minutes, he had proceeded into the picnic area. When he got there, Marshall was lying on the ground and Mrs. Marshall had been shot. Thompson got into McKinnon's car with Maria Marshall's pocketbook and cash from Marshall's pocket, and then got out of the car in order to slash the right rear tire on Marshall's car to support his anticipated explanation for having driven into the picnic area. McKinnon drove out of the picnic area onto the southbound lane of the Garden State Parkway, and was observed by a motorist on the Parkway who described McKinnon's car and noted the high rate of speed at which it left the picnic area. Marshall testified that he was unable to identify the perpetrators, but

hypothesized that they had tampered with his tire and followed his car from Atlantic City in order to rob them.

Thus, the evidence at trial indisputably established that McKinnon, who had been hired and paid by Marshall and had met with Marshall at Harrah's on the night of the murder, had been present at the crime scene and had participated in the murder of Marshall's wife.

## A. The State's Case

Shortly after 1:00 a.m. on September 7, 1984, State Troopers David Mathis and Joseph Randik were patrolling the Garden State Parkway in the vicinity of the Barnegat toll plaza. They heard a radio transmission directing another patrol car to proceed to the Oyster Creek Picnic Area. Because they were closer to the picnic area than the other patrol car, Mathis and Randik responded to the transmission. They entered the picnic area from the northbound ramp. To their left at the top of the ramp were two vehicles, defendant's two-door Cadillac and a white station wagon whose occupants had stopped to render assistance after defendant had waved them down on the Parkway. Defendant's car was facing southbound, about 125 feet from the crest of the 1,000–foot ramp leading into the picnic area. It was parked at the beginning of the easterly leg of the U-shaped paved loop that formed the perimeter of the wooded picnic area. The Cadillac's motor was running, its headlights were on, and both doors were open. The picnic area was dark, and thick underbrush obstructed its visibility from the Parkway.

Defendant informed Trooper Mathis that his wife had been shot and required an ambulance. Mathis inquired about the weapon used to shoot Mrs. Marshall. Defendant stated that they had been robbed and that the gun was not there. Mathis observed that defendant's forehead was injured and his cheeks and forehead were bloodstained.

Approaching defendant's vehicle, Mathis saw Maria Marshall lying face down across the front seat, both arms under her, and her head near the steering wheel. Mathis checked for a pulse but found none. The victim did not appear to be breathing. Mathis told Trooper Randik to call for an ambulance, the medical examiner, and the State Police Major–Crime unit.

Other police officers soon arrived at the scene, including Troopers Sink and Loblein to whom the initial State Police radio transmission had been directed, State Police Detectives John Petracca and George Joo, and Detective–Sergeants Richard McHugh and Charles Liber, who photographed the crime scene. The officers who testified at trial recalled various details about the crime scene. Specifically, they found Marshall's wallet on the ground near the passenger door. The right rear tire was flat and had a clean one-inch cut on the upper sidewall. There was a puddle of blood on the ground to the rear and right of the car. The glove compartment and trunk of Marshall's Cadillac were closed. The inside of the car was orderly and did not appear to have been disturbed. The officers found two shell casings, one lodged in the crease of the front passenger seat and the other between the driver's and passenger's seats. A gold-colored earring was on the driver's seat. The victim was wearing other jewelry, including a diamond engagement ring and wedding band, a pearl ring, a gold-colored watch, a gold necklace, and two gold bracelets. The victim's purse was missing.

Troopers Mathis and Sink and Detectives Petracca and Joo interviewed defendant at the crime scene. The police then took Marshall to Community Memorial Hospital where he was treated and released. He then returned home. Detectives Petracca and Joo, together with Investigator Edward Murphy of the Ocean County Prosecutor's Office, arrived at defendant's home at about 5:00 a.m. for further interrogation, after first proceeding to the hospital where they learned that Marshall had been discharged. After questioning defendant for approximately thirty minutes at his home, the officers drove Marshall to the

State Police Bass River barracks for additional questioning, conducted by Detective Petracca and Investigator Murphy. The officers returned Marshall to his home later that morning.

Except for variations concerning when he first noticed a problem with his car, Marshall's statements to the police officers who interrogated him that morning were substantially consistent. He stated that he and his wife arrived at the Meadows Restaurant in Harrah's Marina Casino at about 8:45 p.m. They had an 8:30 reservation. After dinner they played blackjack at separate tables. Marshall then paid off some markers to the casino. When they left at about 11:45 p.m., he had approximately two thousand dollars in his pocket and Mrs. Marshall had about $500 in her pocketbook. They traveled down Illinois Avenue to Route 30, and then to the Garden State Parkway.

According to Trooper Sink, Marshall said he noticed a vibration in his car just as he was leaving the Barnegat toll plaza on the Parkway, about two miles south of the picnic area. According to Detective Joo, Marshall said that his car would weave or "shimmy" at speeds of sixty to sixty-five miles per hour, and that he had first noticed that condition when he entered the Parkway from Route 30. Detective Petracca testified that when he interviewed Marshall at the crime scene, defendant said he had first detected a problem with his car about one mile south of the picnic area. According to Petracca, when he again interviewed Marshall at his home later that morning, defendant stated that he had noticed a problem with his car as soon as he left Harrah's, and that the car's tendency to sway had increased the further he drove.

Marshall told the investigators that he knew of the availability of the picnic area because of his familiarity with the Parkway, and that he pulled into the area at about 12:30 a.m. to check his car. Mrs. Marshall was asleep with her head on his lap. He stopped the car, got out, walked to the rear of the car, and observed that the right rear tire was about half-flat. As he

looked at the tire, he became aware that another vehicle, a dark-colored sedan, had pulled into the picnic area. The sedan parked with its lights on. Marshall then approached the passenger door of his car and asked Mrs. Marshall to open the trunk, the trunk release lever being accessible from the glove compartment on the passenger side. He stated that as he turned away from his wife, he was struck on the head.

Defendant told the officers that when he regained consciousness, he found his wife lying motionless on the front seat. Her back was bloody and there was a spent bullet casing on the seat. He got into the car and tried to hold her and revive her. When he realized she had been shot, he went onto the Parkway and attempted to flag cars down. He stopped two cars; the second car was the white station wagon whose five occupants were on the scene when the police arrived. He asked the occupants of the cars to summon the police, and he returned to his wife. After summoning the police, the occupants of the station wagon returned to the picnic area. At their suggestion, Marshall started his car and covered his wife with her jacket. At some point before the police arrived, Marshall realized that the $2,000 was missing from his pants pocket.

In the course of the interrogation conducted at Marshall's home a few hours after the homicide, defendant acknowledged that he and his wife had experienced marital problems and had begun seeing a marriage counselor. He attributed their problems to his accumulation of debt and to his wife's suspicions that he had been unfaithful. In response to questions, Marshall denied that he had been "cheating" on his wife and denied any involvement in her murder. At no time during the course of Marshall's interrogations did he inform the police officers that he had hired McKinnon to investigate his wife and had met with him and paid him money that evening at Harrah's.

An autopsy performed on the victim revealed two entry bullet wounds on the mid-portion of the victim's back. The wounds were "very close together," about three millimeters apart.

There were two corresponding exit wounds on the front of the chest, one near the collar bone and the other on the left breast. There was also an entry and exit wound, described as a superficial grazing wound, in the medial or inner area of the left forearm. There was also an entry wound without an exit wound in the left forearm, the bullet having been lodged in the rear of the forearm and protruding slightly through the skin. Based on the close proximity of the two entry wounds in the back, the pathologist who performed the autopsy expressed the opinion that two shots had been fired in succession and at very close range. The pathologist removed the bullet protruding from the left forearm during the autopsy. He identified it as a .45 caliber bullet, and indicated that it had entered the victim's back, passed through the chest, and lodged in the left forearm. The other bullet, following a similar course, had passed through the left arm. The pathologist determined that when the shooting occurred, the victim was lying down with her left arm under her body. The cause of death was "massive hemorrhage due to laceration * * * of the left lung and the main artery of the chest."

State Police Lieutenant Lorenzo Hillman, a ballistics expert, examined the bullet removed from the victim's arm, a second bullet found by police on the floor of Marshall's car, and the two discharged shells. He testified that the .45 caliber automatic metal-jacketed bullets and the .45 caliber automatic Remington Arms shells had been fired from the same weapon, an automatic or semi-automatic weapon with a heavy recoil.

George Hackman, a forensic chemist employed by the State Police, examined the right rear tire on defendant's car. He testified that he had been unable to inflate the tire because air leaked out through the slit in the sidewall. Other than the slit, he had found no defects in the tire or the rim. He testified that he had discovered no markings on the tire or rim indicating that the car had been driven while the tire was in a deflated or semi-deflated condition. He stated that in his opinion the slit had been made by a knife with a centerpoint that tapered

downward, both edges of which were sharpened. Hackman testified that he had cut out a portion of the tire around the slit in order to photograph the slit from the inner surface of the tire. On cross-examination Hackman acknowledged that he had examined two pocket-knives found in the possession of co-defendant Thompson when he was arrested, and that neither of those knives had been used to slash the tire.

A New Jersey Highway Authority maintenance worker found the victim's light-tan pocketbook on the afternoon of September 7th, near Exit 67 on the southbound exit ramp. There was a one-hundred-dollar bill in a compartment of the victim's wallet. Marshall informed Detective Petracca that about $500 was missing from the pocketbook.

State and County investigators began an extensive investigation of the murder. On the afternoon of September 7th, Investigator Daniel Mahoney of the Ocean County Prosecutor's Office stopped Sarann Kraushaar's car as she was driving northbound on the Garden State Parkway. Mahoney took Kraushaar to the prosecutor's office where he and Detective Petracca interviewed her in the presence of her attorney. Kraushaar acknowledged her relationship with Marshall, stating that it had begun in June 1983 and that they had seen each other regularly since then. She told the officers that Marshall knew that his wife suspected their relationship, because she had discovered records of toll calls to Pineland Regional High School where Kraushaar was employed. She disclosed that she and Marshall had made plans to live together, and referred to their pending effort to rent a house for that purpose. Kraushaar stated that Marshall had telephoned her that morning to inform her of Maria's death, that he had cried during their conversation, and had briefly recounted the events leading to the murder. As described by Kraushaar, Marshall's account to her of the homicide was consistent with his statements to the police.

According to Investigator Mahoney's report of the Kraushaar interrogation, she told police of a conversation with Marshall prior to Christmas in 1983 in which, while discussing his financial difficulties, Marshall had observed that "the insurance on Maria would take care of his debts" and that he "wished she wasn't around." The report indicates that Marshall had asked Kraushaar whether she knew "of anyone who could take care of it." Kraushaar had responded by identifying an individual who had been "in trouble with the law," but had stated that she "never wanted to be involved with him if he could do anything like that to his wife."

During the interview Kraushaar disclosed that she and Marshall shared a post-office box in Toms River, and that she had opened a safe-deposit box in a Toms River bank that contained silver ingots purchased by Marshall, worth a "couple of thousand dollars." She also acknowledged that before Mrs. Marshall's death, she and Marshall had planned to open a joint checking account. In response to a request by Mahoney, Kraushaar expressed her willingness to take a polygraph test.

Telephone toll records of calls to and from Marshall's office and residence established a connection between Marshall and several people from Shreveport, Louisiana. Investigator Murphy testified that he discovered a record of an incoming call to Marshall's office on September 6, 1984, from a pay phone at the Airport Motor Inn in Atlantic City. Murphy examined the guest registrations at the Inn and found one for September 6 and 7, 1984, in the name of James Davis, Riding Club Lane, Shreveport, Louisiana. The toll records also revealed a substantial number of telephone calls from defendant's office to the Caddo Hardware Store in Shreveport, and to the residence of Robert Cumber in Shreveport, as well as additional calls from Cumber's residence and from Caddo Hardware, Cumber's place of employment. Detective Petracca, together with Investigator Murphy and Lieutenant Churchill from the Ocean County Prosecutor's Office, traveled to Shreveport, Louisiana on or about September 20, 1984. They obtained a warrant to search

the residence of James Davis, the name on the guest registration at the Airport Motor Inn on September 6th and 7th. Davis lived on the outskirts of Shreveport. Petracca, Murphy, Churchill, and officers of the Caddo Parish Sheriff's Department were present when the warrant was executed. In a desk drawer in Davis's garage, Detective Petracca found payee copies of two Western Union money orders dated June 25, 1984, payable to James Davis, one for one-thousand dollars and the other for two-thousand dollars. In a drawer underneath a bathroom sink in Davis's residence, the officers found a piece of paper imprinted with the words "memo" and "Caddo Hardware Store." Lieutenant Churchill testified that the initials "RAC" and the date "Sept. 21, 1984" were written on the back of the memo by Robert Cumber, who identified the memo as one he had given to Billy Wayne McKinnon.

James Davis testified that on two occasions in June 1984, he had picked up money orders for McKinnon payable to James Davis. He stated that McKinnon had given him the memo found in his bathroom to assist him in filling out the form that had to be completed in order to pick up the money orders. Davis stated that in early June he picked up two money orders totalling $2500, and later that month he picked up two money orders totalling $3,000, the payee copies of these latter money orders having been found in his garage. At trial Davis identified his signatures on the payee copies of the money orders. Thomas McNeil, an employee of Porter Travel in Toms River, testified at trial that on June 13, 1984, a customer named Robert Marshall of Toms River purchased a $2,500 money order—one draft for $2,000 and one for $500—payable to James Davis of Shreveport, Louisiana. He also testified that on June 25, 1984, a customer identified as James McAllister of Philadelphia, Pennsylvania—stipulated by defendant's counsel to have been Marshall using a fictitious name—purchased $3,000 in money orders payable to James Davis, one for $2,000 and one for $1,000.

On September 21, 1984, Detective Mahoney and Investigator Woodfield of the Ocean County Prosecutor's Office telephoned defendant and asked if they could speak to him briefly about recent developments in their investigation. Defendant agreed, and Mahoney and Woodfield proceeded to his home. According to Mahoney, when the discussion began, Marshall held a drink in his hand and his demeanor was pleasant and cooperative. Mahoney told him that certain names had come to their attention in the course of the investigation. He asked Marshall if he knew either a James or Jimmy Davis or Billy Wayne McKinnon from Shreveport, Louisiana. Mahoney testified that Marshall paled, became visibly upset, and his demeanor changed; Mahoney said he thought Marshall was going to spill his drink.

At a *Rule* 8 hearing conducted before Mahoney's direct testimony, the trial court ruled that Mahoney could not testify that Marshall had declined to respond to his question and had stated that his counsel had instructed him not to discuss the case out of his presence. In accordance with the court's ruling, Mahoney testified on direct that after he had asked Marshall about the names Davis and McKinnon, "the interview was terminated."

On September 23, Marshall and Kraushaar were at her apartment at Ortley Beach. Marshall received a message on Kraushaar's telephone answering machine from his son Robbie. The message was that an unidentified caller from Louisiana had telephoned Marshall, left a phone number, and asked that Marshall return the call. According to Kraushaar's trial testimony, Marshall expressed concern about whether he should return the call without consulting with counsel. She testified at trial that Marshall acknowledged having connections in Louisiana, stating that he had made bets on an "NBA [National Basketball Association] playoff game," and had sent "payments"—something like $3,500—in connection with these bets. Kraushaar testified that she had never known Marshall to make substantial bets on sporting events. She stated that defendant came to her apartment unannounced on September

25, and apologized for deceiving her about the bets. She testified that she was "appalled by the deception" and terminated their relationship, denying on cross-examination that she had done so on the advice of her counsel.

On September 27, 1984, the management of the Best Western Motel in Lakewood, New Jersey, notified authorities that Robert Marshall had registered as a guest around 4:00 p.m. that afternoon. He had taken room number sixteen. Marshall and Kraushaar had often stayed at that motel during their relationship. Ocean County Prosecutor investigators staked out the motel on the stated belief that Marshall might be meeting a confederate there.

One investigator, Michael Mohel, checked into room seventeen, keeping the door open to observe any traffic in and out of Marshall's room. At 10:45 p.m., Mohel observed Marshall walk to a soda machine in the hallway, buy a Coca–Cola, and return to room sixteen. At 11:30 p.m., Mohel saw Marshall walk toward the front office of the motel. After Marshall returned at 11:40 p.m., Mohel went to the front office. After speaking to the motel clerk, Mohel looked into a mail tray located at the front desk and saw two letters inside. Mohel read the writing on the back of one of the envelopes, addressed to Joseph Dougherty, Esq.: "To be opened only in the event of my death." The investigator seized both envelopes; the one addressed to Dougherty appeared to have a cassette tape inside. Mohel then telephoned his superiors, and also telephoned the Lakewood Police Department to request assistance. He obtained a passkey from the clerk. At 12:30 a.m., Mohel called Marshall's room to "check on his welfare." The Clerk placed the call and Mohel listened in. Marshall answered the phone, but Mohel could not determine Marshall's condition. Marshall left the phone off the hook.

Uniformed police officers arrived at the motel shortly thereafter and entered Marshall's room with Mohel. They found Marshall asleep on the bed. They also found an open briefcase

with cassette tapes and recorders. Mohel woke Marshall and asked him if he had taken anything. Marshall said he had emptied fifty capsules of Restoril, a sleep-inducing agent, into a cup of Coke, but had fallen asleep and had not drunk the solution. Marshall said he had wanted to kill himself at the exact time his wife had been murdered, but had overslept. Marshall was then taken to Point Pleasant Hospital for observation.

The State obtained a warrant authorizing the opening of the envelopes. The envelope addressed to Joseph Dougherty, Esq., Marshall's brother-in-law, contained a copy of an agreement of sale for Marshall's office building, a one-page handwritten letter to Dougherty, and a cassette tape dictated by Marshall. After a pretrial suppression hearing, the trial court denied defendant's motion to suppress the contents of the envelopes. Defendant argued that the seizure was unlawful, the warrant improperly issued, and that the contents of the envelope addressed to Dougherty were protected by the attorney-client privilege. We consider elsewhere in this opinion defendant's challenge to the trial court's ruling. *Infra* at 62–73, 586 *A.*2d at 114–120.

During the State's case the cassette tape found in the envelope addressed to Dougherty was played to the jury. The tape discussed Marshall's relationship with Kraushaar, his intention to leave Maria "within a month," his "spiral" of debt that "accelerated to almost * * * two-hundred thousand dollar[s] * * * that I was determined to pay off, but just couldn't seem to climb out," and his reasons for hiring Billy Wayne McKinnon [who he thought was Jimmy Davis] to investigate Maria. On the tape Marshall acknowledged that he had sent McKinnon $5,500 in two installments and had given him an additional $800 at Harrah's the night of the homicide. Marshall instructed Dougherty on the tape with respect to how various business, financial, and personal matters should be handled. Marshall expressed his intention to take his own life because he

expected to be indicted and convicted for his wife's murder, even though he was innocent.

Robert Cumber was arrested in Louisiana on September 22, 1984, and was indicted by an Ocean County Grand Jury on September 26 for conspiracy to commit murder. McKinnon and James Davis were arrested in mid-October, and in a superseding indictment returned October 17, 1984, were charged together with Cumber with murder and conspiracy to commit murder. The charges against Davis were subsequently dismissed. Cumber and McKinnon were extradited to New Jersey.

McKinnon entered into a plea bargain with the State on December 15th. He testified at trial that he and his counsel had reviewed the State's evidence against him, referring specifically to the witness's statement describing his Cadillac leaving the picnic area onto the southbound Parkway lanes at the time of the homicide and to Marshall's cassette tape to his brother-in-law. McKinnon stated that he had entered into the agreement on the advice of counsel, in view of the "preponderance of evidence" against him. The agreement was introduced in evidence and read to the jury. McKinnon agreed to give a full statement identifying everyone involved in the murder of Maria Marshall, to waive immunity, and to testify before a grand jury and at the ensuing trial. In return, McKinnon would be permitted to plead guilty to conspiracy to commit murder, stipulated to be a non-Graves Act offense, the State would recommend a term not in excess of five years without parole ineligibility to be served for security purposes at the State Prison in Clinton, and the prosecutor's office would recommend that he be paroled at the earliest possible date. The State also agreed to relocate his family to a safe location for their protection, and to support their entry into the witness-protection program.

McKinnon gave his statement to Lieutenant Churchill and Detective Petracca on December 21, 1984. In early January 1985, an Ocean County Grand Jury returned the current indictment against Marshall, Thompson, Cumber, and McKinnon,

superseding the prior indictments. McKinnon's trial testimony was substantially consistent with his December 21st statement.

According to McKinnon, he was solicited in June 1984 by co-defendant Cumber, who knew that McKinnon had done investigative work in the past, to stop by Caddo Hardware at a pre-arranged date and time to speak by telephone to Marshall, described as an acquaintance of Cumber who needed an investigator. McKinnon spoke with Marshall, who told him he wanted someone to meet him in Atlantic City and make arrangements to conduct an investigation of his wife. McKinnon identified himself to Marshall as Jimmy Davis, and asked for an advance of $5,000 in "expense money" before traveling to Atlantic City. Marshall agreed to wire the money, and a few days later Cumber told McKinnon that a money order for $2,500 payable to Jimmy Davis had arrived. After picking up the money with Davis, McKinnon asked Cumber about the balance. Cumber spoke with Marshall who said that he would pay an additional $2,500 if McKinnon would meet him on June 18th at Harrah's Casino.

McKinnon testified that he flew to Atlantic City on June 17th, stopping first in Philadelphia. On arrival he asked a cab driver to drive him to the Islander Motel, where his wife had made a reservation because Harrah's had no rooms available. (After the homicide, an investigator from the Ocean County Prosecutor's Office located the cab driver, Tae Yeon. Yeon testified for the State at trial.) The cab driver was unable to find the Islander Motel, and eventually drove McKinnon to Harrah's where he was able to get a room, registering as Jimmy Davis.

Marshall arrived at McKinnon's room at noon the next day. McKinnon testified that he "patted him down" to check for weapons or recording devices. According to McKinnon, Marshall began talking about an investigation of his wife, but McKinnon interrupted and referred to "unfinished business." Marshall then handed McKinnon $2,500 in one-hundred-dollar bills, completing payment of the $5,000 advance that McKinnon

had requested. Marshall resumed his discussion of his wife's activities while McKinnon took notes, at one point in the conversation handing McKinnon photographs of his wife and of their residence.

McKinnon testified that after fifteen or twenty minutes Marshall told him that "what he really wanted to do was to get rid of his wife." McKinnon asked what he meant, and testified that Marshall replied, "I want her killed, done away with." Responding to McKinnon's questions, Marshall suggested that the murder could take place that evening at the Rams Head Inn where the Marshalls had dinner reservations, or after dinner at a place on Route 30 called the Porthole. McKinnon testified that he informed Marshall that he would not kill his wife, but could get someone else to do it.

They then negotiated a price for the homicide. According to McKinnon, after asking for $100,000 he agreed to accept $65,-000. McKinnon had already received $5,000, and Marshall agreed to pay an additional $10,000 in advance and $50,000 out of the anticipated insurance proceeds. McKinnon stated that Marshall then left the room, and returned fifteen or twenty minutes later. He gave McKinnon $7,000 more in cash and agreed to wire an additional $3,000. McKinnon testified that before leaving his room, Marshall gave McKinnon his car's license plate number and told him that he and his wife would be at the Rams Head Inn between eight and nine o'clock that evening. McKinnon walked with Marshall to his Cadillac in Harrah's parking garage.

After having dinner that evening at Harrah's, using a "comp" guest check that Marshall had provided and signing Marshall's name to the check, McKinnon telephoned the same cab driver who had driven him to Harrah's the prior evening. McKinnon testified, as did the cab driver, that they drove to the Rams Head Inn and drove through the parking lot, which McKinnon described as crowded and well-lit. McKinnon stated

that after looking at those "places"—apparently referring to Rams Head Inn and the Porthole—he returned to Atlantic City.

McKinnon testified that Marshall called him at his room the next morning to ask "why the job wasn't done." Although McKinnon testified that he had no weapon with him, he told Marshall that he had only a shotgun and would have to return to Shreveport to get what he needed. McKinnon left Atlantic City on June 19th.

Shortly after McKinnon's return to Louisiana, Cumber informed him that Marshall had wired an additional $3,000 to Jimmy Davis. Davis picked up the money and gave it to McKinnon.

McKinnon testified that after his return from Atlantic City, Cumber relayed numerous messages to him, reporting that Marshall had telephoned and wanted to know when "Jimmy Davis" would return to New Jersey, that the job was not done, and that "Davis" had several thousand dollars of Marshall's money. Through Cumber, McKinnon sent word to Marshall that he would return to New Jersey in mid-July and would telephone Marshall when he arrived. McKinnon testified that he and a friend, Mike Gentry, drove to Atlantic City in McKinnon's Cadillac, which he described as "white or cream color with a brown or beige top." They stayed at the Seacomber Motel, Gentry signing the register for both men. The assistant manager of the Seacomber testified at trial and confirmed that Gentry was registered on July 19th, and that the registration card indicated that the room had two occupants. According to McKinnon, he telephoned Marshall at his office on the morning of July 19th from a phone booth at the Airport Motel, the public telephone nearest to the Seacomber. McKinnon asked if Marshall was on a "clear" phone. Marshall said he was not, and agreed to call McKinnon back at the phone booth. He did so, and told McKinnon that he would have dinner that evening at Harrah's with his wife. He agreed to meet McKinnon at eight o'clock behind Harrah's in the area near the marina. McKinnon

testified that he told Marshall when they met that the "job" was more involved than he had anticipated, and that he would need more money. Marshall said that he and his wife planned to see a show after dining and then play blackjack. McKinnon testified that Marshall agreed to meet him later that evening, and when they met, Marshall gave him $7,000 in chips.

According to McKinnon, Marshall expected that the homicide would occur that night, and described to McKinnon an all-night restaurant at which he would stop on the way home from Atlantic City. McKinnon testified that Marshall told him he would park behind the restaurant and leave the car, ostensibly to use the restaurant's bathroom. He said he would attempt to leave the car doors unlocked but that his wife would probably lock them after he left.

McKinnon and Gentry returned to the casino. At McKinnon's request Gentry cashed in the chips and gave McKinnon the money. McKinnon testified that he observed Maria Marshall sitting at a blackjack table in the casino, holding a single rose.

McKinnon testified that he drove Gentry back to the motel and then drove to the all-night restaurant Marshall had described. He had a pistol in his car. When he arrived at the restaurant, he observed several police cars parked in front. He waited thirty or forty minutes, but Marshall did not arrive. McKinnon returned to the motel. He and Gentry left New Jersey for Shreveport the next morning. McKinnon testified that on the trip back to Shreveport, he told Gentry that Marshall was willing to pay $50,000 to have his wife murdered. When Gentry testified, he denied that that conversation had occurred.

According to McKinnon, after returning to Louisiana he continued to receive numerous messages from Cumber indicating that Marshall was complaining that McKinnon had been paid but had not completed his work. McKinnon gave Cumber a telephone number for a pay phone at a service station near

his home, requesting Cumber to have Marshall call him there at a designated date and time. Marshall's toll records reflected calls to that pay phone. McKinnon testified that when he spoke with Marshall, he gave him a fictitious explanation about why the homicide had not been carried out on his most recent visit. Marshall pressed McKinnon, but rejected his suggestion that the homicide occur during the family's vacation in Michigan.

McKinnon next heard from Marshall through Cumber, who informed him that Marshall had said there would be an "extra fifteen" for McKinnon if he would do the "job" before Labor Day. McKinnon testified that he assumed Marshall meant fifteen thousand dollars, and told Cumber he would try to do it.

McKinnon also testified that he subsequently received a telephone call from co-defendant Larry Thompson asking McKinnon to meet with him that evening at a local McDonald's restaurant. According to McKinnon, Thompson said that "some people out of Dallas" had offered him $75,000 to kill McKinnon. McKinnon stated that he assumed the offer to Thompson was related to McKinnon's failure to fulfill his commitment to Marshall, which Thompson said he had heard about from Gentry. McKinnon testified that Thompson told him "these things can be done," suggesting that they go back to New Jersey "and look at it."

According to McKinnon, Thompson's wife drove Thompson to McKinnon's home on September 4th or 5th, and they left for New Jersey that evening. They stayed overnight at a Comfort Inn in Jackson, Mississippi, and drove to New Jersey the next morning. At trial the Comfort Inn's manager identified McKinnon's name on the guest registration. He stated that the Inn's records indicated that two people had occupied the room, based on the room rate, and that they had checked in late at night on September 4th or early on September 5th, checking out before noon on September 5th. He could not identify the room's other occupant.

McKinnon testified that they arrived in Atlantic City at about 6:30 a.m. on September 6th and checked into the Airport Motor Inn, McKinnon signing in under the name of James Davis. He telephoned Marshall at his office from a pay phone, and Marshall returned the call a few minutes later. According to McKinnon, Marshall told him that he would be going to Harrah's that night, but asked McKinnon to meet him at 11:30 that morning in the parking lot of the Roy Rogers service area just south of Toms River. McKinnon testified that he and Thompson drove to the service area, arriving about noon. Thompson remained in the car. McKinnon walked to the north end of the parking lot and found Marshall there. According to McKinnon, he and Marshall then drove southbound on the Parkway in Marshall's car to check out possible sites for the homicide. After McKinnon rejected two other locations, Marshall drove into the Oyster Creek Picnic Area and McKinnon said that it was satisfactory. They returned to the service area. McKinnon asked about the extra $15,000 and Marshall said it would be in his pocket that night. McKinnon then returned to his car where Thompson was waiting. They returned to Atlantic City, stopping briefly at the Oyster Creek picnic area on the way. McKinnon testified that Thompson suggested that he should wait in the woods for the Marshalls to arrive at the picnic area, in order to observe whether any other vehicles were parked there.

McKinnon testified that he met Marshall at about 9:30 that evening outside of Harrah's. At Marshall's request McKinnon returned to him the pictures of Maria and of their residence that Marshall had given him when they met in June. Marshall told McKinnon they would be leaving Harrah's around twelve or twelve-thirty. According to McKinnon, he and Thompson ate dinner, later stopping at a hardware store to buy a pair of rubber gloves. McKinnon stated that he had with him a .45 caliber colt pistol, Army special, from which he had eliminated any fingerprints by wiping it down.

McKinnon testified that he dropped Thompson off at the picnic area between twelve and twelve-thirty. Because it was cold, he gave Thompson one of his knit shirts to wear. McKinnon then drove southbound on the Parkway, exited, reentered the northbound lane, and waited for the Marshalls at the toll plaza. When they passed him, he delayed about two minutes and then drove northbound and entered the picnic area. He saw Marshall's car parked with the passenger door open and Marshall lying on the ground at the rear of the car. Thompson got into the car, put something on the floor, then got out and ran to the right rear tire of Marshall's car. McKinnon testified that he saw Thompson "squat down" and then heard air "hissing out" of the tire. Thompson reentered the car and they drove out of the picnic area onto the Parkway southbound lanes.

McKinnon testified that he left the picnic area slowly, pulling into the right-hand lane of the Parkway heading southbound. Christine Hilton testified at trial that as she and a friend passed the Oyster Creek Picnic Area at about 1:00 a.m., driving southbound on the Parkway, a white Cadillac with a "different color roof" came "flying out of the rest area." Ms. Hilton said she had to slow down her car to avoid being hit. She did not see how many people were in the Cadillac or whether they were male or female.

According to McKinnon, Thompson had Mrs. Marshall's pocketbook and cash that had been removed either from the pocketbook or from Marshall's pocket. On their way to Atlantic City, Thompson handed McKinnon three or four hundred dollars in cash. McKinnon testified that he told Thompson to throw the pocketbook out the window as they drove off the Parkway. He also stated that Thompson had thrown the murder weapon into a "large body of water" that they had passed on the Parkway, but was uncertain about where Thompson had disposed of the knife and rubber gloves.

McKinnon testified that he and Thompson spent the night at the Airport Motor Inn, leaving for Shreveport the next morning. McKinnon said that after returning to Shreveport, he went to see Cumber and informed him that "something bad" had occurred in New Jersey but "[w]e didn't have anything to do with it." He asked Cumber to try to get a paper and find out what went on. In that connection the State produced Cumber's stepfather, Michael Suswal, who testified that Cumber telephoned him on a Monday early in September and asked him to send Cumber newspapers from the three previous days. Suswal was unable to get the newspapers. Nina Storino, at whose party Marshall had initially met Cumber, testified that Cumber, an old family friend, telephoned her around September 11 to wish her a "happy birthday." In the course of the conversation she told Cumber about Maria Marshall's death.

McKinnon was subjected to extensive cross-examination, defense counsel emphasizing particularly the generous terms of his plea bargain, which would allow McKinnon to be paroled soon after the completion of the trial. Thompson's counsel pressed McKinnon to concede that the State would not have offered McKinnon such generous terms if he had been the "shooter," and McKinnon acknowledged that no evidence other than his testimony implicated Thompson in the murder. Thompson's counsel questioned McKinnon persistently about his explanation of Thompson's role in the homicide, implying that McKinnon himself had murdered Mrs. Marshall and had fabricated Thompson's involvement in order to negotiate a favorable plea bargain.

The State produced other witnesses and evidence that were consistent with McKinnon's account of the homicide. Telephone toll records established that calls had been made between Thompson's home and the residence of Mike Gentry shortly after Gentry's return from Atlantic City in July, supporting McKinnon's assumption that Thompson's initial contact with him was prompted by information he had received from Gentry. Toll records also confirmed that a call was placed to Marshall's

office on the morning of September 6th from a public telephone at the Airport Motor Inn. The State elicited testimony from a credit executive at Harrah's confirming that Harrah's had regularly extended credit to Marshall in the form of "markers." Marshall's account with Harrah's indicated that on June 18, 1984, the date McKinnon said he and Marshall first met, Marshall paid back a $4,000 marker at 1:00 p.m. and withdrew an additional $7,000 in markers between 2:30 and 3:00 p.m. On July 20th, the date on which McKinnon said he met with Marshall outside Harrah's in the evening, Marshall withdrew $3,000 in markers at about 9:30 p.m.

The State produced witnesses employed by various insurance companies that had policies insuring Mrs. Marshall. Policies in effect at the time of her death had been issued in June 1984 by Bankers Life and Casualty Company for $20,000; in April 1984 by Minnesota Mutual Life Insurance Company for $100,000; in June 1984 by the Knight Insurance Agency for $33,480 (tuition payment insurance); in February 1984 by Fireman's Fund Insurance Company for $100,000; on an undetermined date by Banner Life Insurance Company for $500,000; in February 1984 by Manhattan Life Insurance Company for $500,000; and on September 10, 1982, by Provident Mutual Life Insurance Company for $100,000. Employees of the Banner and Manhattan Life Insurance Companies testified that Marshall also had $500,000 policies on his life in effect with their companies, but that he paid the August 1984 premiums only on Mrs. Marshall's policies, permitting his own policies to lapse. Marshall reinstated both his policies retroactively, paying the August premiums subsequent to Mrs. Marshall's death.

The claims manager of First Colony Life Insurance Company testified that after Mrs. Marshall's death, they received an application for $100,000 insurance on her life in an envelope postmarked September 4, 1984, containing an unsigned check for the initial premium drawn on Marshall's bank account. The application was not processed.

Ruth Ann Scala, of Scala Insurance, testified that in August 1984 her agency was soliciting by mail applications for "mortgage" insurance, and on August 30th received a response from the Marshalls, indicating an interest in life insurance but not disability insurance. She spoke by telephone on September 4th with defendant, who said he wanted the cheapest available policy to cover his mortgage. Mrs. Scala testified that Marshall told her he would like to pick up the applications, stating that he was going on vacation at the end of the week and "wanted to get it taken care of before he left." She instructed her husband to deliver the applications to Marshall the next morning. Christopher Scala testified that when he delivered the applications to Marshall the next day, he proposed that the required physical examinations be done the following week. Marshall suggested instead that he use his own physician, but Scala indicated he would have to request approval from the issuing company. According to Scala's testimony, Marshall told him the physical examinations had to be done the next day—September 6th—because Marshall was going on vacation. Scala testified that when he returned to his office, he was able to make special arrangements for both Marshalls to be examined on September 6th at 11:00 a.m. Scala testified that at noon on September 6th, he picked up at Marshall's residence the completed applications for $130,000 in insurance on defendant and Mrs. Marshall, witnessing both their signatures. The medical examiner engaged by Scala testified that he performed the required physical examinations of the Marshalls between 10:00 and 11:00 a.m. on September 6th.

As noted above, *supra* at 38, 586 *A.2d* at 102, Sarann Kraushaar testified during the State's case. Unknown to defense counsel, prior to Kraushaar's second interrogation on September 27, 1984, the Ocean County Prosecutor had signed a letter agreeing neither to charge nor to prosecute Kraushaar in connection with the death of Maria Marshall, in return for her "truthful cooperation." The nondisclosure of the prosecutor's agreement concerning Kraushaar was the subject of a remand

hearing ordered by this Court after trial, and we address the issues raised at the remand hearing elsewhere in this opinion. *Infra* at 171–207, 586 *A.*2d at 175–196. Kraushaar's testimony at trial was essentially consistent with her statements to Investigator Mahoney and Detective Petracca on September 7, 1984. *Supra* at 35–36, 586 *A.*2d at 101. In her statement on September 7th, Kraushaar had recalled Marshall saying to her, "I wish she [Maria] wasn't around. Do you know anyone who would take care of it?" At trial, however, Kraushaar recalled Marshall's comment to have been, "I swear if there were a way that I could either do away or get rid of her I would." In her September 7th statement Kraushaar said that she and Marshall were both planning to leave their spouses that month and live together. In her trial testimony, Kraushaar testified that although Marshall planned to move out immediately, her plans were less certain and her intention was to move in with Marshall at some time in the future.

The State's proofs also included testimony from Detective Petracca, who retraced Marshall's route the night of the homicide to ascertain what other locations were available for defendant to have checked out his car trouble. Petracca observed that from Route 30 to the Parkway was about "a nine mile stretch," and that two service stations would have been open as well as the Absecon State Police Barracks. From the Parkway entrance to the Oyster Creek Picnic Area, a distance of thirty-one miles, Petracca identified as available facilities the Atlantic City service area, which was open all night; the Bass River State Police Barracks; the New Gretna toll plaza; the Stafford Forge Picnic Area at milepost seventy-one, which he described as "wide open," a big paved area that is visible from one side of the Parkway to the other; and the Barnegat toll plaza just south of the Oyster Creek Picnic Area. According to Petracca, there were also fourteen paved U-turns on the Parkway between Route 30 and the crime scene that a motorist could use to check for car trouble.

B. Defendant's Case

Defendant testified in his own behalf. In addition, he produc-
ed four character witnesses who testified to his general reputa-
tion for honesty and integrity. Charles Luker, the postman
whose route included the Best Western Motel in Lakewood, and
Paul Rackoczy, the Best Western manager, both testified that
the mail depository box in use at the motel on September 27,
1984, was not the flat open box described by Investigator
Mohel, but rather was a large mail depository with a slot at the
top and a latch at the bottom that the postal carrier had to
unhook to gain access to the mail.

Marshall also produced an insurance financing expert who
testified that the rates for term insurance charged by Provident
Mutual Insurance Company, Marshall's primary company, were
substantially higher than those charged by other companies;
that rates for term insurance had generally declined in the past
few years; and that it was sound practice to replace expensive
term insurance with less-expensive policies. John Zerrer, a
former agency manager for Provident Mutual Insurance Com-
pany, testified that Marshall had been one of the company's
most productive agents, selling between fifty- and eighty-mil-
lion dollars of insurance during his career. He testified that
Marshall was authorized to place insurance with companies
other than Provident Mutual, and that most of Provident's
agents placed term insurance with other companies because
Provident's rates were too high. Zener stated that there had
been a dramatic reduction in term-insurance rates the past few
years, and therefore it had been a good time to buy term
insurance.

Joseph Dougherty, Marshall's brother-in-law, testified as a
defense witness primarily to establish that the envelope ad-
dressed to him and seized at the Best Western Motel was
privileged because of his attorney-client relationship with Mar-
shall. According to Dougherty, he had agreed to assist Mar-

shall's counsel in the conduct of his defense by performing legal research and writing memoranda of law and briefs.

All three of Marshall's sons testified. John and Christopher confirmed that when Marshall telephoned them on September 27th from the motel, he had sounded upset and depressed. Robbie Marshall testified that on September 6, 1984, he was awakened at about 11:30 a.m. and left his home at noon with both parents to have lunch at the Toms River Country Club, where they stayed for about an hour. His testimony conflicted with McKinnon's assertion that he and Marshall had met at about noon that day at a rest stop on the Garden State Parkway.

Marshall's testimony commenced with a description of his background and education, his marriage to Maria, their family history, and the development of his insurance business. He acknowledged his relationship with Sarann Kraushaar, indicating that it had been their intention to leave their respective spouses but not live together immediately, in order to avoid the perception that their relationship had begun while their marriages were intact. He related a conversation with Kraushaar in which she informed him that a lawyer had told her that Maria was suspicious of their relationship. He also testified that Maria had been unable to account for several thousand dollars in casino winnings that he had given to her. He acknowledged having met Robert Cumber at a party given by a neighbor in May 1984, and in the course of a conversation about gambling having mentioned to Cumber that he was interested in hiring an investigator to account for the missing funds. Marshall testified that he had also wanted to find out whether his wife had been having him followed and had known about his involvement with Kraushaar.

According to Marshall, he telephoned Cumber in June 1984, and Cumber agreed to help Marshall find an investigator, instructing him to call back a few days later at a designated time. He did so, and Cumber introduced him to McKinnon, who

identified himself on the telephone as Jimmy Davis. McKinnon offered to perform an investigation for Marshall for $2,500, which Marshall wired to him. Marshall acknowledged their meeting at Harrah's in June 1984, but denied paying McKinnon any money during their meeting. He admitted giving McKinnon a photograph of Maria and of their home, but insisted that McKinnon's assignment was limited to determining whether Maria was having Marshall followed and what she had done with the money that Marshall had given to her.

Marshall testified that after meeting McKinnon at Harrah's, he telephoned Cumber because McKinnon had not communicated with him. Cumber said that Davis [McKinnon] would come back to New Jersey if Marshall wired an additional $3,000, and that Marshall should use the name "James McAllister" when he sent the money. Marshall sent the $3,000, and continued to telephone Cumber when McKinnon did not arrive. Marshall also testified that he sent Cumber information about establishing an Individual Retirement Account [IRA] and opened a file in his name.

Marshall acknowledged that McKinnon returned to New Jersey in July and again met him at Harrah's, a meeting not mentioned on the tape recording Marshall made at the Best Western Motel on September 27th. According to Marshall, McKinnon told him on this occasion that the investigation had not been completed and that he needed more money. Marshall testified that he had refused to give him additional money, but apparently assumed that the investigation would eventually be completed.

Marshall testified about an incident that occurred after their July meeting, when an unknown person tried to open the door of the motel room that he was occupying with Sarann Kraushaar. That incident increased his concern that he was being followed and prompted him to call Cumber and offer Davis [McKinnon] an additional $1500 if he would complete the investigation by early September.

Marshall testified that after he returned in August from a family vacation in Michigan, he began looking for a house he could move into, focusing on a rental that was available in Beach Haven West. He also acknowledged that during that time period he purchased silver ingots and put them in a safe-deposit box in Sarann Kraushaar's name.

According to Marshall, McKinnon telephoned him from Atlantic City at about 10:00 a.m. on September 6, 1984, and asked that Marshall call him back from a pay phone. They arranged to meet outside Harrah's at about 9:30 p.m., McKinnon reminding Marshall to bring the extra $1,500, and Marshall insisting that McKinnon bring his report. When they met, McKinnon said he had not finished the report and Marshall refused to give him more money. Marshall testified that McKinnon then threatened to leave without completing the investigation, and Marshall gave him an additional $800 to induce him to stay. According to Marshall, he and Maria played blackjack that evening and won some money. After paying off a $4,000 marker, Marshall left the casino before midnight with about $2,000, and Mrs. Marshall had an additional $500 or $600. He testified that during the evening, he telephoned his son Christopher and learned that Christopher did not intend to come home from Lehigh University the next day. When Mrs. Marshall expressed her intention to go to see Christopher, Marshall telephoned a friend to cancel a tennis match, indicating that he planned to go to Lehigh with his wife.

Marshall's testimony about the drive from Harrah's to the picnic area and of the events prior to the murder was consistent with the statements he gave to police officers who interrogated him after the homicide. *Supra* at 31–33, 586 *A.*2d at 99–100. He conceded that he had responded falsely when the police had asked him if he was seeing another woman.

Marshall testified that when he checked into the Best Western Motel on September 27th, he did so intending to take his life. He made farewell tapes to each of his sons, which were

played for the jury. Marshall stated that after being taken from the motel to Point Pleasant Hospital, he was admitted to a psychiatric-care hospital in Philadelphia where he remained for twelve days.

Marshall also testified about an extensive telephone conversation on September 26th with Russel Kolins, an investigator hired by his counsel, who had gone to Louisiana on Marshall's behalf. According to Marshall, he learned during this conversation that Cumber had been arrested and that the man he had known as Jimmy Davis was named Billy Wayne McKinnon. Marshall stated that he also discussed with Kolins the costs he was incurring in Louisiana, expressing concern that Kolins had stayed there too long. On cross-examination the prosecutor questioned Marshall about that conversation, suggesting that Kolins had read to him a statement prepared by McKinnon for his counsel that purported to explain McKinnon's activities in New Jersey without implicating him in the murder of Mrs. Marshall. The prosecutor, observing that both McKinnon's prepared statement and Marshall's tape to his brother-in-law omitted any reference to the July meeting at Harrah's, questioned Marshall on whether that omission from his tape resulted from his conversation with Kolins. Marshall denied that Kolins had read McKinnon's statement to him, and responded that the omission of the July meeting was inadvertent.

Marshall testified that in October 1983, he had prepared a capital-needs analysis for himself and Mrs. Marshall to determine the amount of life insurance that should be in force on each of them in order that in the event either was to die, the survivor would be provided with an adequate income. He estimated that because he then had in force about $500,000 in insurance and had other assets and benefits available for Mrs. Marshall, he required an additional $500,000 in insurance. He estimated that Mrs. Marshall should have in force approximately one-million dollars in insurance, based on Marshall's assumption that his income would be reduced because of added responsibilities he would assume in the event of her death. He also

testified that rates for term insurance were quite low in 1983 and 1984. Referring specifically to the Provident Mutual Insurance Company policy issued September 10, 1982, Marshall observed that that policy by its terms would have been "incontestable" if Mrs. Marshall had died after September 10, 1984, three days after her murder.

Russel Kolins, the investigator hired by Marshall's counsel, also testified in Marshall's behalf. According to Kolins, he flew to Louisiana on September 26th and met with McKinnon's lawyer, Henri Loridans, his son Maurice Loridans, and Henri's wife, Sandra, who was McKinnon's sister. He also met with McKinnon, who he initially thought was Jimmy Davis. Kolins testified that after his telephone conversation with Marshall on September 26th, Maurice Loridans, acting on Sandra's instructions, gave Kolins a copy of a statement McKinnon had prepared for his lawyers, the accuracy of which he repudiated during his trial testimony. Kolins denied having discussed the content of the statement with Marshall or Marshall's counsel on September 26th. After Kolins returned to New Jersey, he had a conference call with McKinnon and his sister, who expressed concern about comments Kolins had made to the media relating to McKinnon's prepared statement. They cautioned Kolins about mentioning a woman named Peggy who, according to McKinnon's statement, accompanied him to New Jersey in September. They asked Kolins to return or destroy McKinnon's statement; according to Kolins, he did neither.

Kolins also was permitted to testify, over the State's objection, to a conversation he had with McKinnon prior to his extradition hearing, in which McKinnon denied coming to New Jersey in September with Larry Thompson but apparently acknowledged traveling to New Jersey with a woman named Peggy or Sherry. According to Kolins, McKinnon never told him that he came to New Jersey for the purpose of murdering Maria Marshall.

C. Co–Defendant Thompson's Case

Angela Gallien, from Natchitoces, Louisiana, a dental assistant for Dr. Larry Burke, testified that co-defendant Thompson's son Brian had an appointment with Dr. Burke at 4:45 p.m. on September 6, 1984. She recalled that when Brian came to the office, he was accompanied by a male adult, but she could not identify Thompson as the person who was with Brian. She testified, however, that she prepared a receipt reflecting payment for Brian's dental work, and the receipt bore Larry Thompson's name. She testified that her practice was to prepare a receipt in the name of the person responsible for payment. On cross-examination, she acknowledged having received a telephone call from co-defendant Thompson's wife, Ulanda, informing her that an investigator was coming to see her, but denied that Ulanda had asked her to say that Thompson was in the office on September 6th. She conceded that when interrogated by investigators from the prosecutor's office, she had expressed uncertainty whether a man, woman, or child had paid for Brian Thompson's dental work.

Garland Giddings, a social friend of Thompson who lived about ten miles from Thompson's home in Fairview–Alpha, Louisiana, testified that he and Thompson talked regularly on the telephone and that he recognizes Thompson's voice. He stated that he had telephoned Thompson at his home on Thursday, September 6th, between 8:00 and 10:00 p.m., to solicit his help the next day in "raising" a boat that Giddings had sunk the prior weekend. Giddings testified that he had spoken with Thompson, but that Thompson was unable to accompany him the next day. According to Giddings, he recalled the date of the telephone call because the next day—on which he was to retrieve the boat—was his wife's birthday.

Steven Thompson, co-defendant's brother, testified that he lived in Shreveport in a house owned by Larry Thompson, and that Thompson and his wife had stopped by to see him there between 10:30 and 11:00 a.m. on Saturday, September 8th.

Brian Thompson, co-defendant Thompson's eighteen-year-old son, testified that his father was at home from September 6th through September 9th. He stated that his father had accompanied him to the dentist on the afternoon of September 6th and had spent the evening at home. Brian recalled that his father was in bed when he left for school the next morning, and testified that they ate dinner together that evening, September 7th. Brian testified that his father was not at home Saturday morning, but returned home later in the day and ate dinner at home. On Sunday, September 9th, his father was at home to celebrate Brian's sister's birthday.

Lynette Giddings, Garland Giddings' wife, testified that she overheard her husband speaking to Thompson on the telephone during the evening of September 6th. She also recalled having seen Thompson and his wife drive past her in Thompson's truck at about 4:30 p.m. on September 8th.

Michael Gentry also testified as a witness for Thompson. Although confirming that he had accompanied McKinnon to Atlantic City in July 1984, Gentry testified that he had never met or seen Marshall or his wife, and that McKinnon had never told him that Marshall wanted his wife murdered. Conceding that he had worked with Thompson and had spoken with him regularly by telephone, Gentry denied having told Thompson that McKinnon had been hired to murder Maria Marshall.

Thompson testified in his own behalf, denying any involvement in the death of Maria Marshall. Thompson maintained that he was at home in Louisiana when the murder occurred. He recalled taking his son to the dentist on September 6th and paying the receptionist with money his wife had given him. Thompson confirmed that he and Garland Giddings had spoken on the telephone that evening. According to Thompson, he spent Friday, September 7th, doing work at home, and had dinner at home that evening. He testified that he had driven to Shreveport on Saturday, visited his brother Steven, bought a part for his truck and a birthday cake for his daughter, and

returned home that evening. He denied having had any conversations with McKinnon about people in Dallas putting out a "contract" on him, and denied traveling to Atlantic City with McKinnon. He conceded that he knew McKinnon, and had purchased a car from him on September 10, 1984. He acknowledged that his wife had been staying at Marshall's home during the trial, explaining that she had received permission from Marshall's sister and had asked about staying there to save the expense of a motel. Mrs. Thompson also testified, and her testimony about Thompson's activities from September 6th to September 9th was substantially the same as his.

D. The Verdict

After several hours' deliberation, the jury found Marshall guilty of conspiracy to commit murder, and of purposely or knowingly causing the death of Maria Marshall as an accomplice by payment or promise of payment of a sum of money. The jury acquitted Larry Thompson of all charges.

E. The Sentencing Proceeding

At the inception of the sentencing phase of the case, defense counsel stated that it was defendant's decision, with which he concurred, to call no witnesses during the sentencing proceeding. The State offered no additional evidence, relying on the record that had been established during the guilt phase of the case.

The State argued that the proofs established the existence of one aggravating factor, that defendant had procured the commission of the murder by payment or promise of payment of money. *N.J.S.A.* 2C:11–3c(4)e. Both sides stipulated the existence of one mitigating factor, that defendant had no history of prior criminal activity. *N.J.S.A.* 2C:11–3c(5)f. Defense counsel argued that evidence in the record concerning Marshall's business, charitable, and community activities was sufficient to establish an additional mitigating factor, "[a]ny other factor

\* \* \* relevant to the defendant's character or record or to the circumstances of the offense." *N.J.S.A.* 2C:11–3c(5)h.

The jury unanimously found beyond a reasonable doubt the existence of the aggravating factor, and also found evidence of the existence of both mitigating factors. It concluded unanimously beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors. The trial court sentenced Marshall to death.

## II.

### Pretrial Motions

A. Letters Seized in Best Western Mailbox

Among the most sharply-contested issues in this case, both at trial and at a pretrial-suppression motion, was the State's seizure and subsequent use of the cassette tape made by defendant in the course of his aborted suicide attempt at the Best Western Motel on September 27, 1984. The tape, enclosed in an envelope addressed to defendant's brother-in-law and opened after the police had obtained a search warrant, contained an acknowledgment by Marshall that he had hired McKinnon to investigate his wife, and had paid him $6,300, $800 of which was paid at Harrah's on the night of the homicide. The State played the tape for McKinnon to induce him to enter into a plea agreement. The State also offered the tape in evidence during the trial, and it was played for the jury. Defendant challenges the trial court's pretrial rulings denying his motion to suppress the tape on the grounds that the seizure of the envelope was unlawful, the search warrant lacked probable cause, and the tape's content was protected by the attorney-client privilege.

The trial court conducted a pretrial hearing to determine the admissibility in evidence of the contents of the envelope addressed to Dougherty that consisted of a three-page contract of

sale, a one-page letter written on motel stationery, and the cassette tape dictated by defendant.

At the hearing, Zillah Hahn, the front-desk manager at the Best Western, testified that she checked defendant into room 16 at 4:00 p.m. on September 27th. She notified the prosecutor's office of defendant's presence about ten minutes later. Chief Palmer Herbert of the Ocean County Prosecutor's Office and State Police Lieutenant George Justin arrived at the hotel between 4:00 and 4:30 p.m., received a passkey for room 17, and began their surveillance of defendant.

Investigator Michael Mohel arrived at the hotel at approximately 9:15 p.m. Mohel observed defendant leave room 16 at 10:45 p.m. and buy a soda. At 11:30 p.m., defendant again left his room and proceeded to the front-desk area. Mohel followed defendant and recounted the sequence of events that transpired:

Q. What happened thereafter? Where did you go or what did you do after you saw Marshall walking towards the front desk?

A. I followed him to the area of the front desk I believe unobserved by Mr. Marshall, at which time I observed him at the desk area and then I saw him leave that area and proceed back to the room at which time I then went to the front desk.

Q. Tell the Judge what happened at the front desk.

A. At the front desk I was advised by [the night-desk manager] that Mr. Marshall had deposited two letters in a box located on the desk.

Q. Now, did you go over and examine that box on the desk?

A. I looked into the box and I observed a white envelope on top of another envelope and on the envelope itself had the terminology, "To be opened in the event of my death."

Q. Could you see that—those words written as you looked into that box or did you have to pick up the envelopes and actually physically hold them?

A. No. I observed it when I looked into the box.

The two envelopes were white, letter-sized, business envelopes. Each envelope was sealed and contained first-class postage. One letter was addressed to defendant's secretary [1] and the

---

[1]Defendant's motion to suppress also sought to exclude from trial the contents of the envelope addressed to Marshall's secretary. However, the

other, containing the legend described by Mohel, to the Pennsylvania business address of "Joseph Dougherty, Esq.," defendant's brother-in-law.

The investigator took the envelopes back to room 17 and notified his superiors. He explained that he retrieved the envelopes in order "[t]o justify [his] future actions that [he] would have to go into [defendant's] room to check on [defendant's] well-being." Mohel did not open the envelopes; instead, he asked the night manager to phone room 16 and check on defendant's condition. The call was made at 12:30 a.m. and Mohel listened in on the conversation. Subsequent efforts to contact defendant by phone failed because defendant had taken his phone off the hook. Mohel then contacted the Lakewood Police Department, which alerted the first-aid squad.

At 12:55 a.m., Mohel, Investigator Daniel Mahoney, Investigator John Kurilla, and a Lakewood police officer entered the defendant's room with a passkey. Medical personnel arrived at 1:10 a.m. Mohel and Mahoney woke up defendant, who volunteered that a cup of Coke at his bedside contained a large quantity of Restoril, a sleep-inducing agent. He stated that he had intended to kill himself but had fallen asleep and had not drunk any of the solution. Defendant left the room under his own power and was taken to a local hospital for observation, where he refused treatment. We address defendant's motion to suppress in the context of those events.

### 1. *Seizure of the Envelope*

We begin our analysis by examining the testimony concerning the type of depository into which defendant placed the two envelopes on the night of September 27th. Hahn, the front-desk manager, described the depository used by the motel during September 1984 as "an open box that sat up on the

contents of that envelope were evidently unrelated to the murder investigation and were not introduced at trial.

counter" at the front desk. The word "mail" appeared on two sides of the box. Mohel described the depository in similar terms. Investigator Mahoney, who arrived at the hotel at about 12:30 a.m., testified that the depository was a "rectangular * * * open tray, without any lid on it and the kind that would be like for out mail in an office." Zahn testified that the motel later replaced the open box with a container that had a slot on top, and a latch at the bottom that the postal carrier had to unhook in order to retrieve the mail.

Investigators Mohel and Murphy testified that in August 1985, they went to the Best Western Motel to attempt to locate the open mail depository that Mohel testified was in use in September 1984. Based on Mohel's description, the owner of the hotel located the mail depository in a shed. Both that mail depository and the replacement container described by Zilla Hahn were introduced in evidence at the suppression hearing.

The defense presented evidence to support its claim that defendant had placed the two envelopes in the hotel's present mailbox, not in an open tray. Paul Rokoczy, the night manager at the hotel on September 27th, stated that the current mailbox is "the only mailbox that we have had or have to this date. That is the box." During cross-examination, Rokoczy acknowledged that he may have told Investigator Murphy that Marshall had placed the two envelopes on top of the mail box then in use, and Murphy testified that Rokoczy told him that one envelope would not fit in the slot. In addition, the mailman who had delivered the mail to the hotel since February 1978 testified that he had never seen the mail tray and that the present mailbox was the only one he had ever used. Defendant also identified the hotel's present mailbox as the one he used on September 27th, and testified that the cassette tape was not enclosed in a container.

On rebuttal, Lieutenant Churchill testified that neither the envelope addressed to Dougherty nor the cassette would fit into the mail slot in the hotel's current mailbox.

The trial court, acknowledging the conflicting testimony, noted that as a matter of common experience people "wouldn't really be normally paying too much attention to what type of mail receptacle was present." The court also observed that both receptacles might have been in use at the same time. The court was persuaded, however, that the production of the mail tray by the hotel's owner, based on Mohel's description of the tray in August 1985, suggested strongly that the tray had been in use on the night the envelopes were seized, and made that factual finding. Based on our own careful scrutiny of the record, we sustain the trial court's determination, which is amply supported by the evidence adduced at the suppression hearing. *See State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964). In the context of that factual finding, we proceed to consider defendant's fourth-amendment claims deriving from the seizure of the envelope containing the tape and the search of its contents.

We first consider whether defendant had a protected constitutional interest in the words on the envelope observed by Mohel. Investigator Mohel testified that he proceeded to the front desk after defendant had left the lobby. The night-desk manager informed Mohel that defendant had deposited two envelopes in the box. Mohel then "looked into the box and * * * observed a white envelope on top of another envelope and on the envelope itself had the terminology, 'To be opened in the event of my death.' " He stated that he could see the words without picking up the envelope.

One seeking to invoke the protection of the fourth amendment must establish that a reasonable or legitimate expectation of privacy was invaded by government action. *Smith v. Maryland*, 442 *U.S.* 735, 740, 99 *S.Ct.* 2577, 2580, 61 *L.Ed.*2d 220, 226 (1979). The resolution of that issue depends on whether the person "exhibited an actual (subjective) expectation of privacy," *Katz v. United States*, 389 *U.S.* 347, 361, 88 *S.Ct.* 507, 516, 19 *L.Ed.*2d 576, 588 (1967) (Harlan, J., concur-

ring), and whether the expectation of privacy is "one that society is prepared to recognize as 'reasonable.' " *Ibid.*

■ We conclude that defendant did not manifest an actual or subjective expectation of privacy in the envelope, in that he exposed the mailing address and the words "To be opened in the event of my death." Those words were apparently visible to anyone observing the envelope. It is well settled that "[w]hat a person knowingly exposes to the public * * * is not a subject of Fourth Amendment protection." *Katz, supra,* 389 *U.S.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 582. Thus, we find no fourth-amendment violation when Investigator Mohel read the words on the outside of the envelope. *See United States v. Choate,* 576 *F.*2d 165 (9th Cir.1978) (finding that sender waived fourth-amendment privacy claim in names and addresses on outside of envelope).

■ We next consider whether Mohel could lawfully retrieve the envelopes from the depository. We are satisfied that although defendant had a reasonable expectation of privacy only in the *contents* of the envelope, *see, e.g., United States v. Jacobsen,* 466 *U.S.* 109, 104 *S.Ct.* 1652, 80 *L.Ed.*2d 85 (1984); *United States v. Van Leeuwen,* 397 *U.S.* 249, 90 *S.Ct.* 1029, 25 *L.Ed.*2d 282 (1970); *Ex parte Jackson,* 96 *U.S.* 727, 24 *L.Ed.* 877 (1878); *State v. Hempele,* 120 *N.J.* 182, 576 *A.*2d 793 (1990), the removal of the envelopes nevertheless constituted a "seizure" for fourth-amendment purposes. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen, supra,* 466 *U.S.* at 113, 104 *S.Ct.* at 1656, 80 *L.Ed.*2d at 94 (footnote omitted).

■ The fourth amendment prohibits not all searches and seizures but only those that are deemed unreasonable. *State v. Campbell,* 53 *N.J.* 230, 233, 250 *A.*2d 1 (1969). Ordinarily, a seizure of property is unreasonable unless it is accomplished pursuant to a warrant issued on probable cause and particularly describing the items to be seized. *United States v. Place,*

462 *U.S.* 696, 701, 103 *S.Ct.* 2637, 2641, 77 *L.Ed.*2d 110, 117 (1983) (citation omitted). However, not all warrantless seizures are unlawful:

> Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.
>
> [*Ibid.* (citations omitted).]

*See also United States v. Jacobsen, supra,* 466 *U.S.* at 114, 104 *S.Ct.* at 1657, 80 *L.Ed.*2d at 94–95 ("[e]ven when government agents may lawfully seize [a sealed] package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package"); *United States v. Van Leeuwen, supra,* 397 *U.S.* 249, 90 *S.Ct.* 1029, 25 *L.Ed.*2d 282 (upholding seizure of envelopes based on suspicion of illegal content until investigation completed and search warrant obtained).

■ Thus, the validity of the seizure depends largely on whether the State's investigator, at the time he seized the letters, had a reasonable basis for believing that the envelopes contained evidence pertaining to the murder. At the time of the seizure, the focus of the investigation had narrowed, and defendant knew that he was a suspect. The police were aware of defendant's affair with Kraushaar, his purchase of substantial insurance on Mrs. Marshall's life, and that defendant had mailed money orders to Jimmy Davis in Shreveport. Investigators had also discovered that defendant had communicated with Cumber and had spoken with McKinnon about an "investigation." Although all of the details about the extent of defendant's involvement with McKinnon and Cumber had not been uncovered, there was sufficient information available to the authorities to justify their surveillance of defendant at the Best Western Motel. The conclusion is inescapable that when Investigator Mohel read the possible suicide message written on the outside of the envelope, in the context of the accumulation of

evidence incriminating defendant in his wife's murder, there were reasonable grounds for him to believe that the envelope could have contained evidence pertaining to the murder.

■ We note that in contrast to the *seizure* of envelopes upheld in *Van Leeuwen, supra*, where the police held the envelopes for twenty-nine hours before a search warrant issued, in this case five days elapsed between the seizure on September 27th and the issuance of the warrant on October 2nd. Under the circumstances, however, which included an intervening weekend and the necessity for preparing an extensive affidavit in support of the warrant, we cannot conclude that the five-day delay was unreasonably intrusive. That determination draws support from the fact that Marshall's suicide attempt was aborted and the envelope addressed to his brother-in-law was to be opened only in the event of his death. Accordingly, we hold that the seizure of the envelope did not violate defendant's fourth-amendment rights.

### 2. *Attorney–Client Privilege Issue*

Defendant also claims that the mere seizure of the envelope violated the attorney-client privilege, *see Evidence Rule* 26, between himself and his brother-in-law Joseph Dougherty, a Pennsylvania attorney. At the suppression hearing, Dougherty testified that within a day or two after the homicide defendant inquired whether Dougherty could represent him in "a potential criminal matter." Dougherty told defendant that he could not do so. Dougherty also testified that in a conversation on September 12, 1984, he recommended that defendant consider signing a power of attorney authorizing his son John Marshall to sign checks and real-estate agreements, referring specifically to the possible sale of defendant's office building in Toms River. Dougherty testified that he prepared the power of attorney on September 21st, and that defendant signed it in Dougherty's office on September 25th when defendant stopped to see Dougherty to discuss insurance for his law firm. Dough-

erty also testified that on September 23, 1984, he agreed that his law firm would perform legal research, if requested to do so by the attorney defendant retained to represent him in connection with the homicide investigation.

To whatever extent an attorney-client relationship between defendant and Dougherty may have existed at the time of the seizure, we are unpersuaded that the seizure of the envelope violated the attorney-client privilege. Dougherty's role as a Pennsylvania attorney in defendant's New Jersey trial was limited in scope. Neither Dougherty nor defendant's trial counsel had informed the State that Dougherty would participate in Marshall's defense. The investigator who seized the envelope knew that Dougherty was defendant's brother-in-law, but was unaware that he represented defendant in any capacity relating to the homicide investigation. Although Mohel may have been aware that the letter was addressed to an attorney, he was not obligated before seizing the envelope to determine whether the letter was a protected attorney-client communication within the context of the Maria Marshall homicide investigation.

### 3. *Validity of the Search Warrant*

On October 2, 1984, the State obtained a warrant to search the envelope addressed to Dougherty. To establish probable cause, the State presented a thirteen-page affidavit, which alleged that that envelope contained "writings, notations, tapes and any and all other items of evidence which will establish the person or persons responsible for the homicide death of Maria Marshall." Defendant challenges the issuance of the warrant on several grounds.

First, defendant claims that the court lacked the authority to issue the search warrant. He relies on a United States Postal Service regulation, *Domestic Mail Manual* § 115.61 (1988), which provides, in part, that "[n]o employee shall permit the

execution of a search warrant issued by a state court and served by a state officer." *Id.* at 115.61(b).

■ We note that the regulation on which defendant relies applies only to letters within the custody of the postal authorities at the time of the seizure. However, even if the envelope had been in the custody of the Postal Service, the federal statute governing the classification and inspection of mail expressly permits the opening of letters of domestic origin "under authority of a search warrant issued by law * * *." 39 *U.S.C.* 3623(d). The statute does not limit search warrants to those issued by federal judges or magistrates. *See State v. McCully,* 64 *Haw.* 407, 642 *P.*2d 933 (1982). Nor does defendant contend that a federal magistrate would have reached a different conclusion on probable cause had he or she been presented with the identical affidavit. Thus, we conclude that the regulation on which defendant relies does not invalidate the examination of the contents of defendant's envelope pursuant to a lawfully-issued search warrant.

Defendant also contends that the search is invalid because the warrant was not based on probable cause. According to defendant, the affidavit established nothing more "than a mere hunch or suspicion that the envelope would contain any information leading to the identity of the person(s) responsible for the crime."

■ The fourth amendment prohibits searches that are unreasonable. *State v. Bruzzese,* 94 *N.J.* 210, 217, 463 *A.*2d 320 (1983). A search is reasonable if the State obtains a search warrant from a neutral magistrate on a showing of probable cause. The affidavit in question set forth detailed information strongly suggesting that defendant may have been involved in the murder of his wife. The affidavit disclosed that defendant had been having marital and financial difficulties and was involved in a long-standing relationship with Sarann Kraushaar. It stated that defendant had asked Kraushaar if she "knew of anyone who would take care of his wife." The affidavit de-

scribed defendant's attempts to purchase additional life insurance for Mrs. Marshall the day before the murder. Finally, the document disclosed that Marshall, through Cumber, had arranged to hire McKinnon, and revealed that defendant had sent at least one money order to Shreveport payable to James Davis.

■ We accord substantial deference to the discretionary determination resulting in the issuance of the warrant. *State v. Kasabucki*, 52 *N.J.* 110, 116, 244 *A.*2d 101 (1968). Based on the totality of the circumstances, we are satisfied that there was probable cause to believe that the envelope contained evidence that would help identify the murderer. *See State v. Novembrino*, 105 *N.J.* 95, 122, 519 *A.*2d 820 (1987).

Defendant also contends that the warrant is invalid because Investigator Mahoney misrepresented material facts in the affidavit. Defendant maintains that the investigator failed to mention in the body of the affidavit Dougherty's status as an attorney. However, we find, as the trial court did, that the investigator disclosed Dougherty's status as an attorney on the first page of the affidavit, although the affidavit is silent about any attorney-client relationship between Dougherty and Marshall. We also concur in the court's conclusion that defendant failed to make a "substantial preliminary showing" that the investigator included any misleading or false statements in the affidavit, either intentionally or with reckless disregard for the truth. See *Franks v. Delaware*, 438 *U.S.* 154, 169–70, 98 *S.Ct.* 2674, 2683–84, 57 *L.Ed.*2d 667, 681 (1978). We are satisfied that the court properly concluded that defendant was not entitled to a hearing to determine the veracity of the statements in the affidavit.

■ Nor would we disturb the issuance of the warrant on the basis of the attenuated attorney-client relationship between Dougherty and Marshall. Nothing in the record suggests that either of the investigators or the judge who issued the warrant had any basis on which to assume that defendant, who had already retained Glenn Zeitz as his counsel, also had engaged

his brother-in-law to do research in connection with his defense. To the extent that an attorney-client relationship existed, it was undisclosed, and hence cannot constitute a ground for attacking an otherwise-valid search warrant.

We are also in accord with the trial court's determination that the tape found in the envelope addressed to Dougherty could be played at trial. The court found that the content of the tape was "unrelated to the services to be performed by Dougherty in connection with the criminal investigation of defendant." Although acknowledging that the tape included references to legal matters requiring attention in the event of defendant's death, the trial court concluded, based on their "personal relationship" and the "content of the communication," that "defendant was attempting to memorialize his thoughts, suggestions and wishes to Dougherty primarily as a trusted friend." The record fully supports the trial court's determination that defendant did not sustain the burden of proving the existence of a privileged attorney-client relationship, and that defendant was communicating with Dougherty primarily as a trusted friend and relative, not as an attorney. *See McCormick, Evidence* § 88 at 209–10 (E. Cleary 3d ed. 1984); *cf. United States v. Tedder*, 801 *F.*2d 1437, 1442–43 (4th Cir.1986) (record sustained trial court's finding that defendant's statement to attorney related to co-conspirator was intended as communication to personally-involved friend and not to legal advisor). Adhering to that view, the trial court properly permitted the State to play the cassette tape found in the envelope during the presentation of its case.

## B. Venue

On April 25, 1985, an Ocean County trial court judge conducted a hearing on defendant's motion seeking a change of venue. See *Rule* 3:14–2. After reviewing voluminous newspaper accounts of the murder in both local and national newspapers, the

court concluded that the Marshall family's prominence in the Toms River area threatened defendant's right to a fair trial:

The pretrial publicity in this case has been extensive. The defendant has submitted a videotape of a news segment, broadcast by a Philadelphia TV station, as well as voluminous clippings from the Asbury Park Press, Atlantic Observer, Philadelphia Inquirer and Philadelphia Daily News, as well as a transcript of the broadcast proceedings from the local television Channel 8, local television station Channel 8.

 * * * * * * * *

The question is, what about his right to a fair and impartial jury? And there's another factor for the Court to consider besides the publicity, because *the publicity is all over*. It may not be up in Warren County or Hunterdon County, but it's all around. It's in Burlington County, Atlantic City, wherever the Philadelphia Inquirer is sold. It's in those counties below Camden, Salem, Gloucester, Cumberland and Cape May, or wherever the Philadelphia News is sold or where the Atlantic Press is sold or where the Asbury Park Press is sold or where the Ocean County Observer is sold.

There's another factor which the Court is considering besides all this publicity, because *that publicity is going to be there*. There is, in this Court's opinion, an inordinate interest in this case on the part of many people in Ocean County, people who either know Mr. Marshall and his family or others who were involved in the case, or people who know people who know the Marshall family. And I don't think that inordinate interest is going to disappear. *It's always there*. The case is being talked about; it's being thought about constantly. And the defendant, his family, and others in the case, have enjoyed a wide acquaintance, not just in the Toms River area, but in the Ocean County area.

 * * * * * * * *

This Court is of the opinion that for the reasons stated, the defendant cannot receive a fair and impartial trial here in the courthouse in Toms River. There is the pretrial publicity, but, of course, that's in other counties, too. There's the wide acquaintance of persons in the case—defendant, family, friends in the community, and outside the Toms River community, in the general Ocean County community. And as I said before, *there is inordinate and continuing interest of the people of this county in this case, and I think that's different in other counties, because in other counties, presumably the Marshalls are not known, none of the other people in the case are known*. Three of the four defendants come from outside the state, so they're not known. And I think it's in his interest to have the case transferred.

(Emphasis added.)

Accordingly, the Court found that there was "a realistic likelihood of prejudice from pretrial publicity," *State v. Williams*, 93

*N.J.* 39, 67 n. 13, 459 *A.*2d 641 (1983), and ordered that the case be tried in Atlantic County.

Defendant does not contest that decision. Instead, he argues for the first time on appeal that Atlantic County was not the proper venue for his trial because there had been as much publicity about the homicide in Atlantic County as there had been in Ocean County. Specifically, defendant claims that in transferring the matter to Atlantic County, the court disregarded the fact that a substantial portion of the publicity that made Ocean County inappropriate for trial had also circulated in Atlantic County. To support that argument, defendant submitted a post-trial motion, which we granted, that sought to supplement the trial record with the following:

 1. Seventy-one pages of newspaper coverage of the trial, as reported by the Atlantic City Press;

 2. A four-hundred-plus page report detailing the Atlantic City circulation of the Atlantic City Press, the Philadelphia Daily News, and the Philadelphia Inquirer from 1984 to 1986;

 3. An Asbury Park Press article dated January 26, 1986, describing the similarity between defendant's trial and a trial in Japan.

██ The sixth amendment of the United States Constitution and article I, paragraph 10 of the New Jersey Constitution guarantee a criminal defendant "the right * * * to trial by an impartial jury." An impartial jury goes to the very essence of a fair trial. *State v. Williams, supra,* 93 *N.J.* at 60, 459 *A.*2d 641. The requirement of fairness is especially significant in capital cases, *id.* at 61, 459 *A.*2d 641, and requires that a defendant be tried before a jury panel not tainted by prejudice. *Irvin v. Dowd,* 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.*2d 751, 755 (1961). Thus, we have imposed on trial courts the duty "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process * * *." *State v. Williams, supra,* 93 *N.J.* at 63, 459 *A.*2d 641. We begin our analysis with a review of the nature and extent of the pretrial publicity in Ocean County.

■ As indicated earlier, the court granted defendant's motion to change venue from Ocean County. In the exercise of its discretion, the court was permitted to change venue if it determined that a change was "necessary to overcome the realistic likelihood of prejudice from pretrial publicity." *State v. Williams, supra,* 93 *N.J.* at 67 n. 13, 459 *A.*2d 641. On this record, we are satisfied that defendant's prominence in the community, coupled with the extensive local media coverage, threatened defendant's right to a trial before an impartial jury. Therefore, we conclude that the trial court did not abuse its discretion in granting defendant's motion to try the case in a county other than Ocean County. Nonetheless, defendant's arguments require that our analysis proceed further, and that we determine whether defendant received a fair trial in Atlantic County.

■ We first consider whether, as defendant urges, the trial court should have changed venue *sua sponte* from Atlantic County. Our decisions make clear that such a change can be granted only if a court concludes that there is a "realistic likelihood of prejudice from pretrial publicity." *Ibid.* To determine whether a realistic likelihood of prejudice exists in a case, we have adopted the federal distinction "between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel." *State v. Biegenwald,* 106 *N.J.* 13, 33, 524 *A.*2d 130 (1987) (citations omitted). It is the rare case indeed in which prejudice due to pretrial publicity will be presumed. *State v. Koedatich,* 112 *N.J.* 225, 269, 548 *A.*2d 939 (1988) (citation omitted). Defendant does not argue, nor is there evidence in the record to suggest, that the publicity in Atlantic County was so great as to justify a finding of presumed prejudice. See *id.* at 273, 548 *A.*2d 939. Accordingly, we will apply the "realistic likelihood of prejudice" test to defendant's claim.

 Defendant points out that ninety-seven out of 147 potential jurors had read or heard about the case. In addition, defendant notes that nine out of sixteen impanelled jurors knew something about the case from the media. Seven of the twelve deliberating jurors had similar knowledge. Defendant argues that based on those statistics, the court should have excused any juror who had read, heard about, or had an opinion concerning the case, and that the failure to exclude such jurors constitutes reversible error. We disagree.

Jurors who have formed an opinion on the guilt or innocence of a defendant must be excused. *State v. Williams, supra,* 93 *N.J.* at 61, 459 *A.*2d 641. None of the impanelled or deliberating jurors had expressed such an opinion, however. Moreover, simply because some of the impanelled jurors indicated that they had some familiarity with the case does not warrant their automatic excusal. We have long recognized that impanelled jurors need not be ignorant of the facts of the case. *State v. Sugar,* 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980); *accord State v. Koedatich, supra,* 112 *N.J.* at 268, 548 *A.*2d 939.

Although we address issues related to jury selection elsewhere in this opinion, *infra* at 79–98, 586 *A.*2d at 123–134, defendant's contentions concerning venue also encompass a specific challenge to the *voir dire.* Defendant claims that the *voir dire* failed to probe each juror's knowledge of the defendant and the murder. He argues that the jury questionnaire inadequately addressed the issue of pretrial publicity, and maintains that the court compounded that deficiency with inconsistent and superficial questioning of those jurors who indicated that they had heard about the case.

 Pervasive pretrial publicity does not preclude the likelihood of an impartial jury. *State v. Biegenwald, supra,* 106 *N.J.* at 35, 524 *A.*2d 130. To determine the effect of that publicity, the court required that each prospective juror complete a seven-page questionnaire before *voir dire* began. Three questions dealt specifically with pretrial publicity:

45. Have you read in the newspapers or acquired information from any other news media sources regarding this case?

 A. Yes ___ No ___

46. If so, is there anything that you have read or heard which would prevent you from being a fair and impartial juror in this case?

 A. Yes ___ No ___

47. Have you formed an opinion as to the guilt or innocence of Mr. Marshall or Mr. Thompson?

 A. Yes ___ No ___

If yes, would that opinion prevent you from rendering a fair and impartial verdict based solely upon the evidence and in accordance with the law which the judge shall explain to you?

 A. Yes ___ No ___

The court then questioned every juror who had checked "yes" to any of the three questions.

We find no indication that any juror was so tainted by pretrial publicity as to affect the deliberative process. We emphasize that any deliberating juror who indicated exposure to pretrial publicity also disclaimed any detailed knowledge about the case. No seated juror had formed an opinion about defendant's guilt and each stated that his or her minimal knowledge of the case would have no effect during deliberations. Accordingly, we conclude that the *voir dire* adequately disclosed any impermissible exposure to pretrial publicity. Because we are convinced that the publicity did not affect the jury's deliberative process, there was no need to change venue *sua sponte* from Atlantic County, to augment the jury pool, or to use a foreign jury.

We also note that the courts below took steps to ensure that defendant received a trial before an impartial jury. The Ocean County court, obviously aware of the extensive publicity generated by defendant's trial, ordered that no newspaper could publish a twenty-five page statement given by McKinnon. The Appellate Division affirmed that order. *State v. Marshall,* 199 *N.J.Super.* 502, 489 *A.*2d 1235 (1985).[2] The court then changed

---

[2] A Pennsylvania newspaper violated that order. However, we believe that any resulting prejudice to defendant was insignificant.

the venue to Atlantic County. Defense counsel did not raise an objection to that decision, either in Ocean County at the time of the transfer or in Atlantic County at any later point in the proceedings.

Once the case was in Atlantic County, the court further protected defendant's right to a fair trial through an extensive and open-ended *voir dire. Infra* at 93–94, 586 *A.*2d at 131–132. Moreover, the court frequently ordered the jurors to refrain from reading about the case or discussing it with anyone. Those instructions were repeated throughout the trial. We find that those measures adequately protected defendant's right to a trial before an impartial jury.

Finally, we note the significant differences between trying the case in Ocean County and in Atlantic County. Neither the victim nor defendant was prominent in Atlantic County. There was no indication in the record that the Atlantic County community was hostile toward defendant or predisposed to his guilt. We are convinced that there was no "realistic likelihood of prejudice from pretrial publicity." Accordingly, we conclude that the decision to try defendant in Atlantic County was correct and that defendant's arguments to the contrary are without merit. See *State v. Biegenwald, supra,* 106 *N.J.* at 35–36, 524 *A.*2d 130.

## III.

### Jury–Selection Issues

Defendant raises a variety of challenges to the adequacy of the jury-selection process. His challenges fall into three basic categories: that certain jurors should have been excused when their answers to *voir dire* questions revealed bias; that the death-qualification process was flawed in several important respects; and that the Atlantic County jury selection system was unconstitutional. We address those contentions separately.

## A. Three Prospective Jurors Not Excused for Cause

Defendant argues that three prospective jurors should have been excused for cause because they had formed opinions concerning defendant's guilt. Defendant also contends that two of those jurors should have been excused for cause based on their close family relationships with law-enforcement professionals. More particularly, defendant argues that those two potential jurors admitted a proclivity toward finding the testimony of a police officer more credible than that of a non-police officer, and that that proclivity disqualified those jurors from serving on the jury. Although defendant peremptorily challenged all three of the challenged jurors, he argues that the "waste" of peremptories on those jurors, who should have been excluded for cause, in the context of a trial in which all of defendant's peremptories were eventually used constituted reversible error. Because we find that the trial court properly exercised its discretion in refusing to excuse the challenged venirepersons for cause, we need not determine whether the "waste" of peremptories in the situation described by defendant constitutes reversible error.

Prospective jurors in this case filled out a questionnaire to which the trial court and counsel referred during the individualized portion of the jury-selection process. The questionnaire was designed to expose juror bias by requiring potential jurors to report if they had been exposed to pretrial publicity, if they had any knowledge of the parties, or if any other influences might affect their impartiality. The final portion of the questionnaire related to juror views on the death penalty.

### (1) Lenora Wilkins

Prospective juror Wilkins indicated in answer to the questionnaire that she had read newspaper accounts of the criminal investigation of the murder. She also indicated that her father, husband, and brother-in-law were police officers, and that another brother-in-law was a judge.

Questioned by the trial court about the extent of her exposure to pretrial publicity, Wilkins stated that she had read articles in the Asbury Park Press at the time of the murder investigation and an additional article before the jury-selection process began. Noting that Wilkins had indicated in her answers to the questionnaire that the material she had read might prevent her from being a fair and impartial juror, the trial court probed for evidence of bias. Wilkins initially stated that she took what she read in the newspapers for "gospel truth," acknowledging, however, that she should base her conclusions on the evidence. She indicated that when she had·read the papers, she "automatically" assumed that defendant and his co-defendants were guilty, but further inquiry by the court revealed that her mind was open to a fair consideration of the evidence:

Q. What do you mean, it would have to be in the evidence?

A. Well, if I was picked on the jury, I guess what I had heard, it would probably turn which way you want it, I don't know. It is just what I read in the papers, you know, *you're only hearing one side of the story in the newspapers.*

Q. Which side do you think you heard in the newspapers?

A. How do you mean?

Q. You say you only hear one side in the newspapers?

A. When I read the newspapers, I said he was guilty.

Q. You did?

A. Yes.

Q. Now, the question of whether or not a defendant is guilty or not guilty of a charge has to be based upon the evidence to be presented at the trial. No evidence has been presented yet.

A. Yes.

Q. The fact that a defendant is charged with a crime is not evidence of his guilt.

A. Right.

Q. Now, do you feel that the opinion that you formed when you read about this case is going to affect your ability to decide the issues on the evidence that you would hear at the trial?

A. No, no, I would keep an open mind.

Q. So that despite the fact that you formed an opinion at the time, do you feel you could set aside that opinion, disregard it, ignore it, and proceed anew, so to speak, with a open mind?

A. Yes.

Q. Listen to the evidence in the case and decide, based on the evidence, and the evidence alone, whether the State has proven the defendants guilty?

A. Yes, I would think so.

(Emphasis added.)

Wilkins demonstrated some initial uncertainty when questioned about the potential for bias based on her views of the credibility of law-enforcement agents:

Q. Do you feel you would automatically believe the version of the police officer over the other person?

A. I would say yes.

Q. You would?

A. Automatically, yes.

Subsequent questioning established that the juror was not predisposed to believing the police where there was conflicting testimony from a lay witness:

Q. The question is, what did John Jones say? The police officer said John Jones said so-and-so, and another witness says no, I was there, and I heard John Jones say something else, and they are each testifying from their memory. The police officer, according to what he says, and the other person, according to what he says, are testifying from their memory as to what John Jones said.

A. Yes.

Q. Do you feel you would automatically accept the version of the police officer as the truth over the other person?

A. No, I don't think I would in a case like this. *This is a trial.* I would be hearing other things, too, and it would be a combination of things to fit in.

Q. Just as to that one particular fact?

A. No, I don't think so.

Q. What was said, do you think you would automatically believe the version of a police officer?

A. No, I don't think I would in a case like this.

After defense counsel requested a more probing inquiry of the potential juror's attitude toward police credibility, the following exchange took place:

Q. Now, getting back to police officers against other people when it comes to something said, the situation like I talked to you about before * * * do you feel you would tend to automatically believe one or the other in that situation?

A. I don't know if—well if one guy is saying one thing, the police officer, and another guy is saying another thing, you have to hear what went on, more stuff being brought in, to decide.

Q. What you are saying is if one said one thing and another said another, you would have to hear all the evidence and then decide who's telling the truth?

A. Yes, I would, yes.

After the second round of questioning, defense counsel challenged the potential juror's fitness to serve. The trial court concluded, however, that the juror was fit to serve.

### (2) Annmarie Smith

Potential juror Annmarie Smith indicated that she had read newspaper accounts of the Marshall murder and had talked to co-workers about those newspaper accounts. She testified that she had formed a tentative opinion concerning defendant's guilt, but stated that that opinion would not affect her ability to decide the issues in the case based on the evidence. Defense counsel requested additional questions on the extent of publicity to which this potential juror was exposed, and the trial court undertook that questioning. In her responses to a question whether her initial opinion would intrude on her deliberations in the case, potential juror Smith stated:

I would trust not. No, I don't think so. I mean, I really don't. I mean I am accustomed to looking at problems and considering things * * * [c]oming to conclusions from what is there, and I honestly don't think it would, but I don't know. That is the way I feel at the moment.

Q. You honestly don't think it would. You honestly don't think that what you heard at the time or what you read at the time isn't going to affect you?

A. No no, because at the time, I didn't know really anything about it, you know except for the story that I read in the newspaper, and, as I said, I would certainly not make any decision on that, except for in a very casual manner, as you say, in a conversation, that's about all.

When asked yet again whether she could be impartial, she responded thoughtfully:

Q. Some people might say, "I couldn't be fair and impartial," and if they said that, they walk out of here and we excuse them. Thank you very much, and that is what would happen to you, too, if you felt that you couldn't be fair and impartial. So, that is why we want an honest answer.

A. It is a terrible temptation to say no, I couldn't be fair and impartial, and then I could just walk out of here and forget about the whole thing, right?

Q. You could.

A. But I'm supposed to be under oath, and I honestly think I could make a decision on the evidence, yes. I would want to make a decision on the evidence, because it is certainly terribly unfair to judge people in any actual process on publicity or anything like that.

Defense counsel continued to express reservations about the potential juror, but the trial court ruled that no more questions would be permitted:

> All right. While I've considered the argument of counsel. This person has been questioned extensively. I have listened to her answers. She is an intelligent person, obviously. I have also observed her demeanor, and her demeanor is such that she appears to be sincere, frank, honest, in attempting to answer the questions to the best of her ability, and as far as I'm concerned, there is nothing else to ask her. I don't think it is proper to impose on a venireperson by asking them to give guarantees of anything to the court. That is not the way in which persons are to be questioned.

Defense counsel then challenged the juror and the trial court ruled as follows: "[C]onsidering the totality of her testimony, her demeanor, * * * there is no basis to excuse her for cause at this time."

(3) Nora Bader

Potential juror Nora Bader indicated in answers on her questionnaire that she had read about the case in papers or had gotten information about it from the media. In her testimony she confirmed that she had read that the "husband might have been involved," but she stated that she could decide the case impartially. This juror also indicated that she had relatives who worked in law enforcement. She testified, however, that that fact would have no effect on her ability to serve as a juror:

> THE COURT: Do you feel, because of your relationship with police officers, or for any other reason, that you would tend to give more weight to the testimony of a law-enforcement officer, simply because of his or her status as a law-enforcement officer, than to another person?
>
> THE JUROR: I would like to think that I wouldn't. And to the best of my ability, I wouldn't give more credence to one than the other. I have to be honest. I wouldn't know.
>
> THE COURT: You don't know?
>
> THE JUROR: I don't feel that I would.
>
> THE COURT: You don't feel you would what?
>
> * * * * * * * *
>
> THE JUROR: I don't think I would favor one above the other, because of myself.

THE COURT: And you feel you could evaluate the testimony of a law-enforcement officer versus a non[-]law[-]enforcement officer fairly and impartially, without bias or favor of one or the other?

THE JUROR: I think, sir, I could.

THE COURT: All right. Do you think ma'am, that being the wife of a police chief would cause you a problem in your household [were] you, just for example, to be a member of the jury they returned a verdict of not guilty. Would that cause you a problem, do you think?

THE JUROR: No.

Defense counsel questioned whether Bader's answers about potential bias were unequivocal. The trial court engaged in a second round of questions. The portion of the *voir dire* examination relating to the potential for bias includes the following:

THE COURT: Well, suppose you had a situation in which a police officer testified one way, and another witness testified another way.

THE JUROR: That's what you asked me.

THE COURT: And the indication was that it had to be a lie. Somebody had to be lying.

THE JUROR: Um-hum.

THE COURT: And suppose you said to yourself, well, it's pretty hard to tell who's lying. They both appear to be, from looking at them and listening to them telling the truth. But I have to decide which one is lying. Do you think you—the juror:

THE JUROR: I understand what you're saying now.

THE COURT: Do you think that you'd go with the police officer?

THE JUROR: No. No. Not necessarily.

THE COURT: You think you could either way.

[THE JUROR]: I told you I would be objective about it. I certainly would.

Defense counsel challenged the potential juror for cause but the trial court found her qualified to serve.

We have set forth principles to guide trial courts in selection of death-penalty juries in *State v. Williams, supra,* 93 *N.J.* 39, 459 *A.*2d 641:

Under the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution, criminal defendants are guaranteed "the right to * * * trial by an impartial jury." * * *

The securing and preservation of an impartial jury goes to the very essence of a fair trial. See *Sheppard v. Maxwell,* 384 *U.S.* 333, 362–63, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.*2d 600, 620 (1966); *Estes v. Texas,* 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.*2d 543, reh. den., 382 *U.S.* 875, 86 *S.Ct.* 18, 15 *L.Ed.*2d 118 (1965). It has long been recognized under the federal constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to

the evidence and arguments presented in court in the course of the criminal trial itself. *Patterson v. Colorado*, 205 *U.S.* 454, 462, 27 *S.Ct.* 556, 558, 51 *L.Ed.* 879, 881 (1907) (Holmes, J.).

The courts in this state have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance. We have stressed repeatedly that the triers of fact must be "as nearly impartial 'as the lot of humanity will admit.' " *State v. Singletary*, 80 *N.J.* 55, 62 [402 *A.2d* 203] (1979) (quoting *State v. Jackson*, 43 *N.J.* 148, 158 [203 *A.2d* 1] (1964), *cert.* den. *sub nom. Ravenell v. New Jersey*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965)); *id.*, 80 *N.J.* at 70 [402 *A.2d* 203] (Clifford, J., dissenting); *id.* at 74 [402 *A.2d* 203] (Handler, J., dissenting); *see In re Kozlov*, 79 *N.J.* 232, 239–40 [398 *A.2d* 882] (1979); *State v. Wagner*, 180 *N.J.Super.* 564, 567 [435 *A.2d* 1190] (App.Div.1981); *see also N.J.S.A.* 2A:78-1 to -9 (implementing legislation intended to ensure the impanelling of impartial jurors). This requirement of fairness—and particularly jury impartiality,—is heightened in cases in which the defendant faces death. The death penalty is a categorical imperative for trial fairness. *See, e.g., Beck v. Alabama*, 447 *U.S.* 625, 637–38, 100 *S.Ct.* 2382, 2389–90, 65 *L.Ed.*2d 392, 403 (1980); *State v. Jackson, supra*, 43 *N.J.* at 156 [203 *A.2d* 1]; *State v. Mount*, 30 *N.J.* 195, 213 [152 *A.2d* 343] (1959); *State v. Wynn*, 21 *N.J.* 264, 271 [121 *A.2d* 534] (1956).

So important is the quality of impartiality in the trial of criminal prosecutions that jurors who have formed an opinion as to the guilt or innocence of the defendant must be excused. *See State v. Van Duyne*, 43 *N.J.* 369, 386 [204 *A.2d* 841] (1964), *cert.* den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965); *In re Kozlov, supra*.

Only if it is demonstrated that "the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court" will extraneous exposure to the facts not be grounds for automatic disqualification. *State v. Sugar*, 84 *N.J.* 1, 23 [417 *A.2d* 474] (1980) (quoting *Dobbert v. Florida*, 432 *U.S.* 282 [97 *S.Ct.* 2290] 53 *L.Ed.*2d 344 (1977)); *State v. Conyers*, 58 *N.J.* 123, 143–44 [275 *A.2d* 721] (1971); see also *State v. Trantino*, 45 *N.J.* 37 [211 *A.2d* 193] (1965).

[*Id.*, 93 *N.J.* at 60–61, 459 *A.2d* 641.]

In a subsequent stage of the *Williams* case, we emphasized the broad discretion afforded trial courts in carrying out jury-selection processes:

*Voir dire* procedures and standards are traditionally within the broad discretionary powers vested in the trial court and "its exercise of discretion will ordinarily not be disturbed on appeal."

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

On reviewing capital jury *voir dire* proceedings in *State v. Biegenwald, supra*, 106 *N.J.* at 35–37 [524 *A.2d* 130], and *State v. Ramseur, supra*, 106 *N.J.* [123] at 256–57 [524 *A.2d* 188 (1987) ], we found in each case the trial court's approach to the problems of death qualification and pre-trial publicity entitled to

deference. We further noted in *Ramseur* that "[a] sensitive weighing and appraisal of a juror's entire response must be made by the trial court in its duty to resolve the question of whether the juror has shown bias or prejudgment * * *." 106 *N.J.* at 257 [524 *A.*2d 188]. It has also been observed that this court is "perhaps too far removed" from the realities of the *voir dire* to appreciate the nuances concealed by a "bloodless record"; therefore, deference to the trial court is usually prudent.

[*State v. Williams*, 113 *N.J.* 393, 410–11, 550 *A.*2d 1172 (1988) (citations omitted).]

According due deference to the trial court's perception of the demeanor of the potential jurors and their testimony, we find there was no error in the trial court's decision to qualify potential jurors Wilkins, Smith, and Bader.

### B. Qualification of Juror Neil Marzano

█ Defendant also challenges the trial court's decision qualifying juror Neil Marzano to participate as a juror. Defendant contends that Marzano was incapable of fairly evaluating the testimony of the witnesses at trial because a relative worked in law enforcement.

Marzano's *voir-dire* examination indicates that he had never heard or read anything about the case before appearing for the jury-selection process, nor had he known that the case was pending. Trial-court questions based on his questionnaire answers disclosed that his sister was employed as a sheriff's officer in Mays Landing, that her duties included transportation of prisoners, and that she had held the job for four or five years. Because Marzano had not answered the questionnaire inquiry on whether he would give the testimony of a law-enforcement officer special weight, the trial court explained at length the possibility of a conflict in the evidence to be presented at trial between versions offered by law-enforcement agents and civilian witnesses. The court then asked whether, because Marzano had a sister in law enforcement, or for any other reason, Marzano "would have to believe the testimony of the law-enforcement officer, rather than the other person?", Marzano answered, "No." The following exchange ensued:

THE COURT: Do you feel that way?
THE JUROR: No.
THE COURT: Do you feel that you could evaluate the testimony of witnesses in a situation of that type in the light of common sense and all the other evidence on the case as to what the truth was?
THE JUROR: *No.*
 (Emphasis added.)

The court then moved on to another area of questioning and then ended the initial round of *voir dire* questions. The juror was then asked to leave the courtroom while the attorneys offered areas for further questions.

Defense counsel made no reference to Marzano's negative answer concerning the ability to weigh the evidence and find the truth. Instead, defense counsel focused his request for additional questions on the possibility that Marzano had heard from his sister that defendant was at that time in custody:

Perhaps your Honor could ask them whether or not he has had any discussions with either his sister or anyone in the sheriff's office in any way, shape or form, about either of the defendants, without getting into the fact that they may either be in custody there now, or at one time have been there at some point.

 In other words, I—that's my only concern. If he, for one reason or another, knows of their status right now, then that, in turn, may have an impact or influence him in some fashion. So if your Honor could figure out a way to frame a question to ensure the fact that he comes into this case with the same lack of knowledge as everyone else. I'd like your Honor to do that, if you could.

When Marzano reentered the courtroom, the court asked several questions designed to reveal whether he had had discussions with any law-enforcement personnel regarding the case. When he answered that he had not, and that he would obey an instruction not to have any such conversations, the court, without objection from defense counsel, found him qualified to continue to serve as a prospective juror.

Defendant argues that Marzano's negative answer to the question concerning his ability fairly to evaluate the evidence and to determine the truth should have disqualified him as a juror. We find that that isolated negative answer, especially in the context of both the trial court's and counsel's total lack of response, is inexplicable. Even assuming that the transcript

accurately reflects Marzano's answer, however, that isolated response, when considered in the context of the entire *voir dire,* does not demonstrate that the juror was unfit to serve.

C. Death Qualification

Defendant argues that the death qualification of the jury was inadequate in several important respects. Defendant's first contention is that the trial court's preliminary instructions to the jury improperly put potential jurors "in the position of determining whether [they] met the legal requirements to serve on a jury." *State v. Williams, supra,* 113 *N.J.* at 413, 550 *A.*2d 1172 (footnote omitted).

1. *Preliminary Instructions*

The jury-selection procedure followed by the trial court in this case began when the trial court gave a preliminary, orienting instruction to the jury pool. In that instruction the court made the following observation:

> I am sure that members of this jury panel have widely different opinions [with respect to the death penalty]. Some of you may believe that the death penalty should never be imposed no matter what evidence is presented in that regard. Conversely, others may believe that capital punishment should always be imposed upon a defendant who is found guilty of murder. Others may believe that the death penalty is proper in certain instances and not in others. Some of you may not have formed any opinion on the subject.
>
> Having any of these views does not necessarily disqualify you from serving on the jury in this case. You are only disqualified if your view is so broad and firmly held that you will not follow my instructions at the close of the trial with respect to whether a defendant is to be found guilty or not guilty, or if found guilty, whether the death penalty is to be imposed.
>
> In short, your views about the death penalty disqualify you only if they would prevent or substantially impair your ability to perform your duties as a juror and follow my instructions.

In *Williams, supra,* 113 *N.J.* at 412, 550 *A.*2d 1172, we expressed "serious reservations concerning the propriety of an instruction * * * that * * * effectively tells a juror what answers during the death qualification process lead to automatic excusal and what responses avoid excusal." In that case the court instructed the jury as follows:

In short, your views about a death penalty disqualify you only if they cause you to vote automatically one way or the other without regard to the evidence or my instructions as to whether defendant is guilty or as to whether a death penalty is to be imposed.

[*Ibid.*]

In this case, the offending instruction contained a somewhat-less-explicit reference to the conditions for disqualification than the instruction in *Williams*. Although we continue to have strong reservations about any instruction that suggests to prospective jurors the conditions for disqualification in advance of their *voir dire* examination, we do not consider it to be reversible error to instruct the venire, as the trial court did here, that jurors who cannot follow the court's instructions will not be qualified to serve.

### 2. *Limited Individualized Questioning on Death Qualification*

Defendant's principal argument concerning the death qualification of jurors pertains to the adequacy generally of the court's questions to prospective jurors about their views on the death penalty. Defendant challenges the trial court's failure to ask of each potential juror thorough and probing questions about that juror's attitude concerning the death penalty.

Before the jury selection began, defense counsel stated that he preferred to omit all death-qualification questions from the jury-selection process because he believed that such questions led to a conviction-prone jury. He then argued, relying on the Eighth Circuit's opinion in *Grigsby v. Mabry*, 758 F.2d 226 (1985), *rev'd sub nom. Lockhart v. McCree*, 476 *U.S.* 162, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986), that to exclude prospective jurors opposed to the death penalty from the guilt phase violated defendant's right to an impartial jury. Consequently, defense counsel proposed that those jurors ordinarily excludable for cause through death qualification be qualified for the guilt phase of trial. If a penalty phase were necessary, counsel proposed that those jurors be replaced by death-qualified ju-

rors, also selected before the guilt phase, who would sit as alternates during the guilt phase. Defense counsel asserted that the method proposed was the "fairest way to try a capital case."

The trial court denied the motion:

I will deny the motion, because I believe that it is appropriate to question the jurors regarding their views on the subject of whether their views would compel them to vote for that penalty, whether their views would compel them to vote against that penalty, whether their views would substantially affect or impair their ability to either decide the question of guilty or not guilty or the question of what punishment would be imposed in the event that they do return a verdict of guilty. So therefore I will deny the motion.

After one full day of jury selection, defense counsel reiterated his view that death qualification of jurors violated his client's right to an impartial jury. To reduce the asserted prejudicial impact, counsel moved to limit death qualification of potential jurors. Specifically, defendant's counsel, with the concurrence of counsel for Thompson, sought to have the trial court rely on prospective jurors' answers to questions regarding death qualification as they appeared in the questionnaire that had been distributed before the individual questioning began. Defense counsel argued:

On the questionnaire, appearing on the last page are three questions pertaining to a prospective juror's views on capital punishment. In the past at least, even if the prospective juror answered in a fashion which would be consistent with being qualified to serve on this jury, your Honor has still explored to some extent their views in this area. My request is that at least with regard to further panelists, if the answers to the questions are such that they would be qualified by virtue of their answers, I ask that your Honor not inquire any further into their views on capital punishment inasmuch as I feel it only serves to highlight further the area that I had objected to in the very beginning that deals with death qualification.

There being no objection to this request from the State, the Court permitted the defense to make the strategic determination to limit death qualification of potential jurors to those questions printed in the questionnaire. Accordingly, during the balance of the *voir dire*, the trial court conducted additional questioning on death qualification only in the event that a potential juror indicated in the questionnaire that his or her

views on the death penalty might impair that juror's ability to follow the court's instructions.

It is by now well settled that no person may serve on a jury in a capital case whose views concerning the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Williams, supra,* 113 *N.J.* at 415, 550 *A.*2d 1172 (quoting *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980)). To discover juror attitudes concerning the death penalty we have taken a strong position in favor of individualized open-ended questioning:

> Given the important, delicate and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry by the trial court into each individual's attitude concerning the death penalty. An important ingredient in this inquiry is the use of open-ended questions, which in our opinion are most likely to provide counsel and the court with insight into juror's opinions and biases.
>
> [*Id.* 113 N.J. at 413, 550 *A.*2d 1172.]

Our views on the proper administration of the *voir dire* process, however, like our views on the proper administration of other death-penalty concerns, have, from the first, been seasoned by a degree of deference to defense counsel's strategic decisions. Thus, in *State v. Hunt,* 115 *N.J.* 330, 558 *A.*2d 1259 (1989), decided one year after *Williams,* we tempered our view on the indispensability of open-ended questions during death-qualification *voir dire:*

> We continue to believe that trial courts should not rely on leading questions, but should formulate questions that give potential jurors the opportunity to air their views on the death penalty. *Here, however, defendant's counsel declined the opportunity to request further questioning and did not object to the jurors' qualifications.* Furthermore, the relatively limited *voir dire* of [certain] jurors * * * does not indicate the tenor of the trial court's questioning of other jurors. Although the court often began the death-qualification inquiry by simply asking whether the juror would automatically vote for or against the death penalty if a defendant was convicted of murder, it generally pursued an affirmative response with more detailed questioning. * * * Although the *voir dire* may not have been perfect in all respects, we are satisfied that it was sufficient to enable counsel and the court to evaluate the jurors' fitness to serve.
>
> [*Id.* at 354, 558 *A.*2d 1259 (emphasis added).]

Moreover, except in the most extreme cases, strategic decisions made by defense counsel will not present grounds for reversal on appeal:

"The defendant cannot * * * request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." *State v. Pontery,* 19 *N.J.* 457, 471 [117 *A.*2d 473] (1955). To justify reversal on the grounds of an invited error, a defendant must show that the error was so egregious as to "cut mortally into his substantive rights * * *."

[*State v. Ramseur,* 106 *N.J.* 123, 281–82, 524 *A.*2d 188 (1987) (citing *State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.*2d 771 (App.Div.), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974)).]

■ On the facts presented it is clear that counsel twice requested a limitation on the death qualification of prospective jurors. On the first occasion, before the start of jury selection, defense counsel sought to permit jurors opposed to the death penalty to participate in the guilt phase. When that motion was denied, defense counsel requested that death qualification be limited to those questions on the jury questionnaire, except with respect to those jurors whose questionnaire answers were unsatisfactory. When the State did not object, the trial court granted the motion. It is clear that defense counsel's request was a well-considered strategic attempt to limit juror exposure to questions concerning capital punishment.

■ We continue to believe that by far the better course is to submit all potential jurors to "thorough and searching inquiry by the trial court into each individual's attitude concerning the death penalty," *Williams, supra,* 113 *N.J.* at 413, 550 *A.*2d 1172. The advantage of a complete and thorough investigation of each individual juror's attitude concerning the death penalty is that it guarantees a complete record on "which to apply the *Adams/Witt* standard in granting or denying excusals for cause." *Ibid.* However, we do not conclude that a trial court's decision to limit individualized death-qualification inquiry necessarily constitutes error, where that decision is the result of a strategic and informed request by defense counsel.

On the record before us, we hold that the trial court's decision to grant defense counsel's request to limit death qualification with respect to those jurors whose answers to the questions printed on the jury questionnaire were acceptable, if it was error at all, was not error sufficiently "egregious as to 'cut mortally into [defendant's] substantive rights * * *.' " *Ramseur, supra,* 106 *N.J.* at 282, 524 *A.*2d 188 (quoting *State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.*2d 771 (App.Div.), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974)).

We also note that the lack of specific death-qualification interrogation during the *voir dire* stands in sharp contrast to the trial court's patient and methodical conduct of the overall jury-selection process. With but few exceptions, the trial court consistently and repeatedly acquiesced in defense counsel's requests to reinterrogate prospective jurors about specific subjects. The trial court's conduct of the *voir dire* was thorough and meticulous, and was painstakingly responsive to counsel's concerns that the scope of inquiry about specific subjects required amplification. Particularly striking illustrations of the trial court's willingness to reopen and supplement the *voir dire* process to address defense counsel's concerns can be found in the interrogation of prospective jurors Wilkins, Gibbons, Weiner, Hudson, and Fox. The trial court's general responsiveness to counsel's concerns during the *voir dire* suggests that the scope of questioning relating to death qualification would have been far more extensive had defense counsel evinced a desire to pursue that subject more thoroughly.

### 3. *Excusal of Jurors Opposed to Death Penalty*

Defendant's final allegation of error concerning death-qualification is based on the trial court's excusing for cause three potential jurors who indicated that their views concerning the death penalty would prevent or substantially impair the performance of their duties as jurors. Specifically, defendant argues that the three jurors so excused did not in fact hold

views that were incompatible with service on a death-penalty jury.

 Potential juror Robert Corrigan expressed the view that he was "an advocate against the death penalty. I always have been." When the court sought further to explore his view, the following exchange occurred:

Q. When you say you always have been, for what length of time have you held that view?

A. I was a college professor in criminology and familiar with the literature, and I taught my students, in fact for many years when I was a college professor, against the death penalty for many reasons, morally, ethically.

Q. Did you feel, sir, that if you were a member of the jury that you would vote against the death penalty, if that were the issue, no matter what evidence was presented in that regard?

A. I think so.

Q. And when you say you think so, what do you mean by that, sir?

A. I think that I would have to vote against the death penalty.

Q. Can you conceive of any circumstances under which you would vote for it?

A. I can't conceive of any.

Q. If you could conjure up in your mind the most horrible type of crime and murder, would you think that your view would still be the same and you would not vote for it?

A. I think so. I think I would have to not vote for it.

On the basis of that preliminary exchange, the State moved to have Corrigan excused because his views on the death penalty would substantially interfere with his performance as a juror. Defense counsel sought further questioning to establish whether, in spite of his views, the juror could follow the court's instructions if he was selected as a juror. The trial court agreed to ask further questions. After describing in detail the process involved in a penalty phase; the trial court again asked Corrigan whether he could follow instructions of the court, knowing what the results of his findings might be. Corrigan responded that he could not follow such instructions. The following exchange ensued:

Q. When you say you don't think you could, does that mean there is some uncertainty in your mind?

A. Yes, I have never been through this process before. You know, one's convictions are one thing. When they are tested is reality, and they have never really been tested. But, right now I have strong convictions against the death penalty, and I don't think I could put myself in the position to impose the death penalty. In reality that is what I would be doing.

On the basis of his answers, the trial court found "as a matter of fact, having heard him and listened to him, that his views clearly would substantially impair his ability to follow the instructions of the Court." Therefore, the juror was excused. After reviewing the transcript of this *voir dire* testimony, we conclude that there was no error in the trial court's exercise of its discretion in excusing potential juror Corrigan for cause.

■ Potential juror Michelle Denise Hart also expressed significant doubts about her ability to follow the court's instructions in the penalty phase. Moreover, Hart also had some difficulty in understanding the process and procedures involved in death-penalty cases. During the portion of her *voir dire* testimony that dealt with death-qualification, she seemed at first to confuse the question of the penalty phase with the determination of guilt. When, however, she was asked whether she could make a determination of guilt based on the instructions of the court, she answered, "Yes, to a certain extent":

Q. What do you mean to a certain extent?

A. If it comes down to the chair or something like that, you know.

Q. The what?

A. The electric chair or anything.

Q. I can't hear you.

A. The electric chair, you know, murdering them. I can't make a decision on that.

Q. I am not sure what you mean by that.

A. You know, if a person is guilty, then they send them to the chair or whatever. I can't make a decision on that, because I don't feel like it is my place to murder somebody else.

Q. Are you telling me then that you do not believe in the death penalty?

A. Right. I mean not for me. I'm not—

Q. All right, and you feel that if you had to make a decision, you would never vote for the death penalty?

A. I don't think so, because it would be bothering me for the rest of my life.

Q. Is this a belief that you have had for quite a while?

A. I am quite a bit into religion, and it seems like to me that if you gave somebody the death chair, the death penalty, it is like you done it to that person, so why not do it to this person, but you never get nowhere. You do the same to another person, you know. It is just like revenge, it sounds like to me. You done it to me, so I'm going to do it to you. I am more like a forgiving person, to a certain extent, and I do believe in justice, but as far as death—

Q. Are you saying then that you personally would never vote for the death penalty for somebody?

A. Right.

Based on the foregoing testimony, the trial court determined that this juror "doesn't have the ability * * * to understand these matters, and also, it is quite apparent to me that her view on the death penalty is such that it would prevent her from following the instructions of the court * * *." Therefore, the trial court excused Hart for cause. We find no error in the trial court's determination.

■ Prospective juror John Scanny indicated that he would not vote for the death penalty under any circumstances. The court questioned him:

Q. All right. If you were a member of the jury and the issue were whether the death penalty had to be imposed in the case of murder, would you always vote against the death penalty?

A. I believe I would because, if I can go further on, Your Honor * * *

Q. Yes.

A. I'd be too conscientious about it. I wouldn't be able to, you know—if I had to say the person had to die for me voting on it, I don't think I could make a judgment.

Q. Okay, you think there are any kinds of cases in which defendants do deserve the death penalty?

A. As serious cases, yes; but, like I say, I wouldn't want to be the one to say who's to die.

Q. Are you saying, sir, that you would—regardless of what penalty a person might deserve, if you were on the jury, you would—and you had to vote, you were forced to be there, you would vote against it?

A. Yeah.

Q. No matter what the circumstances?

A. That's right.

Based on the foregoing testimony, the State requested that potential juror Scanny be excused for cause. Defense counsel attempted to rehabilitate the juror. Emphasizing the use of the word "conscientious" by the juror, defense counsel requested

that the trial court develop with the juror hypothetical questions related to "whether or not he feels he could follow the Court's instructions * * *" and "into what type of cases" deserve the death penalty. The court, however, relied on Scanny's answer that he could not, regardless of the circumstances, vote for the death penalty, and found, "after listening to this witness and observing him," that "his views would obviously impair his ability to vote for the death penalty." Therefore, the court excused Scanny from serving on the jury. Although further interrogation might have been enlightening, we find no error in the court's excusal of this juror. It is the trial court that is in the best position to gauge a potential juror's demeanor and determine whether that juror is fit to serve. We defer to the court's exercise of judgment in respect of juror Scanny.

 D. Constitutionality of Atlantic County Jury Selection System

Defendant raises as plain error the contention that the Atlantic County procedures for selection of the petit jury venire deprived him of the representative jury pool to which he was constitutionally entitled. We considered and rejected that argument in *State v. Long*, 119 *N.J.* 439, 467–69, 575 *A.*2d 435 (1990), and adhere to our ruling in that case.

## IV

### Guilt–Phase Issues

 A. Photographs

■ Defendant challenges the admission into evidence, over defendant's objection at trial, of six crime-scene photographs (Exhibits S–6 through S–11) and one autopsy photograph (Exhibit S–21) on the ground that they had no probative value and were inflammatory. The crime-scene photographs depict various views of the victim's body lying on the front seat of defendant's Cadillac, two photographs revealing close-up views of the bullet exit and entry wounds. The victim's blood was

visible in several photographs. The autopsy photograph, cropped to remove from the image the victim's breast and face, shows the re-entry bullet wound in the victim's arm. The trial court, acknowledging the prejudicial impact of photographs depicting a deceased victim of crime, determined that the crime-scene photographs were not particularly inflammatory and tended to corroborate the testimony of police officers concerning the position of the victim's body at the crime scene. Although excluding two of the five autopsy photographs offered because they were inflammatory and not probative, the trial court admitted S–21, which was described by the medical examiner as portraying the re-entry wound in the victim's arm. Defendant challenges these rulings, arguing that because the victim's death from gunshot wounds was uncontested, the admission of the crime-scene photographs was not probative of any issue in dispute, and that the prejudicial effect of all of the photographs mandated their exclusion from evidence.

The general rule is that

"the admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of palpable abuse." *State v. Thompson, supra*, 59 *N.J.* [396] at 420 [283 *A.*2d 513 (1971)]; *see also Evid.R.* 4 ("the judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will * * * (b) create a substantial danger of undue prejudice or of confusing the issues or misleading the jury").

[*State v. Rose*, 112 *N.J.* 454, 535–36, 548 *A.*2d 1058 (1988).]

Our review of the disputed photographs persuades us that they are not unduly inflammatory. We also conclude that although their probative value is limited, the trial court acted well within the ambit of permissible discretion in concluding that they were relevant for the purpose of corroborating the testimony of State's witnesses who testified in detail about the physical evidence at the crime scene. We perceive no significant likelihood that the admission of these photographs created a danger of undue prejudice to the jury. Accordingly, we hold that their admission into evidence by the trial court was not an abuse of discretion. See *Evidence Rule* 4.

■ Defendant also challenges the admission into evidence of a photograph depicting a metal rod inserted by State Police Detective Charles Liber into the bullet hole in the front seat of defendant's automobile, and downward through the foam rubber seat to the location in the floor board under the seat where the spent bullet was found. The purpose of the metal probe shown in the photograph was to demonstrate the "angle" of the bullet from the point at which it was discharged. Detective Liber, who was not a ballistics expert, acknowledged that the bullet's course could have been deflected as it passed through the victim's body. Both at trial and before us, defendant contends that the photograph was inadmissible because Detective Liber was not an expert and therefore lacked the qualifications to testify concerning the bullet's trajectory. The trial court ruled that the photograph was admissible because it portrayed visually the physical facts described by Detective Liber's testimony. In our view, defendant's challenge to this exhibit related to its weight and not to its relevance. We find no error in the trial court's ruling. .

B. Admissibility of Hearsay Statements by Robert Cumber

At the outset of co-defendant McKinnon's direct testimony, defendant objected on hearsay grounds to any references by McKinnon to out-of-court statements made to him by co-defendant Robert Cumber. The State argued that such testimony by McKinnon was admissible under *Evidence Rule* 63(9)(b), the so-called co-conspirator exception. *See generally State v. Phelps*, 96 *N.J.* 500, 508–13, 476 *A.*2d 1199 (1984) (setting forth standards for determining admissibility of co-conspirator's hearsay statement). After the State represented that it would establish the existence of the conspiracy in the course of trial, the trial court overruled defendant's objection, observing that the State was not required to offer all of its evidence of the conspiracy in advance of the admission of evidence of Cumber's statements.

At the conclusion of the State's case, defendant moved to dismiss the conspiracy count of the indictment, contending that the State had failed to prove either Cumber's participation in the conspiracy or that the conspiracy's duration coincided with the period alleged in the indictment. Responding to the trial court's request to clarify the relief sought by defendant, defense counsel stated that "[i]f your Honor is not going to grant the remedy of dismissal of the indictment, then we're probably entitled to have stricken from the record [testimony concerning Cumber's hearsay statements]."

The trial court denied the motion to dismiss the conspiracy count of the indictment. The court did not rule on whether Cumber's hearsay statements should be stricken from the record, observing, however, that the court's recollection of the evidence was that if the statements had been erroneously admitted, the error would have been harmless because the statements were innocuous.

> Well, possibly that would be another application, but it's in the record, and whatever's in the record is in the record. My recollection of it, and this is subject to revision, and I don't intend to make this a definitive statement, is that Cumber didn't testify in any way to anything incriminating as to any conversation with Mr. Marshall. As I say, I'm not really dealing with it, but since you've raised it, my reaction to it, I would have to study it more carefully. I suppose I'd have to study a transcript of it, if there was any evidence of out-of-court statements made by Cumber with which we're concerned, as far as the truthfulness is concern[ed], that they were innocuous, and that if that type of evidence is in the case erroneously, in any sense, it would be harmless.

Before us defendant concedes that all but five of the statements attributed by McKinnon to Cumber were harmless. Defendant contends that the admission of the following five statements constituted reversible error:

> (1) [McKinnon] I did go back and talk to Bobby Cumber.
>
> [Prosecutor] What did you tell him?
>
> A. I told him that, of course, he had already known that the man didn't send the $5,000.00 as I requested.
>
> He had evidently already had another phone conversation with Marshall who advised him that if I would come to Atlantic City, Harrah's Marina at a specific

time and date written down on a piece of paper, that he would have the remainder of the $2,500.00 there for me [on] my arrival.

\* \* \* \* \* \* \* \*

(2) Q. Now, when you got back to Shreveport after the 20th or 21st, whatever day you arrived, did Cumber contact you thereafter?

A. Always. I received so many phone calls from him. And only dealings I—he and I had were with Marshall. Yes. He told me that I had—I believe he said $15,000.00 of his friend's money and I had done nothing for him.

\* \* \* \* \* \* \* \*

(3) Q. Mr. McKinnon \* \* \* you told the jury about returning to Shreveport, that within a few days the police came down from New Jersey, from the Prosecutor's Office and the New Jersey State Police. Would you tell the jury about what, if anything, you did regarding what had happened back in the Oyster Creek Picnic Area for the next few days during that period of time?

A. I did a number of things. One, I contacted—or Robert Cumber contacted me and advised me, first of all, that the Ocean County Prosecutor's Office was in the area questioning him about Maria Marshall's murder. He hadn't been arrested yet.

\* \* \* \* \* \* \* \*

Of course, he was frightened. I talked to him one or two times along the same lines.

\* \* \* \* \* \* \* \*

(4) A. Cumber had told me at the time that he advised me that the authorities were in town talking with him about the murder of Maria Marshall that the excuse or the alibi that he had for having these phone call conversations with Marshall, that it was in reference to an investment policy, insurance investment policy \* \* \*.

A. He had sent some information even through the mail to that fact. The purpose of him receiving the money orders down there was for a bet on the NBA game or something.

\* \* \* \* \* \* \* \*

(5) A. Cumber told me, Robert Cumber told me that when the authorities came to him in Shreveport, asked him if he knew Robert Marshall and I believe James Davis or Jimmy Davis, that he told them no, and that the only correspondence he had had with Robert Marshall was the bet with the NBA game, or whatever they call it, a basketball game, and some correspondence as far as some financial insurance investment business.

[Co-defendant Thompson's Counsel] Now, when would this NBA game be, in September?

A. I really don't know.

Q. Do you know if the NBA is playing basketball about the 7th or 8th of September?

A. That wasn't my story.

Q. I suggest to you it is your story. I suggest to you that Cumber never said anything to you about the basketball game, the NBA bet, because he didn't have any money to cover.

[The State]: Objection. That is not a question.

Q. It is a suggestion, and I am putting it to you to deny or admit the truth of it.

A. Well, yes, he did say that to me.

Q. So, you deny that it was something that you made up about what Cumber said.

A. I deny that, that is correct.

Based on our review of each of the allegedly-prejudicial hearsay statements attributed to Cumber, we are satisfied that even if their admission was erroneous, the error was harmless beyond a reasonable doubt. *R.* 2:10–2. Hence, we do not reach the question whether the State's evidence concerning the role of co-defendant Cumber "was substantial enough to engender a strong belief in the existence of the conspiracy and of defendant's participation." *Phelps, supra,* 96 *N.J.* at 511, 476 *A.*2d 1199.

 1. The essence of the first hearsay statement is that Cumber allegedly told McKinnon that Marshall, in a telephone conversation with Cumber, had stated that he would pay McKinnon an additional $2500 when he arrived at Harrah's Hotel in Atlantic City. We find no prejudice to defendant from the admission of that statement because its content was repeated in McKinnon's direct testimony, which included a statement that Marshall paid him $2500 in cash at their initial meeting at Harrah's.

2. Similarly, Cumber's alleged statement to McKinnon, made after McKinnon's return from his July 1984 trip to Atlantic City, that he had $15,000 of Marshall's money and "had done nothing for him" was, if anything, less damaging than McKinnon's direct testimony that when he returned to Louisiana after his July trip to Atlantic City, he had received $20,000 to $22,000 from Marshall and had performed no services.

■ 3. Cumber's third statement to McKinnon—that representatives of the Ocean County Prosecutor's Office were in the area questioning him about the murder, and that he was frightened—cannot be regarded as prejudicial to defendant. There was trial testimony indicating that investigators from the Ocean County Prosecutor's Office had traveled to Louisiana after the murder, and had interviewed Cumber and others. The fact that Cumber was "frightened" by the interrogation did not necessarily suggest that his involvement went beyond his acknowledged function as the intermediary between Marshall and McKinnon.

■ 4. Cumber's next hearsay statement to McKinnon, elicited during cross-examination of McKinnon by Thompson's counsel, without objection by defendant, was that he had told the Ocean County investigators that his telephone conversations with Marshall concerned an insurance or investment policy, and that the money orders from Marshall related to wagers on basketball games. Because this interrogation was intended to impeach McKinnon's credibility, without objection from defendant's counsel, we assume that any prejudice anticipated from McKinnon's response was considered to be insignificant. We also note that in the course of defendant's testimony he acknowledged that he maintained an insurance file for Cumber, and also acknowledged that he misrepresented to Sarann Kraushaar that the money sent to Louisiana was related to basketball wagers. Hence, we discern no prejudice from the admission of this statement.

5. The final hearsay statement was essentially the same as the prior statement, reflecting Cumber's alleged comments to police that his only contact with defendant concerned insurance policies or basketball wagers. It is plain from the context in which this answer was elicited from McKinnon that the objective of Thompson's counsel was to discredit McKinnon's direct testimony. We find that defendant was not prejudiced by its admission.

C. Cross–Examination of McKinnon

In the course of his cross-examination of McKinnon, defendant's counsel attempted to question McKinnon about an insurance settlement he received covering damage to his Cadillac automobile, in an effort to demonstrate that McKinnon had defrauded the insurance company by misrepresenting that the damage had been caused by his brother. Defendant argued that the questioning was proper under *Evidence Rule* 55 to demonstrate a common plan or scheme and to impeach McKinnon's credibility. The trial court sustained the State's objection to the proposed cross-examination, ruling that McKinnon's character could not be proved by prior conduct that was not the subject of a criminal conviction, *Evid.R.* 47, and that there was no conceivable basis on which the alleged fraud could be linked to Mrs. Marshall's homicide within the category of common plan or scheme. The trial court also concluded that the proposed cross-examination was excludable under *Evidence Rule* 4 because of its capacity to mislead the jury. In our view, the trial court's ruling that excluded the proposed cross-examination was indisputably correct and in any event well within the trial court's ambit of discretion. *See Evid.R.* 4.

D. Expert's Examination of Tire

Defendant contends that the manner in which the State's forensic expert conducted his examination of the right rear tire of defendant's automobile damaged the tire to such an extent that defendant's expert could not test the tire to determine if there were leaks other than that caused by the large slit in the sidewall. Hence, defendant argues that his constitutional right to a fair trial, and particularly his so-called "constitutionally guaranteed access to evidence," *United States v. Valenzuela–Bernal,* 458 *U.S.* 858, 867, 102 *S.Ct.* 3440, 3446, 73 *L.Ed.*2d 1193, 1203 (1982), was frustrated by the State's excision of a portion of the tire in order to photograph the slit as it appeared on the tire's inside surface. Defendant contends that his conviction must be reversed and that on retrial the jury must be

instructed that it could infer, from the State's failure to preserve the tire intact, that defendant's inspection of the tire would have yielded exculpatory evidence.

George Hickman, a forensic chemist for the State Police, testified that the right rear tire was flat when it arrived at his laboratory in West Trenton on September 7, 1984. He initially examined the tire with a hand lens, using a high intensity light, to ascertain whether there were any defects visible other than the slit in the sidewall. Finding none, he attempted to inflate the tire, first setting the pressure gauge at thirty pounds per square inch and then at fifty-five pounds per square inch. Hickman testified that he could not inflate the tire at all because the air escaped through the slit.

According to Hickman, there was no damage in the tire other than the slit from which air could have escaped. He verified that the tire's valve was intact by fastening it on an undamaged tire, inflating it while mounted on a rim, and checking for leaks. Hickman also determined that there was no indication on either the tire or the rim that the car had been driven while the tire was in a semi-deflated condition.

Hickman stated that the slit in the sidewall was one and three-eighths inches long. He testified on cross-examination that on or about September 19, 1984, he cut out a portion of the tire surrounding the slit, in order to take close-up photographs of the slit from both the outside and inside of the tire. Based on his examination, Hickman concluded that the slit in the tire was made by a stiletto-type knife with a centerpoint and a double-edge-style blade. In response to questions by Thompson's counsel, Hickman stated that the slit could not have been made by either of two pocket knives in Thompson's possession when he was arrested.

Defendant apparently made no attempt before trial to examine the tire. On February 14, 1986—the nineteenth day of trial—defendant's counsel informed the trial court that an expert was arriving that day for the purpose of examining the

tire. The prosecutor objected, noting that no expert report had been submitted. Consequently, defense counsel offered to provide a report in the event the expert was called as a witness.

On the next trial day the State offered the tire into evidence. Defendant objected, arguing that the excision of a portion of the tire had prevented his expert from determining whether the tire had other defects. Defense counsel asserted that if the tire had been intact, the slit could have been patched and the tire submerged in water while inflated to check for other leaks. He contended that the State had deliberately or inadvertently interfered with defendant's ability to test the tire, depriving defendant of his constitutional right to a fair trial. The trial court admitted the tire into evidence, without ruling on the alleged constitutional violations.

Before us, defendant acknowledges that trial counsel did not establish through expert testimony that the slit in the sidewall could have been patched in order to permit inflation of the tire for the purpose of ascertaining the existence of other defects. Nevertheless, defendant argues that the State's excision of a portion of the tire so interfered with defendant's access to potentially exculpatory evidence as to require reversal of his conviction. Defendant also seeks a jury instruction on retrial that the damage to the tire warrants an inference that if intact, the tire would have revealed exculpatory evidence.

We address defendant's contentions on the basis of evolving constitutional doctrine concerning the prosecution's duty to disclose or preserve evidence. The basic rule was established in *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), which held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 *S.Ct.* at 1196, 10 *L.Ed.*2d at 218. Absent a specific request for disclosure, the State has a duty to disclose exculpatory evidence tending to raise a reasonable doubt about defendant's guilt. *United*

*States v. Agurs,* 427 *U.S.* 97, 112, 96 *S.Ct.* 2392, 2401, 49 *L.Ed.*2d 342, 355 (1976).

Other cases have suggested that a due-process violation could occur if the State unreasonably interfered with a defendant's preparation for trial. *Cf. United States v. Marion,* 404 *U.S.* 307, 324, 92 *S.Ct.* 455, 465, 30 *L.Ed.*2d 468, 480–81 (1971), and *United States v. Lovasco,* 431 *U.S.* 783, 795–97, 97 *S.Ct.* 2044, 2051–52, 52 *L.Ed.*2d 752, 762–64 (1977) (both acknowledging that due-process violation could occur if government delayed indictment for so long as to prejudice unduly defendant's ability to prepare for trial). The Supreme Court has also recognized that the government, by deporting potential witnesses, could violate a defendant's due-process rights if their testimony would have been material and favorable to the defense. *United States v. Valenzuela–Bernal, supra,* 458 *U.S.* at 873, 102 *S.Ct.* at 3449, 73 *L.Ed.*2d at 1206.

In *California v. Trombetta,* 467 *U.S.* 479, 104 *S.Ct.* 2528, 81 *L.Ed.*2d 413 (1984), the Court addressed an analogous argument advanced by defendants convicted of driving while intoxicated on the basis of breath-analysis equipment readings. Defendants contended that the State's failure to preserve samples of breath tested by the equipment deprived them of the ability to conduct independent tests to impeach the Intoxilyzer readings, thus denying them the right guaranteed by the due process clause of the fourteenth amendment to present a complete defense. Rejecting defendants' contentions, the Court first noted the absence of any evidence of bad faith or of "a conscious effort to suppress exculpatory evidence." *Id.* at 488, 104 *S.Ct.* at 2533, 81 *L.Ed.*2d at 422. The Court also reasoned that a State's obligation to preserve evidence must be limited "to evidence that might be expected to play a significant role in the suspects' defense," *ibid.,* that standard encompassing evidence whose exculpatory value was obvious before its destruction and of such a nature that comparable evidence would not reasonably be available. *Id.* at 489, 104 *S.Ct.* at 2534, 81 *L.Ed.*2d at 422. The Court determined that in view of the

demonstrated accuracy of the California breath-analysis equipment, it was highly unlikely that preserved samples of breath would have been exculpatory, *ibid.*, and that defendants had adequate opportunity to challenge the test results through inspection, expert testimony, and cross-examination. *Id.* at 491, 104 *S.Ct.* at 2535, 81 *L.Ed.*2d at 423.

Most recently, in *Arizona v. Youngblood*, 488 *U.S.* 51, 109 *S.Ct.* 333, 102 *L.Ed.*2d 281 (1988), the Court reinstated defendant's convictions for child molestation, sexual assault, and kidnapping, reversing the judgment of the Arizona Court of Appeals that the State's failure properly to preserve semen samples that could have exonerated defendant constituted a denial of due process. The critical evidence consisted of semen samples on the victim's clothing, and an expert witness testified that earlier testing or refrigeration of the clothing might have permitted a conclusive determination of the assailant's identity. There was no indication that the police had acted in bad faith. The trial court instructed the jury that it might "infer that the true fact is against the State's interest" if it determined that the State had lost or destroyed evidence. *Id.* at 54, 109 *S.Ct.* at 335, 102 *L.Ed.*2d at 287. The Court concluded that absent bad faith, no due-process violation had occurred:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, supra, [467 *U.S.*] at 486, 81 L Ed 2d 413, 104 S Ct 2528 [2532], that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." * * * We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

[*Id.* 488 *U.S.* at 57–58, 109 *S.Ct.* at 337, 102 *L.Ed.*2d at 289.]

■ In our view, no violation of defendant's due-process rights occurred because the State's expert excised a piece of the tire in order to photograph the slit. The record contains no suggestion of bad faith. The State's expert testified to his belief that the tire constituted inculpatory, not exculpatory, evidence, and that the excision of part of the tire was part of his examination routine. The tire was offered in evidence to prove the existence of the slit, and excision of a portion of the tire did not affect defendant's ability to contest either the existence of the slit or the expert's testimony that it had been caused by a stiletto-type knife with two sharp edges. Unlike *Trombetta,* the State did not rely at trial on evidence no longer available to prove that the tire, except for the slit, was undamaged. The State's proof was its expert's testimony that an examination of the tire with a hand lens under illumination disclosed no defects. The expert's conclusions were subjected to cross-examination, and defendant's expert could have conducted the identical examination even though part of the tire had been excised. The fact that defendant made no effort to have an expert inspect the tire until well into the trial suggests that defense counsel attached little significance to the possibility that the tire had damage other than the slit. Finally, even if the tire had been preserved intact, the slit patched, and the tire tested to reveal another leak, that evidence would not have been wholly exculpatory. It might have supported defendant's explanation for stopping to check the tire, but the jury would then have had to weigh that evidence in the context of substantial additional evidence of guilt. Under these circumstances, we hold that the excision of a portion of the tire did not deprive defendant of his constitutional right to a fair trial.

E. Admissibility of Victim's Hearsay Statements

1. *Testimony by Christopher Scala*

Christopher Scala of the Scala Insurance Agency testified that he had arrived at the Marshall home about noon to pick up

life insurance applications of Maria and Robert Marshall. During his testimony the following colloquy occurred:

[Prosecutor]: Was Mrs. Marshall there at that time?

[Witness]: Yes. I had to witness her signature. She came in and signed the application.

Q. What, if anything, did Mrs. Marshall say in Mr. Marshall's presence about this application?

[Defense Counsel]: Objection. Hearsay, your Honor.

[Prosecutor]: Not if he was there.

THE COURT: Well, it depends on what it is. Counsel approach the bench.

(The following takes place in the presence but out of the hearing of the jury:)

\* \* \* \* \* \* \* \*

[Prosecutor]: She is going to question as to—she asked Marshall what this is for, what is this, and he said it's an application for insurance on a mortgage period.

THE COURT: Well, that wouldn't be hearsay, if that's what it's going to be.

[Prosecutor]: That wouldn't be hearsay because it's not coming in to prove the truth of anything.

[Defense Counsel]: If I had known that, then I wouldn't have objected.

(The following takes place in the presence and hearing of the jury:)

THE COURT: Proceed.

[Prosecutor]: What did Mrs. Marshall say in Mr. Marshall's presence regarding this application?

[Witness]: He had asked her to sign it and she said, "What is it?" He said, "It's for the mortgage."

Defendant contends before us that the statement, "What is it?", attributed to Mrs. Marshall, was inadmissible hearsay, offered to prove the decedent's "lack of knowledge about the insurance policy." The State counters that the victim's statement was offered merely to establish a context for defendant's explanation that the policy's purpose was related to their mortgage. However, during the State's cross-examination of defendant, Marshall was pressed to admit that his wife had asked, "What's this for," in the presence of the agent, the State's purpose clearly being to establish a lack of knowledge on the part of Mrs. Marshall concerning the new policy.

 Although we agree that, notwithstanding defense counsel's concession to the contrary, the statement was inadmissible hearsay, we are satisfied that its admission was harm-

less beyond a reasonable doubt. During his cross-examination defendant stated that Mrs. Marshall knew she was signing an insurance application, having just been examined for that purpose. Moreover, the witness who followed Christopher Scala was the person who had examined defendant and Mrs. Marshall that morning between ten and eleven o'clock. He stated that he had questioned Mrs. Marshall in order to fill out the required medical questionnaire, obtained a blood sample and urine specimen, and checked her pulse and blood pressure. Hence, the record strongly suggests that Mrs. Marshall must have been aware that the examination and application form related to life insurance, and there is little likelihood that the jury would have been misled by the erroneous admission of Mrs. Marshall's statement.

2. *Admission into Evidence of Mrs. Marshall's July 1984 Letter to Edward O'Malley, Esq.*

Edward O'Malley, an attorney hired by Mrs. Marshall to represent her in connection with matrimonial problems, testified for the State, identifying among other documents a letter dated July 23, 1984, from Mrs. Marshall to him, with a note attached to the letter. The letter asked Mr. O'Malley to check on two telephone numbers set forth in the letter, one of the numbers having been rewritten on the attached note. In fact, the number on the note corresponded to the number on the pay phone at the Airport Motor Inn in Atlantic City. The letter from Mrs. Marshall ended with the words "Holding my own, pray for me." At trial, defendant objected to the letter's admission into evidence, contending that its contents constituted hearsay and that at least the concluding statement should be redacted because of its capacity to prejudice the jury. The State argued that the letter was admissible under the "business entries" exception to the hearsay rule. *Evid.R.* 63(13). The trial court admitted the letter in evidence, reasoning that it was not offered to prove the truth of its content but rather to prove that Mrs. Marshall had furnished the letter containing the

telephone numbers to her attorney. Before us defendant contends that the admission of the letter in evidence constituted reversible error, which was compounded when the prosecutor read the letter to the jury during his summation.

 We agree that the portion of the letter on which defendant focuses—"Holding my own, pray for me"—was inadmissible hearsay because it was capable of being understood by the jury to reflect Mrs. Marshall's state of mind at the time she wrote the letter. A prerequisite to the application of the "state of mind" exception to the hearsay rule, *Evid.R.* 63(12), is that the declarant's state of mind is in issue. Nothing in this record suggests that Mrs. Marshall's state of mind in July 1984 was in issue, and our decisions preclude the use of evidence of her state of mind to prove defendant's motive or state of mind. *See State v. Machado,* 111 *N.J.* 480, 486–88, 545 *A.*2d 174 (1988); *State v. Downey,* 206 *N.J.Super.* 382, 390–91, 502 *A.*2d 1171 (App.Div.1986).

 Nevertheless, the error was harmless beyond a reasonable doubt. Although the letter was read to the jury during the prosecutor's summation and admitted into evidence, it occupied only a few moments of a protracted trial and its significance was only peripheral. No evidence at trial suggested that Mrs. Marshall feared for her safety. More likely than not, the jury understood the words at the end of the letter not as a manifestation of fear but as an expression of emotional upheaval, characteristic of a wife or husband whose longstanding marriage was in jeopardy. We cannot conceive that the admission of Mrs. Marshall's letter into evidence, in the context of the totality of the proofs introduced at trial, had the capacity to produce or contribute to an unjust result.

F. Alleged Infringements of Defendant's Privilege Against Self–Incrimination

Defendant cites three specific instances at trial during which the prosecutor allegedly infringed on his State common-law and

federal-constitutional privilege against self-incrimination. We deal with each contention separately.

1. *The September 21, 1984, Interview*

Defendant contends that the trial testimony of Investigator Mahoney of the Ocean County Prosecutor's Office concerning his interview of defendant on September 21, 1984, was necessarily understood by the jury to convey the impression that defendant had refused to cooperate with Mahoney, thereby permitting the State to derive an adverse inference from defendant's exercise of his privilege against self-incrimination. Before Investigator Mahoney was permitted to testify in the jury's presence, the trial court heard argument with respect to defendant's contentions that the proposed testimony would infringe on defendant's right to counsel and privilege against self-incrimination, and should be excluded as unduly prejudicial under *Evidence Rule* 4. The trial court, informed that Mahoney was prepared to testify that defendant became "visibly shaken" and "pale" when asked if he knew James Davis or Billy Wayne McKinnon, conducted a hearing pursuant to *Evidence Rule* 19 to determine whether Mahoney was qualified to testify about defendant's change in demeanor. In the course of the hearing, at which Mahoney testified that defendant became visibly upset when the names "Davis" and "McKinnon" were mentioned, Mahoney stated that the interview was then terminated at defendant's request. Both defendant's counsel and Thompson's counsel argued that testimony by Mahoney that defendant had terminated the interview infringed on defendant's constitutional rights. Both counsel urged, over the prosecutor's objection, that Mahoney be instructed to limit his trial testimony by noting merely that "the interview terminated," rather than attribute the termination to defendant. The trial court agreed, and instructed the prosecutor accordingly.

Mahoney testified before the jury that he called Marshall on September 21, 1984, and asked to meet with him. "I explained to him that some information has come to light regarding the

death of his wife, and we were seeking his assistance." Mahoney and Investigator Woodfield went to Marshall's house. Mahoney testified that Marshall's demeanor was initially "pleasant, cooperative." The direct examination continued.

Q. So you went into what portion of his house?

A. He let us into the living room area of his home and we sat down. I had asked him that, told him at that time several names have surfaced during the investigation into the death of his wife and if he could possibly help us, if he recognized any of these names. I proceeded to ask him if he knew either a James or Jimmy Davis or Billie Wayne McKinnon from Shreveport, Louisiana.

Q. Did you observe his reaction at that point in time when you asked him that question?

A. Mr. Marshall became visibly upset. I thought he may have, was going to spill his drink. He became pale. His demeanor changed.

Q. Did the conversation terminate at that point?

A. The interview was terminated at that point.

Before us defendant contends that Mahoney's trial testimony, even as limited by the trial court's ruling in response to counsels' objections, contravened defendant's right to silence. We disagree. Investigator Mahoney's trial testimony focused primarily on defendant's change of demeanor when the names "Davis" and "McKinnon" were mentioned. Although Mahoney's testimony may have permitted the jury to infer that defendant did not respond to his question about Davis and McKinnon, no such inference was compelled because Mahoney did not testify about defendant's response. Later in the trial Sarann Kraushaar testified that defendant had told Mahoney that he did not recognize the names. In our view, the trial court's ruling to limit Mahoney's testimony in a manner consistent with the objections advanced by defense counsel effectively avoided the likelihood that the jury would consider Mahoney's testimony as implicating defendant's exercise of his right to remain silent.

## 2. *Cross-examination of Defendant*

Defendant contends that that portion of the prosecutor's cross-examination of defendant that focused on defendant's failure to question the police about the progress of the

investigation infringed on defendant's privilege against self-incrimination. The State's cross-examination of Marshall is best understood by noting that during his direct testimony defendant stated that he and two friends published an advertisement offering a $10,000 reward to anyone offering information helpful in locating Mrs. Marshall's murderer. Defendant also introduced in evidence a letter from his attorney to the prosecutor's office stating that defendant "remains willing to cooperate with your office during this investigation. Therefore, I will assume that you will notify me should you require any information from my client." The State contends that its cross-examination was intended to test the credibility of defendant's willingness to cooperate and the genuineness of his interest in finding the identity of his wife's murderer.

The following constitutes the challenged portion of the prosecutor's cross-examination:

Q. Was that offer [the reward] made in an effort to mislead and deceive the police, sir?

A. No.

Q. Now, I'm assuming that you made that reward out of your concern and desire to have these people captured and convicted; is that right?

A. Right.

Q. I think on your tape you referred to them as "bastards"; is that correct?

A. Yes.

Q. After Maria's funeral on September 10th, during the next week that followed, did you ever once walk over to the Prosecutor's Office * * * and ask for Lieutenant Churchill and ask him how the investigation was going? Did you do that the week after Maria's death?

A. No.

Q. Now,—ever pick the telephone up at any time during the month of September and call the Prosecutor's Office or the State Police and say, hey, fellas, how's the investigation going? Any leads?

Did you ever do that?

A. No, I was told not to contact you.

Q. Sir, for the month of October, the entire month, did you ever contact anybody in law enforcement, being a concerned spouse, a widower—

[DEFENSE COUNSEL]: I object to this because of the fact he was represented by counsel then and the letter that was dictated is in evidence, and he's already answered the question about he was advised by counsel. This is getting into now an attorney-client situation where he's had counsel from

September 23, 1984, on and, obviously, he's now trying to create some type of negative inference which is not fair with regard to the witness.

THE COURT: I agree. I think that from the—based on his record from and after the date of the letter, which I don't remember—

[DEFENSE COUNSEL]: It was September 24th.

THE COURT: September 24th, from and after that date, it would not be proper to ask such a question. So I'll sustain the objection.

[BY THE PROSECUTOR]:

Q. Before September 24th did you ever contact any law enforcement authorities even once to ask them how the investigation was going?

A. On the 21st of September, when Mr. Mahoney and the other gentleman came to the house, I asked them how things were going.

Q. My question was, sir—

A. Did I contact?

Q. Did you ever take it upon yourself to contact law enforcement and ask them how the investigation was going?

A. No. Upon advice from other attorneys I did not.

Q. Did you ever go down to the Prosecutor and say to him, the heck with these other attorneys, I hear all these rumors and suspicions going around, I had nothing to do with it, the trail's getting cold, you better go start looking in another direction?

Did you ever do that?

Defense counsel objected again that the prosecutor was trying to create an improper inference in the minds of the jurors. The prosecutor withdrew the question and proceeded:

Q. Your office was searched on Saturday, September 8th, was it not?

A. I believe so.

Q. Are you aware that every one of your drawers in your office was all clean; there were no papers, there were no documents, there was nothing when they searched your office? Are you aware of that?

A. Yes.

Q. Did you clean up before they came?

A. I have two offices, Mr. Kelly. I didn't clean up, no.

Q. On September 8th, the day after your wife died, [defense counsel] was not your lawyer, was he?

A. On September 8th, no, he was not.

Q. You came to your office and you found a copy of the search warrant at your office, did you not?

A. Yes.

Q. You knew that the police officers had searched your office on that date?

A. Right.

Q. Did you go down to the Prosecutor's Office and say to the Prosecutor, I have nothing to hide, why are you suspecting me? You better go off and look in another direction because the trail's getting cold? Did you do that, sir?

[DEFENSE COUNSEL]: Your Honor, I object again because this suggests a certain duty upon a citizen or anyone to take certain action, and also that their failure to do that should lead to some negative inference. That's not clearly the case, nor the law. That's totally improper.

The prosecutor responded that the questioning related to the defendant's credibility. The court sustained the objection. The court stated that questioning about "initiating or lack of initiating contacts with the law enforcement authorities" impermissibly implicated fifth-amendment concerns. At defendant's request, the court instructed the jury:

Under the law, I'll give you some instructions later in some detail about the applicable law, but one of the principles in the law is that, when a person is being investigated for allegedly having committed a crime, that person does not have a duty to go to or speak to the authorities about it, and you can't draw any inferences of guilt against that person if the person either doesn't go to the authorities or doesn't talk to the authorities.

At this point, the questioning about whether Marshall had ever approached the authorities concerning the investigation ceased.

Defendant contends that the prosecution's cross-examination, emphasizing defendant's failure to communicate with the authorities about the progress of the investigation, infringed on defendant's exercise of his privilege against self-incrimination, citing *State v. Deatore*, 70 *N.J.* 100, 358 *A.*2d 163 (1976); *State v. Merola*, 214 *N.J.Super.* 108, 518 *A.*2d 518 (App.Div.1986); and other state and federal precedents.

In *Deatore*, the defendant was on trial for armed robbery. Testifying in his own behalf, he stated that he was elsewhere at the time of the crime. On cross-examination, the defendant was asked whether he had disclosed his alibi to the police at the time of his arrest. He responded that he recalled only that he had asked for a receipt for money taken from him by the police. When asked if it was not true that he had refused to make any statement, the defendant replied, "Nobody asked me." 70 *N.J.* at 107, 358 *A.*2d 163. The Appellate Division reversed the defendant's conviction on the ground that the State's cross-ex-

amination had penalized the defendant's exercise of his privilege against self-incrimination. *Id.* at 109, 358 *A.*2d 163. In affirming the Appellate Division's decision, we observed that

> [t]here can be no doubt that the right of an accused or a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege in this state.
>
> The practical effect of the privilege to remain silent is, as we held a decade ago, "that when a defendant expressly refused to answer, no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept." * * * This being so, it should certainly follow that a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not.
>
> [70 *N.J.* at 114, 358 *A.*2d 163 (citations omitted).]

*Cf. State v. Merola, supra,* 214 *N.J.Super.* at 119, 518 *A.*2d 518 ("To permit the use of [the defendant's] prearrest silence, if only for impeachment purposes, * * * improperly burdens [the defendant's] right to testify in his own defense.").

As the Court noted in *Deatore, supra,* however, there is a distinction between the kind of silence that enjoys constitutional protection and silence that constitutes conduct inconsistent with a defendant's trial testimony. 70 *N.J.* at 118, 358 *A.*2d 163. The Court referred to *State v. Burt,* 59 *N.J.* 156, 279 *A.*2d 850 (1971), *cert. denied,* 404 *U.S.* 1047, 92 *S.Ct.* 728, 30 *L.Ed.*2d 735 (1972), where the defendant was charged with shooting a friend and testified at trial that the shooting had been accidental. The cross-examination at trial established that the defendant

> had not sought medical or other assistance for his injured friend after the incident, had left the locale without knowing whether he was dead or alive and had not reported the occurrence to the police when he was arrested for another offense a few hours later * * *.
>
> [70 *N.J.* at 118, 358 *A.*2d 163]

Accordingly, the Court in *Deatore* concluded that *Burt* was

> in fact not a true case of silence in police custody as to an exculpatory story, but rather one of *conduct,* albeit non-action, after the charged crime inconsistent with defendant's story at trial. As such, questioning of a defendant thereon runs into none of the difficulties of the self-incrimination privilege or of the law of evidence and is entirely proper.
>
> [70 *N.J.* at 118, 358 *A.*2d 163 (footnote omitted).]

In our view, the cross-examination of defendant concerning his failure to have questioned authorities about the progress of the investigation did not focus at all on defendant's exercise of his privilege against self-incrimination. The prosecutor's inquiry did not address defendant's refusal to admit or reveal his own guilt, but rather questioned an aspect of his conduct that appeared to conflict with his avowed interest in tracing down his wife's murderer. Although "silence" was a component of the conduct addressed by the prosecutor's cross-examination, it did not constitute the type of silence protected by defendant's privilege against self-incrimination. In view of defendant's direct testimony, the prosecution on cross-examination was entitled to test the genuineness of defendant's interest in ascertaining the identity of his wife's assailant. We conclude that defendant's privilege against self-incrimination was not infringed by the segment of cross-examination addressed to his failure to have communicated with authorities about the progress of the investigation.

### 3. *Prosecutor's Remarks in Summation*

Finally, defendant contends that two consecutive statements made by the prosecutor during summation, each one critical of defendant's failure to have disclosed to authorities his relationship with Billy Wayne McKinnon, infringed on defendant's privilege against self-incrimination. The challenged comments follow:

His wife is dead, the mother of his children. Does it make sense to you that he did not say to the police at the Oyster Creek picnic area, "I just met with this guy from Louisiana. He probably followed me up here. You better go down there and get him. Here's his phone number. Here's his address. Go to the Caddo Hardware Store. I paid him money"? Does that make sense to you? It makes sense if you're trying to hide something, does it not?

He's given a second chance, on September 21st, when Mahoney and Woodfield go to his house. They say, "Hey, Rob, we need your assistance." "Come on in." He's having a drink. Sarann's there. Having a good time. "Sure, come on in. Have a seat." "Listen. A couple names came up, Jimmy Davis and Billy Wayne McKinnon." Don't you think at that juncture, after he's had plenty of rest and he's not cold, that he'd say, "Yeah"? It makes sense if you're trying to hide something.

We note initially that no objection was asserted when the statements were made by the prosecutor. The first statement—addressing defendant's failure to disclose his connection with McKinnon when speaking to the police at the crime scene—does not implicate defendant's privilege against self-incrimination because it relates to the events on the night of the murder, before the investigation was substantially in progress and before defendant was a suspect. *Cf. Miranda v. Arizona*, 384 *U.S.* 436, 477–78, 86 *S.Ct.* 1602, 1629–30, 16 *L.Ed.*2d 694, 725 (1966) (*Miranda* protections are not implicated by general on-the-scene questioning as to facts surrounding a crime or other general questioning in the fact-finding process).

The second statement was clearly improper, since it criticized defendant's failure to disclose his incriminatory relationship with McKinnon at a time when the investigation had begun to focus on defendant. The jury should have been instructed to disregard the prosecutor's comment and been given a curative instruction. Although the prosecutor's remark constituted a violation of defendant's privilege against self-incrimination, its significance was minimal because the jury was already aware that Marshall, before becoming a suspect, had provided the police with a detailed description of the events leading up to the murder but omitted any mention of McKinnon. In the context of the entire trial and the abundant evidence of guilt, we conclude that the offending statement was harmless beyond a reasonable doubt. *Chapman v. California*, 386 *U.S.* 18, 23, 87 *S.Ct.* 824, 827, 17 *L.Ed.*2d 705, 710 (1967).

G. Prosecutorial Questioning Concerning Defendant's Retention of Counsel

Defendant seeks reversal of his conviction on the basis of a highly improper and inexcusable attempt by the prosecutor, during cross-examination of defendant's sister Oakleigh De Carlo, to suggest that defendant's retention of counsel was inconsistent with his claim that he was innocent.

■ The incident occurred during the State's cross-examination of Mrs. De Carlo, who testified briefly as a defense witness about defendant's demeanor during his interrogation by Investigator Mahoney on September 21st at the Marshall residence. The cross-examination began with the following questions and answers, addressed to Mrs. DeCarlo's recollection of defendant's interview by Investigator Mahoney:

[THE PROSECUTOR]: You didn't hear him answer any questions, did you, when they said—

[THE WITNESS]: Yes, I did.

Q. You did?

A. Yes.

Q. Answer their questions?

A. He answered a question.

Q. A question?

A. A question.

Q. One question?

A. One question.

Q. Then the conversation ended; is that correct?

A. No. They said they had other questions and he said, "I think I should have my lawyer here if you're going to ask any more questions."

Q. Did you say to him, "Hey, Rob. Why get your lawyer. Your wife was murdered. Maybe these people—"

A. No, I didn't say that. I—

Q. You didn't say—

[MARSHALL'S COUNSEL]: Could she be permitted to at least answer the question before the next one?

THE COURT: I think she may have been interrupted.

[BY THE PROSECUTOR]:

Q. Did you say to your brother, "Rob, wait a minute. Don't just answer one question. Take a good look at these photographs"?

A. He wasn't shown any photographs.

Q. Let me finish my question. "Think hard. Maybe you can help the police officers." Did you say that to him, ma'am?

A. He wasn't shown any photographs? No, I did not say that.

Although defendant contends that the prosecutor deliberately elicited from Mrs. De Carlo the testimony that defendant stopped the interview because his lawyer was not present, the record indicates that the comment about counsel was volunteered by the witness. Although the prosecutor verged on an infringement of defendant's right to counsel when he asked,

"Did you say * * * [w]hy get your lawyer. Your wife was murdered * * *," he did not dwell on the issue and the cross-examination proceeded along other lines.

 Thompson's attorney then cross-examined the witness briefly, returning to the issue of Marshall's retention of counsel. That questioning was immediately followed by the prosecutor's supplemental cross-examination, which began with the offensive and impermissible suggestion that the retention of counsel is incompatible with innocence:

[BY THOMPSON'S COUNSEL]:

Q. You wouldn't think it unreasonable that if a person retained an attorney and was possibly under suspicion that they should have their attorney present?

A. Not at all. That's why you hire them for his advice.

[THOMPSON'S COUNSEL]: I have no other questions, your Honor.

## CROSS–EXAMINATION

[BY THE PROSECUTOR]:

Q. Especially when your wife has been killed and you haven't—you didn't have anything to do with it, you still run out and hire an attorney?

A. Are you asking me? An attorney—

[MARSHALL'S COUNSEL]: Objection. Argumentative.

THE COURT: I think it is. I will sustain the objection. Any other questions?

[THE PROSECUTOR]: No, your Honor.

THE COURT: You may step down.

Even though the court sustained counsel's objection to the question, the prosecutor's comment—which could be characterized as a question only by a most indulgent reading—required *sua sponte* a clear and forceful curative instruction. None was given or, for that matter, requested.

The prosecutor did not return to the issue during the remainder of the trial or during summation. During defendant's direct testimony he acknowledged that he had consulted one attorney after his office was searched on September 8th, consulted with another attorney on September 20th, and retained his trial counsel after their initial meeting on September 22nd. Thus, despite the prosecutor's improper comment, defendant asserted his innocence while simultaneously acknowledging

that shortly after the murder he freely exercised his right to consult and retain counsel.

 Although this Court has not addressed the issue expressly, we are fully in accord with the decisions of the federal Courts of Appeals holding that a prosecutor's statement suggesting that retention of counsel is inconsistent with innocence impermissibly infringes on a defendant's constitutional right to counsel. See, *e.g., United States v. Daoud,* 741 *F.*2d 478, 481 (1st Cir.1984); *Bruno v. Rushen,* 721 *F.*2d 1193, 1195 (9th Cir.1983); *United States v. Milstead,* 671 *F.*2d 950, 953 (5th Cir.1982); *Jacks v. Duckworth,* 651 *F.*2d 480, 483 (7th Cir.1981); *United States v. McDonald,* 620 *F.*2d 559, 564 (5th Cir.1980); *United States ex rel. Macon v. Yeager,* 476 *F.*2d 613, 615 (3rd Cir.1973). Although the Fifth Circuit in *McDonald, supra,* 620 *F.*2d at 564, considered the error to be harmful per se, the same Court of Appeals applied a harmless-error analysis in *Milstead, supra,* 671 *F.*2d at 953. The other circuits appear to apply a harmless-error analysis. See *Chapman v. California, supra,* 386 *U.S.* at 24, 87 *S.Ct.* at 828, 17 *L.Ed.*2d at 711. As in *Milstead, supra,* the courts in *Duckworth, supra,* 651 *F.*2d at 483, and in *Daoud, supra,* 741 *F.*2d at 482, concluded that the error was harmless and hence not reversible. The courts in *Bruno v. Rushen, supra,* 721 *F.*2d at 1125, and in *Macon, supra,* 476 *F.*2d at 616–17, applied the *Chapman* harmless-error standard and found the error to be reversible.

In *Macon,* the defendant was convicted of manslaughter based on the shooting of the victim during an altercation following a minor traffic accident. The defendant's version of the event was that he had been assaulted by the victim and his friends, and his gun went off accidentally during the struggle. In summation, the prosecutor commented on the defendant's conduct after the shooting, arguing that his actions were inconsistent with his claim of innocence. Among the prosecutor's remarks was the following:

"He goes home and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold, what does he do? He calls his lawyer. These are acts of innocence?"

[*Id.* at 614.]

In reversing the defendant's conviction, the Court of Appeals determined that because the defendant's guilt was sharply disputed, the prosecutor's comment could not constitute harmless error:

In the present case, because critical portions of the evidence were disputed, the credibility of the petitioner as a witness was a central issue. This is not a situation where the case against the petitioner was otherwise "so overwhelming" that the constitutional error did not, beyond a reasonable doubt, contribute to the conviction. The prosecutor's comment concerning Macon's consultation with counsel the day after the shooting incident, would appear to have been directed to, and may have had the effect of, raising in the jurors' minds the inference that petitioner was, or at least believed himself to be, guilty.

[*Id.* at 616 (citations and footnote omitted).]

 We apply the *Chapman* harmless-error standard to the prosecutor's impermissible attempt to encumber defendant's right to counsel. *Cf. Wainright v. Greenfield,* 474 *U.S.* 284, 295 n. 13, 106 *S.Ct.* 634, 640 n. 13, 88 *L.Ed.*2d 623, 632 n. 13 (1986) (implying that harmless-error standard determines whether prosecutor's suggestion that defendant's refusal to answer was inconsistent with insanity defense constitutes reversible error). Although we consider the prosecutor's comment to constitute an impropriety that is inexcusable for a lawyer experienced in the trial of criminal cases, we conclude that in the context of this extraordinary record the error was harmless beyond a reasonable doubt. We reach that conclusion in part because the jury knew from defendant's own testimony that he had retained counsel and did not consider that conduct to detract at all from his claim of innocence. More important to our conclusion, however, is that the evidence of defendant's guilt was so persuasive that it is virtually impossible to conceive that this isolated comment by the prosecutor, however reprehensible it may have been, could have contributed significantly to the jury's determination of guilt.

H. Questioning and Argument Challenging Defendant's Professed Love for His Deceased Wife

Defendant contends that the prosecutor improperly cross-examined him concerning his wedding ring, the disposal of his wife's ashes, and his relationships with other women after his wife's death. The State asserts that the questioning was intended to rebut defendant's direct testimony that portrayed him as "a loving husband who could not have masterminded his wife's murder," as well as to rebut his testimony during cross-examination that he loved his wife and missed her terribly.

The direct testimony that the State relies on to justify this line of cross-examination consists of defendant's testimony that he cried on the night of the murder and his statement that he could not have participated in his wife's homicide because "she was the mother of my children." During cross-examination, defendant was asked if he missed and loved his wife and he answered, "terribly." The prosecutor then told defendant to hold up his left hand and asked if he was wearing the wedding ring that his wife had given him. Marshall said, "Yes." The prosecutor then asked if defense counsel or the defense investigator had told him to wear the ring. Marshall began to answer, "I wanted to wear the ring—," when counsel objected. The court sustained the objection. The questioning continued:

Q. Is that ring a reflection of just how much you love and miss Maria?

A. They took this ring off me when they arrested me and I got it back here because they allow it here and not in Ocean County. And that's why I have it now and I didn't have it before.

Q. My question is: Is that ring that you're wearing a reflection of just how much you love and miss Maria?

A. Yes, it is.

Q. Can you explain to me, sir, why her ashes are still in a brown cardboard box at the funeral home in a desk—

Defense counsel objected, arguing that the only purpose of the questioning was to inflame the jury. The prosecutor claimed the questioning was relevant to defendant's avowal of love for his wife. The court agreed with the prosecutor that the ques-

tioning was relevant, and rejected the argument that the questioning was unduly prejudicial.

The prosecutor resumed the questioning about the deceased's ashes. Marshall explained that his wife's ashes had not been disposed of because the family had not reached a decision on the matter at the time of his arrest. The prosecutor pointed out the three-month interval between the murder and Marshall's arrest. Marshall replied that one option the family members were considering was disposing of the ashes in Florida, noting that they had been waiting until Christmas vacation to travel there together, but that they had not been able to arrange the trip.

The prosecutor then asked defendant if he had a girlfriend when he went to Florida for a few days following his suicide attempt. Defense counsel objected, the prosecutor arguing that it was relevant to defendant's claim of undying love for his wife. The trial court overruled the objection. Marshall explained that he had gone to Florida to see a woman he had met. The prosecutor then asked if Marshall had recently requested a contact visit with another woman he was engaged to marry. Marshall said he had made the request but that he had not been and was not engaged to marry anyone. He testified that he had made such a request because contact visits were allowed only for wives and family members.

The prosecutor commented on this testimony in summation:

He doesn't wear his wedding band until the day this trial starts, and tells you that, "Well, they wouldn't give it to me in the Ocean County Jail." What are they afraid of, he's going to hang himself with it? That's an insult. That was testimony and actions on his part calculated to deceive you.

And on direct examination, "I miss Maria. I love Maria," so forth and so on. This man carried on three separate relationships within a three-month period after his wife died, and misses her so much that her ashes are still sitting in a drawer in a funeral home. That's how much he misses her. And he gets on this witness stand, after there's an objection at side-bar, after I asked that question and he's had an opportunity to think about his answer, and he says, "Well, we were really going to take her to Florida."

Although the trial court sustained the objection to the question concerning who had advised defendant to wear his wedding

ring at trial, the court determined that the remaining questions were relevant to defendant's stated affection for his deceased wife. Whether the testimony sought to be elicited by these questions would "create substantial danger of undue prejudice," *Evid.R.* 4, is normally a matter left to the discretion of the trial court. As we observed in *State v. Carter*, 91 *N.J.* 86, 106, 449 *A.2d* 1280 (1982):

> Whether the probative value of the evidence is outweighed by the potential prejudice is a decision left to the discretion of the trial judge. *See Evid.R.* 4, Comment 1. The party seeking to preclude the admission of evidence must convince the court that the factors favoring exclusion substantially outweigh the probative value of the contested evidence. *Cf. State v. Sands*, 76 *N.J.* 127 [386 *A.2d* 378] (1978) (whether prior convictions may be excluded as too prejudicial). On appellate review, the decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted. *See State v. Rogers*, 19 *N.J.* [218] at 229 [116 *A.2d* 37 (1955)]; *Evid.R.* 4, Comment 2.

Although we would not disturb the trial court's exercise of discretion concerning this line of questioning, we acknowledge an element of contrivance in the State's position, since defendant's representation that he "loved" his wife was elicited only by the prosecutor's questions on cross-examination. Almost immediately after extracting an admission from defendant that he missed and loved his wife, the prosecutor confronted defendant with a question about the unburied ashes. Nevertheless, a fair characterization of defendant's direct testimony is that his feelings for his wife—the "mother of his children"—were such that he could not have participated in her homicide.

▮▮▮ Although we find that defendant's affection for his wife was a proper subject of cross-examination, it is a matter of speculation whether defendant's failure to arrange for burial of his wife's ashes was particularly probative on that issue. We also find the potential for prejudice from the admission of that testimony to be significant. We cannot conclude, however, that the State's cross-examination did not adduce evidence that a jury could have found to be material to defendant's stated affection for his deceased wife. We also note that defendant

had an opportunity to explain his conduct with respect to the wedding ring, his wife's ashes, and his relationships with two other women. On this record, it is debatable whether the potential for undue prejudice from this evidence "substantially outweigh[ed] the probative value," *State v. Carter, supra,* 91 *N.J.* at 106, 449 *A.*2d 1280, and hence we are satisfied that the trial court's ruling on this issue was well within its broad ambit of discretion.

### I. Exclusion of Testimony of Henry Tamburin

On the fifteenth day of trial, after the close of the State's case and after four defense witnesses had testified, defendant asked the court for permission to call Henry Tamburin as a witness. Tamburin was not on the witness list provided to the State. Defense counsel claimed that the importance of this witness's testimony became clear over the previous weekend, following a conference with his client. Defense counsel argued that the witness's name was on the defendant's so-called "suicide" tape and that the tape constituted sufficient notice to the State. The defense proffered that the witness ran a casino-gambling club and had taught Marshall gambling techniques, including how to manipulate the casino credit system to acquire "comp" tickets. The defense argued that the testimony was relevant to Marshall's marker activity at Harrah's, specifically that Tamburin's testimony would suggest an explanation for Marshall's marker activity to contradict the State's assertion that the markers had been taken out in order that Marshall could pay McKinnon. The trial court questioned whether the prosecutor could effectively cross-examine Tamburin or locate and prepare rebuttal witnesses if they proved necessary. The court ruled that it would not be fair to the State at that stage of the trial to allow the testimony that day or the following week. The court allowed Tamburin to testify as a character witness.

On appeal, defendant argues that the preclusion of Tamburin's testimony violated his right to present a defense, thereby

depriving him of due process. He also contends that his right to call a witness in a capital-murder case outweighs any prejudice to the State.

We find no error in the trial court's ruling. Defendant acknowledges that the request to call Tamburin as a witness, without prior notice or production of a copy of his proposed report, was a violation of the discovery Rules, *Rule* 3:13–3(b)(5), which specifically authorize preclusion of the witness's testimony in such circumstances. We invest in trial courts broad discretion to determine the appropriate sanctions to be imposed for discovery-rule violations. *State v. Labrutto*, 114 *N.J.* 187, 205, 553 *A.*2d 335 (1989); *State v. Toro*, 229 *N.J.Super.* 215, 223, 551 *A.*2d 170 (App.Div.1988).

We note the trial court's observation that the evidence proffered was not newly discovered and its tender at that stage of trial was not the product of extenuating circumstances. We also note that defendant testified about belonging to Tamburin's club, and explained Tamburin's theory that extensive credit activity in the casinos enabled a player to qualify for complimentary rooms, meals, and show tickets. Defense counsel argued in summation that defendant's extensive "marker" activity with the casinos was for the purpose of generating "comps," the defense's objective apparently being to contradict the State's theory that defendant took out "markers" on three occasions in order to get cash to turn over to McKinnon. Hence, the exclusion of Tamburin's expert testimony did not preclude defendant from offering comparable evidence or from arguing that his marker activity was an integral part of his overall gambling strategy. We will not disturb the trial court's discretionary ruling on this issue.

J. Preclusion of Portion of Testimony of Defendant's Son John Marshall

During the defense case, defendant's counsel attempted to elicit testimony from defendant's youngest son, John Mar-

shall, concerning the substance of a telephone conversation that he had had with his father on the evening of September 27, 1984. The witness was permitted to testify that the conversation lasted four or five minutes and that defendant sounded "depressed and kind of upset," but the trial court sustained the prosecutor's objection to testimony about the substance of the conversation. The prosecutor contended the proposed testimony was hearsay, and asserted that defense counsel had failed to provide the State with any memoranda of the conversation, contrary to *Rule* 3:13–3(b)(3). Defense counsel argued that the testimony would confirm that defendant's state of mind that evening was suicidal, and explained the discovery-rule violation on the basis that the conversation was extremely brief, and he had made no notes summarizing the proposed testimony. The trial court sustained the State's objection because of the discovery-rule violation. We note parenthetically that defendant's son Christopher Marshall, the next defense witness, was permitted to testify that his father had also telephoned him that evening and sounded "like he was saying goodbye." Moreover, tapes that defendant had dictated that evening to each of his three sons were played for the jury. We find no error in the trial court's discretionary ruling, nor do we perceive that the exclusion of this testimony was prejudicial to defendant.

### K. Admissibility of Testimony Discrediting Defense Witness Rakoczy

Zillah Hahn was the front-desk manager of the Best Western Motel on September 27, 1984, and a rebuttal witness for the prosecution. Paul Rakoczy, another employee of Best Western, was on duty at the front desk the night of defendant's aborted suicide attempt. The testimony of Hahn and Rakoczy conflicted concerning the type of mailbox into which defendant had placed the envelope addressed to his brother-in-law. Hahn's testimony supported that of Investigator Mohel, who testified that the mailbox was a flat tray.

On cross-examination, Thompson's attorney attacked Hahn's credibility, suggesting that the witness was biased against the defense. He insinuated that Hahn resented the defense's failure to have provided her with transportation home following a pretrial hearing, resulting in her paying for an expensive cab ride. He also implied during questioning that the motel's management had recently fired Rakoczy because he had spoken with defense investigators and was going to testify for the defense. Rakoczy was fired on January 19, 1986, shortly after Hahn received a subpoena to testify in the trial.

On redirect examination, the prosecutor asked Hahn, "Why was Paul Rakoczy fired?" Hahn answered that "officially, we fired him for poor attitude * * * but that was not [the] reason." Asked to elaborate, Hahn said she had overheard Rakoczy arranging to have his car stolen because he needed cash. She added that a few days later Rakoczy had told her his car had been stolen. This testimony was received without objection. As the witness began to list other reasons for the firing, Marshall's attorney objected, and the prosecutor withdrew the question about other reasons for the dismissal.

■■■ Defendant contends that Hahn's testimony that Rakoczy had arranged to have his car stolen was hearsay, admitted in violation of *Evidence Rule* 63. In this context, however, we conclude that Hahn's testimony did not constitute hearsay because it was offered to prove her state of mind—her motive for firing Rokoczy—and not to prove the truth of the statements attributed to Rakoczy. *Accord State v. Johnson,* 216 *N.J.Super.* 588, 600, 524 *A.*2d 826 (App.Div.1987); *State v. Smith,* 113 *N.J.Super.* 120, 138–39, 273 *A.*2d 68 (App.Div.1971); 6 Wigmore, *Evidence* § 1789 (Chadbourn rev. 1976) ("Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned."). Hence we find no error in the admission of the challenged testimony, nor any prejudice from

the trial court's omission to instruct the jury, *sua sponte*, on the limited relevance of the testimony. *See Evid.R.* 6. The issue concerning the type of mailbox in use at the motel was vigorously contested, and Rakoczy's testimony was supported by other witnesses. It is most improbable that the testimony in question influenced the jury significantly.

### L. Denial of Defendant's Motion for Mistrial Based on State's Discovery Violations

Defendant contends that the trial court's denial of his motion for a mistrial, based on the State's failure to have produced as part of discovery its notes of interviews with four potential witnesses, constituted an abuse of discretion and, therefore, reversible error.

The discovery violation became apparent to defense counsel during the course of the prosecutor's cross-examination of defendant, in the course of which he was asked whether defendant had made certain statements to two of his friends, Dick Reed and Ted Serrao; to Jack Zerrer, his manager at Provident Mutual; and to his brother-in-law, Joseph Dougherty. All four had been identified as potential witnesses prior to trial—Serrao for the State, and Reed, Zerrer, and Dougherty for the defense. For example, defendant was asked if he had told Reed and Zerrer that he was "leaning into" or "looking into" his car trunk when he was hit on the head; defendant denied having said that to Reed or Zerrer. Defendant also denied telling Serrao that he saw Maria's feet "swing to the pavement" when he stopped the car at the rest area. Of the questions alleged by defendant to have been based on the withheld interview notes, the only one that elicited an affirmative response concerned whether defendant had told Serrao on September 27th that he "gave Billy Wayne $800 the night Maria was murdered and the police knew it," to which defendant replied, "I don't recall it, but I may have."

When defense counsel objected to the interrogation on the ground that the prosecutor was obviously using inter-

view notes that had not been produced during discovery, the trial court correctly ruled that the interview notes were discoverable pursuant to *Rule* 3:13–3(a)(8), and ordered the prosecutor to make the notes available to defense counsel. At the conclusion of his cross-examination, defendant moved for a mistrial on the basis of the prosecutor's discovery violation. The trial court denied the motion, observing that although the interview notes had obviously been used to frame questions during defendant's cross-examination, defendant had either denied making the statements or not recalled having made them. Hence, the trial court concluded that defendant had not been prejudiced by the prosecutor's use of the interview notes. Although denying defendant's mistrial motion, the trial court precluded the State from using the notes for further cross-examination and from calling any of the four persons as rebuttal witnesses concerning any subject covered by the interview notes.

We find no error in the trial court's determination. The choice of sanctions appropriate for discovery-rule violations is left to the broad discretion of the trial court. *State v. Toro, supra,* 229 *N.J.Super.* at 223, 551 *A.*2d 170. Moreover, a motion for mistrial "is addressed to the sound discretion of the court; and the denial of the motion is reviewable only for an abuse of discretion." *State v. Winter,* 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984) (citing *State v. Witte,* 13 *N.J.* 598, 611, 100 *A.*2d 754 (1953)). Under these circumstances, where the State's discovery-rule violation caused no apparent prejudice to defendant, the grant of a mistrial would have been manifestly inappropriate. In our view, the sanction imposed was a proper and measured response to the nondisclosure of the interview notes.

M. Dilution of State's Burden of Proof

Defendant contends that the final paragraph of the trial court's jury instruction intimated that the jury's responsibility in arriving at a verdict was to determine "the truth," and

that instruction, not objected to by counsel, impermissibly diluted the State's burden to prove defendant's guilt beyond a reasonable doubt.

The challenged portion of the trial court's charge reads:

Ladies and gentlemen, it has been said, and correctly, that many of the words that we use are derived from the Latin, and one of the words in that category is the word verdict. The word verdict is derived from the Latin veredictum, and it means a true declaration. So let your verdict declare the truth.

We have consistently observed that "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973); *accord State v. Hunt*, 115 *N.J.* 330, 373, 558 *A.*2d 1259 (1989); *State v. Ravenell*, 43 *N.J.* 171, 186–87, 203 *A.*2d 13 (1964), *cert. denied*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *State v. Hipplewith*, 33 *N.J.* 300, 317, 164 *A.*2d 481 (1960).

Defendant acknowledges that the trial court properly instructed the jury concerning the State's burden to prove all elements of each offense beyond a reasonable doubt. Defendant asserts, however, that the instructions on reasonable doubt occurred at the commencement of the charge, whereas the paragraph quoted above was delivered at the conclusion of the charge. Defendant contends that the final paragraph of the instruction, in the context of counsel's emphasis in summation on the jury's critical role in determining the credibility of conflicting witnesses, misled the jury into believing that its role was merely to determine issues of credibility, and not to reach a verdict based on whether the State had met its burden of proving guilt beyond a reasonable doubt. Defendant relies on *United States v. Pine*, 609 *F.*2d 106 (3d Cir.1979), which involved a jury instruction that included this statement:

The basic question is whether the Government's witnesses are telling the truth or whether the defendants and their witnesses are telling the truth. Your basic task is to evolve the truth.

[*Id.* at 107–08.]

The Court of Appeals observed that such an instruction tended "to dilute and thereby impair the constitutional requirement of proof beyond a reasonable doubt." *Id.* at 108. Nevertheless,

the court reviewed the trial court's instruction in its entirety and concluded on the basis of the trial court's "forceful charge on the requirement of proof beyond a reasonable doubt" that no due-process violation had occurred. *Ibid.*

We have carefully reviewed the trial court's charge on each count of the indictment. The instruction concerning the State's burden to prove each element of each offense is stated and frequently restated, not only as a general proposition of law but also in the context of the specific instructions concerning each of the three offenses for which defendants were indicted. The concept of the State's burden to prove guilt beyond a reasonable doubt permeates the trial court's jury charge. Viewing the trial court's charge in its entirety, we are fully satisfied that defendant was not denied his constitutional right to be convicted only on proof beyond a reasonable doubt.

N. Sufficiency of the Evidence

Defendant contends that his motion for a new trial should have been granted on the ground that the jury verdict was against the weight of the evidence. He also asserts that the State failed to prove guilt beyond a reasonable doubt. Those contentions are without merit. On this record, there is no basis on which a reviewing court could conclude that the jury verdict constituted a "manifest denial of justice." *R.* 3:20–1. Moreover, our review of the record demonstrates beyond question that a "rational trier of fact could have found the essential elements of the crime[s] [of which defendant was convicted] beyond a reasonable doubt." *Jackson v. Virginia,* 443 *U.S.* 307, 319, 99 *S.Ct.* 2781, 2789, 61 *L.Ed.*2d 560, 573 (1979).

## V.

### Sentencing–Phase Issues

A. Aggravating Factor Duplicating Element of Crime

Defendant points out that his death sentence was based solely on an aggravating factor that duplicated an element of

the crime for which he was convicted. Defendant claims this statutory structure is unconstitutional because it fails to narrow the class of murder eligible for the death penalty. Defendant did not raise this issue below.

This Court addressed this issue in *State v. Ramseur, supra*, 106 *N.J.* 123, 524 *A.*2d 188, stating:

> There is one class of murder in which a factor defines both death eligibility as well as selection for the penalty itself. The defendant who pays another to commit knowing or purposeful murder and is therefore death eligible (Sec. c) will, without proof of any further aggravating factor (since such payment itself is an aggravating factor, Sec. c(4)(e)), be subject to the death penalty if that aggravating factor outweighs any mitigating factors. But there is nothing whatsoever unconstitutional about that. *The definition of the circumstance is precise, and the penalty therefor consistent.*
>
> [*Id.* at 188, 524 *A.*2d 188 (footnote omitted).]

More recently, in *Lowenfeld v. Phelps*, 484 *U.S.* 231, 108 *S.Ct.* 546, 98 *L.Ed.*2d 568 (1988), the United States Supreme Court upheld the constitutionality of a death sentence imposed under Louisiana law where the sole aggravating factor found by the jury, "the offender knowingly created a risk of death or great bodily harm to more than one person," *La.Code Crim. Proc.Ann.* art. 905.4(d) (West 1984), duplicated one of the statutory categories of first-degree murder ("When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." *La.Rev.Stat.Ann.* § 14.30A(3) (West 1986)). In upholding the constitutionality of the death sentence and the Louisiana statutory scheme the Court observed:

> It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.
>
> \* \* \* \* \* \* \* \*
>
> Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm

upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

[484 *U.S.* at 246, 108 *S.Ct.* at 555, 98 *L.Ed.*2d at 582–83.]

We adhere to our holding in *Ramseur*, and find that no constitutional infirmity exists because the aggravating factor found by the jury mirrors an element of the offense of which defendant was convicted.

### B. Instructions on Aggravating Factor

Defendant contends that because the sole aggravating factor alleged by the State—that "defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value," *N.J.S.A.* 2C:11–3c(4)(e)—duplicated an element of the crime found by the jury in the guilt phase, the trial court's failure explicitly to direct the jury to disregard its prior determination and deliberate anew effectively "directed a verdict" for the State in the penalty phase. The point at issue was not raised below. Defendant relies on *State v. Ragland*, 105 *N.J.* 189, 519 *A.*2d 1361 (1986). There, defendant had been convicted by a jury of several offenses, including unlawful possession of a weapon. *N.J.S.A.* 2C:39–5. Another charge, possession of a weapon by a convicted felon, *N.J.S.A.* 2C:39–7, had been severed to avoid prejudice, but was then tried before the same jury. The trial court's instruction to the jury before it deliberated on the severed count included these comments:

If you find that the defendant, Gregory Ragland, was previously convicted for the crime of robbery and that he was in possession of a sawed-off shotgun, as *you have indicated* * * * then you must find him guilty as charged by this Court.

[*Id.* at 192, 519 *A.*2d 1361.]

We held the charge improper, observing that the phrase "as you have indicated" suggested that the jury need not redetermine in the severed proceeding whether defendant had been in

unlawful possession of a weapon. *Id.* at 196, 519 *A.*2d 1361. We also noted that in such circumstances the appropriate instruction is one that informs the jury to disregard its prior verdict and to deliberate anew on the issue of unlawful possession. *Id.* at 195–96, 519 *A.*2d 1361.

We have carefully reviewed the trial court's charge in the penalty phase. On several occasions, both before and after counsel's summations, the court informed the jury of the State's burden to prove the alleged aggravating factor beyond a reasonable doubt and of its duty to reject the aggravating factor if the State failed to sustain its burden. Moreover, unlike *Ragland,* the ultimate issue for this jury in the penalty phase was not whether the jury would make the same finding as it had in the antecedent proceeding, but rather how the jury would balance the aggravating and mitigating factors.

Obviously, trial courts in future capital cases in which this issue arises should explicitly inform the penalty-phase jury that under our Capital Punishment Act, the guilt and sentencing phases are considered as separate proceedings. Hence, the jury in the penalty phase should be informed of its duty to deliberate anew concerning any facts established by the verdict in the guilt-phase determination that the State relies on to prove an aggravating factor, and of its right to reach a different conclusion concerning such facts in the penalty phase. We acknowledge that it would be the rare case in which a penalty-phase jury, especially one not presented with any new evidence in the penalty phase, would make penalty-phase determinations that contradict its verdict in the guilt phase. We are fully satisfied that this jury understood clearly that the penalty proceedings were separate from the guilt phase of the case, and required the jury's fresh determination on the existence of aggravating and mitigating factors, as well as its ultimate decision concerning the appropriate punishment, based on its balancing of aggravating and mitigating factors. We find no

error in this aspect of the trial court's penalty-phase instructions.

### C. Absence of Mitigating Evidence

Defendant contends that because no evidence in mitigation was offered in his behalf in the sentencing proceeding, the jury was unable to discharge its constitutionally-mandated determination whether death was the appropriate punishment. We find no merit in defendant's contention.

Defendant analogizes the sentencing phase of his case to that in *State v. Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939. There, the defendant refused to permit his attorney to present any evidence in mitigation, and counsel presented no argument on mitigating factors. We held that "mitigating factors must be introduced, regardless of defendant's position." *Id.* at 336, 548 *A.*2d 939.

At the outset of the sentencing phase in this case, counsel informed the trial court that neither the State nor defendant would introduce any additional evidence in the penalty phase, but would rely on the evidence that had been adduced during the guilt phase. Defense counsel expressly represented that defendant had been consulted and concurred in that decision. Defendant's counsel also represented that he intended to present argument to the jury concerning two mitigating factors that he would ask the jury to find. One such factor—that defendant had no significant history of prior criminal activity— *N.J.S.A.* 2C:11–3c(5)(f), was stipulated to by the State. The other mitigating factor, the so-called "catch-all" factor, *N.J.S.A.* 2C:11–3c(5)(h), was to be supported by evidence adduced during the guilt phase. The trial court instructed the jury before counsel's argument that based on counsels' stipulation, it would be obligated to find the existence of the mitigating factor reflecting no prior history of criminal activity. During closing argument defendant's counsel asserted that evidence in the record demonstrated defendant's involvement in civic and chari-

table activities to an extent sufficient to enable the jury to conclude that the "catch-all" mitigating factor had been established. The jury's verdict sheet indicated that it found that both mitigating factors advanced by defendant had been established. Hence, we find no basis whatsoever for defendant's attempted analogy of this sentencing-phase record to that in *Koedatich*. We are fully satisfied that the jury's determination of the appropriate punishment was based on its consideration of the mitigating factors relied on by defendant.

### D. Adequacy of Sentencing–Phase Instructions

Defendant raises several challenges to the adequacy of the trial court's instructions to the jury during the sentencing proceeding. We consider separately each of the asserted deficiencies in the charge.

#### 1. *Failure to Explain Mitigating Factors*

Although defendant raised no objection at trial to the court's instructions in the sentencing proceeding, he contends before us that the trial court failed adequately to explain to the jury the function of the mitigating factors and failed to define for the jury the mitigating factors relied on by defendant. Defendant relies primarily on *State v. Bey* II, 112 *N.J.* 123, 166–71, 548 *A.*2d 887 (1988), decided after the trial of this case. There, following a sentencing proceeding in which the trial court declined defendant's request that it incorporate in its charge an explanation of the specific mitigating factors on which defendant relied and a general explanation of their function, *id.* at 166, 548 *A.*2d 887, we considered and elaborated on the principles that should inform a trial court's instruction on mitigating factors. *Id.* at 168–70, 548 *A.*2d 887. We observed that both this Court and the federal courts had "declined to prescribe specific language to guide the jury's consideration of mitigating factors," *id.* at 168, 548 *A.*2d 887, and determined that "the Constitution does not require specific and detailed instructions * * * with respect to mitigating and aggravating circum-

stances, so long as there is no reasonable possibility that the jury misunderstands its role in the capital sentencing procedure or misunderstands the meaning and function of mitigating circumstances." *Id.* at 169, 548 *A.*2d 887 (quoting *Peek v. Kemp,* 784 *F.*2d 1479, 1493–94 (11th Cir.1986)). We held in *Bey* II that the trial court's reading of the statutory language did not adequately explain the meaning of the specific mitigating factors advanced by the defendant, and also noted that the trial court's failure to have informed the jury that it could consider all mitigating evidence, in both the guilt and penalty phases, had inhibited the jury's understanding of the function of mitigating evidence. *Id.* at 170, 548 *A.*2d 887. We did not determine whether those deficiencies constituted reversible error, there being independent grounds for reversal of the sentence. *Id.* at 168, 548 *A.*2d 887.

In this case, the trial court's clearest explanation of the nature and function of mitigating factors occurred in the course of its introductory comments during jury *voir dire:*

> If the jury determines that the defendants, or either or both of them, are guilty of a purposeful or knowing murder, then a second proceeding must take place in which the jury is to consider imposition of the appropriate penalty. It would not be appropriate for me to describe our law in great detail at this early stage of the proceedings. Nonetheless, it is imperative that you are aware of the fact that the issue is to be decided by virtue of the jury's decision with respect to the presence or absence of what are called aggravating factors, and whether such factors outweigh beyond a reasonable doubt any mitigating factors.

> An aggravating factor may be said to be one which the New Jersey Legislature says might tend to increase the severity of the punishment which would otherwise be appropriate for an offense.

> A mitigating factor may be said to be one which the Legislature says might tend to decrease the severity of the punishment which would otherwise be appropriate for an offense.

> \* \* \* \* \* \* \* \*

> \* \* \* If the jury is satisfied that at least one aggravating factor has been proven, then they must determine whether any mitigating factor or factors are present. If mitigating factors are present, then the jury must weigh them against the aggravating factors.

> Mitigating factors can include such things as the particular manner in which a crime is committed, the extent of a defendant's participation, and particular

features of his character, mentality, background and conduct. In my instructions, I will describe in some detail the mitigating factors which the jury may consider together with any other pertinent circumstances that should be assessed.

It will be the function of the jury to determine whether any aggravating factor or factors are present, and, if so, whether they outweigh any mitigating factors beyond a reasonable doubt.

During the sentencing proceeding, the trial court did not repeat its explanation of the nature and function of mitigating factors. However, the court's instruction made clear to the jury that aggravating and mitigating factors performed opposing functions in the sentencing proceeding, aggravating factors supporting the imposition of the death penalty and mitigating evidence, including all evidence in the guilt phase, opposing the imposition of the death penalty. *Cf. Peek v. Kemp, supra,* 784 *F.*2d at 1490–91 (although instruction did not explain role of mitigating factors, it indicated clearly that concepts of aggravation and mitigation are opposites and would be presented by parties for opposing purposes). The trial court stated:

It is important to note that the penalty proceedings will not focus upon whether or not the defendant is guilty. You have already returned a verdict in which you concluded beyond a reasonable doubt that the defendant is guilty of the murder. Rather, what is presented here will be concerned with whether or not there are factors which, on balance, lead you to conclude that the defendant should suffer the death penalty.

You will hear argument as to the alleged aggravating factor which the State contends, or may contend, warrants the imposition of the death penalty in this case, in addition to the evidence at the trial of which you can take cognizance.

The aggravating factor which is alleged is that the defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value. That is one of the aggravating factors listed in our statute. And that is the aggravating factor that the State may contend calls for the imposition of the death penalty.

On the other hand, you will hear argument as to mitigating factors which the defendant argues exist. As with the alleged aggravating factor, you should also consider the evidence at the trial as evidence pertaining to the mitigating factors.

The two mitigating factors which are alleged to exist are, first, that the defendant has no history of criminal activity. And I might state parenthetically at this point that the parties have stipulated, or agreed, that the defendant has no history of criminal activity. Therefore, when you come to that place on the

form that you'll get, you will have to answer that yes, the defendant has no history of criminal activity, because he does not.

The second mitigating factor alleged is any other factor which is relevant to the defendant's character or record or to the circumstances of the offense, which, I presume, there will be some statements made to you shortly.

Should you find beyond a reasonable doubt that the aggravating factor has been proven, then it will be your obligation to determine the mitigating factors also present.

While the State must prove aggravating factors beyond a reasonable doubt, the defense has a lesser burden. If any evidence has been presented with respect to a mitigating factor, then you are bound by law to consider it and weigh it against any aggravating factor you may have found present. The defendant does not have to establish the existence of mitigating factor, merely introduce evidence of them.

You will be asked to weigh the evidence of mitigating factors against the aggravating factor proven.

Under our law, the jury must return a special verdict on a form which will be provided to you, stating in writing the existence or nonexistence of the aggravating factor, and the evidence of the mitigating factors alleged.

If any aggravating factor is found to exist, the verdict must also state whether any such factor beyond a reasonable doubt outweighs all mitigating factors. Should you find that any aggravating factor exists, and beyond a reasonable doubt that this aggravating factor outweighs all mitigating factors, then it's the responsibility of the Judge to impose the death penalty in this case.

If you're not satisfied beyond a reasonable doubt that the aggravating factor exists, or you're not satisfied beyond a reasonable doubt that the aggravating factor outweighs all mitigating factors, then the defendant would be sentenced by the Court to a term of imprisonment from thirty years to life, and whatever term would be imposed, the defendant could not be considered for parole until he has served thirty years in prison.

The trial court did not attempt to "define" either the aggravating factor relied on by the State or the mitigating factors relied on by defendant. The closing arguments by defendant's counsel explained in clear and simple terms the nature and function of the mitigating factors advanced by defendant:

What, in essence, we are at right now at this stage is a situation where the State has agreed that there is one mitigating factor which you must find exists in the case, and that that is Rob Marshall has never had any type of criminal record of any kind.

The reason why I believe, when you look to the legislative history of the death penalty when it came into New Jersey that that clearly is a mitigating factor, is because, if you will, people feel, and I think quite rightly, that if you live a law-abiding life, that at some point in time you may be in a position where you may have to ask people to allow you to draw, if you will, maybe a credit

because of the fact that you've led such a life. There are people obviously who have not led law-abiding lives and have been in situations where they've been in front of a jury and the jury has convicted them of a capital offense, and the jury will hear that this person has led a life, not law-abiding, but, in fact, has had a juvenile record, has had a record of other offenses and, for the most part, has lived a life that in all ways, shapes, and forms never conformed to what our society at least requires.

In this particular case it's been agreed that Rob Marshall has led a law-abiding life, and that you must consider that as a mitigating factor.

 * * * * * * * *

The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigation with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that he has done, which he is entitled for you to consider.

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for the United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature.

I don't want to stand here and go through the whole litany of things that he's done in forty-six years that—either for other people or for his family or of a civil nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

 Although arguments of counsel can by no means serve as a substitute for instructions by the court, *Taylor v. Kentucky,* 436 *U.S.* 478, 488–89, 98 *S.Ct.* 1930, 1936–37, 56 *L.Ed.*2d 468, 477 (1978), the prejudicial effect of an omitted instruction must be evaluated "in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel * * *." *Kentucky v. Whorton,* 441 *U.S.* 786, 789, 99 *S.Ct.* 2088, 2089, 60 *L.Ed.*2d 640, 643 (1979); *accord Henderson v. Kibbe,* 431 *U.S.* 145, 152 n. 10, 97 *S.Ct.* 1730, 1736 n. 10, 52 *L.Ed.*2d 203, 211 n. 10 (1977).

Following counsel's arguments, the trial court instructed the jury concerning its duty to weigh, qualitatively, the aggravating and mitigating factors in order to determine "whether or not the defendant is to be sentenced to death":

The evidence at the trial, which is relevant to the aggravating and mitigating factors, shall be considered by you without the necessity of reintroducing that evidence at this proceeding.

The State has the burden of convincing you beyond a reasonable doubt that the aggravating factor has been proven. If you're not so convinced, the defendant will not receive the death penalty, but will be sentenced by the Court to a term of imprisonment, which I will mention to you shortly.

With respect to mitigating factors, you do not have to be convinced of their existence. That is to say, the defendant doesn't have the burden of establishing the mitigating factors. If any evidence has been presented with respect to mitigating factors, then you are bound by the law to consider it and weigh it against any aggravating factor that you have found present.

Of course, with respect to both aggravating and mitigating factors, you are the sole judges of the truth of the evidence presented. Should you find that this aggravating factor alleged has been proven and that evidence of at least one mitigating factor is present, you must then weigh the aggravating and the mitigating factors, and the defendant will be sentenced to death only if you are convinced beyond a reasonable doubt that the aggravating exists and outweighs the mitigating factors, and all of the mitigating factors, beyond a reasonable doubt.

If you reach the point in your deliberations where you're weighing aggravating and mitigating factors, it's important for you to understand that this is not a mechanical process. It doesn't necessarily or simply depend upon the number of factors on each side. It does depend on your careful and considered judgment as to whether or not the aggravating factor is of such gravity, seriousness, or weight, that, beyond a reasonable doubt, it outweighs all of the evidence as to mitigating factors.

If you are convinced beyond a reasonable doubt that the aggravating factor or factors outweigh—aggravating factor, I should say, since there's only one alleged—outweighs all mitigating factors, then the defendant will be sentenced to death by virtue of your verdict. If you are not convinced beyond a reasonable doubt of the existence of an aggravating factor or not convinced beyond a reasonable doubt that any aggravating factor which exists outweighs all mitigating factors, then the defendant will be sentenced to a term of imprisonment for a period of thirty years to life, with no parole possible for at least thirty years.

 In the context of the entire record, we think the conclusion is inescapable that this jury did not "misunderstand[ ] its role in the capital sentencing proceeding or * * * the meaning and function of mitigating circumstances." *State v. Bey* II, *supra*, 112 *N.J.* at 169, 548 *A.*2d 887 (quoting *Peek v. Kemp*, *supra*, 784 *F.*2d at 1493-94). Confronted with evidence of a single aggravating factor—"defendant procured the commission of the offense by payment or promise of payment of

anything of pecuniary value," *N.J.S.A.* 2C:11–3c(4)(e)—the court repeatedly instructed the jury on its duty to weigh, against that aggravating factor, the mitigating factors it found to exist, in order to determine whether death was the appropriate punishment. The jury was instructed to find—and it so found—that defendant's lack of prior criminal history was a mitigating factor. That mitigating factor's self-evident meaning, enhanced by defense counsel's explanation of its rationale, would have rendered almost redundant any instruction by the trial court intended to illuminate further the scope or function of that factor. The jury necessarily understood that in order to determine the appropriate sentence, it was to weigh the significance of defendant's prior record, unmarred by any criminal convictions, against the gravity of the aggravating factor advanced by the State.

Concerning the second mitigating factor, which the court defined as "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense," the court instructed the jury to consider all evidence at trial in determining the existence of that factor. Defendant's counsel, in closing argument, relied specifically on evidence in the record of defendant's civic, business, and philanthropic activities to support that factor, and the jury found that factor to have been established. Unquestionably, in the context of the court's charge and counsel's argument, the jury must have understood that its duty was to weigh the significance of the evidence of defendant's civic, business, and philanthropic activities, combined with the absence of any prior criminal record, against the gravity of the evidence of the sole aggravating factor.

We do not doubt the desirability of more precise instructions that would clarify even further the scope and function of those mitigating factors and would explain in more detail the rationale underlying the weighing of aggravating and mitigating factors in arriving at the appropriate punishment, see *Bey* II, *supra*, 112 *N.J.* at 166–71, 548 *A*.2d 887, and we specifically

trial courts to follow the dictates of *Bey* II in fashioning penalty-phase instructions on mitigating factors. But in assessing the overall adequacy of the charge in *this* sentencing proceeding, our standard, consistent with the principle underlying *Bey* II, is that the jury understand its function and the function and meaning of the mitigating circumstances. We have no doubt that that standard is satisfied in this case.

2. *Did Trial Court's Instructions Adequately Inform Jury of Its Responsibility to Determine Whether Death was Appropriate Punishment?*

■ Defendant contends that the trial court's charge to the jury diluted its function to that of merely weighing aggravating and mitigating factors, and did not convey to the jury that its duty was to determine if defendant should live or die. We find that the jury was adequately instructed and could not have misunderstood that its duty was to determine the appropriate punishment for defendant's crimes.

We have consistently required in capital cases that the court's instructions "communicate to the jury that a death verdict is not the product of a mechanical application of the statute, but a reflection of the jury's normative judgment that death is 'the fitting and appropriate punishment.'" *State v. Bey* II, *supra*, 112 *N.J.* at 162, 548 *A.*2d 887 (quoting *State v. Ramseur, supra*, 106 *N.J.* at 316 n. 80, 524 *A.*2d 188). The jury must understand that its role is to determine whether the defendant shall live or die. *Bey* II, *supra*, 112 *N.J.* at 162–63, 548 *A.*2d 887.

On several occasions during the sentencing proceeding the trial court described the jury's function in terms that emphasized that the jury would decide whether defendant should be executed:

You will now be asked to determine whether the defendant shall be sentenced to death or not.

\* \* \* \* \* \* \* \*

It is important to note that the penalty proceedings will not focus upon whether or not the defendant is guilty. You have already returned a verdict in which you concluded beyond a reasonable doubt that the defendant is guilty of the murder. Rather, what is presented here will be concerned with whether or not there are factors which, on balance, lead you to conclude that the defendant should suffer the death penalty.

 \* \* \* \* \* \* \* \*

Ladies and gentlemen, now you have to decide whether or not the defendant is to be sentenced to death. Quite obviously, your ultimate decision in that regard is extremely important, both from the perspective of the State of New Jersey and from the viewpoint of the defendant.

I fully understand the significance of the difficulty with respect to the task that you will be called upon to undertake. Nevertheless, I am confident that you will be equal to your oath.

The trial court also emphasized that the jury's function in deciding defendant's punishment was not "mechanical" but required a qualitative evaluation of the relative significance of the aggravating and mitigating factors in determining the appropriate punishment:

If you reach the point in your deliberations where you're weighing aggravating and mitigating factors, it's important for you to understand that this is not a mechanical process. It doesn't necessarily or simply depend upon the number of factors on each side. It does depend on your careful and considered judgment as to whether or not the aggravating factor is of such gravity, seriousness, or weight, that, beyond a reasonable doubt, it outweighs all of the evidence as to mitigating factors.

If you are convinced beyond a reasonable doubt that the aggravating factor or factors outweigh—aggravating factor, I should say, since there's only one alleged—outweighs all mitigating factors, then the defendant will be sentenced to death by virtue of your verdict. If you are not convinced beyond a reasonable doubt of the existence of an aggravating factor or not convinced beyond a reasonable doubt that any aggravating factor which exists outweighs all mitigating factors, then the defendant will be sentenced to a term of imprisonment for a period of thirty years to life, with no parole possible for at least thirty years.

At the conclusion of the charge, the court acknowledged the magnitude of the jury's responsibility:

I don't want to place any greater burden upon you than exists by virtue of the law. You have a difficult task. However, you accepted this responsibility as public citizens pursuant to the oath that was administered to you. There's nothing peculiarly different than the way a jury is to consider proof in any criminal case or any criminal proceeding from that in which all reasonable persons treat any questions, depending upon evidence presented to them.

You're expected to use your good sense, consider the evidence for only the purposes for which it has been admitted, and give it a fair and reasonable construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

Although the charge also included specific instructions concerning the weighing of aggravating and mitigating factors, the court's instructions contained numerous references to the jury's fundamental obligation to decide between life and death. No specific words are mandated to convey to a capital jury the essence of its task. A fair reading of the trial court's charge demonstrates beyond question that the jury was clearly informed of its duty to decide whether defendant should live or die.

3. *Was Defendant Constitutionally Entitled to Charge that Jury Could Reject the Death Penalty Based on any Mitigating Evidence, Notwithstanding Outcome of Weighing Process?*

Relying primarily on *Penry v. Lynaugh,* 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989), defendant asserts a constitutional requirement that "the sentencer not be precluded from rejecting a death sentence on the basis of *any* mitigating evidence, even if on balance, a determination has been made that the aggravating factor outweighs the mitigating factors." Defendant's argument, which we reject, misconstrues the Supreme Court's opinion in *Penry* and is otherwise unsupported by decisions of the United States Supreme Court or this Court.

The relevant constitutional principle is that "a state could not, consistent with the eighth and fourteenth amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigates against imposing the death penalty." *Penry, supra,* 492 *U.S.* at 318, 109 *S.Ct.* at 2946, 106 *L.Ed.*2d at 278. *Accord Eddings v. Oklahoma,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982); *Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973

(1978). The Supreme Court has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin v. Lynaugh*, 487 *U.S.* 164, 179, 108 *S.Ct.* 2320, 2330, 101 *L.Ed.*2d 155, 169 (1988). Although our Capital Punishment Act, *L.*1982, *c.* 111, incorporates the Model Penal Code recommendation that evidence of aggravating and mitigating factors should be weighed against each other in determining the appropriate sentence, ALI, Model Penal Code § 201.6, comment 3, p. 71 (Tent. Draft No. 9, 1959), the Supreme Court has upheld capital-sentencing procedures that do not require the sentencer to weigh aggravating against mitigating factors. *Gregg v. Georgia*, 428 *U.S.* 153, 197, 96 *S.Ct.* 2909, 2936, 49 *L.Ed.*2d 859, 888 (1976). We have no doubt that New Jersey's procedures requiring the weighing of aggravating and mitigating factors against each other reduce the likelihood that sentences will be imposed arbitrarily or capriciously, *Gregg v. Georgia, supra,* 428 *U.S.* at 194–95, 96 *S.Ct.* at 2935–36, 49 *L.Ed.*2d at 886, and exceed prevailing constitutional standards concerning the sentencer's duty to consider mitigating evidence.

█ In *Penry*, the Court's narrow holding, applying Texas' capital murder statute, which requires as a prerequisite for a death sentence an affirmative jury finding on three "special issues," was that Texas juries must be given instructions that allow them the opportunity to give effect to mitigating evidence while deliberating on the special issues. It is an understatement to observe that the Texas procedure in effect in *Penry* accorded substantially less opportunity for Texas capital defendants to rely on mitigating evidence than does New Jersey's capital-sentencing procedure. There is no suggestion whatsoever in the Court's opinion in *Penry* of a constitutional requirement that a jury, instructed to weigh aggravating and mitigating factors, must then be allowed to ignore the result of that weighing process and reject a death sentence on the basis solely of mitigating evidence, nor do we recognize any such requirement under our state constitution.

### E. Presumption Against Imposition of Death Penalty

Defendant raises as plain error the trial court's failure to instruct the jury that defendant was entitled to a presumption against the death penalty. We considered and rejected the identical argument in *State v. Rose, supra,* 112 *N.J.* at 545, 548 *A.*2d 1058, and adhere to our ruling in that case.

## VI

### Other Issues

### A. Prosecutorial Misconduct

Defendant alleges 116 instances of prosecutorial misconduct in the course of trial, and contends that they require reversal of his conviction and death sentence. We have carefully reviewed each allegation. We have evaluated the conduct complained of in the context of the specific segment of the trial in which the alleged misconduct occurred and in the context of the entire proceeding, which consumed twenty-two trial days, exclusive of the seven days devoted to jury selection. The trial was hard-fought and emotional, highlighted by intense and aggressive cross-examination of the principal witnesses, defendant and Billy Wayne McKinnon. All counsel employed a wide range of advocacy techniques to advance the interests of their respective clients. We have concluded that the vast majority of the asserted claims of prosecutorial misconduct are without merit, perhaps better characterized as overly-zealous advocacy than misconduct. Hence, we address only those allegations of prosecutorial misconduct that we believe raise significant legal issues.

At the outset, we reiterate those principles that should guide the conduct of a prosecutor in a criminal trial. The primary duty of a prosecutor is not to obtain convictions but to see that justice is done. *State v. Farrell,* 61 *N.J.* 99, 104, 293 *A.*2d 176 (1972). Thus, "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just

one." *Id.* at 105, 293 *A*.2d 176 (quoting *Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)). The importance that we attach to those principles is enhanced in the context of a capital case:

Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters; prosecutors who fail to take seriously their particularly stringent ethical obligations in capital cases thus strongly risk postponing, and even jeopardizing, the enforcement of the law.

[*State v. Ramseur, supra,* 106 *N.J.* at 324, 524 *A*.2d 188.]

Whether prosecutorial misconduct requires reversal of a criminal conviction depends on whether "the conduct was so egregious that it deprived defendant of a fair trial." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A*.2d 188 (citing *State v. Kelly,* 97 *N.J.* 178, 218, 478 *A*.2d 364 (1984)). The determination of whether prosecutorial misconduct denied defendant the right to a fair trial must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred. *See Ramseur, supra,* 106 *N.J.* at 323, 524 *A*.2d 188. "In determining whether prosecutorial misconduct is prejudicial and denied defendant a fair trial, we consider whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." *Id.* at 322–23, 524 *A*.2d 188 (citing *State v. Bogen,* 13 *N.J.* 137, 141–42, 98 *A*.2d 295 (1953)).

### 1. *Representation that Other Witnesses are Available to Support Prosecutor's Version of Facts*

The cross-examination of defendant by the prosecutor began with this exchange:

Q. Sir, did you hear me tell this jury in opening statements that at or about the time of your wife's death you were in debt in excess of $300,000? Did you hear me say that?

A. Yes.

Q. And I'm going to put some figures up here and, if you disagree, I'd appreciate it if you let me know so we can bring in the people from the banks who gave me the figures to testify—

[DEFENSE COUNSEL]: I object. He's editorializing and it's improper. If he wants to ask a question, that's fine. To suggest people from the bank and what have you as part of his question is improper and he knows it.

[THE PROSECUTOR]: I'll withdraw it.

THE COURT: It does incorporate evidence within the question. It will be disregarded.

Q. If you have any questions about these figures, let me know and we'll subpoena the proper people. All right?

A. Fine.

[DEFENSE COUNSEL]: That's not the way cross-examination should be conducted, " * * * and we'll subpoena the proper people."

THE COURT: I'll sustain the objection to the form of the question.

The prosecutor's statement that he would "bring in people from the banks * * * to testify" was clearly improper. It implied that the prosecutor's characterization of defendant's finances was accurate, and would be supported by other unidentified witnesses if contested by defendant. *See ABA Standards for Criminal Justice* § 3–5.8(b) (2d ed. 1980) (*ABA Standards*) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant"), and *ABA Standards, supra*, § 3–5.8(a) ("It is unprofessional conduct for the prosecutor intentionally * * * to mislead the jury as to the inferences it may draw."); *cf. State v. Rose, supra*, 112 *N.J.* at 519, 548 *A.*2d 1058 (prosecutor's statement that he could have produced "ten experts" to testify differently from defense experts was improper.). The impropriety, however, was harmless beyond a reasonable doubt. The critical point at issue was not the precise extent of defendant's indebtedness but whether defendant was experiencing serious financial difficulties, a fact defendant conceded on the cassette tape he dictated to his brother-in-law.

### 2. *Prosecutor's Unsupported Reference to Senility of Decedent's Father*

During cross-examination by Thompson's counsel, defendant testified that while he was in prison, his family had

received financial assistance from Mrs. Marshall's father, who had loaned defendant and his sons $50,000. During recross-examination by the prosecutor, the following colloquy occurred:

Q. And Maria was an only child, was she not, sir?

A. Yes.

Q. Her father is a retired physician?

A. That's correct.

Q. How old is he?

A. Seventy-two or three.

Q. Going a little senile at the present time, as I understand it.

MR. ZEITZ: That's a medical conclusion for him to make a suggestion. That is not a conclusion that I believe—

MR. KELLY: I withdraw the question.

Q. How's his health?

A. He's had a partial stroke about three years ago, but he's otherwise in good health.

Q. Sir, isn't it a fact that the money he gave, $50,000, was done as a result of his love for his grandchildren and it had nothing to do with you, sir?

A. No, that's not true. He would not have given that money if he thought I was in any way involved in this.

Q. Is he here in court today?

A. No, he is not.

Q. Has he been here any time during this trial?

A. His health would not permit him to be here.

The prosecutor's implication that decedent's father's was approaching senility, unsupported by any evidence in the record, was clearly improper. See *ABA Standards, supra,* § 3–5.8(a) ("The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw."); *RPC* 3.4 ("A lawyer shall not * * * (e) in trial, allude to any matter that * * * will not be supported by admissible evidence."). The point at issue—whether defendant's father-in-law would be willing to provide financial assistance to defendant and his sons if he were sufficiently competent to comprehend the likelihood that defendant was implicated in the homicide—is far too collateral to the primary issues in the case for the prosecutor's infraction to constitute reversible error. Nevertheless, it was highly improper cross-examination, a "cheap shot," and the prosecu-

tor's attempt to withdraw the question after it was asked did nothing to remediate the false impression conveyed by the question. A strong curative instruction by the trial court would have been appropriate.

### 3. *Vouching for Truth of McKinnon's Testimony*

The most critical issue at trial was the credibility of Billy Wayne McKinnon. During summation the prosecutor made statements that purported to vouch for the truthfulness of McKinnon's testimony:

Ladies and gentlemen of the jury, there is an ancient defense that is used in trials such as this, a defense that has been around this courtroom, this courthouse, for a long time, and it will be around this courthouse for a long time to come, and that is, in a case such as this, *when a co-defendant has agreed, in order to save himself, to tell the truth,* then you attack the plea bargain, the agreement that was reached with that co-defendant. And if you cross-examine him hard enough and long enough, and if you harp on that plea agreement, you just might be successful in confusing a jury and they will acquit, and that's a fact.

(Emphasis added.)

\* \* \* \* \* \* \* \*

Ladies and gentlemen of the jury, in order to save himself, Billy Wayne McKinnon had to tell the truth. That was the deal. Because when he gave that statement, we checked it out up and down and sideways, and if we caught him in one lie—and you heard the testimony. He waived immunity. Everything he said could be held against him. If we caught him in one lie, then he would be facing a murder charge.

Although the prosecutor was free to argue that McKinnon's testimony was credible, it was improper for the prosecutor personally to vouch for his credibility or to suggest that the truthfulness of his testimony had been "checked * * * out up and down and sideways," obviously referring to matters outside the record. *See ABA Standards, supra,* § 3–5.8(a) ("It is unprofessional conduct for the prosecutor intentionally to * * * mislead the jury as to the inferences it may draw."), and § 3–5.8(b) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony of the defendant."). This impropriety, however, was of limited significance because counsel for both

defendant and Thompson, through vigorous cross-examination and extensive closing argument, exposed to the jury McKinnon's motivation to lie, his extremely favorable plea bargain, and inconsistencies in his testimony. McKinnon's credibility was obviously contested to an extent sufficient to minimize the impact of the prosecutor's infraction.

### 4. *Misrepresentation of Facts During Summation*

Defendant testified that he had waived any rights to the proceeds of at least two life insurance policies insuring his wife, and that $600,000 in proceeds had been paid by the issuing companies to defendant's sons, the contingent beneficiaries. Defendant's testimony during cross-examination by Thompson's counsel, however, was unclear in respect of whether defendant had waived his rights to all policy proceeds and whether defendant would realize any benefit from the proceeds paid to his sons:

Q. The Prosecutor asked you if some of the proceeds of the various life insurance policies that existed on your wife Maria's life have been paid by one or more companies. Do you recall that?

A. Yes.

Q. Have some proceeds of those policies been paid?

A. Just recently, yes.

Q. Have they been paid to you?

A. No.

\* \* \* \* \* \* \* \*

Q. When a person buys a life insurance policy, do they have the right to nominate the beneficiary; that is, the person that should be paid the benefit on behalf of the insured?

A. Yes.

Q. In Maria's policy was there a primary beneficiary named?

A. Yes.

Q. I say her policy. I should make that plural. In all of her policies.

A. Of course.

Q. Who is the primary beneficiary of her insurance?

A. I was.

Q. In addition to naming a primary, can you name a contingent beneficiary in a life insurance policy?

A. Yes.

Q. What was the significance of the phrase "contingent beneficiary"?

A. If the first beneficiary is not alive or for some reason waives their rights, then the proceeds are paid to the contingent beneficiary.

Q. Who was or who were the contingent beneficiary or beneficiaries of those policies on Maria's life of which you were the primary beneficiary?

A. I beg your pardon. My sons, Robbie, Chris and John.

Q. And when you use the phrase—this is what I want to be sure—when you use the phrase "You waived your rights," did you execute some kind of a document to the insurance companies that said you would hold them harmless from paying the money to your children instead of paying the money to you?

A. Yes, I did.

Q. Regardless of whether you're acquitted or convicted in this case?

A. Yes, I did.

Q. Anybody force you in any way to do that?

A. No.

Q. Could you have waited and, if you were acquitted in this case, made claim to the benefit of those policies?

A. Yes.

Q. Is there a reason why you did not?

 * * * * * * * *

A. Well, our financial situation was—my income virtually dropped and my children needed income, needed family income, *needed money to pay for our defense.*

(Emphasis added.)

## In the course of summation the prosecutor stated:

The bulk of that insurance was taken out in twelve-month period before Maria Marshall's death. I don't care if it's accidental; I don't care if it pertains to getting killed in a car on a Thursday only. That insurance was in effect, and he has the audacity to get up here and talk about contestability clauses, to give you the impression that he's not going to get any of that money. He's already received six hundred thousand dollars, and I can guarantee you, ladies and gentlemen, if you acquit this defendant, the checks will be in the mail within a week. Make no mistake about it.

Defense counsel immediately objected, and the prosecutor offered to withdraw the statement. Following the prosecutor's summation, defense counsel moved for a mistrial based in part on the prosecutor's representation to the jury that defendant would benefit from the insurance proceeds in the event of an acquittal. The trial court denied the motion, but instructed the jury as follows:

And if I should say anything that differs from your recollection, your recollections will control. I don't have the precise language here, but he did make reference to the fact that, I believe, six hundred thousand dollars in insurance

proceeds has already been paid to the defendant Marshall. The evidence in the case, I believe, however, is somewhat different, in that the evidence is that the defendant waived his rights to that particular six hundred thousand and, therefore, the monies have been paid for the benefit of his sons in trust.

 Although the record was unclear on whether defendant had realized financial benefit from the $600,000 in proceeds already paid to his sons, or had waived his rights to proceeds of the remaining policies, the prosecutor's assertions that defendant had "already received six hundred thousand dollars" and that "I can guarantee you * * * if you acquit this defendant, the checks will be in the mail within a week," were obviously mischaracterizations of the testimony and, as such, highly improper. *See ABA Standards, supra,* § 3–5.8(a) ("It is unprofessional conduct for the prosecutor intentionally * * * to mislead the jury as to the inferences it may draw."), and § 3–5.8(b) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony * * * of the defendant."). Nevertheless, defendant's testimony did not preclude the inference that he could benefit, at least indirectly, from the insurance proceeds. On balance, although the prosecutor's statements exceeded the bounds of permissible argument, we are satisfied that any significantly-prejudicial impact from these remarks was ameliorated by the trial court's curative instruction.

5. *Castigating Defendant for Calling His Sons as Witnesses*

Among the most inflammatory portions of the prosecutor's summation was the following reference to the fact that defendant's three sons each testified as defense witnesses:

And he has the audacity to bring in his three boys to testify. That's obscene. And I'm not being critical of them, because I would probably do the same thing. To put his boys on that witness stand is obscene, and for that there's a place in hell for him. He will use anybody, he will say anything and he will do anything, including his own family, to get out from under. And that's Robert Oakley Marshall. Make no mistake about it.

The trial court denied defendant's motion for a mistrial, based in part on this portion of the summation. The court neverthe-

less characterized the prosecutor's comments as "inflammatory," "an emotional type statement" and "beyond the bounds of propriety." The court instructed the jury that the reference to "a place in hell" for defendant should be disregarded, and further instructed the jury as follows:

> And finally, there was a comment by the Prosecutor regarding the fact that the defendant—that the sons of the defendant testified as part of the defense case. A defendant in a criminal case has a right to bring in any witnesses or subpoena or bring in any other way any witnesses to testify on his behalf, and no adverse inferences should be drawn against the defendant merely because his sons testified as witnesses on his behalf.

Defendant contends that the trial court's instruction was "woefully inadequate," and that the prosecutor's comment could be understood to suggest that defendant should be sentenced to death because he called his sons as witnesses.

The thrust of the prosecutor's challenged remarks is self-evident. Arguably, defendant's sons' testimony concerned only peripheral aspects of the case—except for that of Robbie Marshall who stated that defendant was at home at noon on September 6, 1984, the time, according to McKinnon, that he and defendant met on the Garden State Parkway. Thus, it was not unreasonable for the prosecutor to have implied that defendant's sons had been called as witnesses not so much for the substance of their testimony but because their mere presence as witnesses would suggest support for their father, support that would have been unwarranted if defendant had participated in the murder of their mother. Thus, in emotional and inflammatory terms, the prosecutor expressed his revulsion at what he perceived as defendant's "using" his sons in order to gain an acquittal.

We are reminded of Justice Clifford's observation, dissenting in State v. DiPaglia, 64 N.J. 288, 305, 315 A.2d 385 (1974):

> Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.

The prosecutor's comments, however, were not merely "forceful and graphic," they were inflammatory and highly emotional, possessing the capacity to anger and arouse the jury and thereby divert them from their solemn responsibility to render a verdict based on the evidence. Although the prosecutor's remarks went beyond the boundaries of permissibly forceful advocacy, we note that their focus was on a distinctly collateral aspect of the trial, not on a critical and contested issue of fact. We acknowledge that the trial court's curative instruction could have been more forceful, but we are satisfied that it was adequate to ameliorate any significant prejudice to defendant.

6. *Prosecutor's Remarks in Summation Focusing on Victim*

(a) Guilt Phase

In his guilt-phase summation, the prosecutor concluded his argument with the following comments:

I didn't know Maria Marshall, but I know and you know that she loved her boys. I know and you know that she loved her husband. For eight months that lady knew that his afternoons were spent in the arms of another woman. She continued to cook for him, she continued to clean his clothes, she continued to keep the house clean, she continued to make love with him, because she loved him. She wanted to start all over. She wanted to give him a second chance. She had a right to live her life in full, to watch her boys continue to grow, to watch them graduate from school, to get married and have families of their own, but he tossed it all away because of his desperation and his greed. And that is Robert Oakley Marshall.

Before us, defendant contends that these remarks improperly focused the jury's attention on the qualities of the victim and deprived defendant of a fair trial.

We addressed this issue in *State v. Williams, supra,* 113 *N.J.* at 446–54, 550 *A.*2d 1172, where the prosecutor, after adducing evidence concerning the personal qualities and future plans of the homicide victim, elaborated on the virtues of the victim during opening and closing arguments in both the guilt phase and sentencing phase of the case. We observed:

Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately

intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.*, defendant's assertion of self-defense or provocation. Where, however, as in the matter before us, the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury.

 \* \* \* \* \* \* \* \*

 \* \* \* It is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary. Failure to purge successfully such comments from admittedly emotion-charged proceedings creates the unacceptable risk that what will result is the arbitrary and capricious imposition of the death penalty. *Booth v. Maryland, supra,* 482 *U.S.* [496] at 501, 107 *S.Ct.* [2529] at 2532, 96 *L.Ed.*2d [440] at 448 [(1987)].

 [*Id.* 113 *N.J.* at 451–52, 453–54, 550 *A.*2d 1172.]

Similarly, in *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816 (1990), we observed that the prosecutor "consistently emphasized the character and background of the victim, as well as the impact of her death on her family." *Id.* at 566–67, 575 *A.*2d 816. We concluded that the prosecutor's opening statement, as well as his guilt- and penalty-phase summations, reflected an intention "to divert the jury from the material facts to the worthiness of the victim," using "the character and family of the victim to excite the jury." *Id.* at 571, 575 *A.*2d 816.

▮▮ We perceive a significant distinction between the prosecutor's comments about the victim in this case and the offending comments in *Williams* and *Pennington.* The statements about Maria Marshall's conduct during the period of defendant's infidelity were supported by evidence in the record and were consistent with the theory of the State's case—that defendant arranged for the murder of his wife primarily to collect the proceeds of her insurance and pay off his debts. There was no evidence demonstrating that the victim had shown significant antagonism toward defendant during his relationship with Sarann Kraushaar, and defendant's tape to his brother-in-law stated that the victim continued to love him and wanted to "start over." Thus, the prosecutor's comments do not merely

describe the victim sympathetically, but characterize her relationship with defendant in a manner relevant to "critical aspects of the trial," *Williams, supra,* 113 *N.J.* at 451, 550 *A.*2d 1172, and tend to support the State's proofs concerning defendant's motive for the homicide.

■ However, the prosecutor's comments did not end with his observations about the victim's willingness to give defendant "a second chance." His concluding statement was an obvious appeal for sympathy toward the victim:

> She had a right to live her life in full, to watch her boys continue to grow, to watch them graduate from school, to get married and have families of their own * * *.

That comment had no bearing on any substantive issue in the case and falls within the category of inappropriate prosecutorial argument we criticized in *Williams* and in *Pennington.* The prosecutor's references to the victim, however, were much more circumscribed and far less emotional than those in either *Williams* or *Pennington.* Based on our review of the prosecutor's entire guilt-phase summation, we are satisfied that those references to the victim that were unrelated to any substantive issues were neither extensive nor inflammatory, and we find them harmless beyond a reasonable doubt.

(b) Sentencing Phase

■ The prosecutor's sentencing-phase argument, which was extremely brief, contained this abbreviated reference to the victim:

> I really cannot think of anything more heinous in our society than to, you know, hire somebody to kill somebody else, let alone a family member; in this case, your wife.
>
> * * * * * * * *
>
> Maria Marshall had no prior criminal history. Maria Marshall was civic-minded, and this defendant did not give her the option of thirty years.

Because defendant had offered his lack of a prior criminal record and his civic activities as mitigating factors, the prosecutor could properly argue that their qualitative value did not overcome the weight of the aggravating factor. Although the

prosecutor was free to depreciate the significance of defendant's mitigating evidence, the argument that the victim could claim the same qualities relied on by defendant is diversionary, focusing attention away from the mitigating evidence and emphasizing the lack of justification for the homicide. We find the argument inappropriate, but have no doubt that this isolated statement in the prosecutor's brief closing argument did not have the capacity to affect the jury's deliberative process.

### B. Ineffective Assistance of Counsel

Defendant contends that the ineffective performance of trial counsel at both the guilt and sentencing phases deprived him of his constitutional right to effective assistance of counsel and to a fair trial.

In *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987), this Court adopted, with slight modification, the standard for ineffective assistance of counsel established by the Supreme Court in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984). This Court held that "a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. This standard applies in capital cases. *State v. Davis,* 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989).

The contention that defendant was denied effective assistance of counsel in the guilt phase is utterly without merit. Defense counsel, a certified criminal trial attorney, *see Rule* 1:39, provided a zealous and conscientious defense of his client throughout this protracted trial. Counsel was obviously well-prepared, thoroughly familiar with the record, and persistently and forcefully advocated his client's interests throughout the

guilt-phase proceedings. The examples of the deficiencies relied on by defendant represent no more than a fraction of the strategic decisions with which counsel was confronted in the course of this lengthy and sharply-contested proceeding. With hindsight, it is not difficult to suggest different trial strategies that counsel might have pursued, but the law is settled that "[i]n assessing the adequacy of counsel's performance, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Burger v. Kemp*, 483 *U.S.* 776, 819, 107 *S.Ct.* 3114, 3139, 97 *L.Ed.*2d 638, 673 (1987) (Powell, J., dissenting) (quoting *Strickland, supra*, 466 *U.S.* at 690, 107 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Nor can the quality of counsel's effectiveness fairly be assessed by focusing on a handful of issues, while ignoring the totality of counsel's performance in the context of the State's compelling evidence of defendant's guilt. Based on our close scrutiny of the entire record, we reject defendant's contention that counsel's performance was deficient under the *Strickland/Fritz* standard.

█ With respect to the penalty phase, defendant focuses on defense counsel's alleged failure to present mitigating evidence and counsel's "abdication of the role of advocate" in his closing argument to the jury. We have heretofore rejected defendant's contention that the absence of mitigating evidence in the sentencing proceeding prevented the jury from discharging its duty to determine whether death was the appropriate punishment, noting that defense counsel relied on evidence in the guilt phase to prove mitigating factors, that the existence of one mitigating factor was stipulated by the State, and that the jury found both mitigating factors relied on by defendant. *Supra* at 140–141, 586 *A.*2d at 157. We also note that several defense witnesses at trial testified to defendant's good reputation in the community, and defendant testified extensively concerning his background, education, family life, and civic activities. Although defendant argues that additional mitigating evidence was available, we are unpersuaded that in the

context of this record the failure to adduce additional mitigating evidence in the sentencing proceeding constituted ineffective assistance of counsel. It is self-evident that in view of the crime of which defendant was convicted, the selection of mitigating evidence on which to rely was a matter of some delicacy, requiring counsel to consider carefully the prospect of rebuttal evidence and rebuttal arguments, as well as the jury's anticipated reaction to any mitigation evidence that was offered. We are unwilling to second-guess counsel's strategic decision on this issue, particularly in view of the jury's determination that both mitigating factors offered had been established.

■ Defense counsel's closing argument is faulted for its brevity, its lack of emotion, and its concession that "whatever you feel is the just thing to do, we can live with it," a remark characterized by defendant as "relieving the jurors of any legal or moral responsibility they may have felt for his client." Defendant contends that counsel's "failure to affirmatively request a life sentence," combined with his overall performance at the penalty phase, was "so unreasonable and unsound as to be constitutionally defective."

We acknowledge that the closing argument of defense counsel in the sentencing proceeding was quite brief, although somewhat longer than the prosecutor's closing argument that followed. Defense counsel explained to the jury the two mitigating factors on which defendant relied, noted that one was stipulated, and cited evidence in the record that supported the other factor, and then concluded his argument with the following statement:

> One thing I have to tell you about this, which I think makes it an individual decision for each one of you, and that is that the only way that the death penalty can be imposed is if all twelve of you agree to do it unanimously. So that you, in essence, have a power in your hands that, quite candidly, I would never have in my hands, because, as a lawyer, we generally don't serve as jurors. So I have no way of knowing what it must be like.

All I can say is this, that I hope when you individually consider the death penalty, that you're each able to reach whatever opinion you did in your own heart, and that whatever you feel is the just thing to do, we can live with it.

In assessing whether counsel's closing argument constituted ineffective assistance of counsel in the sentencing phase, we note that the prosecutor's closing argument, although brief, included a response addressing both mitigating factors relied on by defendant. Hence, it is reasonable to assume that the content of defendant's closing argument was formulated in anticipation of the State's response. *Cf. Martin v. McCotter*, 796 *F*.2d 813, 821 n. 2 (5th Cir.1986) ("[C]ounsel did not want to act as a 'foil' for the prosecution, enabling the prosecution to 'reply all the harder.' ").

We also infer from counsel's closing argument a strategic decision to avoid any emotional appeal to the jury, in favor of a low-key statement that emphasized that the life or death decision was the responsibility of each individual juror. In the context of this record and the grave offense of which defendant was convicted, a closing argument that focused each juror's attention on his or her moral responsibility for defendant's life or death cannot easily be discredited.

We note simply by way of comparison the closing argument delivered in the capital case of *Romero v. Lynaugh*, 884 *F*.2d 871 (5th Cir.1989), by an experienced Texas trial lawyer whose client had participated in the brutal rape and killing of a fifteen-year-old girl, had assaulted two other women within weeks of the crime, and laughed in the presence of the jury when evidence of the details of the crime was presented. Although defense counsel had argued extensively in the guilt phase, his closing argument in the sentencing phase was as follows:

I appreciate the time you took deliberating and the thought you put into this. I'm going to be extremely brief. I have a reputation for not being brief.

Jesse, stand up. Jesse?

The Defendant: Sir?

Defense Counsel: Stand up.

> You are an extremely intelligent jury. You've got that man's life in your hands. You can take it or not. That's all I have to say.
>
> [*Id.* at 875.]

In rejecting defendant's contention that counsel's closing argument constituted ineffective representation, the Fifth Circuit observed:

> There is no question that Wood engaged in substantial preparation for trial. He obtained access to the prosecutor's file, even the report of the state's investigator, and observed each of the three trials of Romero's confederates. He knew the jury. He knew the community. As for the events of trial, there is nothing to suggest that any mitigating facts were not before the jury.
>
> * * * * * * * *
>
> Given his difficult situation, we are not prepared to fault Wood's effort to highlight the heavy responsibility of the jury by not burdening them with the obvious and avoiding the risk of losing them by arguing the absurd. To do so comes close to insisting on a pro forma argument in every case. Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance.
>
> [*Id.* at 877.]

We are in accord with the reasoning of the Fifth Circuit in *Romero, supra.* What constitutes an effective closing argument in a capital case depends on the crime, the evidence, the circumstances—in short, the entire record, and there is no general rule requiring counsel in such cases to appeal specifically to the jury to spare the defendant's life. The argument that may succeed in one case can fail in another, and our responsibility is to insure that competent capital counsel, having an "expertise regarding the special considerations present in capital cases," *State v. Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082, made a reasonable strategic choice based on adequate investigation. We are unpersuaded that defendant's highly-experienced and qualified counsel acted unreasonably in formulating his closing argument to the jury. In any event, we have no doubt that even if counsel's closing argument were deemed to be deficient, there was no reasonable probability that that deficiency materially contributed to defendant's death sentence. *See State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336.

### C. Constitutionality of Capital Punishment Act

Defendant contends that New Jersey's Capital Punishment Act violates the eighth amendment, a contention that we rejected in *Ramseur, supra,* 106 *N.J.* at 185–90, 524 *A.*2d 188. We adhere to our prior rulings on this issue.

### D. Cumulative Error

Defendant contends that even if errors found to have occurred in the guilt and sentencing proceedings are deemed to have been harmless, the cumulative effect of all errors requires reversal of defendant's conviction and death sentence. Defendant relies on *State v. Orecchio,* 16 *N.J.* 125, 106 *A.*2d 541 (1954), for its recognition that where "the legal errors * * * in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury." *Id.* at 129, 106 *A.*2d 541. Justice Jacobs, writing for a unanimous Court in *Orecchio,* also observed:

> The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial * * *.
>
> [*Ibid.*]

We acknowledge that in this capital proceeding, as in every other capital case that this Court has reversed, errors were committed in the course of trial. The fact that capital cases are vigorously contested, protracted, and consistently implicate subtle and difficult legal issues virtually assures that in the course of each trial some errors and imperfections will be apparent. Trial judges, unlike appellate judges, make their rulings in the heat of trial, without the opportunity for deliberative review, and not even the most experienced and conscientious trial judges can be perfect.

██ But even in capital cases, we adhere to the general principle that "[a] defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953). Our "meticulous and comprehensive procedure for reviewing capital cases" stems from our conviction that in such cases we must "subject the record to intense scrutiny," recognizing that a defendant's very life is at stake. *State v. Bey* I, 112 *N.J.* 45, 92–93, 548 *A.*2d 846 (1988). In determining whether errors that occur in the course of a capital proceeding require reversal of either the verdict or the sentence, we make

> a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence.
>
> [*Id.* at 94–95, 548 *A.*2d 846.]

We continue to believe that that standard, which we have assiduously applied to this record, is able to "accommodate our heightened concerns and responsibilities in reviewing death-penalty prosecutions." *Id.* at 95, 548 *A.*2d 846.

In the context of that standard, we have carefully reviewed each of the errors identified in the course of this opinion. Based on that review, and recognizing that the evidence of defendant's guilt was overwhelming, we are fully satisfied that considered individually and in the aggregate, the errors committed at trial were not clearly capable of affecting either the verdict or the sentence.

### E. Proportionality Review

As authorized by the Capital Punishment Act, *N.J.S.A.* 2C:11–3e, defendant has specifically requested that this Court determine whether defendant's "sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," deferring its determination until a full record can be made and argument had thereon. We acknowledge defendant's request for proportionality review. That review shall be undertaken pursuant to a briefing and argument

schedule to be established by the Clerk of the Court after consultation with counsel.

## VII.

### Remand Hearing to Consider Alleged *Brady* Violation

#### Introduction

In January 1985, approximately one year before trial, defense counsel filed an omnibus motion with the court, which included defendant's pretrial discovery demands. One of those demands was that the State disclose to defense counsel the following:

Any and all considerations or promises of consideration given to or on behalf of the witnesses or expected or hoped for by the witnesses. By "consideration", defendant refers to absolutely anything, whether bargained for or not, which arguably could be of value or use to a witness or to persons of concern to the witness, including but not limited to * * * criminal, civil or tax immunity grants; and anything else which could arguably reveal an interest, motive or bias in the witness in favor of the plaintiff or against the defense or act as an inducement to testify or color testimony.

On March 29, 1989,—some three years after the trial's conclusion—an article in the New York Times disclosed the existence of two documents that discussed a promise that had been made by former Ocean County Prosecutor Edward Turnbach in the fall of 1984 not to prosecute Sarann Kraushaar in return for her truthful cooperation in the investigation of defendant. The prosecution's file also contained two other documents related to that promise. Asserting that none of those documents was disclosed to the defense, defendant moved before this Court for a hearing to determine whether a violation of *Brady v. Maryland, supra,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215, had occurred. We granted defendant's motion, limiting the issue for decision on remand to "whether correspondence in respect of a grant of immunity for Sarann Kraushaar was disclosed to the defense; if it was not, was the

non-disclosure willful and was the information improperly withheld from the defense." [3]

At the outset of the hearing, the parties stipulated that the documents had not been disclosed to the defense prior to or during the pendency of the trial. The State conceded during the hearing that all or some of the documents were discoverable and had been improperly withheld because they were in the possession of the State and had not been disclosed. Thus, the only question to be determined at the hearing was whether the nondisclosure was willful. Our review of the trial court's findings will include our determination of whether the nondisclosure was "material" to the defense in that it had the capacity to affect the outcome of the trial.

The court determined that the burden of proof was on the State to prove "to the satisfaction of the court" that the failure to disclose the documents had not been willful. The State offered the testimony of the investigators and prosecutors who had assembled and presented the case against defendant, including former Ocean County Prosecutor Edward Turnbach, former Assistant Prosecutor Kevin Kelly, Supervisor of Investigations James A. Churchill, Sergeant Daniel Mahoney and Lieutenant Edward Murphy of the Major Crimes Unit of the Ocean County Prosecutor's Office, and Sterling Jones of the State Police. Through their testimony, the State sought to demonstrate that the prosecutor and the investigators who had contact with the immunity correspondence had not been involved in the production of discovery in the case. Moreover, the State sought to establish that the Kraushaar documents had been inadvertently misfiled and that that misfiling was

---

[3]We note parenthetically that a *Brady* violation can be found irrespective of the good faith or bad faith of the prosecution. However, pursuant to a request by the defense, to which the State acquiesced, the scope of the remand hearing was limited to a determination of whether a *Brady* violation had occurred, and, if so, whether the prosecutor's actions were willful. Nevertheless, we reach and determine the ultimate issue under *Brady*—whether the withheld evidence is material either to guilt or punishment.

responsible for the State's failure to have included the correspondence with other materials disclosed to the defense.

The defense attacked the credibility of the State's version of the facts through cross-examination of the State's witnesses and through the testimony of Patrick Sheehan, another assistant prosecutor in the Ocean County Prosecutor's Office. In particular, defendant sought to establish that because of the importance of Sarann Kraushaar's testimony to the State, it was inconceivable that the prosecutors and investigators would not have shared among themselves their knowledge of promises made to her. In an attempt to expose such shared knowledge, and thereby suggest willful conduct, defense counsel questioned the witnesses about their contacts and conversations with each other at the time of Kraushaar's interview on September 27th and at time periods before and during the trial.

After three days of testimony, the court rendered the following findings:

The initial interview of Serann [sic] Kraushaar by representatives of the Ocean County Prosecutor's Office took place on September 7, 1984 within hours after the murder of Maria Marshall. Kraushaar was at the Prosecutor's Office and was accompanied by two attorneys, Daniel Carluccio and Edward Liston, both of whom were experienced in criminal matters. After acquainting themselves with the situation, they indicated to the investigators that Kraushaar would speak with them and the attorneys departed, after which the interview was conducted. It is clear that Kraushaar was regarded as being merely a person with knowledge of relevant facts. During this interview Kraushaar furnished information regarding the details of her affair with Robert Marshall, the plan to leave their respective spouses, the financial difficulties that Marshall was having, the fact that insurance on Maria's life would solve these difficulties, the fact that Marshall had inferred a desire to have his wife killed, as well as other matters.

On September 27, 1984, then Ocean County Prosecutor Turnbach was called on the telephone by attorney Richard Altman of the firm of Pellettieri, Rabstein and Altman, of Trenton. Altman now represented Kraushaar and stated that she had additional information that she wished to disclose to the Prosecutor. Altman also raised the matter of immunity from prosecution of Kraushaar. The Prosecutor stated, in essence, his feeling that a grant of immunity was inappropriate since Kraushaar was not suspected of any criminal conduct. Altman, nevertheless, was insistent that some writing be signed by the Prosecutor assuring that Kraushaar would not be prosecuted if she disclosed the information. The Prosecutor reiterated that his office had no evidence of

criminal conduct by her, but in order to placate the attorney he had prepared the letter in question dated September 27, 1984 (S-1). The letter was read to Altman over the telephone and the content approved by him. On the same day, county investigator Daniel Mahoney and State Police detective Sterling Jones went to Altman's office to conduct the interview. Attorney John H. Pettito of Altman's office was present with Kraushaar. Pettito asked for the letter that had been read over the telephone. However, Mahoney and Jones did not have it with them. Accordingly, Pettito had prepared on his firm's letterhead a document (S-2) stating, in essence, that the letter in question had been prepared and signed by the County Prosecutor. Since the document was prepared for the signatures of Mahoney and Jones, Mahoney called the Prosecutor, read the document to him and secured his approval to sign the same. Mahoney and Jones signed the document and the interview of Kraushaar was conducted. Mahoney returned to the Prosecutor's office and delivered to him a copy of the document. Mahoney never saw the document again. The Prosecutor realized the discoverable nature of both S-1 and S-2. He had them placed in the Marshall file and, thereafter, assumed that all persons concerned in his office would know of them. He gave no further thought to them.

In the Ocean County Prosecutor's office at the time, correspondence files and investigation files pertaining to a case were maintained separately. The person in the office who filed correspondence at the time placed S-1 and S-2 on a pin in the correspondence file. This would be understandable since S-1 is a copy of a letter and while S-2 is not a letter, it is prepared on the attorney's letterhead.

The case manager was Investigator Edward Murphy. Among his duties was that of preparing discovery packets for delivery to defense attorneys. For that purpose he would maintain investigation portions of files on his desk and he did so in this case. Although he may have had the correspondence file for a period of time, at some point the correspondence file was placed in a file room in accordance with the procedures of the office. When Murphy prepared discovery he did not go through the correspondence files of cases and did not do so in this case. The police reports, laboratory reports and other items that comprised discovery were obtained from the investigation·section of the file. Therefore, S-1 and S-2, as well as other correspondence were not included in the discovery packet. The Prosecutor himself was not at all involved in the discovery process and, therefore, had no knowledge as to whether any particular items were included or not.

Then Assistant Prosecutor Kevin Kelly was assigned to try the Marshall case at an early stage of the proceedings. However, due to other trial commitments and his part time status, he did not take actual control of the file for a period of time. He interviewed Kraushaar in preparation for trial. No reference was made in any such interview to the documents in question or to any grant of immunity from prosecution. Kelly at no time during the pendency of the proceedings went through the correspondence files, never saw the documents in question and was not informed of their existence by anyone. His trial preparation, insofar as it related to the file on the case, was limited to the trial or investigation portion of the file. While an attorney in thoroughly preparing for trial might well go through every piece of correspondence in the file, it would

also be understandable that a person might not do that unless he were searching for a particular item.

Then Assistant Prosecutor Patrick Sheehan assisted Kelly at the trial. Prior to trial he had prepared for and handled a discovery motion. During the pendency of the proceedings he never saw or at least had no recollection of ever having seen S–2. He did at sometime, however, see S–1 in the correspondence file. Although his recollection is not completely clear as to the matter, I am satisfied that he saw it at some time after the Marshall trial had been concluded. It is fairly inferrable [sic] from the evidence that he did not thoroughly review the correspondence file in preparation for the discovery motion.

The court acknowledged that the prosecutor's office might have negligently handled the filing of the letters. Nonetheless, the court emphasized that the nondisclosure was unintentional:

I am satisfied that apart from an unnamed filing person the only persons in the Prosecutor's office who were aware of the existence of the documents in question in any way were the County Prosecutor and Investigator Mahoney. Neither of these individuals was personally familiar with what was actually sent in discovery. In fact, the evidence demonstrates that each assumed that the items would be included in the discovery packet.

In addition, the court observed that the "presence or absence of motive bears upon whether an intentional wrong would be committed." In that regard, the court found that any motive for nondisclosure was "substantially outweighed by the motive to disclose." That conclusion was based on the court's assessment of the materiality of the letters to defendant's case:

[T]he Prosecutor would have been aware that he could demonstrate that a substantial portion of Kraushaar's story was told on September 7, 1984, twenty days prior to any discussion of immunity. He was aware of what the testimony of Billy Wayne McKinnon would be, together with the fact that it would not have been plausible for McKinnon to have been involved in the murder either as an accomplice (as alleged by the State) or as the shooter (as alleged at trial by co-defendant Thompson) except at the instigation of Marshall. He was aware that he could demonstrate false and inconsistent statements made by Marshall following the murder.

As a result, the court concluded "that the State has shown that the failure to disclose the documents in question was not willful." Defendant challenges that ruling on grounds related both to the conduct of the hearing and to the sufficiency of the evidence. We address those contentions in turn.

## A. Disqualification of Prosecutor's Office from Hearing

Prior to the hearing, the trial court denied defendant's motion to disqualify the Ocean County Prosecutor and direct the office of the Attorney General to represent the State. The court refused to disqualify the Prosecutor's office for several reasons. First, the order issued by this Court did not require that the Attorney General represent the State at the hearing. Second, the Attorney General's office certified to the court that it "specifically requested the Ocean County Prosecutor to handle the matter." Moreover, the court noted that the Ocean County Prosecutor at the time of trial, and the assistant prosecutor who tried defendant's case, were no longer members of that office. The court concluded that defendant had not met the burden of proving that the Prosecutor's office should be disqualified:

[This is] just a garden variety hearing * * * to determine whether [the withholding of the documents] was done wilfully [sic], the failure was willful.

\* \* \* \* \* \* \* \*

These types of hearings are routinely held and representation of the State is routinely had by the Prosecutor handling the matter. It's not a situation that seems to call for a disqualification of the Prosecutor. It's not a situation in which the Prosecutor has this type of nefarious interest such as personal, personal financial stake in the outcome of the case or something of that nature. I suppose in a sense you could always argue the Prosecutor has an interest in the outcome of any case, but this is not that type of situation in which the Prosecutor has that type of interest.

\* \* \* \* \* \* \* \*

This is simply a question of whether two documents, arguably three documents should have been turned over to the defense. That's all it is.

Defendant challenges the court's ruling, claiming that the Ocean County Prosecutor had a conflict of interest at the time of the remand hearing. See *RPC* 1.7(b). Specifically, defendant contends that the interests of justice would be compromised by the Prosecutor's interest in vindicating its management of the discovery file in the *Marshall* case. Defendant argues that the court's failure to disqualify the Prosecutor's

office resulted in an unfair hearing and constituted an abuse of discretion.

The Legislature conferred on the Attorney General the responsibility to "maintain a general supervision over * * * county prosecutors with a view to obtaining effective and uniform enforcement of the criminal laws throughout the State." *N.J. S.A.* 52:17B–103. In addition to that broad supervisory power, the Legislature envisioned several circumstances in which the Attorney General could aid in a particular criminal prosecution. Criminal proceedings in counties without a county prosecutor are prosecuted by the Attorney General. *N.J.S.A.* 52:17B–104. The Attorney General can respond to a written request for assistance by the county prosecutor. *N.J.S.A.* 52:17B–105. The Legislature also requires the Attorney General to supersede the county prosecutor on written request by the Governor. *N.J.S.A.* 52:17B–106. Supersession is discretionary "whenever requested in writing by a grand jury or the board of chosen freeholders of a county or the assignment judge of the Superior Court for the county * * *." *Ibid.* Finally, the county prosecutor can be superseded "[w]henever in the opinion of the Attorney General the interests of the State will be furthered by so doing * * *." *N.J.S.A.* 52:17B–107a.

 Defendant argues that the Attorney General's decision not to intervene in the matter "constituted a gross abuse of discretion and resulted in an unfair hearing with unreliable results." It is clear that the Attorney General was under no statutory obligation to represent the State at the remand hearing. See *N.J.S.A.* 52:17B–106. Neither the grand jury, the board of chosen freeholders, the assignment judge, nor the Ocean County Prosecutor's office requested the Attorney General's assistance. In fact, the Attorney General's office indicated that it preferred that the Prosecutor's office represent the State at the hearing. We will not disturb that decision, particularly in light of its separation-of-powers implications. *Cf. In re Yaccarino,* 101 *N.J.* 342, 353, 502 *A.*2d 3 (1985)

(decision by Attorney General's office not to present judicial removal proceeding to grand jury involved discretionary determination by executive branch). Moreover, in ordering the remand hearing we found no basis for requesting that the Attorney General intervene. Accordingly, we find no abuse of discretion in the trial court's decision to permit the Ocean County Prosecutor's office to represent the State at the remand hearing. Therefore, we consider defendant's other arguments in the context of the testimony adduced at the hearing.

### B. Limitation of Discovery

The court limited discovery at the remand hearing to documents closely related to the scope of this Court's remand order. Defendant argues that the court erred by limiting discovery and urges this Court "to issue an *ex parte* order directing the seizure of the entire Marshall file by disinterested officials." Shortly after being designated to represent defendant at the remand hearing, defense counsel wrote to the Ocean County Prosecutor to request

discovery of any and all documents, reports, notes, memoranda, or other writings of any kind, as well as any other information that may be available and which would be helpful to the defense, bearing on any aspect of this inquiry. This request specifically includes, but is not limited to, anything relevant as to 1) those who had information about the existence of oral and/or written promises to Ms. Kraushaar; 2) the persons responsible for channeling it to the appropriate parties (both within your office and to the defense); 3) the manner in which the information was actually processed and/or maintained within your office; and 4) the explanation for the State's failure to supply it to the defense.

The State informed the court at the remand hearing that discovery had been provided at the time of defendant's trial. More specifically, the State indicated that the "immunity documents" had been forwarded to defense counsel, "[a]nd that's it. Those are the documents. I don't have anything. I don't know what he's looking for. He's got the discovery in this matter. He has the full discovery." Five days later, the defense filed a motion for discovery, seeking an order that would

direct[ ] the Ocean County Prosecutor's Office to provide the defendant with copies of any and all documents, reports, notes, memoranda, or other writings of any kind, as well as any other information that may be available and which would be helpful to the defense, bearing on any aspect of the matters in issue at the remand hearing that has been ordered by the New Jersey Supreme Court.

In an attorney certification attached to the notice of motion, defense counsel explained why broader discovery was necessary:

[I]t is clear that defense counsel should not be required to rest on what was provided as discovery as of the date of the trial, given the fact that the very reason for the remand hearing is the apparent non-disclosure of relevant and discoverable information and documents that occurred at that time. Certainly, under the circumstances, it would appear to be highly appropriate for the court to order that a further search be made of the prosecutor's files for any other documents, and for any other information helpful to the defense, which may not have been disclosed * * *.

Defense counsel stated further that wide latitude was required because the issues at the hearing pertained to the mental processes of those involved in the prosecution of the murder trial.

At the hearing, defense counsel argued that broader discovery should be permitted in the remand hearing than was permitted in the original trial:

[The State's] position seems to be * * * that this isn't the kind of discovery that you get. This is work product. They all say what you're entitled to get and this isn't included and I say to your Honor very simply that we're not dealing with an ordinary criminal trial here.

The issues here are not the Defendant's guilt or innocence. The issue that you have to resolve is in fact the way they worked this file. The work product is what we have to deal with here. We're dealing with whether they acted in good or bad faith. There's no way to engage in that inquiry without knowing what they have in that file. There's no way to be assured that we'll get the complete picture.

According to defendant, cases involving potential misconduct by the prosecutor's office require the broadest possible discovery. As a result, defense counsel requested that the entire prosecutor's office file on the *Marshall* case be turned over to the defense:

I think the only simply and proper solution, if they have nothing to hide, let them show us. If there's nothing in there, that's fine. I want to go through

the file page by page. I want to see every note in that file, if the court can permit it, so I can pull out anything that will be germane to this case and if anything that they say I should not see, let them give it to you and you look at in camera.

The State responded that there were no more documents in their offices related to the promise of the nonprosecution of Sarann Kraushaar:

[Defense counsel] says since * * * there was a document or two documents together that related to this matter that were not turned over [at the time of the original trial], there must be more. There aren't any more. He says that there must be a report prepared showing how these documents were found. There's not a report. There is no such report and Counsel doesn't like the fact that a report was not made. I can't help that. There is no physical document that I have to turn over to him. It just doesn't exist.

Defense counsel then focused his argument for additional discovery more narrowly:

In terms of discovery, I note first that the Prosecutor again is specifically ignoring the request for such things as Kelly's trial notes and preparation notes. Nobody is saying they don't exist. He keeps saying they gave me everything. He gave me everything by his narrow definition of, as I understand it, of what he has to give me. I understand the Prosecutor's representation on the record that they don't have a report on the missing items or how they came not to be disclosed, but I understand there must be all kinds of memos, notes, documents, in that file which pertain to these issues. He's not denying. He's saying I'm not entitled to it and he's skirting around it.

Defense counsel requested that the court order the State to represent whether there were notes, documents or other personal memoranda of the witnesses that would pertain to the grant of immunity.

Before ruling on the discovery motion, the court acknowledged that there might be cases where it was appropriate for the State to turn over an entire file in a criminal matter. The court determined that this was not such a case:

This is simply a question of whether two documents, arguably three documents should have been turned over to the defense. That's all it is.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

What shall be turned over is any reports, notes, correspondence, memoranda, statements or other documents relating to the alleged immunity granted to Sarann Kraushaar, whether generated prior to the conviction in this matter or subsequent to the conviction or pertaining to any interviews or statements of her taken or to be taken which have not previously been supplied.

During the hearing, defense counsel renewed his request for additional discovery. Narrowing his request, he sought production of the correspondence file in which the Kraushaar letters had been misfiled:

[G]iven the nature of the testimony we have heard, * * * we are all entitled and the court should see what the context was for the misplacing, if I may call it that, as the State seems to be describing it, and the location eventually of these documents. I think we have—what else is in there, what this file looks like, it is unlikely it is work product. It is correspondence and things that go in and come out from the office, but certainly while we are trying to judge the likelihood of preparing for the Louisiana case Mr. Churchill, Captain Churchill, would have looked through the file and not found it, when we are talking about the likelihood that Prosecutor Turnbach would never have realized where it was located, that other investigators wouldn't have known about it, * * * I think we need to know where it was and what it was surrounded by and how plausible the exchange is * * *.

The State again opposed defendant's motion, suggesting that "counsel just wants an opportunity to obtain that entire file and start leafing through it * * *." The court ordered that the correspondence file be produced for inspection by the court.

After reviewing the file the next day, the court heard further argument concerning whether defense counsel ought to be permitted to see it. The State argued against disclosing the file because it was "in the nature of work product. It's certainly not discoverable material." The court rejected that argument and permitted defendant to examine the correspondence file.

Defense counsel reviewed the correspondence file, and found what might have been additional *Brady* material. Specifically, defense counsel discovered letters from the Ocean County Prosecutor's Office to the State Police requesting reimbursement for expenses related to housing and food for Billy Wayne McKinnon's family during defendant's trial. Based on that revelation, defense counsel renewed his request for the broadest possible discovery, *i.e.*, disclosure of the entire State file in the *Marshall* matter:

The State went through the files, told us we have everything we need in this case * * *. We're in the process of remand hearing on the basis of exculpatory evidence withheld. We want to see the entire file. We're not sure there's nothing else we need to know. If they lost letters before, for the purposes of

this hearing, they've gone through everything. Nobody brought this forward. The Ocean County Prosecutor's office in the disinterested role, which is their claim, has never told us about this.

\* \* \* \* \* \* \* \*

For those reasons, your Honor, I have several applications. The first is access to their entire file. \* \* \* And the third, your Honor, is certainly for copies of anything that's in here and I think we ought to have a recess of these proceedings for a sufficient time to allow us to go over and go through their boxes, all of them. I would say, your Honor, it can be done under appropriate circumstances. The court can direct that the Sheriff Officer or anybody else accompany us. It certainly can be done in the presence of Mr. Millard or anybody else from the Prosecutor's office, but at this point, there's no way we can be assured that we have everything we ought to have on behalf of the Defendant and I think that if it's not considered within the scope of this remand by the Supreme Court, there's no question that somebody's going to have to answer at some point for the fact that this information was not disclosed.

The State again opposed the motion to produce the entire file. The court acknowledged the possibility that the discovery of the McKinnon letters might justify disclosing the entire file at a later date, but declined to disrupt the remand hearing for the purpose of permitting further discovery.

Subsequent cross-examination of Investigator Murphy revealed that the Prosecutor's office regularly engaged in the practice of maintaining a separate "discovery file." According to Murphy, that file consisted of photocopies of discoverable police reports and other documents. The copies were made before the originals were filed and were accumulated by the case agent in a separate folder in order to expedite the delivery of appropriate materials to the defense. Murphy's revelation of the existence of such a file provided an occasion for renewed defense requests for an expanded order of discovery.

According to defense counsel, the contents of the discovery file could prove determinative on the issue of willfulness:

Their whole defense in affect [sic] to the claim of the willful withholding of the documents is that the only place they could be located is the correspondence clip[,] put there by mistake and nobody ever looked there again. If [the Kraushaar immunity letters are] in the discovery file, then obviously that argument doesn't wash.

The Court granted defendant's motion and ordered that the State produce the discovery file.

The State informed the court the next day that the discovery file was now empty:

Your Honor, when we were here last, you had requested or directed that I go back to the file room with Lt. Murphy and look for the discovery file that he had prepared in that regard and we did that last night.

When we left here, we went back to the file room. There's a locked room where the file is kept. We went in there.

We searched through the various boxes looking for anything, didn't find a discovery file.

Lt. Murphy went back to his office and—which is in another building and when he was back there, he found in his private office this folder and the folder has—you can see what it is, it's an old expandable folder.

It has "copies" written on the top; "discovery—State versus Marshall, copies, two of two" written there and what was in it in his office was some personal correspondence and items of that sort from the Louisiana trial.

There was no discovery file and I submit that to the court and present that information to the court's attention.

On appeal, defendant argues that the trial court's rulings denying defense counsel access to the State's entire file were error. *Rule* 3:13–3(a) provides criminal defendants with broad access to documents in the State's possession. That Rule operates independently of the prosecution's absolute obligation to reveal exculpatory material, documentary or otherwise, to the defense. *See Brady, supra,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.* 215; *see also* Pressler, *Current N.J. Court Rules,* Comment R. 3:13–3 [Comment 3, p. 569] (discoverability of exculpatory materials intentionally left out of Court Rules because "irrespective of rule the prosecutor has an absolute obligation to reveal such material both to the defendant and the court").

When evaluating motions for discovery in the criminal setting, trial courts should be guided by determinations of the relevance and materiality of the materials sought to the issues presented. In the context of the limited remand hearing, the only disputed issue was whether the nondisclosure of the Kraushaar immunity documents was willful, *i.e.,* knowing and intentional. The State had the burden of proving to the court's satisfaction that the nondisclosure had not been willful.

The defense sought to undermine the State's theory that an innocent filing error had caused the nondisclosure by demonstrating that interactions among the prosecutors and investigators would naturally and inevitably have led those who were aware of the immunity documents to disclose that knowledge to those who, actively managing the prosecution, had the duty to turn over such documents to the defense. The defense elicited testimony from the State's witnesses about the practices and procedures of the Prosecutor's Office pertaining to the conduct of investigations, the maintenance of case files, and the production of discovery. Consistent with that strategy, the defense sought disclosure of the correspondence file and the discovery file.

We believe that both files were relevant to the inquiry into the state of mind of the investigators and prosecutors working on the case because they provided a context for evaluating the circumstances relating to the misplacement of the Kraushaar documents. By examining the format of those files, as well as the documents they contained, the trial court was better able to evaluate the testimony of witnesses. Investigator Mahoney, for example, indicated that he had done extensive work on the case, yet had never encountered the Kraushaar documents in the correspondence clip. The trial court's discovery orders requiring the State to produce the correspondence and discovery files were clearly appropriate.

Defendant's motion to require the State to produce the entire file in this case stands on an altogether different footing than the motion to have the correspondence file or discovery file produced. According to defendant, the revelation of additional *Brady* material in the correspondence file, as well as Kelly's participation in another prosecution where the conviction was challenged on *Brady* grounds, indicate a pattern of prosecutorial misconduct sufficient to require the State to produce its entire file for examination by defendant's counsel. We disagree.

We consider the discovery of additional letters in the correspondence file that may have been improperly withheld from the defense to be an issue separate from the nondisclosure of Kraushaar's immunity, and we discuss it elsewhere in this opinion. *See infra* at 205–207, 586 *A.*2d 195–196. Prosecutor Kelly's involvement in another case years prior to defendant's trial, in which the conviction was successfully challenged on *Brady* grounds, is irrelevant and evidentially inadmissible. See *infra* at 186–188, 586 *A.*2d 184–185. Moreover, defendant's allegation of a pattern of bias assumes that the Ocean County Prosecutor's office acted willfully when it failed to disclose the Kraushaar immunity documents. The determination of willfulness is the very subject of the remand hearing, and the trial court, although it placed the burden of proof on the State, properly declined to assume that the State had acted willfully:

> I am not, as I say, about to assume anything, beg any questions, make any assumptions. I'm simply dealing with the situation in which I have to make certain findings of fact. That is all. I'm not assuming wrongdoing or no wrongdoing on the part of anybody.

 On the basis of the evidence adduced at the remand hearing, we will not disturb the discretionary ruling by the trial court denying defendant's request that the State's entire file be turned over for examination. A turnover order as broad as that sought by defendant, which would have required an interruption of the hearing to permit examination of the files produced, was neither contemplated by this Court's order granting a limited remand nor justified by the record before the trial court.

### C. Limitation of Cross–Examination Regarding Willfulness

Defendant argues that the court improperly precluded full exploration of the issue of willfulness by limiting cross-examination of the State's witnesses. He enumerates fifteen examples of allegedly improper limitation of cross-examination. Defendant emphasizes, however, two "egregious rulings," and we

begin our consideration of this issue by examining those rulings.

### 1. *Prior Conduct by the Assistant Prosecutor*

Kevin Kelly, the lead prosecutor at defendant's trial, testified on direct examination at the hearing that he had never seen the Kraushaar letters or heard of them until 1989. He testified further that had he known of the existence of those letters, he would have brought them to the attention of the court. On cross-examination, defense counsel attempted to confront Kelly with the facts of another case in which he had been the prosecutor. In that case exculpatory materials had been wrongfully withheld from the defense. The State objected, indicating that it was inappropriate to impeach the credibility of a witness by reference to specific prior acts. See *Evidence Rule* 55. Defense counsel argued that the facts of a similar, prior incident were relevant and admissible because they tended to show an "absence of mistake" on the part of the actor. *Ibid.* The defense made a proffer that it would show that Kelly had been involved in a homicide prosecution in Essex County in 1976; that sometime thereafter it had come to the attention of defense counsel in that case that exculpatory materials had been withheld from the defense; that in a subsequent habeas corpus proceeding, the federal District Court found that exculpatory materials had indeed been willfully withheld from the defense; and that the court had granted a writ of *habeas corpus* in that case.

Defense counsel maintained that both trials were marked by similar claims of mistake on the part of the prosecutor:

> As here, information which is not what we call exculpatory by itself, but information that would assist in the impeachment of a key state witness. The requests were made, Kelly didn't give it. Later, when the defense found out about it, Kelly's position before the judge was, judge, it was a mistake, I would have told them, but I didn't know.

The State again objected to the admission of the evidence:

> Assuming what you say is accurate, that type of evidence isn't admissible to prove just a general propensity to do something. It is in pursuit of a specific plan or motive.

Defense counsel again responded that the material was relevant to prove absence of mistake or accident, not to show general propensity. He analogized the situation to the one presented in *State v. Atkins*, 78 *N.J.* 454, 396 *A.*2d 1122 (1979):

> In the *Atkins* case * * * the defendant was being charged with burglary. And his position was that he wandered into this house by mistake and the Supreme Court of New Jersey ruled that it was admissible that he had committed other burglaries nine years before to show that it wasn't a mistake.
>
> Mr. Kelly is saying here that this was all a mistake, he didn't know about it, and I say to you that we should be able to prove that he has used that kind of a claim before * * *.

The court disagreed, however, and distinguished defendant's case from the *Atkins* trial:

> I can see a big difference between the "mistake," and the other. The case we are talking about, the burglary, a person goes into a house and he does some affirmative act going into the house and he says, oh, I made a mistake, I thought I was going into my house and they want to show that he committed burglaries. A vast difference between that situation and this situation.
>
> Mr. Kelly in his testimony is not asserting that he did some affirmative act that he thinks that was a mistake. He's not asserting that at all. He's saying I didn't know anything about it.

Defense counsel subsequently argued that the prior incident was relevant to "counter the underlying notion that [Kelly] is an individual who is incapable of this kind of act, who would never do this kind of act * * *." The State argued that

> every single thing [defense counsel] has said is discussing general propensity. [H]e's saying that there was a prior incident where he alleges that Mr. Kelly was aware of some information that wasn't disclosed to the defense and therefore he has a general propensity to do that and therefore [he] should be allowed to get into this.

The court concluded that the evidence was inadmissible under any of defendant's theories:

> Well, in order to admit evidence under this rule, the trier of fact must ascertain and determine first and foremost that the evidence is actually coming in for some legitimate reason under the rule and not merely under some guise or getting it before a jury, or before the trier of fact in this case, for some other reason.
>
> Stepping back and taking a look at it objectively, considering the factual complexion of this case at the present time, it is clear to me anyway that if this type of evidence comes in, it is coming in for only one purpose or perhaps two purposes. Perhaps evidence of character, but it can't come in as evidence of

character * * *, it can only be evidence of character for veracity or lack of it, but in any event you can't prove it by evidence of specific conduct.

[Rule of Evidence] 22[d] I think it is, ["]evidence of specific instances of his conduct[,] relevant only as to tending to prove character[,] shall be inadmissible.["]

Under Rule [of Evidence] 47, character evidence, it is provided that ["S]pecific instances of conduct not the subject of a conviction of crime shall be inadmissible[,"] so it is not admissible under those rules.

*As to Rule 55, it is obvious to me looking at the situation that all it really is happening is that it is an attempt to prove that this witness has a propensity to commit this type of an act. He did it before, allegedly something similar, and therefore I should infer he did it again.* Basically it is that simple.

So I conclude it is expressly prohibited under the rules of Court, the rules cited. I will sustain the objection.

(Emphasis added.)

 Our independent review of this issue leads us to conclude that the trial court ruled correctly when it refused to allow evidence of the prior incident to be introduced at the remand hearing. We believe that the only relevance of that testimony was to show a general propensity on the part of Kelly willfully to withhold exculpatory matter from the defense. Evidence of specific prior acts is not admissible to show a general propensity to do wrong. *Evid.R.* 22(d).

We therefore conclude that the trial court did not err in ruling that the evidence pertaining to Kelly's conduct in a prior case involving a similar issue was inadmissible.

## 2. *The McKinnon Payment Letters*

Defendant next argues it was error for the trial court to prohibit defense counsel's interrogation of Prosecutor Sheehan relating to the letters discovered in the correspondence file detailing expenses incurred by the State on behalf of Billy Wayne McKinnon.

 The letters were discovered by defense counsel when the entire correspondence file was turned over for inspection pursuant to a discovery order. It was alleged by defense counsel that the letters constituted an additional, blatant *Brady*

violation. See *supra* at 181–182, 586 *A*.2d at 181–182. The trial court agreed that the question might be significant but that it was a

> matter perhaps to be determined on another day. Certainly not before me. I see no occasion to disrupt these proceedings, nor occasion to disqualify the Prosecutor. No reason to do anything. Quite frankly, just proceed with the hearing.

Thereafter, the defense called as a witness Patrick Sheehan, an assistant prosecutor at the Ocean County Prosecutor's office, who had been assigned to prosecute the charges against co-defendant Robert Cumber. By way of preparation for that trial, Sheehan had assisted Prosecutor Kelly at the defendant's trial. In that regard, he had argued a discovery motion at defendant's trial. At that discovery-motion hearing, Sheehan had "told the judge several times that all relevant discovery had been turned over." Later, while preparing for the *Cumber* trial, probably between March and June 1986, Sheehan came across S–1 in the correspondence file. When defense counsel at the remand hearing sought to question Sheehan about whether he had also discovered the McKinnon letters in the correspondence file, the State objected, arguing that such questions were outside the scope of the limited remand. Defense counsel argued that the possible willful nondisclosure of the McKinnon letters would reflect on Sheehan's state of mind.

> Clearly, this additional blatant discovery violation went to the issue of willfulness and showed a clear pattern of conduct by the Prosecutor's office.

The trial court sustained the objection to questions about the McKinnon letters, emphasizing that it would be inappropriate to expand the scope of the remand to include an inquiry into the circumstances surrounding the nondisclosure of other documents. We agree.

We also note that the nondisclosure of the McKinnon letters, which had been filed in the correspondence file, is consistent with the State's version of the circumstances surrounding nondisclosure, *i.e.*, that documents placed in the correspondence file had not been produced in the course of discovery because the prosecutor's staff had focused on the investigative file and

ignored the correspondence file in responding to discovery demands. We conclude that the revelation of the McKinnon documents was not compelling evidence of willful nondisclosure of discovery material sufficient to justify a presumption of a pattern of misconduct by the Prosecutor's Office. Thus, we find that the trial court's ruling precluding questions pertaining to the McKinnon letters was a proper exercise of the court's discretion consistent with the limited scope of the remand hearing. We address elsewhere in this opinion the question of the nondisclosure of the McKinnon letters. See *infra* at 205–207, 586 *A*.2d 195–196.

### 3. *Rulings on Examination of State "Discovery" Witnesses*

Defendant argues that on six different occasions the court improperly prohibited defense counsel from exploring the state of mind of State witnesses who had been responsible for handling and disseminating discovery. We find that of these six challenges, three are completely without merit. We offer the following observations regarding the three remaining allegations of error.

Defendant contends that the court improperly limited cross-examination of Captain Churchill. Defense counsel asked Churchill whether he was aware that a promise of nonprosecution would weaken the value of Kraushaar's testimony to the State because it would "furnish[ ] impeachment material for the defense attorney who will be cross-examining her down the road." The State objected and the court sustained the objection:

> [The question] is asking him to give his opinion as to whether this would weaken her value as a witness at the trial. That's really beyond the scope of his experience, expertise, might depend on the entire trial evidence, might depend upon her testimony, it might depend on lots of things. It's not a question appropriate to put to him. It is beyond the scope of his direct examination also.

We believe it was an appropriate exercise of the trial court's discretion to limit questioning of Churchill to matters on which his impressions were relevant.

 The next instance concerns cross-examination of Sergeant Mahoney. Defense counsel sought to establish that Mahoney knew at the time of the initial investigation that a promise not to prosecute Kraushaar might affect her credibility when she later testified at trial. He posed the following question:

> You certainly recognized at the time based on your experience that there would be a good chance that an attorney being furnished with this document might want to cross-examine Sarann Kraushaar as it might affect her credibility when she later testified at trial?

The State objected and the court sustained the objection because it asked the witness to "forecast what would be the strategy of a particular defense attorney in a particular case * * *." Defense counsel rephrased the question and asked:

> At the time * * * did the thought go through your mind that down the road Sarann Kraushaar might be confronted with this, a defense attorney might cross-examine her with this?

The witness answered the question. Requiring defense counsel to rephrase the question was appropriate and did not unduly limit counsel's ability to explore the state of mind of that witness. We therefore sustain the trial court's ruling.

 Defendant's final argument in this area pertains to the direct examination of defense witness Patrick Sheehan. Defense counsel asked the witness whether he would categorize the Kraushaar immunity documents as *"Brady* materials." The State objected because the question required the witness to give a legal conclusion about the nature of the materials. The State had no objection to the witness's being asked whether he believed the materials were discoverable. After hearing extended argument on the issue, the court ruled:

> Well, to me it just doesn't seem an appropriate route of questioning. The appropriate route of questioning is whether he—when you say included these documents, if he knew about the documents, he knew about the documents. If he didn't know about the documents, obviously it wouldn't include the documents.

> I'm not quite sure what you're saying. The question is whether he knew about the documents, whether he recognized—if he did know about them, whether or not he recognized they were discoverable at the time.

After defense counsel rephrased the question in terms of whether the witness believed that the immunity documents were discoverable when he saw them, the witness answered the question. We uphold the trial court's ruling.

### 4. Rulings on cross-examination of Prosecutors Turnbach and Kelly

Defendant contends that on three occasions in the course of the remand hearing the court improperly limited defense counsel's exploration into the state of mind and personal bias of Prosecutor Turnbach and trial Prosecutor Kelly. We find these contentions to be without merit. We note that two of the transcript citations offered by defendant refer to portions of the remand hearing in which no objection was made. We offer the following observations on the remaining allegation of error.

Defendant contends that it was error to prohibit questions about Prosecutor Turnbach's unwillingness to talk to defense counsel before the remand hearing began. The State objected to that line of questioning on the basis of its irrelevance to the limited purpose of the remand hearing. The court sustained the objection:

> [I]f a witness, a proposed witness declines to talk to an attorney or to be interviewed, I've seen it come before and I ruled that way before, and the mere refusal to talk to someone about a case is not evidence of bias.

Because we agree with the trial court's assessment of the defense counsel's line of questioning, we find that it was not error to prohibit defense counsel from exploring the witness's reasons for not wanting to talk to him outside of court.

### 5. Rulings pertaining to inquiry into the practice and procedure of the Ocean County Prosecutor's Office.

Defendant argues that on four additional occasions counsel was improperly barred from inquiring into the general course

of conduct regarding discovery procedures in effect in the Ocean County Prosecutor's office at the time of defendant's trial. We find the contentions to be wholly meritless, and sustain the rulings of the trial court.

### D. Finding of Nonwillfulness

 Defendant argues that the trial court's findings and conclusions at the remand hearing were clearly erroneous. In particular, defendant questions the court's assessments of the credibility of the State's witnesses. Defendant claims that the only credible witness at the hearing was former Assistant Prosecutor Sheehan. According to defendant, the State's explanation for the nondisclosure was "ludicrous" because "[t]he assertion that the strength of Kraushaar's testimony was never discussed at the daily meetings about this notorious case is ridiculous * * *." Thus, defendant maintains that the record demonstrates that the Ocean County Prosecutor's Office had willfully withheld the Kraushaar immunity correspondence from the defense.

We first examine the testimony of Investigator Murphy and former Ocean County Prosecutor Turnbach, both of whom knew of the existence of the Kraushaar immunity correspondence before defendant's trial. Our review of that testimony reveals that the prosecutor's office consistently maintained that the placement of the immunity letters in the correspondence file, instead of in the investigation file, had been inadvertent.

Investigator Mahoney, who was sent to interview Sarann Kraushaar on September 27th, knew that she was not at that time a primary target of the Ocean County Prosecutor's Office investigation. When he arrived to conduct the interview, he was confronted by Kraushaar's attorney, who demanded to see a letter memorializing Prosecutor Turnbach's assurance that his client would not be prosecuted. Mahoney had no such letter. Kraushaar's attorney prepared one, relying on the prior conversation with Turnbach. Mahoney declined to sign the

letter until he got permission from Turnbach. He called Turnbach and read the letter to him over the telephone. Turnbach then instructed Mahoney to sign the letter, assuring him that there would be no problem. After interviewing Kraushaar, Mahoney prepared an internal memorandum summarizing the interview, omitting any mention of the letter prepared by Kraushaar's attorney. Our independent review of Mahoney's testimony demonstrates that Mahoney relied on Turnbach's understanding of the legal significance of the letter. That reliance supports Mahoney's testimony that he gave the letter and its possible effect no further thought after he had delivered it to Turnbach. Accordingly, we find no reason to disturb the trial court's findings of fact concerning Mahoney's testimony.

We also believe that Turnbach testified in a credible manner about the filing of S–1 and S–2. Turnbach knew that S–1 and S–2 were discoverable, so he placed the letters in the Marshall file and assumed that those connected with disclosing discoverable materials would file the documents accordingly:

Q. All right. Sir, you understood, at least as you have told us, earlier that certainly these agreements, these two different documents would be something that Mr. Marshall, if he were ever to go to trial, would be entitled to receive; correct?

A. Yes.

Q. What did you do, sir, to make sure that that information would be available to the defense if necessary at the trial of either Marshall or any of his other alleged co-conspirators?

A. Sent them to the file.

Q. What procedures did you use?

A. Told my secretary to see to it that it was placed in the Marshall file.

There is no indication in the record that Turnbach intentionally directed that the documents be misfiled, or that he was later aware that these letters had not been disclosed. Indeed, Turnbach acknowledged that the letters should have been furnished in the course of discovery, and described his reaction when he found out that it had not been sent out:

When all of this started at the Law Journal and the local papers and when I was reading it and saying, Kevin Kelly said that there was never any agreement or nothing or anything to do with Kraushaar, that's when it struck me

that, my God, he doesn't know about this and how did this happen, why wasn't this in discovery.

Nevertheless, Turnbach denied that the absence of any reference to the letter in Mahoney's internal memorandum concerning his interview with Kraushaar constituted an omission that should have put Turnbach on notice that something had gone wrong:

Q. Sir, having looked at it again and heard me read it, would you admit to me that apart from the omission of the two written agreements, S-1 and S-2, this is a fairly detailed account of the arrangements that were made between you and Altman's office to set up this interview of Saraan [sic] Kraushaar?

A. This is a detailed account of Mahoney's involvement in this. In other words, what he was aware of and what he did.

Q. Certainly he was aware of the fact that he signed an immunity agreement or what seems to be an immunity agreement at Altman's office after talking to you on the telephone. That's not in there, though; isn't that true?

A. Yes, that's right.

Q. And when you saw that, when these crossed your desk, didn't you realize, wait a minute, there is something missing here?

A. No. I can honestly say, I never remembered reading this and saying there is something missing here.

Q. Would you agree with me that if you had realized, certainly the proper step would have been to say to Mahoney put these documents together, make sure this report is accurate so that a fair picture is given here, would you agree with that?

A. Knowing what I know now, I would tell him surely you should have, let's put it all together and make sure it doesn't get lost.

Moreover, Turnbach was steadfast in his testimony denying that the subject of the letters had ever come up in the course of discussions of trial strategy with those responsible for the day-to-day management of the prosecution:

Q. I'm asking what you talked to Kelly about. Didn't you have to discuss with Kelly as a matter of course naturally under those circumstances—for example, well, with him or without him, we have the business about the insurance and his debts, Marshall's debts. That would have been discussed; right?

A. Yes, probably.

Q. You would have discussed, with McKinnon or without McKinnon, we have the circumstances that Marshall is left alive and his wife was killed, the slash to the tire another circumstance?

A. Right.

Q. And in that context, would you not have naturally and obviously been discussing with Kelly the fact that there is the girlfriend, we have the girlfriend

who is prepared to testify that he was talking about getting rid of his wife, asking for somebody who could do it. He was talking about how it would solve his financial problems. He was talking about how the insurance would help and he had these debts and so on. She's prepared to say he was nervous or shaken when the detectives came to the house on September 21st. We have all of that in the case. Wasn't that discussed with Kelly?

A. I don't recollect[ ] it, to be honest with you.

Q. Would you agree with me that it is the natural subject for discussion in that context when you have to decide what to pay McKinnon for his testimony, what agreement to make with McKinnon for his testimony?

A. I had to decide, yes.

Q. And in that context, is there any reasonable way you could have discussed with Kevin Kelly Saraan [sic] Kraushaar's testimony and the value of it without discussing the fact that she had arrangements which included written documents which seemed to promise her a grant that she will not be prosecuted, that she will be immunized?

A. There was never such a discussion.

Murphy testified that he was the "case agent" in defendant's trial. According to the regular practice of the Prosecutor's Office, he or his secretary established a three-part file for each case, with sections for correspondence, facts, and pleadings. In defendant's case the "facts" section of the file was empty because there were so many reports. Murphy's regular practice would have been to copy reports and other discoverable materials as they crossed his desk and set them aside in a separate file designated "discovery." Thereafter, he either filed reports himself in the "facts" section of the case file, or passed on such reports and any correspondence to be filed by secretaries. Murphy testified that he had no specific recollection of the Kraushaar immunity letters. He testified that he had been in Louisiana with Captain Churchill during the period of time when the immunity letters had been written, and that he had no recollection of finding those letters on his desk when he returned. He indicated that secretaries would have filed S-1 and S-2 in his absence. Moreover, Murphy's testimony reveals that he did not recall discussing Sarann Kraushaar's credibility as a witness with any investigator or prosecutor involved in the case before or during trial. He testified that he did not attend the trial on the days that Kraushaar had testified, but recalled

having seen her in the course of the trial. He testified further that he did not maintain daily contact with Prosecutor Turnbach during the trial. Finally, Murphy stated that there was no reason for him to examine the correspondence file to determine whether any documents should have been placed in the investigation file.

Kelly testified that he never saw the immunity document. Although he questioned Kraushaar before trial, the interview was intended to prepare Kraushaar for trial, not to discuss the grant of immunity. In addition, Kelly's trial preparation did not include a review of the correspondence file. We are satisfied that the record amply supports the trial court's finding that Kelly did not know that the Kraushaar correspondence existed and that he did not discuss the grant of immunity with other members of the Ocean County Prosecutor's Office.

Finally, former Assistant Prosecutor Sheehan, who assisted Kelly at trial, testified that he had handled a pretrial-discovery motion for the State. He had no recollection of ever having seen S–2; however, he noticed that S–1 was in the correspondence file but could not recall when he first recognized it.

Q. Now, when did you see S–1 and S–2?

A. S–2 I can tell you I saw very recently in the newspaper.

Q. Is that the first time you saw it?

A. No. Lieutenant Churchill showed it to me several weeks ago.

Q. Was that the first time you saw it?

A. That was the first time.

Q. S–2 you never saw until within the last few weeks, last couple of months?

A. Correct.

Q. How about S–1?

A. S–1 I saw after my conversation with you last week. I believe that I saw this after the Marshall trial and in preparation for the Cumber case. However, I cannot be a hundred percent certain. I may have seen it earlier than that. I may have seen it prior to the Marshall trial or prior to the motion to suppress, which I believe was argued September 9th of 1985.

 \* \* \* \* \* \* \* \*

Q. And you indicated to me basically what you just that you think you saw [S–1] at a prior time, correct?

A. I know I saw it at a prior time. I just don't know exactly when.

Q. Your testimony is that you cannot say whether it's before the Marshall trial or after the Marshall trial, but certainly before the Cumber trial, if I understand you correctly?

A. That's correct.

Q. Now, when you saw that, what did you do with it?

A. I read it and I didn't do anything further with it.

Q. Can you explain to us why, sir?

A. I cannot explain to you what my thought process was at the time because I don't independently recall. I believe it was before the Cumber case because I did not intend to call Saraan [sic] Kraushaar as a witness and, therefore, I didn't attach that much significance to it.

The Court concluded "that [Sheehan] saw it at some time after the Marshall trial had been concluded. It is fairly inferrable [sic] from the evidence that he did not thoroughly review the correspondence file in preparation for the discovery motion." There is no clear indication in the record that Sheehan saw the documents before the trial had been completed. As a result, we defer to the court's findings of fact concerning Sheehan.

In our view, the testimony of Murphy, Kelly, and Sheehan presented a common theme, demonstrating diligence in the investigation of the murder and a lack of willful conduct in regard to the nondisclosure of the Kraushaar letters. We find credible their testimony to the effect that the nondisclosure was caused by the inadvertent filing of the letters in the rarely-used correspondence section of the investigation file. Therefore, we find the State's explanation of the nondisclosure to be credible.

Ordinarily, we accord deference to the fact-finding of a trial judge because of "his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964). After carefully reviewing the record, we find no reason to disturb the court's assessments of the credibility of the State's witnesses. We are satisfied that the court's finding "could reasonably have been reached on sufficient credible evidence present in the record." *Id.* at 162, 199 *A.*2d 809. Accordingly, we conclude, as the trial court did, that the nondis-

closure of the Kraushaar immunity correspondence was not willful.

### E. Materiality of Nondisclosure

We next consider whether the nondisclosure of the Kraushaar correspondence violated the principle established in *Brady v. Maryland, supra,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215. The Supreme Court held in *Brady* that

[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.
[*Id.* at 87, 83 *S.Ct.* at 1196, 10 *L.Ed.*2d at 218.]

The *Brady* rule is invoked where information is discovered after trial "which had been known to the prosecution but unknown to the defense." *State v. Carter, supra,* 91 *N.J.* at 111, 449 *A.*2d 1280 (quoting *United States v. Agurs,* 427 *U.S.* 97, 103, 96 *S.Ct.* 2392, 2397, 49 *L.Ed.*2d 342, 349 (1976)). The nondisclosure of material evidence affecting the credibility of a government witness falls within *Brady.* *Giglio v. United States,* 405 *U.S.* 150, 92 *S.Ct.* 763, 31 *L.Ed.*2d 104 (1972); *Napue v. Illinois,* 360 *U.S.* 264, 79 *S.Ct.* 1173, 3 *L.Ed.*2d 1217 (1959); *State v. Carter,* 69 *N.J.* 420, 354 *A.*2d 627 (1976); *State v. Spano,* 69 *N.J.* 231, 353 *A.*2d 97 (1976). The State concedes that the Kraushaar-immunity correspondence was not disclosed to the defense. Thus, the only remaining issue is whether those letters were "material to [defendant's] guilt or punishment." *Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196, 10 *L.Ed.*2d at 218.

To determine whether evidence is "material" to the defense, we examine the circumstances under which the nondisclosure arose. Where, as here, defendant has made a specific request for the nondisclosed information, the standard of materiality is whether "the suppressed evidence might have affected the outcome of the trial." *Agurs, supra,* 427 *U.S.* at 104, 96 *S.Ct.* at 2398, 49 *L.Ed.*2d at 350. In *State v. Carter, supra,* 91 *N.J.* 86, 449 *A.*2d 1280, we emphasized that a conviction would

not be reversed based on sheer speculation about the effect of the nondisclosed information:

> The 'might have affected the outcome of the trial' test is not translatable into the mere possibility that the undisclosed information might have helped the defense. Otherwise, the test would call for automatic reversal. There must be a real possibility that the evidence would have affected the result.
>
> [*Id.* at 113, 449 *A.2d* 1280 (footnote omitted).]

In essence, the "might have affected the outcome" test requires the application of a harmless error analysis. *Id.* at 114, 449 *A.*2d 1280; *see R.* 2:10–2; *State v. Macon,* 57 *N.J.* 325, 340, 273 *A.*2d 1 (1971). We decline to accept the State's suggestion that we adopt a standard of materiality enunciated in *United States v. Bagley,* 473 *U.S.* 667, 105 *S.Ct.* 3375, 87 *L.Ed.*2d 481 (1985). The *Bagley* standard considers evidence to be material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494.

The significance of a nondisclosure in the context of the entire record determines whether that omission was harmless error. See *Agurs, supra,* 427 *U.S.* at 112, 96 *S.Ct.* at 2401, 49 *L.Ed.*2d at 355 (footnote omitted). Stated differently, the analysis depends primarily on the importance of the witness's testimony and the strength of the State's case against defendant as a whole. *See Carter v. Rafferty,* 826 *F.*2d 1299, 1308 (3rd Cir.1987); *United States ex rel. Marzano v. Gengler,* 574 *F.*2d 730, 736 (3rd Cir.1978). Where, as here, the *Brady* violation allegedly affects credibility of trial testimony, its significance is diminished if the witness had provided essentially the same statements to authorities before and after reaching the undisclosed agreement with the State. See *United States v. Ramirez,* 608 *F.*2d 1261 (9th Cir.1979) (to warrant new trial, agreement must be reached prior to witness's testimony); *cf. Ruiz v. Cady,* 548 *F.Supp.* 764, 769 (E.D.Wis.1982), *aff'd,* 710 *F.*2d 1214 (7th Cir.1983) (finding no *Brady* violations where "no substantial inconsistencies" between testimony before and after

agreement with prosecutor to recommend noncustodial sentence). In that context, it is helpful to compare the statements given by Kraushaar on September 7, 1984, with her post-immunity statement of September 27, 1984, and her testimony at trial.

On September 7th, Investigator Mahoney and Detective Petracca interviewed Kraushaar at the Ocean County Prosecutor's Office. As detailed in Mahoney's report of that interview, Kraushaar told the investigators that she had known defendant for approximately fifteen years and that she had begun an intimate relationship with him in June 1983. She stated that Maria Marshall had become suspicious of defendant because defendant had made telephone calls to Kraushaar's place of employment. Kraushaar also recalled a conversation with defendant that had taken place before Christmas 1983, in which defendant, while discussing his financial difficulties, had told Kraushaar that "the insurance on Maria would take care of his debt. I wish she (Maria) wasn't around. Do you know of anyone who could take care of it?" In addition, Kraushaar was aware that defendant had taken out a second mortgage on his home for $100,000. Further, she revealed their plan to live together and leave their spouses after Labor Day in 1984. Finally, Kraushaar stated that defendant had called her at work the day after the murder, had begun to cry, and had told her that "it's terrible. I didn't want it to be like this."

The statement given by Kraushaar on September 27th recounted the events that had transpired since September 7th. Kraushaar stated that defendant had visited her at her home on September 23rd. One of defendant's sons had left a telephone message for defendant at Kraushaar's apartment. The message stated that defendant had received a telephone call from Louisiana. On hearing the message, Kraushaar described defendant as "visibly shaken" and "pale." She asked about the nature of the call. Defendant told her that it related to a wager he had placed on a basketball game. According to

Kraushaar, defendant's behavior that night had been "unusual, very nervous."

In addition to those observations, Kraushaar again described the conversation she had had with defendant in which he had revealed that his wife suspected he had been having an affair. This time, Kraushaar told the investigators that defendant had told her "I swear if I thought there was a way of getting rid of her I would. Do you know of somebody who would do it?"

Kraushaar's trial testimony contained recollections similar to but more detailed than her prior statements. She testified at length about the nature and length of her relationship with defendant, including the issue of custody over each other's children, if they were to leave their spouses. Kraushaar also revealed that she had quit the job she had held at the time of the murder and that she had found it difficult to procure similar employment elsewhere. In practically every way, her trial testimony mirrored her statements of September 7th and September 27th. The testimony about her 1983 pre–Christmas conversation with defendant is an example of that consistency:

Q. Now, I would like to call your attention to sometime before Christmas of 1983. Would you tell me whether or not you had a discussion with Mr. Marshall about the debts that he had?

A. We had many discussions about the debts that he had.

Q. Can you tell us whether or not there was any discussion about his debts in relation to insurance proceeds on his wife's life?

 * * * * * * * *

Q. And when was that discussion, that particular discussion? Do you recall?

A. To the best of my knowledge it was sometime in November, December, January, that time period.

Q. '83 into '84?

A. Yes.

Q. Would you tell us, please, what you recall him saying in that regard?

A. Well, there was one conversation that I recall in which there was a discussion about the extent of the insurance and the statement to the effect that that insurance was extensive and would take care of, if it were ever paid, would take care of the debts. I don't remember whether it was in the same conversation or [a] subsequent one that he had reference to the fact that if she

had been, if she were not around, the insurance money would definitely take care of the debts.

Q. During that same period of time or it might have been during that same conversation, can you tell us whether or not he made any statements regarding the fact of whether his wife was around or not and his position in that respect?

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

A. There was a conversation in which he was very upset at his home situation, very frustrated.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Did he tell you what the cause of his being upset was?

A. Yes. He described various things that were going on at home.

Q. Like what?

A. Well, to use his expression, she was pulling in the range. She was hovering over him. She was aware that there was some problem between them, and she was suspicious that there was a relationship between us. She was bombarding him with these suspicions to the point that he was very upset with her and in the conversation with me said something like, "I swear if there were a way that I could either do away or get rid of her, I would."

Q. What else did he say in that same conversation?

A. He asked if I knew anyone that would do such a thing.

Q. What did you say, ma'am?

A. I didn't think that he was serious, and I told him that there was only one other person who I even knew who had any kind of dealings with the law, and he wouldn't even consider doing such a thing and that the idea was absurd and out of the question and I could have nothing to do with him if he even considered pursuing it.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. After Maria's death did you ever put him on notice that you had told the police all about his conversation with you back sometime before Christmas of '83 where he said, quote, words to the effect—I shouldn't say, quote end quote; "I wish there was some way I could get rid of her. Do you know anybody?"

Did you ever tell him you told the police that?

A. Yes.

Q. What did he say?

A. He was disturbed by that and wanted to know why I could have told them that. Why was it necessary? And I explained that, the circumstances were that I had been picked up on my way home the day after Maria was killed and brought in for questioning. Since I had nothing to hide and didn't think he had anything to hide, I simply told everything I knew.

As that testimony illustrates, Kraushaar's statements at trial provided no significant, incriminating evidence that she had not

already given before the prosecutor's agreement not to prosecute. In all three statements, Kraushaar discussed defendant's financial and marital problems, her relationship with defendant, and that on one occasion during their relationship defendant spoke about "getting rid" of his wife. The fact that her testimony after the non-prosecution agreement was largely consistent with her statement of September 7th is a significant factor in our materiality analysis.

Another consideration is the strength of the State's case against defendant. This is not a case in which Kraushaar's testimony provided the primary link to the crime. See *Campbell v. Reed*, 594 *F.*2d 4 (4th Cir.1979) (reversing conviction where State failed to disclose pre-agreement of co-defendant who was only witness to burglary). In fact, none of her testimony directly implicated defendant in a homicide conspiracy. Kraushaar did not testify about defendant's hiring of McKinnon, their meetings in Atlantic City, and the payments made by defendant to McKinnon. It is evident that the most damaging evidence against defendant came from McKinnon's testimony and defendant's tape to his brother-in-law, in which he admitted paying money to McKinnon the night of the murder. Although she did testify that defendant had received a phone call from Louisiana, Kraushaar's testimony in that regard simply corroborated other, more detailed, testimony about the various toll records. Moreover, defense counsel cross-examined Kraushaar vigorously and thoroughly. See *United States v. Roberts*, 848 *F.*2d 906 (8th Cir.), *cert. denied*, 488 *U.S.* 931, 109 *S.Ct.* 322, 102 *L.Ed.*2d 340 (1988) (unavailability of report containing false exculpatory statement not grounds for reversal because of thorough cross-examination, and availability of report would not have materially added to effectiveness of cross-examination).

We are satisfied that the overwhelming evidence of defendant's guilt, coupled with the consistency of Kraushaar's testimony before and after the State's non-prosecution agreement, compels the conclusion that the nondisclosure of the non-prose-

cution agreement was not "material" to defendant's guilt or punishment. Even if the defense could have weakened Kraushaar's credibility by confronting her with the agreement, redirect testimony of Kraushaar would have demonstrated that her statements to the police were the same before and after the agreement. Hence, we doubt that the nondisclosure of the agreement could have created a "real possibility that the evidence would have affected the results." *Carter, supra,* 91 *N.J.* at 113, 449 *A.*2d 1280. We find defendant's claims in that regard to be purely speculative. Accordingly, we conclude that the nondisclosure was harmless and that defendant was not denied a fair trial on that ground.

F. The McKinnon Letters

Although they are not within the scope of the remand hearing, we nevertheless address arguments raised by defendant during the hearing relating to the other undisclosed documents. As indicated earlier, *supra* at 181–182, 586 *A.*2d at 181–182, the court required the State to produce the correspondence file in which the Kraushaar letters had been placed. Defense counsel's review of that file revealed that two additional letters had not been disclosed to the defense. Those letters concerned expenses incurred on behalf of State's witness Billy Wayne McKinnon. In the letters, the Ocean County Chief of Detectives requested reimbursement from the New Jersey State Police for monies to house and otherwise assist McKinnon's family during defendant's trial.

According to defense counsel, the letters, if produced, could have been used to impeach McKinnon's credibility and therefore could conceivably have affected the outcome of the trial. Defendant argues that the failure to have produced the McKinnon letters should result in a reversal of his conviction.

The State acknowledges that the letters in question, which had been inserted in the correspondence file along with the Kraushaar letters, were never provided to defense counsel.

The State argues that because of the "vigorous attack on McKinnon's credibility" at trial, which "exhaustively explored the full parameters of his plea arrangement [sic] with the State," the nondisclosure of the reimbursement letters "made absolutely no difference in the jury's assessment of McKinnon's credibility." Thus, the State argues that the failure to have produced the letters was harmless beyond a reasonable doubt.

The Supreme Court of Florida confronted a similar situation in *Groover v. State*, 489 *So.*2d 15 (1986). After a jury had convicted defendant of murder, evidence came to light indicating that the prosecutor had paid sums of cash to several State witnesses for food and travel expenses. The defendant claimed that those "payments should have been made known to the defense in order to expose [those] witnesses' interests in testifying against [the defendant]." *Id.* at 17. The court rejected the defendant's claim that the alleged *Brady* violation required reversal of the conviction, observing that "[defendant's] trial counsel fully cross-examined [the witness] about her interest in testifying, informing the jury that [the witness] received a reduction in charges from first-degree murder to accessory after the fact in exchange for her testimony against [the defendant]." *Ibid.* The court concluded that the witness's "interest in testifying was exposed and the payment in question here could have made no difference in the jury's assessment of her credibility." *Ibid.*

"Nondisclosure of evidence favorable to the accused violates the constitutional right of due process only 'where the evidence is material to guilt or punishment.'" *State v. Carter, supra,* 91 *N.J.* at 112, 449 *A.*2d 1280. In order for evidence to be material, "[t]here must be a real possibility that the evidence would have affected the result." *Id.* at 113, 449 *A.*2d 1280. Stated simply, "[t]here must be a real possibility that the defendant was denied a fair trial." *Id.* at 114, 449 *A.*2d 1280. "Evidence that is merely cumulative does not create a reasonable possibility that the verdict would have been affected." *Ibid.*

On the facts presented here, there is no reasonable possibility that the further impeachment of McKinnon by reference to the financial support his family received from the State would have affected the verdict. McKinnon's fundamental interest in testifying was to obtain a reduction of charges against him from capital murder to conspiracy, thereby reducing his maximum possible punishment from a death sentence to a five-year prison term with no parole disqualifier. Those facts were clearly conveyed to the jury during defense counsel's cross-examination of McKinnon. Any possible incremental effect on McKinnon's credibility from the additional revelation that financial accommodations were made to support his family would have been merely cumulative. We note parenthetically that in the course of oral argument relating to a pretrial discovery motion, defense counsel, seeking disclosure of benefits paid to McKinnon's family, indicated that he had assumed such payments would be made by the State. McKinnon's plea bargain included an undertaking by the prosecutor to recommend McKinnon's acceptance in the Federal Witness Protection program, see 18 *U.S.C.A.* §§ 3521 to –28, which specifically authorizes the payment of basic living expenses for an immediate family member of a protected witness. 18 *U.S.C.A.* § 3521(b)(1)(D). We conclude that there was no reasonable possibility that a different verdict would have arisen had the letters been disclosed. We therefore reject defendant's claim that the State's failure to have disclosed the McKinnon letters requires reversal of defendant's conviction. *See Carter, supra,* 91 *N.J.* at 114–15, 449 *A.*2d 1280.

## Conclusion

To ensure completeness of the record, we note that this Court granted defendant's motion that it take judicial notice of portions of briefs filed in other New Jersey capital appeals. The arguments advanced in each of the briefs have been addressed in the course of the Court's opinion.

We affirm defendant's convictions for murder and conspiracy to commit murder. We also affirm his sentence of death.

O'HERN, J., concurring in part and dissenting in part.

With but certain reservations, I concur almost entirely with Justice Handler's profoundly unsettling dissent insofar as it applies to the sentence of death in this case.

I continue, however, to believe that conscientious prosecutors and capable courts and counsel can fairly try capital cases. *State v. McCrary,* 97 *N.J.* 132, 478 *A.*2d 339 (1984) (O'Hern, J., dissenting). Hence, unlike Justice Handler, I do not base my decision on the unconstitutionality of the Act but rather on the necessary exercise of our appellate jurisdiction in capital cases. When the United States Supreme Court restored the constitutionality of the death penalty, it imposed a concomitant obligation on states to provide "the further safeguard of meaningful appellate review" of every death sentence. *Gregg v. Georgia,* 428 *U.S.* 153, 195, 96 *S.Ct.* 2909, 2935, 49 *L.Ed.*2d 859, 886 (1976).

The twenty-five or so capital cases that we have reviewed and decided thus far comprise a class of capital cases tried before our interpretative decisions in *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987); *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987); *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey* II); and *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). We have had to reverse capital cases often for reasons with which the Legislature itself has concurred. *See, e.g., State v. Biegenwald, supra,* 106 *N.J.* 13, 524 *A.*2d 130 (burden is on State to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors before sentence of death may be imposed); *and see L.* 1985, *c.* 178, § 2 (to the same effect); *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey* I) (sentence of death may not be imposed on juvenile offender); *and see L.* 1985, *c.* 478, § 1 (to the same effect).

Nonetheless, the public perceives those decisions and the application of other principles of law to capital cases as undermining the State's death penalty statute. It calls for an execution to demonstrate the Act's efficacy. But when, as Justice Handler puts it, the bell tolls for one who must die, the people of the State of New Jersey would undoubtedly expect that the condemned has received a fair trial consistent with our history and tradition.

By the Court's own account, that did not happen here. This case contains admitted constitutional error. *Ante* at 169–207, 586 *A.*2d at 174–196; *see Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963). It is undisputed in this case that a promise was given to a critical State witness and that that promise of immunity was not disclosed to the defense. By failing to disclose that information to the defense, the State violated the rule of *Brady v. Maryland, supra*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215. Evidence that may be used to impeach a witness' credibility is favorable to an accused under *Brady. Giglio v. United States*, 405 *U.S.* 150, 92 *S.Ct.* 763, 31 *L.Ed.*2d 104 (1972). A promise of immunity may be used to impeach the credibility of a witness. *Id.* at 154–55, 92 *S.Ct.* at 766, 31 *L.Ed.*2d at 109. It is of no moment whether the promise of immunity was enforceable or not. Even if the non-disclosure were unintentional, we must still decide here if the promise of immunity was material—that is, whether, if disclosed, it could have had an effect on the outcome of the trial.

In *United States v. Bagley*, 473 *U.S.* 667, 105 *S.Ct.* 3375, 87 *L.Ed.*2d 481 (1985), the Court held that for the purposes of a *Brady* inquiry, if the prosecution failed to disclose either exculpatory or impeachment evidence, and if the evidence is material, reversal is warranted. A majority of the Court agreed that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494. Justices Blackmun and

O'Connor equate that standard with a "probability sufficient to undermine confidence in the outcome." *Ibid.* Our Court has adopted a slightly different standard, the "real possibility" standard of *State v. Carter,* 91 *N.J.* 86, 113, 449 *A.*2d 1280 (1982), *ante* at 200, 586 *A.*2d at 192.

The majority in this case has approached the non-disclosure issue by pointing to the overwhelming evidence of guilt, concluding that the error was not capable of producing a contrary result. But the rule of *Brady* does not extend merely to the question of guilt or innocence. Due process requires disclosure by the prosecution, on motion of the defendant, of evidence that would be favorable to the accused and that is material to guilt or punishment. *Brady v. Maryland, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196, 10 *L.Ed.*2d at 218.

I can agree that confidence in the guilt phase of this trial is not sufficiently undermined by the non-disclosure of the promise of immunity to Sarann Kraushaar to warrant reversal of the conviction. However, I cannot understand how one can say that there is no real possibility that had the promise been disclosed to the defense, the result of the proceeding would have been different in the sentencing phase. Kraushaar was a critical witness against Robert Marshall. Defense counsel notes that Billy Wayne McKinnon's testimony was so suspect that the jury entirely acquitted co-defendant Larry Thompson in the face of McKinnon's testimony. Sarann Kraushaar, on the other hand, was presented to the jury as one who was "inherently believable and virtually unimpeachable." Defense counsel also points out that had the defense been able to bring out the extent of Kraushaar's fear of being swept into this murder prosecution, the conditions that she and her attorney attached to her cooperation, and the fact that her "immunity" from prosecution was premised on her continued cooperation, the jury would have been able to consider her motives in testifying as she did and evaluate her testimony accordingly. It is not enough to say that her statement on the second occasion (September 27) paralleled her statement on the first occasion

(September 7). On September 27, she furnished the State with otherwise-unavailable evidence concerning all of her subsequent contacts with Marshall, including the statement in which she said that Marshall "became visibly shaken and turned 'pale'" after hearing he had received a message from Louisiana and the statement in which she detailed Marshall's account of having engaged a person from Shreveport, Louisiana, in a wager on the NBA playoff games.

If aware of Kraushaar's deal with the prosecutors, the defense might have explored at trial the State's failure to investigate her further. In her original statement to the police, Kraushaar stated that defendant once said to her, "I wish she [Maria] wasn't around," and asked her, "[d]o you know anyone who could take care of it?" She then supplied him with a name: Joey Harrison. Defendant testified that it was Kraushaar who had said, "wouldn't it be great if Maria and Stanley [Kraushaar's husband] were out of the picture?" Kraushaar also inquired of investigators if it were true that Mrs. Marshall's pocketbook was found near the exit that she herself used when she traveled to Pinelands Regional School.

It is very difficult to speculate now on what experienced trial counsel could or would do with such information. We do know that other areas of cross-examination of this witness that defense sought to pursue were limited. In *State v. Carter, supra*, 91 *N.J.* at 139, 449 *A.*2d 1280, Justice Clifford explained in a dissent, later adopted by the Third Circuit in *Carter v. Rafferty*, 826 *F.*2d 1299 (1987), *cert. denied*, 484 *U.S.* 1011, 108 *S.Ct.* 711, 98 *L.Ed.*2d 661 (1988), what experienced defense counsel can do with credibility evidence.

Were this the only constitutional error in this case, I too might be able to agree that there is not a real possibility that the result of the proceeding would have been different. But by the Court's own account there are ten other errors in this case. Among the most important of them are, of course, the infringement on defendant's constitutional right to counsel. As the

majority notes, *ante* at 124, 586 *A.*2d at 148, "a prosecutor's statement suggesting that retention of counsel is inconsistent with innocence impermissibly infringes on a defendant's constitutional right to counsel." *See United States v. McDonald,* 620 *F.*2d 559, 564 (5th Cir.1980) ("It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel."). The State may not suggest that a defendant's exercise of the right to counsel is probative of guilt. In the present case, the prosecutor's questions were plainly designed to suggest that Marshall, if innocent, would not have retained counsel. The comment was error. The questions of co-defendant's counsel did not undo the harm created by the prosecutor's attempt to penalize Marshall's exercise of his right to counsel. Lawyers in criminal cases are "necessities, not luxuries," *Gideon v. Wainwright,* 372 *U.S.* 335, 344, 83 *S.Ct.* 792, 796, 9 *L.Ed.*2d 799, 805 (1963), and "even the most innocent individuals do well to retain counsel." *Bruno v. Rushen,* 721 *F.*2d 1193, 1194 (9th Cir.1983), *cert. denied sub nom. McCarthy v. Bruno,* 469 *U.S.* 920, 105 *S.Ct.* 302, 83 *L.Ed.*2d 236 (1984). Although the forbidden inference is guilt, the implication is that there is something squalid about hiring a lawyer.

In addition, as Justice Handler points out, nothing can excuse, justify, or undo the State's attempt to disparage Marshall's exercise of his right to call witnesses on his behalf, guaranteed by the sixth amendment to the Constitution. In summation, the prosecutor stated:

And he has the audacity to bring in his three boys to testify. That's obscene. And I'm not being critical of them because I would probably do the same thing. To put his boys on that witness stand is obscene, and for that there's a place in hell for him. He will use anybody, he will say anything and he will do anything, including his own family, to get out from under, and that's Robert Oakley Marshall. Make no mistake about it.

When did it become "obscene" for a man presumed to be innocent under our system of law to call witnesses on his own behalf?

The dry curative instructions given by the trial court hardly sufficed to dispel the visual image of a place in hell for defendant that the prosecutor planted in the jurors' minds. Those remarks were neither accidental nor the result of the passion of a heated trial. They were planned. Contemporary statements by the prosecution to the press set forth in the record demonstrate that. I cannot conclude that those instances of prosecutorial misconduct, weighed cumulatively with the other instances of trial error and with the constitutional error of non-disclosure of the promise of immunity made to Sarann Kraushaar and the special expenses paid by the State for the support of the McKinnon family, could not present at least a "real possibility" that there would have been a sentence other than death. That "real possibility" is magnified in this case because, as Justice Handler points out, the guilt and penalty phases were effectively telescoped into one proceeding. Death-eligibility and death-worthiness became as but one. The taint in one proceeding could not but have tainted the other.

The majority believes that those errors (harmless in its view and in mine in the guilt phase) cannot have influenced the penalty phase. But the processes of decision on guilt and punishment are entirely different. The verdict of guilt is the end product of the step-by-step construction of a logical and essentially incontrovertible chain of evidence inescapably linking Marshall to the Louisiana killers. Nothing can be realistically controverted. Marshall sent the money to Louisiana under a cover; he met McKinnon in New Jersey; his car tire was slashed to feign a breakdown on the Parkway; he had clearly-established motives to kill. The decision on guilt is logical, progressive, and overwhelming.

But deciding whether a man shall live or die is not the product of building blocks of evidence. "Jurors [in capital sentencing] are not mere fact finders, but the ultimate determiners of whether the defendant shall live or die." *Bey* II, *supra*, 112 *N.J.* at 162–63, 548 *A.*2d 887. Even under today's structure the jury's function surely remains what Chief Justice

Weintraub described as "a moral judgment upon a consideration of the evidence." *State v. Conyers,* 58 *N.J.* 123, 147, 275 *A.*2d 721 (1971).

Despite every attempt to give it constitutional structure, capital sentencing is ineluctably individualistic. Why one defendant who has hired a killer to murder his wife and burn her body, *see State v. Engel,* 99 *N.J.* 453, 493 *A.*2d 1217 (1985), should be spared the death penalty, and another, such as Marshall, should be sentenced to death remains forever entrusted to our juries. Obviously, the aggravating factor itself (the employment of a hired gun) does not bespeak the punishment of death because, as we know, the *Engel* jury did not sentence the defendant to death. There are undefinable and unidentifiable senses of moral quality in such acts. The jury's judgment of the moral quality of the acts in this case was undeniably tainted by constitutional trial error. I know of no principle of logic by which the Court is able to conclude that there is no possibility that a jury in a fairly tried case could not have returned a life sentence.

Whether there will be "a place in hell" for this defendant remains for a greater judge than any of us. What we must decide is whether the sentence of death was imposed in accordance with law. A sentence of death is not imposed in accordance with law when a jury has been influenced by repeated instances of constitutional error and governmental misconduct.

HANDLER, J., dissenting.

Finally, the bell tolls. This Court for the first time affirms both the murder conviction and death sentence of a defendant prosecuted for capital murder. The Court's decision and judgment serve only to confirm the intractable constitutional infirmities of our capital-murder jurisprudence, its unfathomable incoherence and unmanageable contradictions.

Significant shortcomings surround this prosecution, resulting in a death sentence that under our Constitution can be viewed

only as arbitrary and capricious, a death sentence that is unmarked by the due process and fundamental fairness demanded in capital causes, a death sentence that constitutes a cruel and unusual punishment. The Court has previously considered and resolved many of the constitutional issues that are directly implicated in this case. *See State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987); *State v. Biegenwald*, 106 *N.J.* 13, 524 *A.*2d 130 (1987). Given the evolving nature of capital-murder jurisprudence, such issues remain imperatively subject to reconsideration and ripe for redetermination. It is apparent that no guiding legal principle should be considered as definitively settled or controlling when it comes to the death penalty.

This capital conviction and death sentence forcefully draw attention to the weakness of the constitutional support on which the Court has rested the death penalty. The bifurcated-trial scheme in capital prosecutions, with its use of the death-qualified jury, fails to secure genuine impartiality, and in fact may promote the opposite. In this case, the unfairness is peculiarly accentuated: it confronts the defendant with an insoluble dilemma—the choice between a fair trial on guilt or a fair trial on punishment, but not both. Further, identical statutory definitions and simultaneous jury determinations of guilt and punishment create the unacceptable risk that capital prosecutions are overinclusive. These factors, together with the inefficacy of the penalty proceeding, which grossly undermines the reliability of the determination that the defendant deserves to die, exemplify the arbitrary and capricious imposition of the death sentence. Constitutional defects, with other major trial-level errors and deficiencies, impugn this prosecution and demand reversals of the conviction and sentence.

This case augments the formidable doubts concerning the feasibility of the death penalty within a criminal justice system. The enormous resources and extraordinary costs now being poured into capital-murder prosecutions sap our strength in other areas of law enforcement and criminal justice. The distinctive jurisprudence of capital punishment has begun to

exert an influence on the legal principles and doctrines that govern criminal justice. Our growing absorption, if not obsession, with the death penalty, has generated an institutional compulsion to make the death penalty "work" at any price.

The tolling of the bell is sharply and disturbingly dissonant, given the grave instances of reversible error arising from this prosecution, the serious constitutional infirmities of our capital-murder laws, and the genuine policy considerations militating against the death penalty. Even though it is the defendant who suffers the extreme penalty, constitutional failures penalize everyone. A constitution compromised to convict the guilty gives no comfort to the innocent.

## I.

The most profound concern engendered by the imposition of the death sentence in this case is that defendant was sentenced to die by a jury that was not qualified to render that awesome judgment. Astonishingly, this fact goes virtually unnoted by the Court and, sadly, the Court appears untroubled by it.

It is well-settled that in capital-murder trials only a duly-qualified jury may be impanelled to determine a defendant's guilt of capital-murder and, if guilty, whether the defendant deserves to die. Indeed, in a capital-murder prosecution the jury must be specially qualified in order to assure that high degree of objectivity, sensitivity, fairness, and impartiality essential to determine criminal guilt and appropriate sentence. *Ross v. Oklahoma*, 487 *U.S.* 81, 108 *S.Ct.* 2273, 101 *L.Ed.*2d 80 (1988); *State v. Bey*, 112 *N.J.* 123, 151–54, 548 *A.*2d 887 (1988) (*Bey II*); *State v. Ramseur, supra*, 106 *N.J.* 248–54, 524 *A.*2d 188; *State v. Williams*, 93 *N.J.* 39, 61–62, 459 *A.*2d 641 (1983) (*Williams I*). The jury's heavy and special responsibilities in a capital-murder case are unique. In a prosecution in which a defendant can be sentenced to death, the jury is a vital "link between contemporary community values and the penal system—a link without which the determination of punishment could hardly

reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Witherspoon v. Illinois*, 391 *U.S.* 510, 519 n. 15, 88 *S.Ct.* 1770, 1775 n. 15, 20 *L.Ed.*2d 776, 783 n. 15 (1968) (quoting *Trop v. Dulles*, 356 *U.S.* 86, 100, 78 *S.Ct.* 590, 597, 2 *L.Ed.*2d 630, 642 (1958) (plurality opinion)).

We thus take extraordinary pains in capital-murder cases to insure the impanelling of a jury with special qualifications. All potential jurors must submit to "thorough and searching inquiry by the trial court into each individual's attitude concerning the death penalty." *State v. Williams*, 113 *N.J.* 393, 413, 550 *A.*2d 1172 (1988) (*Williams II*). We insist that no person may serve on a jury in a capital case whose views concerning the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 415, 550 *A.*2d 1172 (quoting *Adams v. Texas*, 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980)).

We have wrestled with the dilemma posed by the use of a death-qualified jury: whether such a jury qualified with the capacity to sentence a defendant to death can also fairly and objectively determine the defendant's criminal guilt. *State v. Ramseur, supra*, 106 *N.J.* at 248–54, 524 *A.*2d 188; *see State v. Rose*, 112 *N.J.* 454, 476–77, 548 *A.*2d 1058 (1988). The Court has resolved that dilemma. It has decided that such a jury can adequately perform both functions, rejecting the notion that death-qualification imperils the jury's ability to determine guilt. *Ibid.; Ramseur, supra*, 106 *N.J.* at 251, 524 *A.*2d 188; *but see Ramseur, supra*, 106 *N.J.* at 428–35, 524 *A.*2d 188 (Handler, J., dissenting) (the issue of guilt of capital defendants should not be determined by a death-qualified jury); *id.* at 335–41, 524 *A.*2d 188 (O'Hern, J., concurring) (death qualification may affect jury's ability to determine criminal guilt). According to the Court, a defendant may fairly be tried for both guilt and sentence before the same jury in the same proceeding.

The basic premise underlying the Court's reasoning is that death qualification itself is indispensable in securing a jury that can be relied on to decide whether a defendant should be put to death for his crimes. *See Williams II, supra,* 113 *N.J.* at 413–27, 550 *A.*2d 1172. Further, death qualification does not undermine the ordinary juror qualification that suffices to enable a jury to determine only guilt. The Court thus believes that death qualification, in effect, can be superimposed on conventional qualification. Accordingly, such a jury—conventionally qualified and death-qualified—can determine both criminal guilt and punishment. Therefore, in a capital-murder case both the guilt and punishment of the defendant can—and should—be tried by such a jury.

In this case, however, the jury was *not* death-qualified. Before the jury selection began, defense counsel stated that he preferred to omit all death qualification questions from the jury-selection process because he believed that such questions led to a conviction-prone jury. Counsel obviously reached this position reluctantly. Counsel contended that to exclude prospective jurors opposed to the death penalty from the guilt phase violated defendant's right to an impartial jury. He urged that those jurors ordinarily excludable for cause through death qualification nevertheless be qualified for the guilt phase of trial. Further, counsel proposed that if a penalty phase should be necessary those jurors be replaced by separate death-qualified jurors, also selected before the guilt phase, who would sit as alternates during the guilt phase. Defense counsel asserted that this proposed method was the fairest way to try a capital case. (*See, e.g., State v. Ramseur, supra,* 106 *N.J.* at 339, 524 *A.*2d 188 (O'Hern, J., concurring); *State v. Bey II, supra,* 112 *N.J.* at 198, 548 *A.*2d 887 (Handler, J., dissenting)). The trial court denied the motion.

After one full day of jury selection, defense counsel reiterated his view that death qualification of jurors violated his client's right to an impartial jury. To reduce the asserted prejudicial impact, counsel moved to limit death qualification of

potential jurors. Specifically, defendant's counsel, with the concurrence of counsel for co-defendant Thompson, sought to have the trial court limit death qualification to the prospective jurors' answers to the questionnaire that had been distributed before the individual questioning.[1] The State did not object, and the trial court approved this request. Accordingly, during the balance of the *voir dire*, the trial court conducted additional death qualification only if a potential juror's questionnaire revealed views on the death penalty that might impair that juror's ability to follow the court's instructions. It asked no further questions of jurors whose simple "yes" or "no" answers to the questionnaire contained no such suggestion.

The Court finds nothing untoward in that extraordinary handling of death qualification, explaining that it merely represented a tactical trial decision by defense counsel. *Ante* at 93, 586 *A.*2d at 131. Except in the most extreme cases, strategic decisions made by defense counsel will not present grounds for reversal on appeal. *Ramseur, supra,* 106 *N.J.* at 281–82, 524 *A.*2d 188. Our views on the proper administration of the *voir dire* process, like our views on other death-penalty procedures, are seasoned with a degree of deference to defense counsel's strategic decisions. Thus, in *State v. Hunt,* 115 *N.J.* 330, 354, 558 *A.*2d 1259 (1989), the Court diluted its commitment to the indispensability of open-ended questions during death-qualification *voir dire,* noting that defense counsel had "declined the opportunity to request further questioning and did

---

[1]*Defense counsel stated:*

On the questionnaire, appearing on the last page are three questions pertaining to a prospective juror's views on capital punishment. In the past at least, even if the prospective juror answered in a fashion which would be consistent with being qualified to serve on this jury, your Honor has still explored to some extent their views in this area. My request is that at least with regard to further panelists, if the answers to the questions are such that they would be qualified by virtue of their answers, I ask that your Honor not inquire any further into their views on capital punishment inasmuch as I feel it only serves to highlight further the area that I had objected to in the very beginning that deals with death qualification.

not object to the jurors' qualifications." In that case, however, *voir dire* examination went beyond the acceptance of simple answers to written questions, and the Court found that although death-qualification examination "may not have been perfect in all respects, it was sufficient to enable counsel and the court to evaluate the jurors' fitness to serve." *Ibid.* We observed in *Rose* that trial courts could "take into account a defendant's concerns about the collateral effects of the death qualification process" and address these concerns in the course of the *voir dire.* 112 *N.J.* at 477, 548 *A.*2d 1058. We never intimated, however, that the trial of a capital-murder case involving both guilt and punishment should be undertaken without duly death-qualifying the jury.

Although defense counsel's views of the extent and duration of specific questioning may influence the scope of the examination of potential jurors, counsel does not have the prerogative to dispense with death qualification. The process of death qualification is the only way the State and the defendant are assured that the jury harbors no predetermined or preconceived biases and can follow and apply the law in determining whether the defendant is to live or die. The failure to conduct an extensive, individualized death qualification inquiry, even if the result of a strategic and informed decision by defense counsel, negates that assurance. It inescapably constitutes irremediable error. *See Williams II, supra,* 113 *N.J.* at 413, 550 *A.*2d 1172. On the facts before us, the trial court's decision to grant defense counsel's request to limit death qualification only to those questions printed on the jury questionnaire was error sufficiently "egregious as to cut mortally into [defendant's] substantive rights...." *Ramseur, supra,* 106 *N.J.* at 282, 524 *A.*2d 188 (citation omitted) (quoting *State v. Harper,* 128 *N.J. Super.* 270, 277, 319 *A.*2d 771 (App.Div.), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974)).

Because adequate juror qualification is an imperative condition for a valid capital-murder prosecution, extraordinary importance attaches to the *voir dire* and death-qualification process.

*State v. Bey II, supra,* 112 *N.J.* at 152, 548 *A.*2d 887. In *State v. Biegenwald, supra,* 106 *N.J.* at 29, 524 *A.*2d 130, we underscored the indispensability of the "searching *voir dire* interrogation" to obtaining a fair and impartial jury, earlier stressed in *Williams I, supra,* 93 *N.J.* 39, 459 *A.*2d 641. In *State v. Hunt, supra,* 115 *N.J.* at 348, 558 *A.*2d 1259, we stated: "An impartial jury is, of course, a necessary condition to a fair trial, and a *voir dire* designed to expose potential bias is essential to ensure an impartial jury."

The majority tacitly but clearly dispenses with the need for a fully death-qualified jury. Its decision exposes, if it does not create, conflict between the jury's distinctive responsibilities to determine guilt and punishment. The Court's decision behooves us to revisit the assumptions that required the use of death-qualified juries in a bifurcated-trial scheme for the prosecution of capital causes. We should again ask the original question: is it constitutionally permissible to try the guilt of a capital defendant with a death-qualified jury?

This Court in *Ramseur, supra,* 106 *N.J.* at 248–54, 524 *A.*2d 188, without extended reasoning, chose to follow the majority in *Lockhart v. McCree,* 476 *U.S.* 162, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986). In that case, however, Justice Marshall in dissent persuasively showed that "the very process of death qualification—which focuses attention on the death penalty before the trial has even begun—has been found to predispose the jurors that survive it to believe that the defendant is guilty." *Id.* at 188, 106 *S.Ct.* at 1772, 90 *L.Ed.*2d at 157 (citations omitted). A majority of five justices simply rejected the argument in a footnote. *Id.* at 170 n. 7, 106 *S.Ct.* at 1763 n. 7, 90 *L.Ed.*2d at 146 n. 7. I disagreed then with our Court's acceptance of the Supreme Court's view on this matter, *Ramseur,* 106 *N.J.* at 428–35, 524 *A.*2d 188 (Handler, J., dissenting), and have continued to disagree with it. *See, e.g., State v. Bey II, supra,* 112 *N.J.* at 191–98, 548 *A.*2d 887 (Handler, J., dissenting). In both *Ramseur, supra,* 106 *N.J.* at 431–32, 524 *A.*2d 188 (Handler, J., dissenting) and *Bey II, supra,* 112 *N.J.* at 191–92, 548 *A.*2d 887

(Handler, J., dissenting), I cited the valid studies and authoritative support in ongoing social science research that demonstrate the effect of death qualification on the propensity of jurors to convict. In *Bey II*, I wrote:

> The process [of death qualification] makes paramount the issue of the imposition of the death penalty itself, thus suggesting that the guilt of the defendant is a foregone conclusion. *See* Haney, "On the Selection of Capital Juries: The Biasing Effects of the Death Qualification Process," 8 *Law Hum. Behav.* 121 (1984). One cannot read the transcript of a death-qualifying *voir dire* without a sense of impending doom. *See State v. Ramseur*, 106 *N.J.* at 331, 341 [524 *A.*2d 188] (O'Hern, J., concurring) (citations omitted).
>
> [*Id.* 112 N.J. at 192, 548 *A.*2d 887.]

Knowledgeable defense attorneys in capital causes recognize, as did Marshall's attorney and the co-defendant's attorney, that death qualification predisposes jurors to return a guilty verdict. In capital prosecutions, "defense attorneys are forced to consider whether it is better to minimize questioning of prospective jurors in efforts to limit biases created by death qualification." Hans, "Death by Jury," in *Challenging Capital Punishment* 149, 158 (K. Haas & J. Inciardi, eds., 1988) (hereafter "Hans"). This case adds empirical support for the view that death qualification can engender intolerable levels of bias in the trial of a capital case with respect to the determination of criminal guilt. If knowledgeable and experienced persons, and well-prepared, skilled, highly qualified and extremely vigorous attorneys, as in this case, *ante* at 165, 169, 586 *A.*2d at 171, 174, understand that a death-qualified jury is predisposed toward believing a defendant charged with capital-murder is guilty, then, how this Court in good conscience can continue to reject that understanding is a mystery.

I remain convinced that the bifurcated trial methodology, with its use of death-qualified juries, is fundamentally flawed. My conviction is strengthened by this case. The Court has consistently rejected the argument that the process of death qualification conditions the jurors to assume the defendant's guilt, thus violating the defendant's right to an impartial jury. *See, e.g., State v. Rose, supra*, 112 *N.J.* at 476, 548 *A.*2d 1058.

And yet here, the Court implicitly acknowledges the validity of the position it has professed to reject. It thus characterizes defense counsel's request to limit death qualification as "a well-considered strategic attempt to limit juror exposure to questions concerning capital punishment." *Ante* at 93, 586 *A*.2d at 131. What the Court fails to acknowledge is that its decision, in effect, construes our capital-murder statute to give a defendant a choice between two options: a death-qualified jury to determine guilt or a non-death-qualified jury to determine sentence. To try a defendant with a death-qualified jury is to try him with a jury predisposed toward guilt. To try a defendant with a jury that is *not* death-qualified is to try him with a jury that may be predisposed toward death. Neither choice is constitutionally tolerable.

There are ways out of this dilemma. In *State v. Ramseur, supra,* Justice O'Hern contended that a capital defendant should be sentenced by a different jury from the jury that found his guilt. He wrote, "The question is this: is trial by a jury that is not more prone to convict a good cause for a truly bifurcated trial? I think that it is. It is hard to state a better cause." 106 *N.J.* at 339, 524 *A*.2d 188 (O'Hern, J., concurring). I repeat here that "I continue ... to agree with Justice O'Hern ... that the inconvenience entailed in providing for a non-death-qualified jury—one that is fair and impartial—in the trial of guilt is not too high a price to pay to vindicate constitutional interests." *Bey II, supra,* 112 *N.J.* at 198, 548 *A*.2d 887 (Handler, J., dissenting).

A death sentence must reflect the values of the community. *Witherspoon v. Illinois, supra,* 391 *U.S.* at 519, 88 *S.Ct.* at 1775, 20 *L.Ed.*2d at 783. Society has a critical stake in the integrity of a death-penalty prosecution. *See Barefoot v. Estelle,* 463 *U.S.* 880, 913, 103 *S.Ct.* 3383, 3405, 77 *L.Ed.*2d 1090, 1117 (1983) (Marshall, J., dissenting). The public's interest in a fair and reliable determination that a defendant must die overshadows any separate interest of the State or even of the defendant. It is not up to the defendant to decide whether or

how he or she will be tried for capital murder or sentenced to death. *See, e.g., State v. Koedatich,* 112 *N.J.* 225, 329–32, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). A defendant cannot be tried for capital murder or be exposed to the death penalty in any manner that departs from the minimal constitutional standards governing capital-murder prosecutions, which assure that the ultimate sentence òf death is one that is not capricious, discriminatory or arbitrary, that can be perceived as reliable and accepted as an expression of the conscience of the community. A capital-murder proceeding that fails to reach such standards is unacceptable to a civilized society.

It remains my view that it is unconstitutional to determine the guilt of a capital defendant with a death-qualified jury. But the constitutional offense is infinitely greater if a death sentence is imposed on a capital defendant by a jury that is not death-qualified. The former risks an unfair conviction; the latter risks an unfair sentence of death. Neither a defendant nor defense counsel have the prerogative to decide whether or not to death-qualify a jury in capital cases. The contrary result—a death sentence imposed by an unqualified jury—can be regarded only as arbitrary, unprincipled, and expedient. Nevertheless, that is precisely the result endorsed by the Court. The failure to death-qualify this capital-murder jury cannot be salvaged.

## II.

The defendant was subjected to determinations of criminal guilt and, ultimately, the death sentence by a jury that realistically may well have believed that it could reach those decisions if it simply found that the defense witnesses were not credible and were not telling the truth. That serious misdirection of the jury's proper deliberative responsibility resulted not merely from incorrect instructions of the trial court that advised the jury that it could resolve ultimate issues of guilt and

sentence by deciding who was telling the truth; but also from the failure of the State to provide critical evidence bearing on the credibility of a key prosecution witness. Those circumstances present the palpable danger that the jury's ultimate determinations were based on whom the jury believed, not on whether the evidence convinced the jury of defendant's guilt beyond a reasonable doubt.

## A.

Concededly, the trial court fully explained to the jury the State's burden of proof. In its instructions, however, the trial court also undermined that explanation by advising that the verdict should constitute the jury's determination of the "truth": "So let your verdict declare the truth." [2]

The Court concludes simply that "defendant was not denied his constitutional right to be convicted only on proof beyond a reasonable doubt." *Ante* at 136, 586 *A*.2d at 155. Viewed from a wider perspective, however, the trial court's instruction did not guarantee that a conviction would be based *only* on proof beyond a reasonable doubt.

In *United States v. Pine*, 609 *F.*2d 106 (1979), a bribery case, the Court of Appeals for the Third Circuit considered the confusion and misdirection likely to result from such a jury charge concerning the "truth." In *Pine*, the trial court's instructions to the jury included the following passage:

> Fundamentally, this case, as most cases do, involves the question of fact. The basic question is whether the Government's witnesses are telling the truth or whether the defendants and their witnesses are telling the truth. Your basic task is to evolve the truth.

---

[2]The court's closing admonition to the jury was:

> Ladies and gentlemen, it has been said, and correctly, that many of the words that we use are derived from the Latin, and one of the words in that category is the word verdict. The word verdict is derived from the Latin veredictum, and it means a true declaration. So let your verdict declare the truth.

[*Ante* at 135, 586 *A*.2d at 154.]

[*Id.* at 107–08.]

Observing that such an instruction tends "to dilute and thereby impair the constitutional requirement of proof beyond a reasonable doubt," the Court of Appeals directed all trial courts in the Third Circuit to desist from using such instructions. *Id.* at 108. Nevertheless, examining that objectionable instruction in the context of the entire jury charge, the court held that the trial court's instructions did not violate the constitutional rights of the defendant. *Id.* at 109.

Of course a single instruction to a jury should not be assessed "in artificial isolation." *Cupp v. Naughten,* 414 *U.S.* 141, 146–47, 94 *S.Ct.* 396, 400–01, 38 *L.Ed.*2d 368, 373 (1973); *State v. Hunt, supra,* 115 *N.J.* at 373, 558 *A.*2d 1259. To determine whether the instruction violated defendant's constitutional rights, the Court should consider the instructions both in the context of the complete jury charge and in the wider perspective of the prosecution.

Here, from the outset of the prosecution, the parties initiated a battle over which side was telling the truth. The prosecutor insinuated in his opening statement that Marshall was a liar and that the credibility of his testimony was a central issue in the case. The opening statement by Marshall's counsel suggested that Billy Wayne McKinnon was a liar. Marshall's attorney told the jury, "I ask you to closely listen to [McKinnon], closely scrutinize his demeanor, because you're going to have to decide in your mind whether you can believe that man beyond a reasonable doubt." That battle intensified during the evidentiary phase of the trial. McKinnon and Marshall were critical witnesses for the State and the defense, respectively. The jury could not believe the import of either person's testimony and also believe the other's story. The defense cross-examined McKinnon at length and vigorously attacked the credibility of his testimony; the State subjected Marshall to similar treatment. McKinnon's and Marshall's veracity was challenged through other witnesses as well.

The summations sharpened the issue whether McKinnon or Marshall was telling the truth about their relationship, the events leading up to the murder, and what happened at the Oyster Creek Picnic Area. The prosecutor opened his remarks by telling the jury that the case turned on "what witnesses are believable and what witnesses are not believable." He continued: "[T]he testimony is so diametrically opposed in this case that there can be no question that there has been a conscious effort to deceive you. Make no mistake about that." He told the jury, "[Y]ou would have not found the truth that you have seen unfold during the course of this trial" if McKinnon had not signed the plea agreement and testified. He repeatedly asserted that the jury would have to find all the State's witnesses, separately and together, to be liars in order to find the defendant not guilty. Marshall's attorney's closing argument also presented the case to the jury as a matter of determining the truth. He told the jury to consider "[w]ho you can believe and who you're not going to believe, and who comes in here with a motive to lie and who comes in here to tell the truth."

Thus, prior to the jury charge, the attorneys' statements and the evidence combined to present the case to the jury as a question of which version of the conspiracy and murder—the State's or the defense's—was true. This question was intertwined with the issue of the credibility of the witnesses' testimony. Against that background the jury instructions augmented the importance of credibility. The court stated that the jury should consider all of the testimony "in determining what is the *truth;*" and, again, that the jury should "consider anything and everything ... in determining what is the *truth.*" (Emphasis added.) Finally, any distinction between the search for "truth" and the reasonable-doubt standard became confused when the trial court told the jury that it could consider credibility in deciding whether the State had carried its burden of proof beyond a reasonable doubt. Hence, the references in this jury charge to a duty to find the truth could only obfuscate the correct standard of proof and impair the constitutional require-

ment of proof beyond a reasonable doubt. *United States v. Pine, supra,* 609 *F.*2d at 108.

The cumulative emphasis on "truth" throughout the entire guilt phase of this trial created a very real danger that the jury did not render its guilt verdict on the proper legal standard. Most especially in this, a capital case, any legitimate questioning of such error, implicating defendant's constitutional right to be convicted of capital murder only on proof beyond a reasonable doubt should be resolved in defendant's favor. This is particularly critical because extraordinarily important evidence bearing directly on the credibility of a key prosecution witness was withheld from the defense, and, ultimately, the jury.

### B.

The Court concludes no reversible error inhered in the State's failure to disclose vital information bearing directly on the credibility of a key prosecution witness, Sarann Kraushaar. *Ante* at 204, 586 *A.*2d at 194. I disagree with the Court's disposition of this issue, particularly in light of the trial court's strong direction to the jury that it must determine guilt based on who was telling the "truth."

The State did not dispute that the prosecutor had not disclosed to the defense the documents evidencing the grant of immunity to that witness. Additionally, the State conceded that the material was discoverable and had been improperly withheld. The lower court concluded that the failure to disclose the documents pertaining to the promise of immunity for Kraushaar had not been willful.

The lower court seriously understates the importance of this witness "as being *merely* a person with·knowledge of relevant facts." (Emphasis added.) The court acknowledged that Kraushaar had furnished important information. This included "the details of her affair with Robert Marshall, the plan to leave their respective spouses, the financial difficulties that Marshall was having, the fact that insurance on Maria's life

would solve these difficulties, [and] the fact that Marshall had inferred a desire to have his wife killed." This evidence was not only relevant, but also extremely probative of defendant's motives.

After initially obtaining some of this information on September 7, 1984, the State sought to reconfirm and acquire additional information. Accordingly, it scheduled another interview for September 27, 1984. At that time Kraushaar had an attorney, who insisted on a grant of immunity from prosecution. The State acceded to that request and prepared a letter granting such immunity, which was read to the attorney over the telephone before the interview occurred. Then, a similar letter was prepared and actually signed by the investigating officers at the attorney's office. The second interview transpired only after the immunity had been secured.

The prosecutor, according to the lower court, simply "placed [the letters] in the Marshall file and, thereafter, assumed that all persons concerned in his office would know of them.... [and] gave no further thought to them." The lower court then theorized that non-disclosure by the State had been inadvertent. In concluding that the State's action had not been willful, the court gave significant weight to a "motive" not to withhold this information. That "motive," however, is pure hypothesis, constructed on the putative strength of the prosecution's case.[3]

---

[3]The lower court's determination that the State did not have a purpose or motive to withhold information is conjectural, *viz:*

The conclusion that the non-disclosure was not willful is supported by examination of the question of motive. Presence or absence of motive bears upon whether an intentional wrong would be committed. There would have existed the motive to conceal the documents in order to prevent their being utilized to affect the credibility of the witness. However, the Prosecutor would have been aware that he could demonstrate that a substantial portion of Kraushaar's story was told on September 7, 1984, twenty days prior to any discussion of immunity. He was aware of what the testimony of Billy Wayne McKinnon would be, together with the fact that it would not have been plausible for McKinnon to have been involved in the murder either as an accomplice (as alleged by the State) or

This Court ordinarily must defer to the fact-finding of the trial judge, who has had the first-hand opportunity to assess the credibility of the witnesses. *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964). Nevertheless, no facts were adduced to support the conclusion that the State believed its case against defendant was so strong that it had no reason to withhold disclosure of Kraushaar's grant of immunity. To credit that theory one would also have to impute to the State a belief that the information it obtained from Kraushaar from the second interview was really unnecessary and wholly superfluous and that her trial testimony was either inconsequential or impregnable. The record does not clearly suggest that the prosecution entertained that position or acted on it. In view of the trial court's reliance on the State's motive in determining, without adequate support, that nondisclosure was nonwillful, its conclusion should not be credited.

Moreover, "[i]n determining whether prosecutorial nondisclosure violates due process, the good faith or bad faith of the prosecution is irrelevant." *State v. Carter*, 91 *N.J.* 86, 112, 449 *A.*2d 1280 (1982) (citing *Brady v. Maryland*, 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196, 10 *L.Ed.*2d 215, 218 (1963)). In the context of a non-capital crime we have recognized that "[w]here the defendant has made a specific request for information and the prosecution has failed to reveal the requested information, the standard of materiality is whether 'the suppressed evidence might have affected the outcome of the trial.'" *Ibid.* (quoting *United States v. Agurs*, 427 *U.S.* 97, 104, 96 *S.Ct.* 2392, 2398, 49 *L.Ed.*2d 342, 350 (1976)). That test "is not translatable into the mere possibility that the undisclosed information might

as the shooter (as alleged at trial by co-defendant Thompson) except at the instigation of Marshall. He was aware that he could demonstrate false and inconsistent statements made by Marshall following the murder. He was aware of the compelling circumstantial evidence of guilt. Being aware of all these things, on balance any motive for nondisclosure and its accompanying risks—the documents also being in Altman's file—was substantially outweighed by the motive to disclose.

have helped the defense.... There must be a real possibility that the evidence would have affected the result." *Id.* at 113, 96 *S.Ct.* at 2402. Because this is a capital case, we should under our State Constitution adopt a more protective standard. *See, e.g., United States v. Bagley,* 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985) (If absence of undisclosed evidence is "sufficient to undermine confidence in the outcome," nondisclosure is material).

The importance of Kraushaar's credibility is unquestionable. The undisclosed information relating to her grant of immunity surely would have provided a means to impeach her. On several points, including particularly her testimony about Marshall getting rid of his wife, his financial status, and his anticipation of insurance proceeds, her testimony and the defendant's were in sharp conflict. Credibility as between those two conflicting witnesses was extraordinarily important. Knowledge of Kraushaar's immunity from prosecution could have provided a basis for the jury to infer that she was exaggerating her version of the events. In view of the extensive and vigorous cross-examination and sharp attacks on the credibility of other key prosecution witnesses, like McKinnon, it cannot be assumed that defense counsel could not have effectively weakened Kraushaar's testimony had they known of her grant of immunity. Because the trial court itself, as well as the prosecutor, put credibility in issue, the result of the trial might have been affected had the defense been able to impeach her credibility. Although none of Kraushaar's testimony directly placed Marshall in the conspiracy or implicated him in the murder at the Oyster Creek Picnic Area, it clearly furnished evidence of a strong motive to kill his wife. Defendant strenuously challenged this evidence and was denied without just cause the opportunity to challenge the credibility of its author.

C.

In sum, the trial court's instructions directing the jury to focus on witness credibility and to reach a verdict that reflected

the "truth" enabled the jury to convict in whole or in part on credibility, aside from the cogency and weight of all of the evidence. There simply is no legal authority that a criminal verdict must mirror the "truth." That error takes on a special effect in light of the fact that defendant was denied the opportunity fully to challenge the credibility of a key prosecution witness. Particularly, in the context of a capital-murder prosecution, such errors cannot be passed off as innocuous or harmless.

## III.

Prosecutorial misconduct was rampant throughout the trial. The Court finds no justification for reversal of defendant's conviction or death sentence on those grounds. I disagree.

A capital case solemnifies and enhances the prosecutorial responsibility "to use every legitimate means to bring about a just [result]." *State v. Ramseur, supra,* 106 *N.J.* at 320, 524 *A.*2d 188 (citations omitted). It also elevates the court's supervisory duty to assure adherence to the prosecutor's "particularly stringent ethical obligations in capital cases." *Id.* at 324, 524 *A.*2d 188; *see Williams II, supra,* 113 *N.J.* at 456, 550 *A.*2d 1172.

The record reveals a pattern of calculation on the part of the prosecutor that underscores the offensiveness of his conduct. The prosecutor constantly made needling remarks obviously designed only to cast aspersions on defendant, defense witnesses, and defense counsel. These gibes, individually and together, do not warrant reversal, but, with other tactics of the prosecutor, they injected a tone of opprobrium and denigration that had no place in this trial. In addition, the prosecutor brought to the attention of the jury, against court instructions and in a manner calculated to prejudice defendant, assorted irrelevant and inflammatory tidbits of information. The prosecutor noted, for example, that Sarann Kraushaar's father had died of a heart attack a few weeks after the murder, implying

that it was related to the man's horror at Kraushaar's connections to defendant and the murder. In response to pointed admonitions from the court, the prosecutor several times promised the court that he would refrain from speaking about some objectionable topic, but would subsequently broach that topic before defense counsel could respond. Additionally, many of his comments and questions strongly insinuated that defense counsel, as well as defendant and the defense investigator, had conspired to obstruct the investigation in Louisiana. Although the prosecutor often withdrew objectionable remarks, he made them with such frequency that their damage cannot be discounted. In short, to say that the prosecutor was simply spiritedly trying the case or was carried away by the emotional pitch of the trial is naive. Most of those improprieties were calculated.

Against that background, certain instances of the prosecutor's improper conduct stand out starkly. For example, the trial court ruled that investigator Mahoney could testify only that the September 21 interview with defendant "was terminated," to avoid disclosure by defendant that he had been advised by counsel not to say anything to law enforcement officials about the case outside the presence of counsel. Yet, the prosecutor persistently placed before the jury, albeit in the form of questions to the witness, the fact that defendant had retained an attorney, in effect, betraying his own guilt.

The Court stresses that defendant introduced evidence of his retention of counsel. *Ante* at 122–123, 586 *A.*2d at 147–148. Nevertheless, that does not excuse, justify, or undo the prosecutor's attempt to penalize defendant's exercise of his right to counsel by improperly suggesting defendant's guilt. "Even the most innocent individuals do well to retain counsel." *Bruno v. Rushen,* 721 *F.*2d 1193, 1194–95 (9th Cir.1983), *cert. denied sub nom McCarthy v. Bruno,* 469 *U.S.* 920, 105 *S.Ct.* 302, 83 *L.Ed.*2d 236 (1984) (citations omitted). " '[L]awyers in criminal courts are necessities not luxuries.' " *Gideon v. Wainwright,* 372 *U.S.* 335, 344, 83 *S.Ct.* 792, 796, 9 *L.Ed.*2d 799, 805 (1963)

(citations omitted). Prosecutorial conduct impugning the retention of counsel by a defendant equates with serious trial error. *Bruno v. Rushen, supra,* 721 *F.*2d at 1195 (prosecutor's "insidious" attacks on defendant's exercise of his right to counsel and on the integrity of defense counsel were errors of constitutional dimension); *State v. McDonald,* 620 *F.*2d 559, 564 (5th Cir.1980) ("It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel"); *United States ex rel. Macon v. Yeager,* 476 *F.*2d 613 (3d Cir.1973) (prosecutor's comment penalized defendant exercising his right to counsel and was thus constitutional error), *cert. denied,* 414 *U.S.* 855, 94 *S.Ct.* 154, 38 *L.Ed.*2d 104 (1974); *see United States v. Daoud,* 741 *F.*2d 478, 481 (1st Cir.1984) (trial court's refusal of defendant's request for curative instruction, where prosecutor twice "needlessly" elicited testimony that defendant had requested counsel after issuance of *Miranda* warnings, was error).

Although the Court attempts to bury this error in other evidence, *ante* at 126, 586 *A.*2d at 149, the error cannot be made to disappear. The brevity of the comment in the context of this lengthy trial does not render it harmless. The fact that the reference to defendant's retention of counsel was in the form of a question rather than a statement does not lessen its prejudicial impact. The trial court itself agreed that the question was argumentative, and the intended effect on the jury was not dependent on whether the question was answered. Most importantly, the prosecutor's insinuation was calculated and struck at the core of the defense. *Bruno v. Rushen, supra,* 721 *F.*2d at 1195. The attempt to prove defendant's guilt by pointing to defendant's retention of counsel can be harmful *per se. State v. McDonald, supra,* 620 *F.*2d at 564. This species of prosecutorial misconduct is reversible error.

The prosecution also implied facts by referring to phantom witnesses who were not called to testify. For example, the financial condition of the defendant's family at the time of the

murder was a major issue. The success of either the State's theory of the case or the defense depended significantly on what the jury believed about defendant's financial status and planning. The prosecutor asserted, not once but twice, that the figures he had prepared were correct and based on sources in the financial industry, and that if the defendant challenged the prosecutor's figures, then the prosecutor would bring in witnesses to show that defendant was wrong.

In *State v. Rose, supra,* 112 *N.J.* at 518–19, 548 *A.*2d 1058, this Court found improper "the prosecutor's statement that he could have produced 'ten' experts to testify [concerning defendant's mental condition] differently from the defense experts." The prosecutor's assertions here were no less improper than the statements in *Rose,* given the importance of defendant's finances. The prosecutor misled the jury concerning the inferences it could draw. He also improperly pitted his own credibility against defendant's. *Id.* at 519, 548 *A.*2d 1058; *see ABA Standards for Criminal Justice* § 3–5.8(a) and (b). The trial court's sustaining of the objections could hardly have made clear to the jurors what they could not infer, nor could it have caused them to erase the implications from their minds.

Furthermore, the prosecutor made remarks of a testimonial character that were unsubstantiated, namely, that defendant had already received six hundred thousand dollars and that in the event of acquittal, "the checks will be in the mail within a week." Such a blatant misrepresentation of fact is improper. *Rose, supra,* 112 *N.J.* at 522, 548 *A.*2d 1058; *ABA Standards for Criminal Justice,* § 3–5.8(a) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw"); *New Jersey Rules of Professional Conduct* 3.4 ("A lawyer shall not ... (e) in trial, allude to any matter that ... will not be supported by admissible evidence"). Such references divert the jury's attention from the fact issues in the case. The misrepresentations were not accidental. Indeed, the prosecutor emphatically attested to the truth of his misrepresentations.

"[I]mproper ... assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935); *see also Ramseur, supra*, 106 *N.J.* at 321, 524 *A.*2d 188 (well-established rule that prosecutor may not express personal belief in defendant's guilt because it diverts jury's attention from evidence adduced at trial); *State v. Thornton*, 38 *N.J.* 380, 398, 185 *A.*2d 9 (1962) (prosecutor must refrain from expressing personal belief because of danger that his or her official status may improperly influence jury), *cert. denied*, 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.*2d 1039 (1963).

Moreover, those comments improperly instructed the jury on the consequences of acquittal, implying that a conviction was the only precaution against defendant's receipt of insurance proceeds. "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." *ABA Standards of Criminal Justice* § 3–5.8(d). *Cf. Darden v. Wainwright*, 477 *U.S.* 168, 179–80, 106 *S.Ct.* 2464, 2470–71, 91 *L.Ed.*2d 144, 156–57 (1986) (improper to imply only guarantee against future similar criminal act is death penalty); *State v. Koedatich, supra*, 112 *N.J.* at 323–24, 548 *A.*2d 939 (statement that had defendant not been arrested, "he would have been given a license to kill" constitutes misconduct). In denying defendant's motions for a mistrial based on those comments, the trial court gave only a very brief jury instruction, which did not refute squarely the prosecutor's avowal that defendant, if acquitted, would quickly receive insurance money.

In addition, the prosecutor made improper references to his experience, attempting to influence the jury's perception of the evidence. He added his own testimony to the evidence concerning the size and shape of the supposed mail depository, a factual issue that was disputed throughout the trial, the resolu-

tion of which influenced the determination of many of the. evidentiary issues and inferences. *Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188. The prosecutor's reference to his experience in the middle of summation might well have impermissibly placed the prosecutor's authority behind his summation arguments concerning many other evidentiary disputes. *Id.* at 320, 524 *A.*2d 188. "[S]uch statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced, thus creating the possibility that the jurors consciously or unconsciously might adopt the prosecutor's view without applying their own independent judgment to the evidence." *State v. Thornton, supra,* 38 *N.J.* at 398, 185 *A.*2d 9.

Further, in cross-examination, counsel for both Marshall and Thompson combed McKinnon's plea agreement and statement, attempting to call into question both McKinnon's motives behind his agreement and the substance of his version of the conspiracy and murder. The prosecutor countered that legitimate defense tactic in his closing argument by vouching for the truth of McKinnon's testimony and representing to the jury facts—the truth of which cannot be known—about the defense's cross-examination that had nothing to do with the evidence in the case. He also insinuated that defense counsel was acting improperly in challenging the plea-agreement and the reliability of McKinnon's testimony, observing, again on his experience, that the defense was a sham.

The Court treats these several circumstances dismissively, *ante* at 153–155; 156–159, 586 *A.*2d at 165–166; 166–168, yet diverting the jury's attention from the facts of the case is clearly improper. *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188; *Thornton, supra,* 38 *N.J.* at 398, 185 *A.*2d 9; *ABA Standards for Criminal Justice* § 3–5.8(a). A prosecutor cannot allude to matters not supported by evidence admitted at trial. *See New Jersey Rules of Professional Conduct* 3.4.

Further, the prosecutor stated in summation:

And he has the audacity to bring in his three boys to testify. That's obscene. And I'm not being critical of them, because I would probably do the same thing. To put his boys on that witness stand is obscene, and for that there's a place in hell for him. He will use anybody, he will say anything and he will do anything, including his own family, to get out from under. And that's Robert Oakley Marshall. Make no mistake about it.

After the summation, defendant moved for a mistrial based on those remarks. The trial court simply instructed the jury that defendant "has a right to bring in any witnesses ... to testify on his behalf and that no adverse inferences should be drawn against the defendant merely because his sons testified as witnesses on his behalf." Those instructions hardly palliated the "obscenity" that the prosecutor ascribed to defendant. The prosecutor's comments were studied, coldly calculated remarks designed to prejudice defendant. Such forceful and vivid remarks carried an overwhelming capacity to divert the jury's attention from the proper fact issues in the case. *See, e.g., Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188.

Additionally, in his sentencing-phase statement to the jury, the prosecutor expressed his personal view that there is nothing "more heinous in our society than to ... hire somebody to kill somebody else," particularly "a family member" such as "your wife." He added that the victim, "had no prior criminal history" and was "civic-minded" but that "defendant did not give her the option of thirty years."

Those comments were clearly improper. What the prosecutor thinks is the most heinous crime in our society is not relevant to the issues properly before the jury at sentencing; it has the effect of indirectly adding to the penalty trial an aggravating factor, c(4)(c), that was not before the jury, and in phraseology expressly disapproved by this Court. *See Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188; *Thornton, supra,* 38 *N.J.* at 398, 185 *A.*2d 9. Further, the victim's lack of a criminal record and civic-mindedness were not relevant to defendant's sentence. In effect, the prosecutor rated the victim under the mitigating factors sought by defendant, subtly but impermissibly diverting the jury's consideration of these mitigating

factors from defendant's character to the character of defendant's wife. It encouraged the jury to find that if his wife was civic-minded and law-abiding, the mitigating factor would not be available to defendant, leaving him unworthy of a life sentence. These insidious remarks, in the context of the unusual, highly abbreviated sentencing phase proceedings, denied defendant the protections required in a fair penalty proceeding.

The question remains whether that stream of misconduct warrants reversals respectively of the murder conviction and the death sentence. "The determination that the prosecutor was guilty of misconduct does not end [the] inquiry." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188. None of the instances of misconduct that occurred in the guilt trial, as detailed here, can arguably be described as a slip of the tongue, an unavoidable consequence of the charged atmosphere of a criminal trial, or a mistake committed in good faith. To the contrary, those instances were clearly deliberate attempts to place matters not pertinent to defendant's guilt or innocence before the jury. The few and somewhat meager attempts by the court and counsel to correct the damage wrought by these acts of misconduct were inadequate, and some of that misconduct, and certainly its cumulative effect, was incurable.

The Court greatly misperceives the impact of this misconduct. *Ante* at 170, 586 *A.*2d at 174. Prosecutorial misconduct at the guilt phase requires reversal of the conviction of capital-murder. The prejudice resulting from that misconduct was escalated by the prejudice that arose from the prosecutor's improper penalty-phase remarks, warranting reversal of defendant's death sentence.

## IV.

This case underscores the deficiencies that can, and often do, surround the imposition of the death sentence by invoking the bifurcated trial methodology, which entails the continuous but ostensibly separate trials of guilt and punishment. The use in

both proceedings of the *same* jury achieves continuity. The application of different substantive standards and procedural rules in each proceeding achieves separateness. "[D]eath-qualification and death-selection are discrete, successive determinations, each to be made by the jury under appropriate standards." *Ramseur, supra,* 106 *N.J.* at 392–93, 524 *A.*2d 188 (Handler, J., dissenting). Continuity between the guilt and penalty trials serves only administrative convenience. The purpose of separateness of the penalty hearing is to assure that the penalty determination is independent and objective, and truly focused on the ultimate issue of the death-worthiness of the defendant. In this case, the penalty-phase aspect of the trial was fundamentally unfair because it failed wholly to separate the jury's responsibilities with respect to guilt and punishment.

## A.

Defendant's death sentence was based solely on one aggravating factor, c(4)(e), which duplicated an element of the crime for which he was convicted. Defendant was charged with capital murder consisting of a murder by contract. *N.J.S.A.* 2C:11–3. Defendant claims this statutory structure in which the capital crime, the death-eligible crime, is coextensive with a death-worthy crime is unconstitutional because it fails to narrow the class of murderers eligible for the death penalty. The Court today rejects that contention on the strength of *Ramseur, supra,* 106 *N.J.* at 188, 524 *A.*2d 188. *Ante* at 137–138, 586 *A.*2d at 156. I continue to disagree with the Court's position on constitutional grounds. "[A]s a matter of its basic definition of murder the statute effectively telescopes the definitional narrowing of the class of death-eligible murderers with the jury's finding of aggravating factors at sentencing." *Ramseur, supra,* 106 *N.J.* at 403, 524 *A.*2d 188 (Handler, J., dissenting).

The shortcoming in the statute in failing to narrow sufficiently the class of capital-murder defendants eligible to receive the death sentence *before* the penalty trial commences is particularly significant in this case. The jury here was asked to determine in the guilt trial whether defendant was guilty of the murder of his wife through the payment of consideration to another person. That element—the payment of consideration—was the sole aggravating factor that the State relied on in seeking the death penalty. In the wake of the multitudinous circumstances and the resolution of numerous factual issues, as well as the ultimate determination of guilt, at the guilt phase of this trial, the penalty phase did not genuinely require or allow the jury to render an additional, significantly different decision concerning defendant's death-worthiness. The penalty phase simply asked the jury to reconsider the evidence it had already assessed at the guilt phase. *See ante* at 61, 586 *A*.2d at 114.

To think that the jury could be sufficiently objective in its second assessment of such evidence is unrealistic and naive. It has been observed that "[c]apital jurors begin the penalty phase with a story developed during the guilt phase.... [O]nce the story has been developed, jurors are likely to resist reconstruction of it." Hans, *supra*, at 162. We have recognized in other contexts the perils entailed in asking a jury to redetermine evidence already considered and resolved. If a jury must make a second, independent determination of guilt, it may not simply reconsider evidence previously considered, weighed and resolved in reaching a previous verdict without understanding fully that its reconsideration of such evidence must be fresh and independent. *State v. Ingenito*, 87 *N.J.* 204, 432 *A*.2d 912 (1981). "It becomes essential, therefore, that the jury be instructed in no uncertain terms to consider anew the evidence previously admitted but to disregard completely its prior verdict." *State v. Ragland*, 105 *N.J.* 189, 195, 519 *A*.2d 1361 (1986). When the redetermination is the basis for the imposition of the death penalty, we may reasonably doubt the efficacy

of simple, *pro forma* instructions that allow the jury merely to churn previously digested evidence.

In this case, there is little assurance that the instructions of the trial court were at all effective. The guilt and penalty determinations were in effect collapsed into each other because the identical statutory element defined both the crime and the punishment. Also, as noted, the critical evidence that converted this crime into capital murder was the identical—and only—evidence that could justify the death sentence.

Other equally serious deficiencies occurred in the imposition of the death sentence. The fusion of crime and punishment was intensified because the penalty determination was so perfunctory as to be indistinct from the jury's guilt determination. Even overlooking the problems inherent in the bifurcated trial system, this trial was not, as it should have been, truly bifurcated.

A short sentencing phase will not, in itself, necessarily impugn the ultimate sentencing determination, but here neither the State nor defendant developed any independent evidentiary record in the penalty phase. The *only* evidence available and used in the penalty phase to seek the death sentence was the evidence that was probative on the issue of guilt. Defense counsel relied solely on evidence presented in defense of the crime charged. There is no reason to suppose that the evidence offered by defendant at the guilt trial by way of a defense to the charges could be more than marginally helpful with respect to whether he deserved only life imprisonment. During the defense case in the guilt trial, the defense witnesses had testified in no particular order and with no particular focus on defendant's death-worthiness. Such an unstructured and loose approach to the mitigating factors is unacceptable given the "ultimate" decision, *see State v. Biegenwald, supra,* 106 *N.J.* at 62, 524 *A.*2d 130, for which the proceeding is designed to provide guidance.

Further, the problem of the scant and, at the time of the sentencing phase, distant mitigating evidence was compounded by the timing of the sentencing phase. The entire sentencing phase took place the same day the jury returned its guilt verdict, with the awareness of its guilt determination still vivid. Indeed, the sentencing phase began only a few hours after the guilt phase had been completed. The record of the sentencing phase including the court's opening remarks to its closing instructions requires only seventeen pages of transcript. This record conveys no sense of thoroughness and only a superficial sense of gravity.

It has been argued that a capital defendant's right to a continuance between the guilt and sentencing phases is of constitutional magnitude. *See* Note, "A Capital Defendant's Right to a Continuance Between the Two Phases of a Death Penalty Trial," 64 *N.Y.U.L.Rev.* 579 (1989). A continuance is advisable partly because the defendant, the jury, and defense counsel need time to recover emotionally from the capital conviction and to focus on the issue of sentencing. *Id.* at 582. This observation is not an idle one. On return of the guilty verdict at this trial, defendant collapsed, was taken from the court on a stretcher, and then transported to a hospital. Less than two and a half hours later, defendant was returned to court to begin the sentencing phase, which lasted approximately twenty minutes. After deliberating for about an hour and a half, the jury returned a sentence of death.

It has been further noted that on a substantive level, defense attorneys are not capable of adequately preparing for the two trials—guilt and sentencing—simultaneously. *Ibid.;* Goodpaster, "The Adversary System, Advocacy, and Effective Assistance of Counsel in Criminal Cases," 14 *N.Y.U.Rev.L. & Soc. Change* 59, 83–85 (1986) ("Penalties in capital cases ultimately will turn on mitigating evidence and on the advocate's ability to marshal and present that evidence. As a matter of law and practice, the opportunity to present almost any arguably mitigating evidence crucially distinguishes death penalty trials

from all other criminal trials."); *see also Proffitt v. Wainwright*, 685 *F.*2d 1227, 1271 (11th Cir.1982) (Clark, J., concurring and dissenting) (quoting A.B.A. Project on Standards for Criminal Justice, Standards Relating to: The Prosecution Function and the Defense Function 277 (1970): "The lawyer ... has a substantial and very important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing."), *cert. denied,* 464 *U.S.* 1002, 104 *S.Ct.* 508, 78 *L.Ed.*2d 697 (1983). It is understandable that some states *forbid* courts from holding the sentencing hearing immediately following the return of the guilty verdict. Note, "A Capital Defendant's Right to a Continuance," *supra,* 64 *N.Y.U. L.Rev.* at 623–24.

Newly introduced mitigating evidence might have firmly refocused the jury's attention and closely attuned the jury to the meaning and function of the mitigating factors. Instead, the absence of such evidence, coupled with the celerity and brevity of the sentencing trial, left open the possibility that the jury did not fully and properly set aside its fixed impressions and the impact of its guilt deliberations. A truly separate and distinct penalty trial theoretically succeeds in infusing guilt-phase evidence with a different hue because it is filtered through the prism of the special protective standards that govern the imposition of the death sentence. The integrity of that process is dubious, even under the best circumstances. *See, e.g., State v. Harvey,* 121 *N.J.* 407, 449, 581 *A.*2d 483 (1991) (Handler, J., dissenting and concurring) (other-crimes evidence marginally admissible in guilt phase may be extremely prejudicial in penalty phase; hence, "it is imperative that the potential for prejudice of such evidence in the penalty-phase trial be considered by the trial court in determining its admissibility in the guilt-phase trial."); *State v. Long,* 119 *N.J.* 439, 525–17, 575 *A.*2d 435 (1990) (Handler, J., dissenting and concurring) (same); *State v. Pennington,* 119 *N.J.* 547, 607–08, 575 *A.*2d 816 (1990) (Handler, J., dissenting and concurring) (prior murder conviction admitted in guilt phase to affect only credibility gains added prejudicial

weight when used a second time as an aggravating factor in penalty phase); Hans, *supra,* at 162. The truncated sentencing proceeding in this case, however, defeats the theory that it is fair to use guilt-phase evidence to determine whether defendant deserves to die. I repeat an observation made in *Ramseur:*

> This is not to deny that the weighing of aggravating and mitigating circumstances "provides the additional restraint on jury discretion that the petitioner in [*Zant v. Stephens,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235 (1983)] argued was constitutionally necessary." ... The constitutional infirmity is not in a weighing process. Rather, it inheres in the fact that weighing does double duty. It is used in the factfinding necessary to determine whether a murder is capital in the same proceeding and deliberation that determines whether the murderer should be executed. Any distinction between finding an aggravating circumstance and weighing it when the tasks are performed in the same proceeding is at best, in my view, academic; the potential for jury misguidance and arbitrariness is simply too great.
>
> [*Ramseur, supra,* 106 *N.J.* at 391–92, 524 *A.*2d 188 (Handler, J., dissenting) (footnote omitted).]

Pertinent to this matter is the further observation that "the jury's consideration of aggravating factors serves both to specify which defendants are in the class and, in the same process, to decide their punishment.... [F]rom the defendant's perspective, the sentence is imposed as and when the offense is defined" and determined. *Id.* at 393, 524 *A.*2d 188 (Handler, J., dissenting).

The guilt determination overwhelmed the penalty determination. A death sentence that does not entail a decision that is reliably qualitatively different from its predicate guilt verdict cannot be sustained.

### B.

In addition, the trial court's failure to amplify the meaning and function of mitigating factors exacerbated the prejudice inherent in the abbreviated sentencing phase of this trial. The trial court's instructions during the sentencing phase were erroneous in that they did not explain adequately the significance and function of mitigating factors. Thus, in its introductory remarks during the sentencing phase, the trial court in-

formed the jury that the defendant need not prove the existence of mitigating factors but, rather, need only introduce evidence of them in order for the jury to consider them. The court simply named the two mitigating factors sought by defendant and then told the jury it had to find one of them, no history of criminal activity. The trial court did not, however, explain the meaning of these mitigating factors. Similarly, in its closing sentencing phase instructions, the trial court repeated that the jury did not have to be convinced of the existence of the mitigating factors, but that if defendant introduced any evidence related to those factors—even though the court was aware that no such evidence would be forthcoming—the jury had to consider the factors and weigh them against any aggravating factors. Again, the court did not discuss the meaning of the mitigating factors in the sentencing determination.

Thus, the court's only reference to the function of mitigating factors was indirect, a by-product of its explanation of the weighing process. At no time in the sentencing phase did the trial court express or expound the thought that "mitigating factors are those which would tend toward the sentence of life imprisonment." *See Bey II, supra,* 112 *N.J.* at 167, 548 *A.*2d 887. "[I]n brief, the charge of mitigating factors was essentially a recitation of the statutory language." *Id.* at 168, 548 *A.*2d 887.

The Court has clearly and emphatically imposed a requirement that mitigating factors be fully explained to the jury. *Bey II, supra,* 112 *N.J.* at 169–70, 548 *A.*2d 887. The trial court here did inform the jury that it could consider evidence from the guilt phase in determining sentence, but the court did not specifically say that the jury could consider *mitigating* evidence adduced at the guilt phase. The fact that defense counsel attempted to explain to the jury the meaning and function of one of the two mitigating factors does not redeem the inadequate instructions of the trial court. Moreover, as previously mentioned, the evidence that the jury considered was offered for a different purpose and in a different context,

namely, as it bore on guilt. Furthermore, most significantly, the jury had already considered and discounted that evidence, determining obviously that it did not ameliorate defendant's guilt.

We cannot be confident that the finding of mitigating factors, under those circumstances, demonstrates that the jury understood their meaning or function, absent clarification by the court. This deficiency is especially serious because the jury must not only *find* the existence of mitigating factors, it must *weigh* them and further *compare* their weight to that of aggravating factors. That delicate and complex deliberative process cannot be fulfilled without accurate, clear, and comprehensive instructions. The absence of an explanation of the function and meaning of mitigating factors at the sentencing phase raises the substantive risk that the jury arrived at a sentence in an arbitrary and capricious—and therefore impermissible—manner.

## C.

The foregoing errors compound another significant error in the penalty determination. In *Ramseur,* this Court stated that in capital sentencing it is of paramount importance that "the jury is aware, not simply of the consequences of its actions, but of its total responsibility for the judgment." 106 *N.J.* at 316, 524 *A.*2d 188. The Court stated further that "jury instructions in capital cases should never lead the sentencer to believe that responsibility for determining the appropriateness of defendant's death rests elsewhere." *Ibid.* (citing *Caldwell v. Mississippi,* 472 *U.S.* 320, 105 *S.Ct.* 2633, 86 *L.Ed.*2d 231 (1985)). Correct jury instructions are critically important in capital cases "because of the jury's responsibility to decide whether a defendant shall live or die." *Bey II, supra,* 112 *N.J.* at 162, 548 *A.*2d 887. "[I]n its charge to the jury in the sentencing phase of a capital trial, a trial court must be careful not to dilute the jury's

sense of responsibility for determining the appropriateness of the death penalty." *Ibid.* (citations omitted).

In its introductory sentencing phase remarks concerning the jury's determination of sentence, the trial court said: "You have already returned a verdict in which you concluded beyond a reasonable doubt that the defendant is guilty of the murder.... [W]hat is presented here will be concerned with whether or not there are factors which, on balance, lead you to conclude that the defendant should suffer the death penalty." The court then identified the aggravating and mitigating factors at issue and the burdens of proof with respect to those factors. Arguments before the jury followed.

The court began its final instructions with the remark, "[N]ow you have to decide whether or not the defendant is to be sentenced to death. Quite obviously, your ultimate decision in that regard is extremely important, both from the perspective of the State of New Jersey and from the viewpoint of the defendant." The court acknowledged the difficulty of the jury's task, but expressed confidence in the jury's ability. The court then stated: "The defendant must be sentenced to death if you are satisfied beyond a reasonable doubt that an aggravating factor exists and that such aggravating factor, as you find to exist beyond a reasonable doubt, outweighs all mitigating factors." After reviewing the reasonable-doubt standard, the court explained that not finding the aggravating factor would result in a prison sentence and that "the defendant will be sentenced to death only if you are convinced beyond a reasonable doubt that the aggravating factor exists and outweighs the mitigating factors, and all of the mitigating factors, beyond a reasonable doubt." The court concluded by calling the jury's attention to the special verdict form, which the court described as "self-explanatory."

The record discloses that the trial court twice indicated that the ultimate issue before the jury was whether defendant should be put to death. The court also recognized the difficulty

of that decision. Those instructions are deficient, however, because they cast the difficult, ultimate issue largely in terms of a mechanical process. The crucial point that the court failed to communicate anywhere in the sentencing charge was that to arrive at a death verdict would be to make a "normative judgment that death is 'the fitting and appropriate punishment.'" *Bey II, supra,* 112 *N.J.* at 162, 548 *A.*2d 887 (quoting *Ramseur, supra,* 106 *N.J.* at 316 n. 80, 524 *A.*2d 188).

In *Ramseur,* this Court disapproved of instructions that included language to the effect that the jury was "simply" fact-finding and weighing and "merely" applying the law. 106 *N.J.* at 315–16, 524 *A.*2d 188. Although the trial court in this case did not use words such as "simply" or "merely" in its instructions, the effect of the charge was no different from that in *Ramseur.* In *Bey II,* the sentencing instructions impermissibly left the impression that "the mechanics of the statute or the 'law,'" not the jury, was "ultimately responsible for the imposition of the death penalty." 112 *N.J.* at 164, 548 *A.*2d 887. The instructions in that case suggested in part that a finding on the verdict form of "no mitigating factors" resulted in a death sentence. *Id.* at 163–64, 548 *A.*2d 887. The trial court here gave no such instruction, because the jury was required to find one of the two mitigating factors. As the record indicates, however, the instructions suggested that certain findings by the jury would lead irretrievably to certain sentences. The court should have, instead, expressly instructed the jury that a finding that the aggravating factor outweighed beyond a reasonable doubt all the mitigating factors meant that the jury considered death a fitting and appropriate punishment for the defendant. *See id.* at 164, 548 *A.*2d 887. "Such a charge would have 'suitably directed' any belief of a juror about the inappropriateness of the death penalty to one or more mitigating factors." *Bey II, supra,* 112 *N.J.* at 164, 548 *A.*2d 887 (quoting *Gregg v. Georgia,* 428 *U.S.* 153, 189, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976)).

In this case, "it is not clear that the jury understood that it bore the burden of deciding whether to impose the death sentence and that it was not relieved by some statutory scale as the ultimate arbiter of defendant's life." *Ibid.* The trial court's comment, "Should you find that any aggravating factor exists, and beyond a reasonable doubt that this aggravating factor outweighs all mitigating factors, then it's the responsibility of the Judge to impose the death penalty in this case," further diluted the jury's sense of responsibility in its deliberations. Particularly when coupled with a failure to explain mitigating factors, "any instruction that 'tend[s] to dilute the jury's sense of responsibility in passing on the issue of life or death' is erroneous" and constitutes prejudicial error. *Ramseur, supra,* 106 *N.J.* at 316, 524 *A.*2d 188 (quoting *State v. Mount,* 30 *N.J.* 195, 214, 152 *A.*2d 343 (1959)).

Furthermore, the Court did not sufficiently convey to the jury that a possible and acceptable verdict was a non-unanimous determination. *See State v. Ramseur, supra,* 106 *N.J.* at 301, 524 *A.*2d 188. Finally, because the record and verdict in the guilt phase were determinative in the penalty phase, the trial court's earlier failure to assure that the jury clearly understood the State's correct burden of proof acquired enormous additional weight in the penalty phase. The jury, as previously discussed, was authorized and encouraged to resolve defendant's guilt by deciding credibility, determining who was telling the truth. It cannot be assumed then that credibility—a belief concerning who was telling the truth—did not also influence the jury in determining punishment.

### D.

This case forces us again to confront the arbitrary results engendered by unbounded prosecutorial discretion. The Court has recognized this issue in its decisions. *See, e.g., State v. Koedatich, supra,* 112 *N.J.* at 250–58, 548 *A.*2d 939; *State v. Ramseur, supra,* 106 *N.J.* at 329, 524 *A.*2d 188. In several

cases I have condemned the "virtually unfettered power of prosecutors to select who is to be prosecuted for capital murder." *State v. Di Frisco*, 118 *N.J.* 253, 303, 571 *A.*2d 914 (1990) (Handler, J., dissenting and concurring) (quoting *State v. Matulewicz*, 115 *N.J.* 191, 207, 557 *A.*2d 1001 (1989) (Handler, J., concurring)); *see also State v. Kiett*, 121 *N.J.* 483, 499, 582 *A.*2d 630 (1990) (Handler, J., dissenting and concurring) (prosecutor's decision to allow defendant to seek to avoid imposition of death penalty, even though defendant pled guilty to capital murder, underscores need for uniform standards governing plea agreements). *Di Frisco* presented a particularly egregious example of the perils of lack of prosecutorial guidance. In that contract-murder case, the State prosecuted the defendant triggerman for capital murder without even seeking an indictment against the higher-up. 118 *N.J.* at 259, 571 *A.*2d 914. This case presents a different twist on prosecution in a contract-murder case. Here, the State sought the death penalty against both Marshall and the alleged gunman, Larry Thompson. The record, however, indicates that the prosecutor pursued Marshall with unrelenting fervor, while exercising considerably more restraint with Thompson. This imbalance of zeal is perhaps best dramatized in the prosecutor's closing argument. After rebutting defense counsels' closing arguments (during which he admittedly argued for the conviction of both Marshall and Thompson), the prosecutor argued the State's case. He called strenuously for the conviction of Marshall; not once did he mention Thompson. Most tellingly, the prosecutor informed the jury who he felt was more deserving of conviction:

> Don't be fooled by [Marshall's] tears. He cries for no one but himself. Don't be fooled by his "I love you" signs, because he loves no one but himself. I'll sit across a table from Larry Thompson any day, because with Larry Thompson, you see what you get. What you see is what you bargain for. But this defendant is a coward, he's self-centered, he's greedy, he's desperate, he's materialistic, and he's a liar. He is a legend in his own mind. No one has the audacity to question Robert Oakley Marshall as per Robert Oakley Marshall. He is an outstanding citizen in the community, and no one would ever dare to point a finger at him. And if it comes down to Robert Oakley Marshall's testimony against Billy Wayne McKinnon, no juror in their right mind would

accept the testimony of Billy Wayne McKinnon over such an outstanding citizen. That is what is sitting in that chair. Make no mistake about it. And that's the pill that he wants you to swallow.

Thompson was acquitted of all charges. Because the prosecutor targeted Marshall as the more offensive defendant, Marshall's conviction and death sentence particularly exemplify the arbitrariness and disproportionality resulting from unbounded prosecutorial discretion. Like the decision concerning whom to prosecute, the prosecutor's decision to target Marshall may be "conscientious, but [is] nonetheless ... highly subjective and speculative." *Matulewicz, supra,* 115 *N.J.* at 207–08, 557 *A.*2d 1001 (Handler, J., concurring).

As I have noted in other cases, the absence of guidance for prosecutors closely relates to the importance of thorough, mandatory proportionality review. *See, e.g., Kiett, supra,* 121 *N.J.* at 511, 582 *A.*2d 630 (Handler, J., dissenting and concurring); *Di Frisco, supra,* 118 *N.J.* at 302–05, 571 *A.*2d 914 (Handler, J., dissenting and concurring); *Matulewicz, supra,* 115 *N.J.* at 206–09, 557 *A.*2d 1001 (dissenting and concurring); *State v. Gerald,* 113 *N.J.* 40, 153–67, 549 *A.*2d 792 (1988) (Handler, J., dissenting and concurring). The Court's affirmance of this death sentence renders such review critical. As I stated in *Kiett,* "there are indications that the prosecution of [death penalty] cases in our State is arbitrary.... Certainly there is no evidence on which to conclude with confidence that the selection and prosecution of death penalty cases in this State is consistent and uniform." 121 *N.J.* at 511–12, 582 *A.*2d 630 (Handler, J., dissenting and concurring).

### E.

In sum, the pervasive flaws of the penalty phase of the trial rob the death sentence of any vestige of reliability. Because the critical element defining capital murder was identical to the aggravating factor warranting the death sentence, the statute could not and did not serve effectively to separate the determination of guilt from the determination that death was the

appropriate sentence. That statutory defect was compounded by the absence of a separate and distinct sentencing trial. No additional evidence was introduced at the penalty proceeding; the same evidence was used to prove guilt and to obtain the death sentence; and the court did not attempt to reorient the jury and to explain fully the significance of mitigating factors. Further, the jury did not fully understand that the imposition of the death sentence cannot entail simply a mechanical weighing of evidence. We cannot under such circumstances suffer this death sentence.

## V.

Overall, the majority's opinion acknowledges almost a dozen errors in the course of this trial. Remarkably, it finds none of the conceded errors, separately or cumulatively, to be reversible. It follows what has become a familiar appellate tactic: divide and discount the errors. See, *e.g.*, *State v. Hightower*, 120 *N.J.* 378, 577 *A.*2d 99 (1990); *State v. Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939. It also invokes another, more subtle tactic: it characterizes some incorrect trial rulings as "discretionary" rather than as error, *e.g.*, the admission of inflammatory post-murder conduct of defendant and prosecutorial comment on such evidence, *ante* at 127–128, 586 *A.*2d at 150–151. It thus avoids consideration of the prejudicial impact of such rulings either singly or cumulatively. I strongly disagree with the Court's approach and particularly with its conclusion that cumulatively those errors and "improper" rulings did not taint the conviction and death sentence.

The Court expressed its standard of appellate review of trial errors in capital cases in *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I*):

Thus, in assessing the impact of error in either the guilt or penalty phase of a capital case, we shall continue to determine reversibility on the basis of a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence. The only exception involves "constitutional violations * * * [that] by

their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas,* 486 *U.S.* 249, 108 *S.Ct.* 1792, 1795, 100 *L.Ed.*2d 284 (1988).

[*Id.* 112 N.J. at 94–95, 548 A.2d 846.]

It is clear that the Court's standard for determining reversible error is no different from that governing ordinary cases. *Ibid.* However, even under the Court's conventional standard of review, its conclusion that cumulative error in this case is not reversible is incomprehensible. For example, the Court finds the prosecutor's remarks constituted violations of defendant's privilege against self-incrimination but, "in the context of the entire trial and the abundant evidence of guilt," the remarks were "harmless beyond a reasonable doubt." *Ante* at 121, 586 *A.*2d at 147. Because "evidence of defendant's guilt was so persuasive," the Court believes it is "virtually impossible" that the prosecutor's references to defendant's retention of counsel, "however reprehensible[,] could have contributed significantly to the jury's determination of guilt." *Ante* at 125, 586 *A.*2d at 149. The Court claims that "any significantly-prejudicial impact" from prosecutorial remarks that were "improper" or "that exceeded the bounds of permissible argument" was "ameliorated by the trial court's curative instructions." *Ante* at 159, 586 *A.*2d at 168.

The Court, *ante* at 169, 586 *A.*2d at 174, notes the observation in *State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954):

The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial....

The errors here did not "creep into the trial"; they were repeatedly bootlegged into the trial. The errors were not "incidental legal errors," but were calculated to generate prose-

cutorial leverage, and created unremittent prejudice and enormous unfairness to defendant.

The Court's standard of review does not suffice to meet the high constitutional requirements of due process or the protections of fundamental fairness that attend capital-murder prosecutions. I am convinced that in capital cases we cannot rely on the conventional tests for determining reversible error. Because we are dealing with a capital crime, which more fundamentally addresses through the jury the conscience of the community, it is appropriate to invoke a test that is more strict than one that asks only whether an error affected or contributed to a guilty verdict, or whether the error produced an "unjust result." The Court should resort to an enhanced standard that focuses attention on the jury's *deliberations* rather than on whether the error contributed to the verdict or the result reached was unjust. *Williams II, supra,* 113 *N.J.* at 460, 550 *A.*2d 1172 (Handler, J., concurring).

Thus, my differences with the Court in this case, as in prior cases, reflect the fact that the Court has employed a more indulgent substantive standard for determining reversibility than should be permitted in the direct appeal of capital-murder convictions. We should focus not on results in capital cases but on the integrity of the procedures that produce them. Result-oriented tests such as "harmless error" call essentially for a quantification of evidence, a comparing and weighing of proper evidence with improper evidence, to determine simply whether the former can satisfactorily account for and explain the jury's determination without the latter. The assumption of that test, perhaps well-grounded for the generality of criminal appeals, is that the jury's determination of guilt can be viewed as primarily the consideration and assessment of evidence and only tangentially as the exercise of conscience. That assumption must be discarded in a capital-murder prosecution, the only proceeding in which the jury is not told that it should find the facts with no thought for the ultimate punishment.

The majority's result illustrates how spongy and elastic the standard for harmless error can become, and how easily courts can succumb, in capital cases, to the temptation to defer passively to trial-level judgments. Even under the Court's more relaxed standard of review, reversal is required. It cannot be concluded beyond a reasonable doubt that the errors, each separately discounted by the majority, did not collectively contribute to the jury's verdict of guilty and its ultimate death sentence.

## VII.

As I stated at the outset, this case exposes starkly the irredeemable and irremediable deficiencies in our capital-murder jurisprudence. The result reached by the Court today—the affirmance of this death sentence—is not defensible. It is explainable only on the unacknowledged thesis that standards governing capital-murder prosecutions do *not* in practice maximize or heighten the protections of a defendant. The standards, as applied in this case, do not in any way surpass those that surround a defendant in the prosecution of an ordinary criminal case. We give the lie to the axiom that "death is different."

Although the Court professes to grant capital-murder defendants enhanced protections under the Constitution and statute, it fails to deliver such protection. Consider in this case alone that an unqualified jury convicted defendant of capital murder and sentenced him to death; the jury was allowed to find defendant guilty and deserving of the death penalty by considering whether the defense was telling the truth, while at the same time defendant was denied the real opportunity to challenge fully the truthfulness of a key prosecution witness; and the entire trial was distorted by pervasive prosecutorial misconduct. The prosecution was attended by numerous conceded errors and near-errors, which in human reason and common experience, would in the aggregate surely color the jury's

deliberations. Finally, the death sentence itself was totally unreliable because the capital-murder conviction and the sentence were governed essentially by identical factors, based on the same evidence, and determined virtually at the same time. Further, the penalty-phase instructions were so inadequate that the jury could not sufficiently appreciate the meaning of mitigating factors, and, more tellingly, did not fully understand that the jury alone would be responsible for the imposition of the death sentence.

Errors of this kind flow from the systemic deficiencies in our capital-murder law as enacted, interpreted, and applied. This case exemplifies the irreconcilable conflicts inherent in the bifurcated-trial scheme, which professes to rely on the process of death qualification despite its prepotency toward guilt; and which insists that the same jury determine, with consistency, objectivity, and impartiality, both criminality and punishment. This prosecution exposes the incoherence of capital-murder prosecutions, which incomprehensibly can require that a jury be death qualified in order to impose the death sentence; and, concomitantly, allow a death sentence to be imposed by a jury that is not death-qualified. The Court's decision countenances a proceeding in which the guilt conviction effectively predetermines the ultimate punishment. Further, as this case shows, although the statute mandates that a defendant sentenced to death have the right of appeal, the amorphous nature of the appellate standard of review can sanction a death sentence based on a trial riddled with errors from beginning to end. The case points up how hollow and illusory the constitutional standards of due process and the strictures of fundamental fairness can become in capital-murder prosecutions.

To those misgivings must be added a deeper skepticism about the worth and wisdom of capital punishment. In this time of crisis—economic shrinkage, rising crime rate, inadequate prosecutorial and defense resources, and an understaffed judiciary, we should rethink the value of using the death penalty in our criminal-justice arsenal.

The staggering financial cost of maintaining a capital-murder regime negates any practical benefit of our death-penalty statute. The cost of implementing the death penalty is potentially crippling to a state's criminal justice system. *See, e.g.,* Tabak and Lane, "The Execution of Injustice," 23 *Loyola of L.A.L. Rev.* 59, 133–38 (1989) (hereafter "Tabak and Lane"); Spangenberg and Walsh, "Capital Punishment or Life Imprisonment? Some Cost Considerations," 23 *Loyola of L.A.L.Rev.* 45 (1989); Garey, "Comment: The Cost of Taking A Life: Dollars and Sense of the Death Penalty," 18 *U.C. Davis L.Rev.* 1221 (1985) (hereafter "Garey"); Nakell, "The Cost of the Death Penalty," 14 *Crim.L.Bull.* 69 (1978). Capital cases demand that courts honor due process guarantees punctiliously. *Gardner v. Florida,* 430 *U.S.* 349, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393 (1977); *State v. Williams I, supra,* 93 *N.J.* at 61, 459 *A.*2d 641. Because capital cases are necessarily more complex than non-capital cases, they generate more pre-trial motions, more extended and intense *voir dire,* longer and more frequently repeated trials, greater collateral support from court personnel, and increased use of investigators and experts. The singular problems raised in a capital context, as well as the discouraging effect of the death sentence on plea arrangements, also add to the burden of the death penalty on the criminal justice system. The greater hours necessary for the presentation of capital trials translate into higher court, prosecution, and defense costs. The exhaustive research and investigation required for the penalty phase add further costs. Defendants who are tried for capital murder but are acquitted or receive lesser sentences also invoke the more labor-intensive, expensive capital-prosecution machinery. As a result, less money and time are available for crime prevention and the efficient functioning of the other aspects of the criminal justice system, including the prosecution of other criminal causes and prison maintenance. *See* LeDuk, "Tough N.J. Laws Mean Jammed Jails," *Philadelphia Inquirer,* Dec. 20, 1990 at A1, col. 3 (noting effects of severe prison overflow

and New Jersey's increasing allocations to corrections in a shrinking budget).

Information relating to the cost of the death penalty in New Jersey has started to become available. When it enacted the capital-murder statute, the State estimated an expense of $16 million per year to administer the death penalty. In 1983, the New Jersey Public Defender was budgeting more than $100,000 per capital case for trial costs alone for its fifty-two pending capital cases. Garey, *supra*, at 1261. The Public Defender has acknowledged that it exhausted 6,000 man-hours and spent approximately $300,000 to defend its first capital case, *State v. Ramseur*. Remarks of Dale Jones, Assistant Public Defender, "Life After Murder" (FOX WNYW Television Broadcast, January 2, 1991) (hereafter "Jones"). In 1987, the Deputy Public Defender estimated an expenditure of $1 million per defendant for defense costs. Glading, "Public Defenders Will Fight Death Penalty," *Trenton Times*, March 8, 1987, A6 at col. 1 (hereafter "Glading"). That is partly a result of internal policy, whereby to ensure adequate representation the Public Defender assigns two attorneys to each capital defendant. It has been estimated that it costs $42,000 per capital defendant just for expert witnesses. Tabak and Lane, *supra*, at 137. Currently, the defense of the prosecution of a capital case at the trial level costs the State $500,000, and the defense of the two-dozen cases most recently prosecuted by the State costs approximately $12 million per year. Jones, *supra*. The Administrative Office of the Courts has estimated that the death penalty will cost over $7 million per year in court expenses. Other available information notes the cost of the maintenance of death row and the increased supervision required. *See* Glading, *supra* (reporting that it costs $2,000 more annually to house a prisoner on death row than to house him in the general prison population). Finally, it has been estimated that sentencing one person to death in New Jersey would cost about $7.3 million. *See* Tabak and Lane, *supra*, at 136 (referring to information supplied by New Jersey Office of the Public Advocate (Jan. 19, 1989)).

That does not reflect all of the real expenses. For example, the Supreme Court itself has consumed untold hours and expended enormous effort in deciding capital cases on direct appeal. Those appeals are onerous. Over the last five years the Court has hired two extra law clerks to work virtually full-time on capital appeals; other law clerks also invest time on capital cases. Over twenty-seven cases have reached the Court and undergone final review. Many matters involving capital causes have been before the Court on an interlocutory basis. The Court's opinions in capital cases alone cover more than 2,000 pages in the printed official reports of the Court's decisions, almost twenty-five percent of all the Court's decisional work-product for that period. Research entailed in developing acceptable proportionality review will likely cost more than $300,000.

Studies conducted elsewhere also suggest that the price of death is exorbitant. See, *e.g.*, Moran & Ellis, "Death Penalty: A Luxury Item," *Newsday*, June 14, 1989 at 60, col. 1 (death penalty would cost New York taxpayers $1 million per capital trial); New York State Defenders Association, Inc., *Capital Losses: The Price of the Death Penalty in New York State, A Report From the Public Defense Backup Center to the Senate Finance Committee, the Assembly Ways and Means Committee, and the Division of the Budget* at 12 (1982) (estimating a cost of $1.8 million per capital defendant from trial through initial United States Supreme Court review, three times the cost of life imprisonment); Gradess, "A Lesson in Execution Economics," *Sunday Times Union*, April 16, 1989, at col. 1 (noting that the New York State Bar Association has pledged to oppose the reimposition of capital punishment in New York because of its cost); Von Drehle, "Bottom Line: Life In Prison One–Sixth As Expensive," *Miami Herald*, July 10, 1988, 12A at col. 1 (concluding that it costs $3.2 million to execute someone in Florida, six times the cost of life imprisonment); Magagnini, "Closing Death Row Would Save State $90 Million a Year," *Sacramento Bee*, March 28, 1988, at 1, col. 1 (death penalty

costs California an additional $90 million per year); Indiana Legislature, *A Fiscal Impact Statement Re Senate Bill 531* (1989) (reporting that capital cases cost $204,000 more per case than non-capital cases, and that replacing the death penalty with life-without-parole would save Indiana $5 million annually); Gradess, "The Death Penalty Doesn't Pay," *Houston Chronicle*, March 13, 1988, § 6 at 1, col. 1 (Texas spends $2 million per capital case); Gradess, "Execution Does Not Pay," *Washington Post*, February 28, 1988 at 37 C5, col. 3 (hereafter "Gradess, 'Execution' ") (noting that high costs of death penalty will increase as death row numbers grow); *see also* Gottlieb, "The Death Penalty in the Legislature: Some Thoughts About Money, Myth, and Morality," 37 *U.Kan.L.Rev.* 443 (1989) (hereafter "Gottlieb") (describing the Kansas Senate's defeat in 1987 and 1989 of capital punishment bills and the role of cost arguments in the debates). Indeed, the overwhelming cost of the death penalty has nearly bankrupted one county. *See* Ricks, "Seminole Borrows to Pay for Alday Case," *Atlanta J. and Const.*, Aug. 8, 1988, at B6, col. 4 (describing how the prosecutions of three capital cases drove Seminole County, Georgia heavily into debt). At least two jurisdictions have complained about capital appeal workload clogging their dockets. Gradess, "Execution," *supra* (noting that more than thirty percent of the workload of the Eleventh Circuit consists of capital cases); Cox, "Inaction In Action in California," *Nat'l L.J.*, July 11, 1988, at 1, col. 1 (hereafter "Cox") (because it hears so many capital appeals, the California Supreme Court has had to markedly reduce the number of non-capital cases it can hear). In fact, observers of the California Supreme Court have noted that the scores of backlogged death penalty cases have stalled the development of California's jurisprudence in other areas. Cox, *supra*. Capital cases have been "a real albatross around [the Justices'] necks," severely limiting the number of cases the Court can hear and opinions it can publish. *Ibid.* (quoting Prof. Stephen R. Barnett, Boalt Hall School of Law).

The inordinate cost of death may yet divert resources from other areas of the criminal justice system. Due process demands that if capital punishment is to exist, safeguards requiring the substantial expenditure of public funds be in place. Because we must spend substantial amounts on relatively few cases, limited funds will be deflected from the general pool of cases in the criminal-justice system. One commentator, remarking on the Kansas legislature's rejection of the death penalty, largely because of the tremendous drain of resources that the state would suffer, has noted: "The enormous effort and complex jurisprudence in [capital] cases have produced genuine distortions in the criminal justice systems of states that actively pursue capital punishment." Gottlieb, *supra*, at 448.

There may also be an intellectual drain on our criminal-justice system attributable to the enormous commitment of resources and efforts to capital-murder prosecutions. The Court has, I think, failed to anticipate or acknowledge the strength of the gravitational pull of capital-murder jurisprudence on the criminal law itself, as well as on the general administration of criminal justice. One may legitimately wonder whether the capital-murder jurisprudence that is emerging from this horrendous effort itself is not exerting an influence on our criminal law in general. For example, with respect to capital cases, despite initial strong statements concerning the protections entailed in juror qualification, *see, e.g., State v. Biegenwald*, 106 *N.J.* 13, 524 *A.*2d 130; *State v. Williams II, supra*, 113 *N.J.* 393, 550 *A.*2d 1172, we have shown ambivalence if not outright laxity in succeeding cases. *See, e.g., State v. Moore*, 122 *N.J.* 420, 585 *A.*2d 864 (1991); *State v. Hunt, supra*, 115 *N.J.* 330, 558 *A.*2d 1259; *State v. Koedatich, supra*, 112 *N.J.* 225, 548 *A.*2d 939. This Court has now adopted the same standard with respect to effective assistance of counsel as applies in ordinary cases. *See, e.g., State v. Davis*, 116 *N.J.* 341, 561 *A.*2d 1082 (1989). It does not appear, however, that its application in capital cases is in any way extraordinary. *Compare State v. Oglesby*, 122 *N.J.* 522, 585 *A.*2d 916 (1991); *State v. Davis*,

*supra, with State v. Savage,* 120 *N.J.* 594, 577 *A.*2d 455 (1990). The Court purports to follow the same principles governing expert testimony in both capital and noncapital cases. Ironically, it has tended to be less scrupulous in authorizing the State's use of expert testimony in capital cases. *Compare State v. Moore, supra,* 122 *N.J.* 420, 585 *A.*2d 864; *State v. Zola,* 112 *N.J.* 384, 548 *A.*2d 1022 (1988) *with State v. Pitts, supra,* 116 *N.J.* 580, 562 *A.*2d 1320. But *cf. State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990) (expert testimony without proper foundation should not be admitted); *State v. Johnson,* 120 *N.J.* 263, 576 *A.*2d 834 (1990) (same). The Court started out by expressing a stringent standard governing prosecutorial misconduct. *See State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188; *State v. Biegenwald, supra,* 106 *N.J.* 13, 524 *A.*2d 130; *see Williams II, supra,* 113 *N.J.* 393, 550 *A.*2d 1172; yet it has rarely applied the standard. *See, e.g., State v. Moore, supra,* 122 *N.J.* 420, 585 *A.*2d 864; *State v. Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939. Our standards governing the admissibility of controversial evidence, such as the use of prior convictions and other-crimes evidence, if anything have become less protective of capital defendants. *See, e.g., State v. Moore, supra,* 122 *N.J.* 420, 585 *A.*2d 864; *State v. Clausell,* 121 *N.J.* 298, 580 *A.*2d 221 (1990); *State v. Hightower, supra,* 120 *N.J.* 378, 577 *A.*2d 99; *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816; *State v. Long, supra,* 119 *N.J.* 439, 575 *A.*2d 435. The Court's application of *Miranda* standards protects a capital defendant only in the clearest cases, *see, e.g., State v. Harvey, supra,* 121 *N.J.* 407, 581 *A.*2d 483; *State v. Johnson, supra,* 120 *N.J.* 263, 576 *A.*2d 834, but fails to do so in less clear cases that arguably would have been different had a capital offense not been involved. *See, e.g., State v. Bey I, supra,* 112 *N.J.* 45, 548 *A.*2d 846. One may believe that the corroboration rule applicable to confessions was diluted in a capital prosecution. *See, e.g., State v. Di Frisco, supra,* 118 *N.J.* 253, 571 *A.*2d 914. The Court has seemingly been less protective in invoking the doctrine of lesser-included offenses in capital causes than it would

be in ordinary cases. *Compare, e.g. State v. Rose, supra,* 112 *N.J.* 454, 548 *A.*2d 1058 *with e.g., State v. Grunow,* 102 *N.J.* 133, 506 *A.*2d 708 (1986). The standards governing plea-bargaining have been applied with aspects of strictness in capital causes to the disadvantage of capital defendants. *See State v. Kiett, supra,* 121 *N.J.* 483, 582 *A.*2d 630; *State v. Davis,* 116 *N.J.* 341, 561 *A.*2d 1082. Further, capital-murder sentencing has resulted in a polyglot of principles and rules, many of which would be alien in an ordinary criminal sentencing proceeding, and which can operate with peculiar unfairness against a capital defendant. Thus, a defendant is given the freedom to ask for death, *State v. Hightower, supra,* 120 *N.J.* 378, 577 *A.*2d 99, but the defendant's own family may not implore for mercy. *State v. Moore, supra,* 122 *N.J.* 420, 585 *A.*2d 864. The Court adopted a conventional standard of appellate review believing that it could secure greater protections by a more scrupulous application, *see State v. Bey I, supra,* 112 *N.J.* 45, 548 *A.*2d 846; *State v. Rose, supra,* 112 *N.J.* 454, 548 *A.*2d 1058, but, if anything, that standard is ineffective except with respect to the most egregious kind of error. *See, e.g., State v. Pitts, supra,* 116 *N.J.* 580, 562 *A.*2d 1320.

The Court believes that the legal principles governing capital causes are indistinguishable from those governing ordinary cases. *State v. Davis, supra,* 116 *N.J.* at 341, 561 *A.*2d 1082. Hence, there is no reason to suppose that its capital cases will not constitute precedential authority in ordinary criminal cases. *See, e.g., State v. O'Donnell,* 117 *N.J.* 210, 217–18, 564 *A.*2d 1202 (1989) (citing *Ramseur*'s interpretation of *N.J.S.A.* 2C:11–3c(4)(c) in its interpretation of "cruel" in *N.J.S.A.* 2C:44–1a(1) as an aggravating factor); *State v. Stevens,* 115 *N.J.* 289, 293, 302, 558 *A.*2d 833 (1989) (citing *Ramseur* as governing admissibility of evidence under *Evidence Rule* 55); *State v. Murphy,* 110 *N.J.* 20, 34–36, 538 *A.*2d 1235 (1988) (upholding assignment judge's decision not to dismiss indictment where prosecutor failed to notify assignment judge of possible grand juror bias, citing *Ramseur*); *State v. Breakiron,* 108 *N.J.* 591, 609, 614,

532 *A.*2d 199 (1987) (ruling that defendant's mental disease or defect may negate *mens rea,* but does not, as a matter of law, reduce murder to an unspecified degree of manslaughter, citing *Ramseur* ); *State v. Murray,* 240 *N.J.Super.* 378, 392–93, 573 *A.*2d 488 (App.Div.1990) (finding *voir dire* adequate under standards of *Ramseur* and *Biegenwald* ); *State v. Slattery,* 239 *N.J.Super.* 534, 571 *A.*2d 1314 (App.Div.1990) (trial judge's comment tending to dilute jury's sense of responsibility not reversible, citing *Rose* and *Ramseur* ); *State v. Jenkins,* 234 *N.J.Super.* 311, 316–17, 560 *A.*2d 1240 (App.Div.1989) (applying standards of admissibility of evidence under *Evidence Rule* 55, citing *Ramseur* ); *State v. Gary,* 229 *N.J.Super.* 102, 113–14, 550 *A.*2d 1259 (App.Div.1988) (effect of pretrial publicity governed by *Biegenwald* and *Koedatich* ); *State v. Fiorilla,* 226 *N.J.Super.* 81, 88, 543 *A.*2d 958 (App.Div.1988) (citing *Biegenwald* to support determination of defendant's right to waive jury trial); *State v. Davidson,* 225 *N.J.Super.* 1, 9–10, 541 *A.*2d 700 (App.Div.1988) (citing *Ramseur* as authority for requiring more extensive *voir dire* ); *State v. Watson,* 224 *N.J.Super.* 354, 362, 540 *A.*2d 875 (App.Div.) (citing *Ramseur* as authority in determining effect of prosecutorial misconduct), *certif. denied,* 111 *N.J.* 620, 546 *A.*2d 537, *cert. denied,* 488 *U.S.* 983, 109 *S.Ct.* 535, 102 *L.Ed.*2d 566 (1988); *State v. Juinta,* 224 *N.J.Super.* 711, 722–24, 541 *A.*2d 284 (App.Div.) (citing *Ramseur* as support for effect of diminished capacity on requisite *mens rea* of "recklessness"), *certif. denied,* 113 *N.J.* 339, 550 *A.*2d 453 (1988); *State v. Washington,* 223 *N.J.Super.* 367, 373–74, 538 *A.*2d 1256 (App.Div.) (determination of inclusion of offenses of aggravated manslaughter and manslaughter in jury charge, citing *Ramseur* ), *certif. denied,* 111 *N.J.* 612, 546 *A.*2d 531 (1988); *State v. Garafola,* 226 *N.J.Super.* 657, 665, 545 *A.*2d 257 (Law Div.1988) (citing *Biegenwald* standard with respect to effect of pretrial publicity).

There is every reason to believe, therefore, that the judicial vacillation reflected in the application of those principles in capital prosecutions and the subtle weakening of those protec-

tions even for capital defendants will be mirrored in the prosecution of ordinary criminal causes. That process has possibly already started. See, *e.g., State v. Murray, supra,* 240 *N.J.Super.* at 392–93, 573 *A.*2d 488 (*voir dire* deemed sufficient); *State v. Slattery, supra,* 239 *N.J.Super.* 534, 571 *A.*2d 1314 (improper instruction on jury's responsibility not reversible); *State v. Gary, supra,* 229 *N.J.Super.* at 113–14, 550 *A.*2d 1259 (pretrial publicity not prejudicial); *State v. Watson, supra,* 224 *N.J.Super.* at 367, 540 *A.*2d 875 (prosecutorial misconduct not prejudicial); *State v. Garafola, supra,* 226 *N.J.Super.* at 665, 545 *A.*2d 257 (pretrial publicity not prejudicial).

Despite the concerns that relate to the serious defects in the capital-murder statute as enacted, interpreted, and applied, despite the convincing empirical evidence and strong intuition that tell us that the death penalty cannot be rationally invoked or fairly imposed, despite compelling countervailing considerations of public policy, the Court validates this law. It resists the conclusion that there is something fundamentally awry with our capital-murder jurisprudence, it ignores the emergence of the disquieting truth that capital punishment cannot really be made to work in a *civilized* society. It chooses to live with a case, this case, in which a criminal defendant is arbitrarily sentenced to die. The Court's decision, then, more so than any that has preceded it, brings home the unmanageable conflicts that inhere in the administration of capital-murder prosecutions and the deepening incoherence of our capital-murder jurisprudence.

I believe strongly that society is entitled to express through its institutions the outrage felt when the lives of innocent persons are taken callously, senselessly or cruelly. See *State v. Ramseur, supra,* 106 *N.J.* at 468, 524 *A.*2d 188 (Handler, J., dissenting). None of us can escape our common humanity; we are all violated and reduced by the taking of an innocent victim's life. Yet we can draw no satisfaction in punishment that does not conform to law. Our constitutional values, we

must hope, retain integrity and do not allow us, no matter how outraged, to exact unprincipled retribution. The Court's decision today dashes that hope. No one, not even the most ardent advocate of the death penalty, should rejoice in the unprincipled taking of a life. Our constitution is for all of us: if it fails the most reprehensible, it fails the rest. The death sentence in this case sounds with deafening finality for the defendant, but its discordant reverberations resound for everyone. John Donne, in *Devotions XVII*, gives voice to this truth: "[A]ny man's death diminishes me, because I am involved in mankind; and therefore never send to know for whom the bell tolls; it tolls for thee."

*For affirmance* as to Guilt Phase—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6

*For reversal* as to Guilt Phase—Justice HANDLER—1

*For affirmance* as to Penalty Phase—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, GARIBALDI and STEIN—5

*For reversal* as to Penalty Phase—Justices HANDLER and O'HERN—2